IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

   Plaintiff,

  vs.           Case No. 16-mj-8080-TJJ

LORENZO BLACK,
KARL CARTER
 a.k.a. "KC,"
STEPHEN ROWLETTE,
ANTHON AIONO,
ALICIA TACKETT,
CATHERINE ROWLETTE
 a.k.a. "CATHY,"
DAVID BISHOP,
 a.k.a. "MR. GREEN,"

   Defendants.

## CRIMINAL COMPLAINT

  I, Jeff Stokes, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.

## COUNT ONE

  Commencing in or about September 2015 and continuing until on or about April 8, 2016, in the District of Kansas and elsewhere, the defendants,

LORENZO BLACK,
KARL CARTER a.k.a. "KC,"
STEPHEN ROWLETTE,
ANTHON AIONO,
CATHERINE ROWLETTE a.k.a. "CATHY," and
DAVID BISHOP a.k.a. "MR. GREEN,"

and others known and unknown, knowingly and intentionally conspired to distribute and to

1

possess with the intent to distribute, methamphetamine, a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846. With respect to each defendant charged in Count One, their conduct as members of the conspiracy, which includes the reasonably foreseeable conduct of other members of the conspiracy, involved providing and attempting to provide methamphetamine, its salts, isomers, and salts of its isomers, a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846 and Title 18, United States Code, Section 2.

## COUNT TWO

Commencing in and around September 2015, and continuing until on or about April 8, 2016, in the District of Kansas and elsewhere, the defendants,

**LORENZO BLACK,**
**ANTHON AIONO,**
**CATHERINE ROWLETTE a.k.a. "CATHY," and**
**DAVID BISHOP a.k.a. "MR. GREEN,"**

contrary to 28 C.F.R. § 6.1 and the rules promulgated by Corrections Corporation of America under the supervision of the United States Marshals Service, provided and to attempted to provide methamphetamine, its salts, isomers, and salts of its isomers, to Karl CARTER a.k.a. "KC," Stephen ROWLETTE, and others known and unknown, all of whom were inmates of Corrections Corporation of America (CCA), a prison in Leavenworth, Kansas, that is, a facility in which persons are held in custody by direction of and pursuant to a contract and agreement with the Attorney General, in violation of Title 18, United States Code, Sections 1791(a)(1), (b)(1), and 2.

2

## COUNT THREE

Commencing in and around September 2015, and continuing until on or about April 8,

2016, in the District of Kansas and elsewhere, the defendants,

**LORENZO BLACK,
ANTHON AIONO,
ALICIA TACKETT,
CATHERINE ROWLETTE a.k.a. "CATHY," and
DAVID BISHOP a.k.a. "MR. GREEN,"**

contrary to 28 C.F.R. § 6.1 and the rules promulgated by Corrections Corporation of America

under the supervision of the United States Marshals Service, provided and to attempted to provide

synthetic cannabis, that is, an object that threatens the order, discipline, or security of a prison, or

the life, health, or safety of an individual, to Karl CARTER a.k.a. "KC," Stephen ROWLETTE,

and others known and unknown, all of whom were inmates of Corrections Corporation of America

(CCA), a prison in Leavenworth, Kansas, that is, a facility in which persons are held in custody by

direction of and pursuant to a contract and agreement with the Attorney General, in violation of

Title 18, United States Code, Sections 1791(a)(1), (b)(5), and 2.

## COUNT FOUR

Commencing in and around September 2015, and continuing until on or about April 8,

2016, in the District of Kansas and elsewhere, the defendants,

**LORENZO BLACK,
ANTHON AIONO,
ALICIA TACKETT,
CATHERINE ROWLETTE a.k.a. "CATHY," and
DAVID BISHOP a.k.a. "MR. GREEN,"**

contrary to 28 C.F.R. § 6.1 and the rules promulgated by Corrections Corporation of America

under the supervision of the United States Marshals Service, provided and to attempted to provide

3

tobacco, that is, an object that threatens the order, discipline, or security of a prison, or the life,

health, or safety of an individual, to Karl CARTER a.k.a. "KC," Stephen ROWLETTE, and others

known and unknown, all of whom were inmates of Corrections Corporation of America (CCA), a

prison in Leavenworth, Kansas, that is, a facility in which persons are held in custody by direction

of and pursuant to a contract and agreement with the Attorney General, in violation of Title 18,

United States Code, Sections 1791(a)(1), (b)(5), and 2.


## COUNT FIVE

Commencing in and around September 2015, and continuing until on or about April 8,

2016, in the District of Kansas, the defendants,

**KARL CARTER a.k.a. "KC" and
STEPHEN ROWLETTE,**

both inmates of Corrections Corporation of America, a prison in which persons are held in custody

by direction of and pursuant to a contract and agreement with the Attorney General, possessed,

obtained, or attempted to obtain, a prohibited object, that is, methamphetamine, its salts, isomers,

and salts of its isomers, in violation of Title 18, United States Code, Section 1791(a)(2), (b)(1), and

2.


## COUNT SIX

Commencing in and around September 2015, and continuing until on or about April 8,

2016, in the District of Kansas, the defendants,

**KARL CARTER a.k.a. "KC" and
STEPHEN ROWLETTE,**

both inmates of Corrections Corporation of America, a prison in which persons are held in custody

by direction of and pursuant to a contract and agreement with the Attorney General, possessed, obtained, or attempted to obtain, a prohibited object, that is, synthetic cannabis, that is, an object that threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual, in violation of Title 18, United States Code, Section 1791(a)(2), (b)(5), and 2.

## COUNT SEVEN

Commencing in and around September 2015, and continuing until on or about April 8, 2016, in the District of Kansas, the defendants,

### KARL CARTER a.k.a. "KC" and
### STEPHEN ROWLETTE,

both inmates of Corrections Corporation of America, a prison in which persons are held in custody by direction of and pursuant to a contract and agreement with the Attorney General, possessed, obtained, or attempted to obtain, a prohibited object, that is, tobacco, that is, an object that threatens the order, discipline, or security of a prison, or the life, health, or safety of an individual, in violation of Title 18, United States Code, Section 1791(a)(2), (b)(5), and 2.

## Affidavit in Support

1.      I am a Special Agent (SA) of the Kansas Bureau of Investigation (KBI) and have been so employed for the since February 2013.  I am currently assigned to the Special Operations Division in the Northeast Region of Kansas. In my official capacity I have been investigating federal violations for the past seven years as a Special Agent, as a Task Force Officer (TFO) with the Southeast Kansas Drug Enforcement Task Force and as a TFO with the United States Secret

Service (USSS) with the Financial Crimes Task Force in the Kansas City area. This affidavit is based on the following facts which are known to me as a result of my personal participation in this investigation, and from reports made to me by other law enforcement agents.

2.        In September 2015, I began an investigation into the trafficking of illegal contraband into Corrections Corporation of America's (CCA) facility in Leavenworth, Kansas. At that time, I conducted a proffer interview of Cooperator 1 (C-1), an inmate at CCA. C-1 informed investigators that another inmate, Richard Dertinger, was selling synthetic cannabis inside CCA Leavenworth where they are both being held. I am aware Dertinger is charged with conspiracy to distribute more than 100 kilograms of marijuana and is awaiting sentencing. C-1 said Dertinger was receiving the synthetic cannabis while in the CCA twelve-step program. Dertinger then sells the synthetic cannabis to other inmates for profit. According to C-1, the synthetic cannabis is reportedly being paid for by other subjects, usually family or friends of the inmate who is purchasing the item, by wiring money to the source of supply inmate's CCA account.

3.        In December 2015, I conducted a proffer with Cooperator 2 (C-2), who is also currently being held at CCA. C-2 also informed SAs that other inmates were trafficking synthetic cannabis inside CCA. C-2 had specific information regarding Dertinger and another inmate by the name of David Lougee. Investigators are aware that Lougee is awaiting trial for conspiracy to distribute methamphetamine in the District of Kansas. C-2 said he has seen both Dertinger and Lougee smoke synthetic cannabis inside CCA and also said he thinks the synthetic cannabis is coming to them through the law library at CCA. C-2 said there are also two CCA Correctional Officers (COs), Brown and McCarthy (unknown first names), who were hanging out with an

inmate by the name of "Burress" (known to be Robert Burress who uses the moniker "Bird").    C-2 also informed SAs that he knows CO Brown "smokes" in Burress' cell with Burress.    C-2 said the synthetic cannabis is being sold by inmates is being measured out and sold in Chap Stick lids for approximately $50.00 per lid.

4.    In December 2015, I conducted a second proffer with C-1 about the illegal activities at CCA.    C-1 first told investigators he is currently housed in "M-Pod" at CCA, but a lot of the synthetic cannabis is coming into the last pod he was housed in, which was "R-Pod."    C-1 offered that a lot of the synthetic cannabis and tobacco sold inside CCA is trafficked through the 12-step program, law library and at church.    According to C-1, when he was housed in R-Pod, everyone "started smoking" after Dertinger returned from one of those programs.    C-1 has observed Dertinger visit the law library frequently and has also noticed that Dertinger began attending church on Tuesdays and Thursdays.    C-1 said he has not seen Dertinger obtain the synthetic cannabis at the law library but has seen Dertinger get it at the 12-step program.    C-1 informed SAs the prices of the contraband are $10.00 for two cigarettes or $50.00 for a Chap Stick lid full of synthetic cannabis.    C-1 overheard Dertinger and Burress stating a CO was bringing in the contraband.

5.    During the course of the Dertinger investigation, I have reviewed a large volume of recorded CCA calls made by Dertinger and his co-defendant, Gregory Rapp, while they were incarcerated at CCA.    During this review, I noticed Rapp was being very cryptic in some of his conversations with other family members and friends.    Based on my review of Rapp's calls, I determined Rapp may be involved in the trafficking of contraband into CCA, as well.

6.    During a series of recorded calls in December 2015 with his sister and a female friend, Marie A., Rapp discusses that he is trying to get in touch with Alfred Smith.    Rapp's sister

explained Smith will not take his calls because he is concerned Rapp is in trouble and Smith does not want to get in trouble.  On December 15, 2015, Rapp talks with Marie A. and instructs her to call his mother (a co-defendant in pending District of Kansas marijuana case number 14-20067-CM) and see what is going on because "this needs to happen."  Marie A. then askeds Rapp what is going on and he says "I'm trying to get something sent in and fuckin, these mother fuckers are playing around."  Marie A. agrees to call his mother.  Rapp says to tell his mother that he is trying to call Alfred to "get something handled," and Alfred is not answering.

7.    On December 15, 2015, Rapp talks to Alfred Smith.  Smith asks Rapp if he needs to call anyone and Rapp said he has a number for him.  Smith asks what he is supposed to do and Rapp responds "Call them and tell them you're gonna be sending it to them."  Smith says "a stack," and Rapp responds, "650."  Smith says, "call them and say what."  Rapp responds and says "Just call him and tell him…He will know what you are saying.   Just tell him you're fucking uh trying to send something to him.   Uh get his information and send it to him (unintelligible) up to Wal-Mart or something."  Smith says "Oh, you're talking about Western Union."  Rapp says "Ya, Like MoneyGram or something."  Rapp calls Smith back and gives him the number (660) 827-2381 (known to be used by Catherine ROWLETTE; mother of CCA inmate Stephen ROWLETTE).  Shortly thereafter, Rapp and Alfred discuss whether Rapp's younger sister should be involved because he can get in contact with her more easily.  Rapp then says to talk to her and says to see if she can "keep it safe or something because she doesn't have a bank account or anything so." Smith says ok and Rapp responds "maybe she could keep it at my house or something that way she can go over there if it is needed or something."

8.    On December 18, 2015, Rapp again talks to Marie A.  Rapp asks her if she was able to get ahold of anybody and she said no.  Rapp tells Marie A. that "I owe someone this

money and I can't get it to them." Rapp says he is mad because no one will answer his calls now. Rapp then tells his friend, "I will probably be going to the hole soon then." She asks why and he says "because mother fucker when you owe someone that much money they fucking get mad about it." Marie A. asks how much money Rapp was talking about and he says "enough" and then Rapp laughs.

9.    Investigators then listened to inmate Stephen ROWLETTE's outgoing CCA calls because of implications made by cooperators regarding ROWLETTE's involvement in the trafficking of illegal contraband into CCA. United States Marshal's Service (USMS) Senior Investigator (SI) Matthew Cahill listened to phone calls ROWLETTE made to his wife Alicia TACKETT from CCA to her cell phone number (913) 702-6628 between September 1, 2015, and January 22, 2016. The following is a synopsis of some of those phones calls that involve ROWLETTE, and others, in the conspiracy to traffic narcotics in CCA:

a.    On September 23, 2015, ROWLETTE tells TACKETT that he has been moved to another Pod inside CCA which he states is like being in the "Ghetto." He tells her everyone in that Pod is "blistered" and explains to her that means "high." He tells her they have "K2" (synthetic cannabis), "weed", alcohol and cigarettes.

b.    On October 5, 2015, ROWLETTE tells TACKETT how high his friend ███ (C-3) and others are in his Pod from smoking synthetic cannabis. He tells her they are all walking around like "Zombies." He also tells her it's "Big Money" in there and that "mother fuckers making a mint off of it." Later in the call, he tells TACKETT how high some of his friends have been from smoking it and he also tells her how much it costs. ROWLETTE tells TACKETT that for something shorter than the size of a toothpick goes for $10.00 and one hit is $3.00.

9

c.  On October 7, 2015, ROWLETTE tells TACKETT he needs her to wire some money through Western Union to a couple people.   ROWLETTE tells her to call David (his step-father David BISHOP) and get the card number.   ROWLETTE tells her to make sure she has a pen and paper available for when he calls her back to get the confirmation numbers.

d.  On October 8, 2015, ROWLETTE tells TACKETT the names and amounts of the wire transfers for Western Union.   He gives her the name Karl CARTER #269372 for $150.00 and Tiffany Union for $350.00.   He tells her to get confirmation numbers for both of them and not to get them mixed up.   TACKETT tells ROWLETTE she has already talked to David about the confirmation numbers.

e.  On October 8, 2015, TACKETT tells ROWLETTE "I got it done."   ROWLETTE asked her if it went alright and she stated Tiffany is going to need a tracking number and later says the number is 7468435900 from Kansas.   ROWLETTE tells her to save the number on the other transaction.

f.  On October 13, 2015, TACKETT asked ROWLETTE if he knew anything about her picking up money from Western Union that somebody is sending her. ROWLETTE tells her it is $500.00 and it has to be paid back before anything else.

g.  On October 14, 2015, ROWLETTE tells TACKETT he is having some money sent to her and asked her if she looked into the Wal-Mart thing.   TACKETT explains to him how the Wal-Mart money transfers work.   ROWLETTE tells her he didn't know how soon his Sports Tickets were going to go through.

h.  On October 14, 2015, ROWLETTE tells TACKETT there is going to be $40.00 on her Wal-Mart card.   He asks her if she still has that number for the guy named Karl

(CARTER) and that she is going to need it in the next day or two.   He tells her he is hoping he can send her some more money soon, as soon as he can get his Sports Tickets set up more refined and in motion.

    i.  On October 16, 2015, ROWLETTE tells TACKETT she needs to call his mom and asks her if she still has that name Karl and that inmate number.   He tells her she needs to send $250.00 and they got it.   ROWLETTE tells her somebody owes him $50.00 and he will have them send it to her Western Union using her name TACKETT.

    j.  On October 17, 2015, TACKETT tells ROWLETTE "yea, I got that sent." During the call they again discuss how the Wal-Mart to Wal-Mart system works and confirmation numbers and ROWLETTE told her David had to have the name.

    k.   October 19, 2015, ROWLETTE asks TACKETT if someone texted her a Wal-Mart money gram for $50.00, that there should be another confirmation number from Tiffany Union.   She tells him nobody texted her.   He said he has to be 100% sure or there would be conflict in here with him.

    l.  On October 20, 2015, ROWLETTE tells TACKETT to write the number (816) 306-5088 and tell them to text her the confirmation number.   He then tells her to call his mom the next day and take that one name with her and everything will be good soon. ROWLETTE tells her he has two guys working for him in there doing Sports Tickets and there is "good money to be made."

    m.  On October 21, 2015, TACKETT tells ROWLETTE she texted her five times and never heard back.   ROWLETTE tells her to call David and same person as the last time, the one with the "K" (Karl CARTER).

    n.  On October 22, 2015, TACKETT tells ROWLETTE she got that $300.00 sent.

11

ROWLETTE seemed mad because he needed $1,000.00 or more sent to the inmate's account.   TACKETT tells ROWLETTE it wouldn't let her send more than $300.00. ROWLETTE tells TACKETT David is running up there but he needs her to get that done.

o.   On October 24, 2015, ROWLETTE tells TACKETT to call "Lashaun" at (913) 293-3876 and "tell her you need confirmation number" and "she will know what for."

p.   On October 25, 2015, TACKETT tells ROWLETTE she tried to get ahold of that "lady" and she told her she didn't know what she was talking about.   ROWLETTE tells her he will have David run up to the store.

q.   On October 30, 2015, ROWLETTE tells TACKETT he will have to tell her something in person on the next visit and it will be really important for them.   He also tells her to go to the "Superflea" and see what the price is for the best they got, 28?

r.   On October 31, 2015, ROWLETTE tells TACKETT he needs her to go by the "Superflea" and go to both shops and see if they have the liquid form.

s.   On October 31, 2015, ROWLETTE asks TACKETT what she found out at the "Superflea." TACKETT tells him they didn't have the "Spice" one.   He tells her "it won't go through on this end anyway, she's scared."

t.   On November 5, 2015, ROWLETTE tells TACKETT to get on-line and look for that "liquid stuff." (believed to be liquid synthetic cannabis).

u.   On November 25, 2015, ROWLETTE asks TACKETT if "Bird" had called her. ROWLETTE told TACKETT "Bird" is a buddy of his in CCA who is trying to relay a message to him.

v.   On November 29, 2015, ROWLETTE (using inmate Ransom phone card) tells TACKETT he needed her to get on-line with Western Union and check a balance.   When

she asks why he said David (BISHOP) tried to get some money but they told him the confirmation number didn't have enough numbers.

w.  On November 29, 2015, ROWLETTE (using inmate Ransom phone card) argue for most of the call about how the Western Union system works.   He tells her David had trouble picking up $50.00 with confirmation number 132586585, they said he needed ten numbers.

x.  On December 10, 2015, ROWLETTE tells TACKETT he got written up last night by an "African" CO.   ROWLETTE tells her Ms. West (known to be Leslie West, a CCA Unit Manager) was in his cell about 2:00 in the morning standing over him, he said she's cool and is always fucking with him.   Ms. West asked him about getting written up. After he talked to her, she ripped it up (the write-up) right in front of him.   He says Ms. West is always looking out for him if he needs something done she gets right on it.   He said if they ever try to send him to the "hole," she stops it from happening.   ROWLETTE tells TACKETT Ms. West is "just somebody good to have on the team."

y.  On December 13, 2015, ROWLETTE (using inmate Stewart phone card) and TACKETT talk about checking into a spray bottle and YouTube video how to spray everything.   TACKETT again is worried about talking on the phone.   He tells her to run up to Office Max and stamp any law firm on the envelopes.   ROWLETTE reminds her to make sure she has gloves on.

z.  On December 13, 2015, ROWLETTE (using inmate Stewart phone card) asked if David called her and that he just needed her to get the "Perfume" ordered.

aa.  On December 15, 2015, ROWLETTE tells TACKETT he talked to Ms. West earlier and asked her to move him to N-Pod.   He said some guys were trying to rob him of

his stuff.

    bb.  On December 18, 2015, ROWLETTE tells TACKETT Ms. West moved me back over to N-Pod.

    cc.  On December 26, 2015, ROWLETTE tells TACKETT she is going to be picking up $150.00 and she'll keep some of it.  He tells her people are running around drinking vodka and it cost $40.00 for a half pint.

    dd.  On January 10, 2016, ROWLETTE argues with TACKETT about her leaving him high and dry by not answering the phone for ten days.   He tells her inmates in here are strung out on "real deal drugs."  She says how and then says "guards." ROWLETTE says "Mark dude" (identified as inmate Mark Flaaen) spends $2,000.00 a week of his mom's (identified as Jenelda WOOLERY) money on illegal contraband and a pack of cigarettes cost $150.00 in there.

    ee.  On January 14, 2016, ROWLETTE tells TACKETT he sent her $100.00 today on top of the $2,200.00 and he said he called David to have him send her some money Wal-Mart to Wal-Mart.   ROWLETTE gets on TACKETT about using drugs again.

    ff.  On January 17, 2016, ROWLETTE tells TACKETT "Bird" (Burress) has her number and may have called to get a message to him.

    gg.  On January 22, 2016 TACKETT asks ROWLETTE if he has talked to David and his mom.   She tells him somebody called them and said "I bought a car" and "Nicky Perez." ROWLETTE says he's going to call back from another number.

    hh.  On January 22, 2016 ROWLETTE (using inmate Ransom phone card) tells TACKETT to call them back and get the number.   ROWLETTE talks about his buddy "Feathers" (code for "Bird") and something about $500.00 and that's who they get money

from.

ii.    On January 22, 2016, ROWLETTE tells TACKETT he will find out at "church" what is going on and that Nicky is "Feathers'" girlfriend.   ROWLETTE tells her some "bullshit is going on" in there and a bunch of guys were spreading rumors that Ms. West was bringing him in K2 (synthetic cannabis).   They start to talk about money on his books and he tells her it's not a secure line.

jj.    On January 22, 2016, ROWLETTE (using inmate Stewart's phone card) is telling TACKETT some Mexicans are talking about him being a snitch and are trying to get moved into his Pod.   TACKETT asked him if Ms. West knows about it yet and he tells her he is going to talk to Ms. West about not letting those Mexicans into his Pod.

10.    On March 7, 2016, I conducted a proffer with Cooperator 3 (C-3), who is currently incarcerated at CCA.   The proffer was specific to the trafficking of illegal drugs, alcohol and tobacco into CCA by COs within the facility and to other inmates.   C-3 gave information as to his knowledge of the trafficking.

11.    C-3 stated the inmate who was in charge of distributing the illegal contraband was nicknamed "KC".   I know this inmate to be Karl CARTER (Identified by C-3 through a booking photo).   C-3 said CARTER receives the contraband from a CO whom he said looked to be Samoan (meaning the CO's nationality is Samoan).   This CO was also identified through the investigation to be Aiono.   C-3 was asked what things CARTER received from Aiono and he said tobacco, synthetic cannabis and methamphetamine.   C-3 said he was taking an ounce of methamphetamine and an ounce of heroin with him when he was transferred to the Bureau of Prisons (BOP).   C-3 was asked how much methamphetamine he had purchased from CARTER all together and he said three grams from CARTER, but it was for someone else.   C-3 estimated this

to have been approximately one to one and a half months ago. C-3 said he saw a bag of methamphetamine which CARTER possessed (in CCA) and it was at least four or five ounces in total weight. C-3 said he has personal knowledge of approximate weights of illegal drugs because he has distributed them in the past (prior to his current incarceration). C-3 said he told CCA Investigator (Inv.) D.K. this and she asked if she should go get it. C-3 told her he didn't know but that he wanted her to move him to a different pod because CARTER had a knife in his possession which came from the outside of the facility, via Aiono. C-3 was scared because CARTER had actually stabbed two inmates since he had been in CCA. It wasn't known if the pocket knife CARTER allegedly received from Aiono was the knife used though. C-3 was asked more about the stabbing and he said CARTER stabbed two African male inmates and it was said it was over "store money". C-3 said it was not for the store money and it was actually for money owed for "dope and cigarettes."

12.     C-3 further explained when he first got to CCA, he was in F-Pod with CARTER. C-3 said another inmate, Robert Burress (who C-3 knows as "Bird"), was in this same pod as well and they became friends. Burress told C-3 that CARTER had CO AIONO on "lock" (meaning he was supplying them with illegal contraband) and then pointed CO AIONO out to C-3. C-3 said another inmate, Stephen ROWLETTE, was sending money to CARTER for tobacco, synthetic cannabis and methamphetamine. C-3 said he is currently in Q-Pod and CO AIONO brings in cans of chewing tobacco and gives it to another inmate in Q-Pod free of charge. It is believed through the investigation this inmate to be named Scott Parker. C-3 said Parker is released from his cell early in the mornings to "go do chemicals and supplies" (meaning to gather cleaning supplies to clean the jail cells). C-3 said when CO AIONO brought any illegal contraband into CCA he would leave it behind the mop bucket in the supply closet. Parker told C-3 it was either

16

left behind the mop bucket or it would be handed to him, but that it was always in the supply closet. Parker would then be able to retrieve the illegal contraband for distribution by CARTER. C-3 said he believes Parker receives his tobacco for free so he won't tell anyone about the other illegal contraband being delivered into CCA. C-3 said CARTER and Parker were the first ones to be let out in the mornings because Parker serves as a "porter" in R-Pod and CARTER serves as a "porter" in Q-Pod. C-3 explained that CO AIONO brings in liquor in a Sprite bottle and also provides Parker with tobacco. C-3 asserted this past Sunday (March 6, 2016), CO AIONO brought in 20 pouches of tobacco, five cans of chewing tobacco and one ounce of synthetic cannabis. C-3 said he knew it was coming in because ROWLETTE came to C-3's window and told C-3 he may have him grab something for him (ROWLETTE) from "next door." ROWLETTE went on to tell C-3 it would be synthetic cannabis as "they" owed ROWLETTE ten pouches of synthetic cannabis. C-3 was asked if he knew how CO AIONO was physically bringing the items into the prison. C-3 said CO AIONO had to be bringing it in by putting it in his boxers or perhaps in a potato chip bag. C-3 said one day, CO AIONO brought in a red colored Lays brand potato chip bag and gave it to Parker. C-3 said he saw the potato chip bag and it appeared to him as though the top of the bag had been sealed with super glue. C-3 said he believes CARTER tells CO AIONO to call CARTER's "people" and they get whatever CARTER wants. C-3 thinks CO AIONO is dealing directly with CARTER's people (thought to be Lorenzo BLACK). Burress told C-3 CO AIONO had purchased some synthetic cannabis directly at the Super Flea in Kansas City, Missouri. C-3 said Super Flea is a big flea market off of St John Street in Kansas City, Missouri. Burress said this synthetic cannabis wasn't any good so Burress asked C-3 if he knew where to get any.

13.    C-3 explained that inmates had individuals on the outside disguise incoming mail

as legal mail.   The inmates instructed their family and friends to fill out a large manila envelope with a law firm identified on the return address.   Affixed to the front of the manila envelope is a letter-sized white envelope inside which the individuals put money wrapped in white paper so the CCA guards could not see it.   C-3 knows that ROWLETTE had his family or friends mail in $500.00 in an envelope disguised as legal mail.   C-3 said the yellow envelope may be opened in front of the inmate but not the white envelope taped to the front of the yellow one (with the address on it).   C-3 was asked who ROWLETTE gave that money to ($500.00) and C-3 said it went to CARTER and to BURRESS.

14.    C-3 was asked to explain how he sent money when he bought the contraband.   C-3 said he had his mother take the money over to ROWLETTE's mother, Catherine "Cathy" ROWLETTE.    C-3 said Catherine ROWLETTE lives in Sedalia, Missouri, and C-3's had a relative who physically went to her house and gave her $100.00.   C-3 explained that he and ROWLETTE were previously in the same pod for approximately a year.   C-3 said ROWLETTE had money wired to his stepdad (identified as David BISHOP) from other inmates.   C-3 said at times ROWLETTE or BISHOP would wire money directly to CARTER's "books" too (meaning his CCA inmate account).   C-3 explained how money would get wired to BISHOP.   C-3 said he would get the cell phone number for BISHOP from ROWLETTE.   C-3 then called an associate and tell him to call BISHOP and tell BISHOP he needs "the information" to send some money. At that time, the details would be given as to how to send the money through Western Union to BISHOP.   C-3 said most of the time money was being sent using Western Union or some other type of wire transfer.   C-3 acknowledged an inmate could not make a "Western Union" transaction, but individuals on the outside of CCA could wire the money to an inmate's account at CCA.   C-3 said all the money given to BISHOP was for illegal contraband ROWLETTE had

18

already paid for.  C-3 said ROWLETTE was paying $100.00 for a pouch of tobacco and a gram of methamphetamine costs the inmate $300.00.  C-3 said he didn't know if ROWLETTE was still doing business this way or not, but he used to tell inmates to call his people on the outside (to call Catherine ROWLETTE or BISHOP).  BISHOP or Catherine ROWLETTE would then tell these people how and where to send the money.  BISHOP or Catherine ROWLETTE would then tell Steve ROWLETTE if they received the money for the contraband and then it would be distributed. C-3 said ROWLETTE paid up front for all of the illegal contraband he obtained.

15.    C-3 said BISHOP was holding the money for ROWLETTE.  C-3 was asked if BISHOP was then going directly to someone and purchasing the illegal contraband to give to CO AIONO and he said BISHOP would send the money to CARTER.  C-3 said you can't transfer the money from inmate to inmate on the inside of CCA.  C-3 explained the money has to go from the inmate, to the outside, and then from the outside to the other inmate inside.  C-3 explained a scenario utilizing Steve ROWLETTE where if an inmate wanted something they would contact ROWLETTE.  ROWLETTE would have the inmate contact his people on the outside (BISHOP or Catherine ROWLETTE) and they would tell the inmate where to send the money and how.  He said the Western Union would then go straight to ROWLETTE's people (BISHOP or Catherine ROWLETTE).  Once ROWLETTE had his money built up he would go to CARTER and place an order thus starting the whole process once again.  C-3 explained at first ROWLETTE would receive confirmation numbers over the phone (related to the Western Union transfers).  C-3 said someone told ROWLETTE not to get those numbers over the phone or he'd get "jammed up" (caught) so he quit the practice.  C-3 said ROWLETTE was getting the confirmation numbers over the phone as of August or September of last year.  C-3 said ROWLETTE talks to BISHOP and asks if he had received the money yet and, if BISHOP said yes, he knew it had been received.

C-3 said names most likely wouldn't be used, but rather ROWLETTE would say hey did you get something for 2, something for 150 or whatever.

16.    C-3 was asked how ROWLETTE was getting the illegal contraband from CARTER and he said someone would put the contraband in a sock and put the sock down their pants.   That person would then take it to the "12 steps program, church call out or the law library" and distribute it to whoever was to receive it.   C-3 said the inmates aren't checked (by staff).   He said if an inmate were to go through a metal detector and it were to beep, 90 percent of the time the CO would just allow the inmate to keep going through without checking them.   C-3 said CARTER is the main person and inmates such as ROWLETTE work under him.

17.    On March 20, 2016, I conducted a financial review of inmate's CCA accounts implicated in the trafficking of illegal contraband.   I confirmed some of the information given during proffers and phone calls.   The following is pertinent information found during the financial review:

Robert Burress:
$1369.05 was deposited to his account from Lorenzo BLACK on January 4, 2016
$950.00 was deposited to his account from Lorenzo BLACK on January 12, 2016
$908.05 was deposited to his account from Lorenzo BLACK on January 19, 2016
$750.00 was sent to Nicky Perez (believed to be Burress' girlfriend) on February 23, 2016
$750.00 was sent to Nicky Perez on March 2, 2016

Karl CARTER:
$150.00 was deposited to his account from Alisha TACKETT (girlfriend of ROWLETTE) on October 9, 2015
$250.00 was deposited to his account from Alisha TACKETT on October 19, 2015
$300.00 was deposited to his account from Alisha TACKETT on October 23, 2015
$300.00 was deposited to his account from Alisha TACKETT on October 26, 2015
$300.00 was deposited to his account from Alisha TACKETT on October 26, 2015
$300.00 was deposited to his account from Alisha TACKETT on October 26, 2015
$100.00 was deposited to his account from Alisha TACKETT on October 26, 2015
$1,000.00 was deposited to his account from David BISHOP on November 30, 2015
$150.00 was deposited to his account from Robert Beatty (uncle of inmate Ernest Crawford) on November 30, 2015

20

$150.00 was deposited to his account from Shaunta Howard (associate of inmate  Eric Harris-Edwards) on December 4, 2015
$200.00 was deposited to his account from Robert Beatty on December 7, 2015
$650.00 was deposited to his account from Shaunta Howard on December 7, 2015
$200.00 was deposited to his account from Shaunta Howard on December 9, 2015
$200.00 was deposited to his account from Robert Beatty on December 21, 2015
$200.00 was deposited to his account from Robert Beatty on December 21, 2015
$1,000.00 was deposited to his account from David BISHOP on December 28, 2015
$1,000.00 was deposited to his account from David BISHOP on December 29, 2015
$1,000.00 was deposited to his account from David BISHOP on January 4, 2016
$250.00 was deposited to his account from Robert Beatty on January 4, 2016
$1,000.00 was deposited to his account from David BISHOP on January 15, 2016
$1,000.00 was deposited to his account from David BISHOP on January 21, 2016
$289.00 was deposited to his account from Brittney Williamson (fiancé of inmate Charles Steele) on January 28, 2016
$1,000.00 was deposited to his account from David BISHOP on January 29, 2016
$500.00 was deposited to his account from David BISHOP on February 3, 2016
$500.00 was deposited to his account from Shaunta Howard on February 3, 2016
$500.00 was deposited to his account from David BISHOP on February 4, 2016
$5,000.00 was sent to Jenne Kidd (unknown relationship) on February 16, 2016
$300.00 was deposited to his account from Karen Spaeth (mother of inmate Matt SPAETH) on February 17, 2016
$1,000.00 was deposited to his account from David BISHOP on February 18, 2016
$700.00 was deposited to his account from Karen Spaeth on February 18, 2016
$100.00 was deposited to his account from Carmen Dydell (associate of inmate Eric Harris-Edwards) on March 2, 2016
$1,000.00 was deposited to his account from David BISHOP on March 8, 2016
$1,000.00 was deposited to his account from David BISHOP on March 15, 2016

Kevin Finley:
$90.00 was deposited to his account from Jenelda WOOLERY (inmate Mark FLAAEN's mother) on February 8, 2016

Lamar STEELE:
$45.00 sent to David BISHOP on December 18, 2015
$100.00 sent to Robert Beatty on February 16, 2016

Stephen ROWLETTE:
$500.00 was deposited to his account from his mother, Cathy ROWLETTE, on September 1, 2015

Andre WALLACE:
$700.00 was sent to Lorenzo BLACK on March 2, 2016

Thus, at least two inmates have sent money directly to Lorenzo BLACK.   Notably, my review of

21

inmate accounts showed Karl CARTER had $14,989.80 on his CCA inmate account within the last six weeks.

18.    I listened to various calls from inmates at CCA making calls to (816) 446-0772, a phone subscribed to and used by Lorenzo BLACK. The calls I listened to, began around December 25, 2015. The personal identification number (PIN) that is assigned to the inmates is logged by CCA during these calls. SA Stokes found that from December 25, 2015, to March 26, 2016, inmates used at least five different PIN's to call (816) 446-0772. Those inmates are Jason Neal, Karl CARTER, Arlie Stewart, Frank White and Jermaine Rayton. Based on the context of the recoded CCA calls, SA Stokes believes Karl CARTER is using Jason Neal's PIN to call (816) 446-0772 (BLACK's cell phone) to avoid detection.

19.    During my review of the calls to (816) 446-0772, I found the inmate using Jason Neal's PIN (again believed to be CARTER) was asking if the user of (816) 446-0772 if he has gotten ahold of "Mr. Green" on multiple occasions. SA Stokes knows from speaking with cooperators and other law enforcement SAs that David BISHOP is known as "Mr. Green." Most recently, on March 31, 2016, SAs reviewed a CCA call initiated by CARTER, again using another inmate's PIN, to BLACK asking about obtaining additional items (believed to be referring to contraband). BLACK responded that he had text messaged back and forth with "Mr. Green," and "Mr. Green" said "something was coming." In the past, CARTER has also told BLACK "I don't know if you have been looking and seeing what the movie is but man, the one's you've been fucking showing us love on is the deal!!" Other SAs involved in this investigation who have personally reviewed these calls believe the two are talking code when saying "movies," and that "movies" is talk for the illegal contraband coming into CCA. The calls in early March 2016 still shows Neal PIN being used to call BLACK and the two are still talking in code to "Shoot a line to

your favorite color," meaning "Mr. Green" (BISHOP) and "new releases" (movies), meaning code for contraband is still entering CCA.

20.    On March 17, 2016, the Honorable Teresa J. James signed a 60-day order authorizing the use of a pen register/trap and trace device on (816) 446-0772 (BLACK's phone). A pen register, or dialed number recorder (DNR), is a device that records the telephone numbers dialed during outgoing telephone calls placed from a particular telephone.    A trap and trace device documents inbound phone numbers and is used in conjunction with a pen register.

21.    KBI Crime Analyst, Verla King identified 32 contacts between (816) 446-0772 (BLACK's phone) and (816) 797-7611 (AIONO identified this as his phone number on an Employee Information Sheet he submitted to CCA) between March 23, 2016 and March 28, 2016.    Based on information provided by cooperating inmate C-3, SAs have identified AIONO as a correctional officer who is smuggling methamphetamine, synthetic cannabis, tobacco and alcohol into the CCA facility in Leavenworth, Kansas.    On March 24, 2016, (816) 446-0772 (BLACK's phone) communicated by voice call with (816) 797-7611 (AIONO's) on one occasion.    The duration of this communication showed it to be 0:01:44 in length which is one minute and 44 seconds.    The other 31 communications appeared to have been text messages as the duration of those communications were 0:00:00 in length which is indicative of text messaging.

22.    On April 8, 2016, surveilling agents were advised of a meet between BLACK and AIONO at BLACK's residence located at 2907 East 35th Street in Kansas City, Missouri. Surveilling agents established static surveillance at BLACK's residence and observed BLACK exit his residence and enter the right front passenger seat of AIONO's vehicle.    (It should be noted, an infant was occupying the rear seat of AIONO's vehicle).    Shortly thereafter, BLACK

exited AIONO's vehicle and entered a separate vehicle and departed as did AIONO. Surveilling

agents conducted stop and a K-9 was deployed. According the responding K-9 handler, the K-9

indicated on both vehicles. As a result both vehicles were searched, leading to the recovery of

approximately $2,000.00 in United States Currency and an unknown substance from BLACK's

vehicle which later field tested positive as methamphetamine. Investigators subsequently took

BLACK and AIONO into custody.

23. On April 8, 2016, I responded to the Wyandotte County, Kansas, Jail and conducted

an interview of AIONO who stated $1,000.00 of the recovered currency represented payment for

his prior delivery of contraband to inmates at CCA's facility in Leavenworth, Kansas, where he is

employed as a Corrections Officer. AIONO further stated the remaining $1,000.00 in currency

represented payment for a pending delivery of contraband to CCA-Leavenworth.

24. On April 8, 2016, SA Heather Dahmer, IRS-Criminal Investigation (IRS-CI),

conducted an interview of Alicia TACKETT in conjunction with a search warrant at her

residence, located at 6544 Sni A Bar Road, Kansas City, Missouri. TACKETT admitted to using

methamphetamine on April 7, 2016, and claimed she believed the funds she was transferring on

behalf of her husband Stephen ROWLETTE, via the internet, was related to purported gambling

debts ROWLETTE was incurring as an inmate at CCA-Leavenworth.

24. On April 8, 2016, United States Secret SA John Seubert and I interviewed Stephen

ROWLETTE at CCA-Leavenworth. ROWLETTE admitted to trafficking tobacco and synthetic

cannabis into CCA-Leavenworth and further stated Karl CARTER was the main supplier of

tobacco and synthetic cannabis. ROWLETTEE said he had heard CARTER was trafficking

methamphetamine.

25. On April 8, 2016, KBI SSA Glen Virden and IRS-CI SA Henry Herron interviewed

24

inmate Karl CARTER at CCA-Leavenworth. CARTER admitted Corrections Officer Anthon

AIONO was responsible for smuggling methamphetamine, synthetic cannabis, tobacco, and

alcohol into CCA-Leavenworth.

26.    Cathy Rowlette was interviewed on April 8, 2016 by IRS-CI Agent Julie

Tomlinson and SSA-OIG Agent Joe Espinosa. During the interview, Rowlette said that she

transferred money on behalf of her son Stephen Rowlette, who is an inmate at

CCA-Leavenworth. Cathy Rowlette said that her husband, David Bishop, took money to

"Lorenzo" (whom I know to be Lorenzo Black). She said Bishop took Lorenzo $2,000 the day

before. Cathy Rowlette said Stephen Rowlette said the money was money he made from

gambling while in prison. She said that Bishop thinks the money is for drugs and that Lorenzo

recently told Bishop that the money is for drugs. Cathy Rowlette said she had some concerns the

money was not from gambling. She said she and Bishop had been making the money transfers to

Lorenzo for about a year. Cathy Rowlette said she wanted to discuss the money with Stephen

Rowlette on the phone, but could not because his phone calls are monitored. Cathy Rowlette

said she always had suspicion as to where the money was coming from, but that she did not want

to ask her son because she was afraid that the money was from "dirty" or illegal sources.

27.    On April 8, 2016, law enforcement officers and agents executed a search warrant at

CCA-Leavenworth. Among the areas searched at CCA-Leavenworth included the "R Pod"

where ROWLETTE is housed and "N Pod" where CARTER is housed. During a search of the

cell shared by ROWLETTE and RAPP, investigators recovered suspected synthetic cannabis and

rolling papers from ROWLETTE's bunk. During a search of the shared cell occupied by

CARTER, investigators recovered suspected synthetic cannabis and tobacco. Additionally,

during a search of the shared cell occupied by David Lougee in "R Pod," investigators located

25

drug paraphernalia and an unknown substance which subsequently field tested positive for the presence of methamphetamine.

28.    Based upon the facts detailed therein, I have probable cause to believe that the above-listed defendant committed the above-listed violations of the United States Code.


_____
Special Agent Jeff Stokes
Kansas Bureau Investigation


Sworn to and attested by affiant via telephone, after being submitted to me by reliable electronic means on this 9th day of April, 2016.

Digitally signed by Judge Teresa James
DN: cn=Judge Teresa James, o=US
District Court, District of Kansas,
ou=Magistrate Judge,
email=Judge_James@ksd.uscourts.gov,
c=US
Date: 2016.04.09 23:10:06 -05'00'

_____
Teresa J. James
United States Magistrate Judge

## PENALTIES

**Count 1:**    21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846 and 18 U.S.C. § 2
Conspiracy to distribute and possess with intent to distribute methamphetamine

- NMT 20 years imprisonment;
- NMT $1,000,000.00 fine;
- NLT 3 years supervised release; and
- $100.00 special assessment fee.

If the defendant has a prior conviction for a felony drug offense the penalties are:

- NMT 30 years imprisonment;
- NMT $2,000,000.00 fine;
- NLT 6 years supervised release; and
- $100.00 special assessment fee.

**Counts 2, 5:**    18 U.S.C. §1791
Providing or Possessing Contraband in Prison

If the contraband is methamphetamine, its salts, isomers, and salts of isomers:

- NMT 20 years imprisonment;
- NMT $250,000 fine;
- NLT 3 years supervised release; and
- $100.00 special assessment fee.

**Counts 3-4, 6-7:**    18 U.S.C. §1791
Providing or possessing Contraband in Prison

If the contraband is any object that threatens the order, discipline, or security of a prison:

- NMT 6 months imprisonment;
- NMT $100,000.00 fine;
- NMT 1 year supervised release; and
- $25.00 special assessment fee.