1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,        Docket No. 16-20032-JAR

4         Plaintiff,                  Kansas City, Kansas
                                      Date:  07/21/2016
5    v.

6    LORENZO BLACK,
     KARL CARTER,
7    ANTHON AIONO,
     ALICIA TACKETT,
8    CATHERINE ROWLETTE,
     DAVID BISHOP,
9
          Defendants.
10   ....................

11
                          TRANSCRIPT OF
12             CASE BUDGETING STATUS CONFERENCE
              BEFORE THE HONORABLE JULIE A. ROBINSON
13                UNITED STATES DISTRICT JUDGE

14   APPEARANCES:
     For the Government:  Ms. Erin S. Tomasic
15                        Mr. D. Christopher Oakley
                          United States Attorney's Office
16                        360 U.S. Courthouse
                          500 State Avenue
17                        Kansas City, Kansas 66101

18   For the Defendant Lorenzo Black:
                          Mr. John Jenab
19                        Jenab Law Firm, P.A.
                          110 South Cherry Street
20                        Suite 103
                          Olathe, Kansas 66061
21
     For the Defendant Karl Carter:
22                        Mr. David J. Guastello
                          The Guastello Law Firm, LLC
23                        4010 Washington Street
                          Suite 501
24                        Kansas City, Missouri 64111

25   (Appearances continued on next page).

 1   APPEARANCES:

 2   (Continued)

 3   For the Defendant Anthon Aiono:
                         Mr. Jason P. Hoffman
 4                       Hoffman & Hoffman
                         CoreFirst Bank & Trust Building
 5                       100 East Ninth Street
                         Third Floor East
 6                       Topeka, Kansas 66612

 7   For the Defendant Alicia Tackett:
                         Ms. Kathleen A. Ambrosio
 8                       Ambrosio & Ambrosio, Chartered
                         800 Southwest Jackson
 9                       Suite 817
                         Topeka, Kansas 66612
10
     For the Defendant Catherine Rowlette:
11                       Mr. Michael M. Jackson
                         Attorney at Law
12                       727 South Kansas Avenue
                         Suite 2
13                       Topeka, Kansas 66603

14   For the Defendant David Bishop:
                         Ms. Cynthia Dodge
15                       Cynthia M. Dodge, LLC
                         233 Southwest Greenwich Drive
16                       Suite 10
                         Lee's Summit, Missouri 64082
17
     Court Reporter:     Kelli Stewart, RPR, CRR, RMR
18                       Official Court Reporter
                         259 U.S. Courthouse
19                       500 State Avenue
                         Kansas City, Kansas 66101
20

21

22

23

24

25

1              (3:34 p.m., proceedings commenced).

2              THE COURT:  All right.  You can be seated.

3    All right.  We're here in United States versus Lorenzo

4    Black, et al.  The case number is 16-20032.  Your

5    appearances.

6              MS. TOMASIC:  May it please the Court.  The

7    United States appears by Erin Tomasic and Chris Oakley.

8              MR. JENAB:  Your Honor, Mr. Black is present

9    with counsel, John Jenab.

10             MR. GAUSTELLO:  May it please the Court.

11   Mr. Carter appears in person in custody with counsel,

12   David Guastello.

13             THE COURT:  All right.

14             MR. HOFFMAN:  Mr. Aiono appears not but

15   through counsel, Jason Hoffman, Your Honor.

16             MR. JACKSON:  If it please the Court.  Your

17   Honor, Catherine Rowlette appears in person and through

18   counsel, Mike Jackson.

19             MS. DODGE:  Good afternoon, Your Honor.

20   Cynthia Dodge on behalf of David Bishop, who appears in

21   person.

22             MS. AMBROSIO:  Your Honor, Alicia Tackett

23   does not appear, but appears by counsel, Kathleen

24   Ambrosio.

25             THE COURT:  All right.  I decided to set

1    this for a status conference I think - and Ms.

2    Shaneyfelt is here - based on some communication that I

3    had from her.  This case, because of its size and the

4    nature of the charges and all of that, I-- is something

5    that I think should be case budgeted.  There are six

6    defendants in this case who all have appointed counsel.

7    And, as I understand it, a lot of discovery, including

8    some discovery I want to talk to you about specifically

9    this afternoon.

10          So Ms. Shaneyfelt let me know that part of

11   the discovery is quite a volume of surveillance videos

12   from the CCA.  And Ms. Shaneyfelt advised that the AUSA

13   had said that each defense counsel needed to provide six

14   three-terabyte hard drives in order to download these

15   surveillance videos, which the video, as she

16   understands, it's equivalent to about 200 movies.  And I

17   don't know what that means in terms of the length of the

18   movie.  But in any event, this is quite an expensive

19   undertaking.  That-- but another concern is that there's

20   no index or directory or any means by which the video

21   can be sorted, searched, or organized.  So I wanted to

22   talk to you all about that as well.  And then as well as

23   any other discovery issues that you may have at this

24   point in the case.

25          So Mr. Oakley or Ms. Tomasic.

1            MS. TOMASIC:  Your Honor, I-- I'm fairly

2  concerned based on what you just said that there have

3  been some miscommunications along the line.  Because I

4  communicated directly with defense counsel to let them

5  know there is, in fact, an index.  We were not provided

6  an index from CCA and the U.S. Attorney's Office worked

7  with the marshals service and CCA and created an index,

8  which is available to defense counsel and I believe is

9  being provided apart from the surveillance footage to

10  defense counsel.  So we-- we actually created the index

11  for defense counsel, and for some time defense counsel

12  has been aware that there is an index.

13            And then also, the communications in this

14  case, Your Honor, I would just like to say at the

15  outset, I believe everybody involved in this case would

16  agree we're working together extraordinarily well.

17  There's just a problem that we don't know how to solve

18  in that there is just so much discovery.

19            And so there are 21 terabytes of data.

20  Defense counsel has indicated they were having trouble

21  getting funding because the drives were so expensive.

22  We tossed around the idea that they could just create

23  two copies, one for the Topeka FPD office and one for

24  the Kansas City office and check them out as they wish.

25  I have an additional copy at the U.S. Attorney's Office

1    in Kansas City that anyone could come in and review.

2              I first contacted defense counsel on

3    April 26th of this year and let them know the drives

4    that I needed and that also I would have them available

5    for in-house review.  And I believe those 21 terabyte

6    drives have been available for at least six weeks, maybe

7    eight weeks, for in-house review or for copying.  And to

8    date, through no fault of defense counsel, I haven't

9    gotten any drives to download a copy because I don't

10   believe they can get the money to do that.

11             So to the extent that Ms. Shaneyfelt

12   reported to you that there is not an index, I have

13   e-mails to defense counsel stating there is an index

14   that we created and they will have access to that.

15             THE COURT:  All right.  That's good to know.

16   And so 21-- 21 terabytes total?

17             MS. TOMASIC:  Yes, ma'am.

18             THE COURT:  So I don't know what that means

19   in terms of how many different hard drives would need to

20   be purchased.  I guess if they're three-terabyte hard

21   drives, we'd need about-- more than six, need seven.

22             MS. TOMASIC:  I guess I stand corrected.

23   Six times three is 18.  18 terabytes.

24             THE COURT:  Okay.

25             MS. TOMASIC:  And so the way that CCA has

1    provided the data to us, they provided it on six

2    three-terabyte drives, so we would need to copy it in

3    the same manner.  We provided defense counsel with a

4    photograph of the make and model of the drives that CCA

5    provided to us because that would help facilitate the

6    copying process.

7              It takes about 20 days to copy one set.  But

8    my understanding in speaking with Pauletta Boyd, who is

9    the litigation support specialist in our office - and

10   she's here today to answer any questions - is that once

11   we provide a copy to defense counsel, they could

12   undertake copying additionally amongst themselves or we

13   could do all copies for defense counsel if they so

14   chose, it just would take some time.

15             THE COURT:  Okay.  I understand.  All right.

16   I'll start with you, Mr. Jenab.  Have you all-- has

17   the-- the six defense counsel involved directly in this

18   case had discussion about sharing or how to approach

19   this?

20             MR. JENAB:  Judge, we-- we've had-- we've

21   had some discussion about it.  And I think that some of

22   the defense counsel felt that they would rather have a

23   complete set in their own office.  I--

24             THE COURT:  Some idea-- I mean, hours and

25   hours of video that you would have to go through?

 1            MR. JENAB:  Well, that's the problem.  I

 2    mean, in order to make any kind of headway with the

 3    volume that we're looking at, I think a lot of the work

 4    is going to have to be done at odd hours, evenings,

 5    weekends.  It's-- it's not going to be necessarily very

 6    predictable when-- when we're going to have the blocks

 7    of time to try to do it.

 8            And I know that the government is trying to

 9    help us with an index, but I think - and-- and Erin can

10    correct me on this if I'm mistaken - I think that the--

11    the index is going to-- it's going to help as a guide,

12    but-- but I'm not sure it's going to, for example,

13    identify where each defendant would be found, right, on

14    the surveillance footage.  It's going to identify areas

15    and-- and whatnot.  But I don't know that I could take

16    the index and say, "Well, Mr. Black is going to be here,

17    here, here, and here."

18            THE COURT:  Is that the case?

19            MS. TOMASIC:  That is the case, Your Honor.

20    And I know I've spoken with some defense counsel about

21    this, I don't know that I've spoken with everyone, so

22    I'll just put it on the record.  What the government has

23    provided and is providing in discovery is what I believe

24    to be a complete overview of the life cycle of a

25    defendant as far as how he is managed at CCA, which will

1    include exactly which pod each defendant was in at any

2    given date, the dates that he was transferred from

3    certain pods.  If he had call-outs for medical, that

4    will also be included in his records.

5              And so defense counsel can look at the

6    Offender Management System for his particular inmate and

7    any other inmate that interests him, for example if a

8    source of supply is identified.  Every inmate at CCA, to

9    my knowledge, and I'll have to go back and look, but we

10   have that data for every inmate.  And by looking at that

11   data and extracting that data, then the index provided

12   by the government will say, for example, Pod E, Camera

13   3.  And then defense counsel can go to the particular

14   date that interests them, look at that particular camera

15   angle.  They know their client is in Cell 101, Pod E on

16   that particular date, and they can marry the two to view

17   the footage that they deem pertinent to mounting their

18   defense.

19             THE COURT:  So they'll be able through the

20   Offender Management System to determine the pod, not

21   necessarily the camera in the pod, but at least the pod.

22   Would that be accurate?

23             MS. TOMASIC:  Yes, and the cell.  With the

24   exception that I-- I've learned more about CCA than I

25   ever thought was possible.  But from what I understand

1    at CCA, in some instances, if an inmate is assigned to,

2    for example, Pod 101, he may on his own decide he

3    doesn't like his cellmate and move within that pod,

4    switch with someone, and CCA does not always stop

5    inmates from making their own moves.

6              But as far as what CCA records as an

7    inmate's particular pod, yes, defense counsel has-- will

8    have access to those records in the round of discovery

9    that's going out this week.

10              THE COURT:  Okay.  So the defendants have

11    not yet discovered the Offender Management--

12              MS. TOMASIC:  No.

13              THE COURT:  Which sounds like it's pretty--

14    it's going to be a pretty voluminous document too?

15              MS. TOMASIC:  I--

16              THE COURT:  Because it itemizes each

17    person's movement every time they move?  Or how does

18    that work?

19              MS. TOMASIC:  It is, except that typically

20    an inmate would stay in a particular pod for an extended

21    period of time and only be moved if he was promoted to a

22    particular work assignment or if he was demoted to

23    segregation for getting in some sort of trouble.  Then

24    on a daily basis, there would not be anything

25    documenting his movements except that if he had

1  particular medical call-outs or particular types of

2  call-outs for work, that would be denoted within the

3  system.

4         I have not looked at the full Offender

5  Management System.  Ms. Boyd has looked at it, and I

6  will tell you I do have concerns that it's-- was

7  produced in somewhat of a messy fashion by CCA, and

8  Pauletta is working to clean that up.  There would be a

9  number of blank pages in the middle, hundreds of them,

10 that just made it appear more voluminous than it

11 actually was, but--

12        THE COURT:  Okay.  What about when an inmate

13 leaves the pod to go visit with a visitor or an

14 attorney?  And I don't know, is that in a private room

15 or is there a visitor room or how does that work?

16        MS. TOMASIC:  The-- so in order to have a

17 visit, there would have to be some sort of registration

18 for the visit.  It should be designated in the Offender

19 Management System, but I will add that to something to

20 check.

21        THE COURT:  And there are cameras that are

22 identified with particular-- the visitor room and

23 attorney/client room as well, or no?

24        MS. TOMASIC:  Yes.  Except that there is

25 no-- there are no audio in attorney/client unless

1   someone at CCA, an employee, took it upon themselves to

2   turn on the audio.  But I don't believe it's recorded.

3   It's just that it would allow a particular CCA employee

4   to listen in without recording if-- if the employee

5   believes something was afoot that he needed to be aware

6   of.

7           THE COURT:  Okay.  All right.  Well, now

8   that I have a better understanding, and hopefully maybe

9   you all have a better understanding, because it sounds

10  like Ms. Tomasic's understanding is developing as she's

11  gathering records from CCA, I'm of the mind that we can

12  justify each one of you getting the hard drives

13  individually.

14          It sounds like it's going to be quite an

15  undertaking to go through all of those.  And even

16  though, you know, maybe these hard drives include-- I

17  don't know how many pods there are at CCA, I guess I

18  should've asked, but let's just suppose there are eight

19  pods at CCA and you really only need to focus on one, it

20  still sounds like it's going to be a lot of hours of

21  video to go through.

22          So, as I understand it from Ms. Shaneyfelt,

23  the hard drives will cost around $125 for each or about

24  $750 per defendant if you buy six; is that correct?

25          MS. SHANEYFELT:  Your Honor?

1          THE COURT:  Ms. Shaneyfelt.

2          MS. SHANEYFELT:  If I might.

3          THE COURT:  Yes.

4          MS. SHANEYFELT:  We have-- they do think

5    they can get them for about 100 or $150 per hard drive.

6    Mr. Naseem was good enough to talk with some of his

7    technology experts, and he's come up with a couple of

8    bids that would allow for six defendants in this case

9    and then, by extrapolation, the other defendants who are

10   impacted by this discovery that are charged in other

11   cases, to take-- have a professional company do the

12   copying of the original.

13          And for these six defendants, the total of

14   that would be $10,800.  That is at $300.  It costs $100

15   for each actual hard drive and then $200 for the labor

16   of transferring the materials to the hard drive.  But

17   instead of it taking 20 days for each defendant, they

18   could have a whole project done in 30 to 45 days for

19   each of the six defendants in this case.  So that might

20   be another alternative.

21          THE COURT:  Okay.  So it would be a total of

22   $10,800, but that would suffice to take care of the

23   defendants in this case, as well as the defendants that

24   are pending sentencing?

25          MS. SHANEYFELT:  No.  That would just be the

1   six defendants in this case.

2              THE COURT:  Okay.

3              MS. SHANEYFELT:  That would provide six

4   defendants with the six three-terabyte hard drives of

5   discovery.  Both the hardware and the labor of moving

6   the discovery from one place to the next.

7              THE COURT:  Is that-- and so is that a

8   quicker timeline than what the U.S. Attorney's Office

9   could do if they provided each-- each defendant with

10  copies?

11             MS. SHANEYFELT:  It's my understanding that

12  it's taking about 20 days for the U.S. Attorney's Office

13  to do each-- each copy.

14             THE COURT:  Okay.

15             MS. SHANEYFELT:  And so that would be

16  20 times six defendants.

17             THE COURT:  Obviously they have limited

18  resources, they're not in the business to typically be

19  doing this, so--

20             MS. SHANEYFELT:  Right.

21             THE COURT:  Okay.  Well, I think that's

22  reasonable then to do it all in one fell swoop, 30 to 45

23  days.  So-- so I guess the way to handle this is to

24  submit-- break it into-- evenly across all vouchers and

25  submit it to me that way.

1          MS. SHANEYFELT:  I'm happy to do that on

2   behalf of all defense counsel, just to do it in one

3   voucher and then we'll divide it between the defendants.

4          THE COURT:  Okay.  All right.  We'll do

5   that.  So-- and then the-- the index is available, but

6   is it-- have you all received the index yet?

7          MS. TOMASIC:  They have not.  They-- each

8   defense counsel has provided a one-terabyte hard drive

9   and we are copying those for each defense counsel at

10  this time.  And the index is on that one terabyte hard

11  drive.  It should go out by Monday.

12         THE COURT:  Okay.

13         MS. TOMASIC:  I do want to say just because

14  I-- obviously defense counsel all needs a copy of this

15  surveillance footage, but I don't want the Court to be

16  surprised at a later point.  We are working on charging

17  additional defendants and a significant number of them.

18  Obviously it takes a lot of time to get the evidence

19  together.  So I don't want to mislead the Court down the

20  road if a number of additional defendants are charged

21  that would create additional need for surveillance

22  footage to be produced to each of those defense

23  attorneys at a later date.

24         THE COURT:  And you're planning to supercede

25  and do it in this case?

 1          MS. TOMASIC:  I-- if the time frame allows,
 2   yes.  If not, it would be-- it would be a related case,
 3   filed as a related case.
 4          THE COURT:  Okay.  All right.  So the index
 5   will be going out on the one-terabyte hard drive
 6   everyone has already provided.  The Offender Management
 7   System, you're trying to clean that up first but then
 8   push that out.  And then look at the professional
 9   company going on making the copies.
10          Is there anything else that we need to talk
11   about as far as discovery and-- I should tell you
12   because I decided this was a case budgeting case, even
13   without Ms. Shaneyfelt telling me-- me about her
14   concerns, I would schedule it for an earlier status
15   conference.  I think we had this scheduled for a status
16   conference maybe in August or September, but that's
17   probably too late.
18          It's probably-- it's good to get-- kind of
19   get ahead of it in a case like this where there's going
20   to be a lot of money spent and time spent.  So-- but I'm
21   glad to hear it's-- it seems like it's-- it's being
22   well-managed.  And even though it's daunting, it's being
23   well-managed.  So what else can we talk about at this
24   point, if anything.
25          MS. TOMASIC:  There are some additional

1   discovery concerns that have arisen.  So in speaking

2   with Ms. Boyd, I know that typically the U.S. Attorney's

3   Office sends out discovery in searchable PDF format.  We

4   have obtained a number of e-mails.  I know the e-mails

5   from one account was about - is it correct - 37,000?

6             MS. BOYD:  (Nods head up and down).

7             MS. TOMASIC:  37 [sic] e-mails from one

8   account from CCA, which would take about 200 days to

9   convert to searchable PDF format.  CCA has provided all

10  e-mails in the last three years for CCA Leavenworth,

11  which is about 40 million e-mails.

12            And, Your Honor I just want to explain that

13  CCA's system is set up so that every day that passes,

14  the front end of their retention period was deleting

15  e-mails.  And given that this case keeps identifying -

16  at an alarming rate actually - new targets, I asked if

17  CCA would consent to provide us all employee e-mails for

18  CCA Leavenworth, to preserve those e-mails so that they

19  would no longer be deleted.  They have done that.  The

20  government is in possession of those e-mails.

21            Obviously that's an overwhelming amount of

22  data, not only for the government but to defense

23  counsel.  As a prosecutor, I am in the untenable

24  position of feeling like I need to turn over, pursuant

25  to the U.S. Attorney's Office open file discovery

1    system, everything I have out of concern that there may

2    be something exculpatory in there.  I know, for example,

3    possession of contraband, one of the defenses to

4    possession of contraband would be acquiescence of people

5    in a position of supervisory authority within the

6    facility, for example hypothetically.

7              So I would prefer to be able to turn over

8    all the e-mails not in PDF format because it simply--

9    they could not be converted in a timely manner.  It

10   would take years to do that.  To turn them over in the

11   PST format, which is their native format, and allow

12   defense counsel to upload those to Outlook and then they

13   can search by user a particular account holder.  And at

14   this point, there may be less than ten account holders

15   who would be relevant in the government's view.

16             I don't want to obviously suggest to defense

17   counsel how to conduct their search.  But moving

18   forward, I think defense counsel will identify

19   additional employees of CCA that they may wish to search

20   their e-mails.  I just wanted to throw that out to the

21   Court.  I don't know at this point what size drive

22   defense counsel would need to provide to upload that,

23   but I assume it will be a few terabytes, I want to say

24   maybe three or four, but--

25             (Ms. Tomasic and Ms. Boyd confer).

1              MS. TOMASIC:  Okay.  And then in addition to

2    that, there were approximately 50 electronic devices

3    seized on the day of takedown.  The imaging of those

4    devices is complete.  And if defense counsel wants a

5    copy of the complete imaging, they will need to provide

6    two 3,000-gigabyte drives.  The images from those

7    devices were seized from the residences of Lorenzo

8    Black, Alicia Tackett, Anthon Aiono, Cathy Rowlette, and

9    David Bishop.  So I definitely believe that those

10   devices are pertinent to those defendants.

11             And I leave it to the rest of the defense

12   counsel to decide if they would like to provide two

13   3,000-gigabyte drives.  If not, the Secret Service is in

14   the process of generating forensic reports, which would

15   be much more manageable and smaller in size.  And those

16   will be produced to defense counsel in short order.

17             Other than that, I would just like to put on

18   the record that proffers and interviews are being

19   redacted and they will be available for in-house review

20   next week.  And I know the Court has expressed concern

21   in the past about maintaining cooperator information

22   in-house.  And I just want to represent that I have in

23   all other cases moved to the position that proffers can

24   be sent out in unredacted form pursuant to a protective

25   order.

 1              But I can put on the record I do believe
 2    there is a substantial and significant reason to operate
 3    differently in this case.  And I do believe there is a
 4    sufficient safety concern that proffers and interviews
 5    should be kept in-house in redacted form at least until
 6    much closer to trial.
 7              I have arranged with Ms. Boyd to make
 8    multiple copies.  And if defense counsel wants to come
 9    and view them, we have multiple copies available.  We
10    will find rooms to make them available.  There should
11    not be a single instance in this case of defense counsel
12    wishing to review proffers or interviews at the U.S.
13    Attorney's Office and not being able to do so because
14    there is not a copy or a room available.  We will find a
15    room.
16              THE COURT:  And can you do that both at your
17    Topeka and Kansas City branches?
18              MS. TOMASIC:  Yes, absolutely.  And I
19    believe that concludes my concerns.
20              The only other concern that I would have,
21    and we would have to work this out with defense counsel,
22    is we're sending out the one-terabyte drive that defense
23    counsel provided.  Obviously they're going to need to
24    send either that drive back or a new drive back in the
25    next two weeks so that the-- the last big round of

 1    discovery can go out.  Until we determine the size of

 2    the 40 million e-mails, though, I won't know exactly

 3    what size.

 4                THE COURT:  Okay.  Let me ask you, just for

 5    clarity on the e-mails.  So there are employees that are

 6    charged?

 7                MS. TOMASIC:  There's one employee charged.

 8                THE COURT:  One employee charged.

 9    Potentially more employees charged, I assume.

10                MS. TOMASIC:  (Nods head up and down).

11                THE COURT:  But I'm not-- when you say 40

12    million e-mails over the last three years, that's for

13    all employees?

14                MS. TOMASIC:  Of just CCA Leavenworth.  And

15    I would point out that lower-level employees in the

16    hierarchy, my understanding is, they do not have access

17    to e-mail.  So it's going to be e-mails solely for

18    individuals in a supervisory position or at least

19    corrections officers.  But support staff such as like

20    janitorial services, kitchen services, delivery

21    services, those individuals do not have access to

22    e-mail.  That is how it was represented to me by CCA.

23                THE COURT:  And explain to me why you think

24    you need to disclose all of-- all of the e-mails.

25                MS. TOMASIC:  Well, I think I need to

1    disclose all the e-mails because there's potentially

2    exculpatory information in there.  That way it's up to

3    defense counsel to decide if there's a particular person

4    whose e-mails they would like to search, then they can

5    do so.  Otherwise, I'm picking and choosing what I think

6    may be exculpatory.  And I don't want to be placed in

7    that position.

8              Given the evidence we have at this time, the

9    evidence suggests that there were a significant number

10   of employees involved and that e-mails are pertinent to

11   this investigation as far as designating what CCA

12   employees knew was going on at the time and what they

13   were doing to quell contraband and drug smuggling inside

14   the facility, or rather not doing.

15             And then there would also be, in addition to

16   that, there would be e-mails, for example, related to

17   movement of inmates, the basis for movement of inmates,

18   discipline of inmates for particular acts, decisions not

19   to discipline inmates for particular acts.

20             THE COURT:  So the e-mails might include

21   communications about the charges, but also might include

22   just communications about these particular defendants?

23             MS. TOMASIC:  Yes, ma'am.  Yes, Your Honor.

24   And also about potential sources of supply, potential

25   cooperators, other individuals involved in the drug and

1    contraband trafficking.

2            At this point, based on wire transfer

3    information, the government believes that 95 inmates or

4    more were involved in this conspiracy and 60 individuals

5    or more on the outside working with them.  And so it is

6    a fairly widespread conspiracy.  And I do believe a

7    number of inmates, in addition to those charged here,

8    their information would be contained in-- in the e-mail

9    communications.

10           THE COURT:  Okay.  As far as the e-mails,

11   what is your plan of action in terms of how to go about

12   disclosing those in a way that-- well, you started off I

13   think by saying you typically disclose things in a PDF

14   format that's searchable.  Is there a problem with

15   respect to these e-mails?

16           MS. TOMASIC:  The e-mails could not be

17   converted in a timely manner to PDF.  And so the

18   government's plan is to distribute them in PST format,

19   which is their native format, so that defense counsel

20   can upload them into Outlook.

21           And, for example, the U.S. Attorney's Office

22   has the same system for e-mails, and we have a search

23   platform within Outlook that I use on a daily basis.

24   You can search by content, you can search by user, you

25   can search by date, you can search by recipient.  And in

1    many ways, it's more usable, more user-friendly than

2    just searching in searchable PDF format.

3                    THE COURT:  Okay.

4                    MS. TOMASIC:  And I want to clarify, I don't

5    have my notes in front of me as to the exact number.  My

6    recollection from e-mail communications and from

7    conferences with CCA's counsel, it's 40 million.  But I

8    could be wrong.  They-- they provide an estimation as to

9    all corporate CCA e-mails and then CCA Leavenworth

10   specific.  I believe it's between 30 and 40 million, but

11   I couldn't give an exact number today.

12                   THE COURT:  All right.  And you said-- you

13   keep stressing that it's only specific to Leavenworth

14   CCA, is that because there's some other institution

15   involved?

16                   MS. TOMASIC:  No.  CCA-- CCA's corporate

17   headquarters is in Nashville.  And they had to segregate

18   out CCA Leavenworth's particular e-mails.  I believe

19   they have between 60 and 80 facilities nationwide that

20   they manage.

21                   THE COURT:  Okay.  Okay.  Thank you.

22                   Okay.  Now that we've heard-- well, at least

23   I've heard, maybe you all were aware of these additional

24   types of discovery that are-- that will be coming, are

25   there any concerns or questions or anything that-- from

1     the defense side that we need to discuss?  Yes.

2             MS. DODGE:  Yes, Your Honor.  I don't know

3     what the dates are as to what-- you know, how far back

4     the government is going.  I now have a new concern.  I--

5     I don't know whether there's going to be conflicts of

6     interest that are going to come out of this because of

7     previous clients that we have represented that have been

8     housed at CCA, whether it be through the Western

9     District of Missouri or through the District of Kansas.

10            And so I-- and I don't know that the

11    government-- maybe they have-- I know they're-- they're

12    very concerned about that as well.  And so maybe they've

13    checked all that out.  I don't know what suspects

14    they're looking at or targets they're looking at.  But

15    as to the people who were inmates that were in there, I

16    think there's a good chance that out of the six of us,

17    that we may have other inmate-- we may have other

18    clients that are-- that are somehow going to be woven

19    into this conspiracy.

20            And that-- that is a concern.  You might be

21    bringing in lawyers from the East and West Coast to

22    handle this case in the future, I don't know.

23            THE COURT:  That's a concern.  That is a

24    legitimate concern.  What do you think your time frame

25    is, Ms. Tomasic, in terms of additional indictments and

 1    what-- can we expect those all in one fell swoop or

 2    waves or--

 3                THE COURT:  I have--

 4                THE COURT:  Because obviously there may be

 5    withdrawals and we've got quite a management problem on

 6    our hands here.

 7                MS. TOMASIC:  I've been maintaining a log of

 8    defense counsel, past and present, for individuals I

 9    intend to charge or who are already charged.  And of the

10    six attorneys that are currently representing charged

11    defendants, I have not identified any conflicts.

12                As far as timing, we're moving as quickly as

13    we can.  We intend to charge-- given the volume of

14    defendants, ultimately the goal is to charge in two

15    separate cases so that the marshals service is not, and

16    the Court also, and just as far as space, required to

17    have more than 20 defendants in a courtroom at a

18    particular time.

19                THE COURT:  So you may be superseding to add

20    another ten or so here.  But then if-- beyond that,

21    there would be a separate case.

22                MS. TOMASIC:  Yes, Your Honor.

23                THE COURT:  Which hopefully won't be

24    assigned to me.

25                MS. TOMASIC:  Yes, Your Honor.

1              THE COURT:  Okay.  Thought I'd go on record

2    saying that, for whatever it's worth.  Okay.  Any other

3    questions or concerns?  Ms. Ambrosio?

4              MS. AMBROSIO:  Your Honor, I just want to

5    clarify because I'm concerned about the number that I've

6    heard today that I haven't heard before as to what each

7    individual defense counsel is supposed to provide in

8    terms of disks.

9              I provided, and I think most people have, a

10   one-terabyte disk.  That was my understanding was going

11   to cover a substantial amount of discovery.  Of course,

12   not that 18 terabytes that we talked about originally.

13   But then I wrote down, maybe I heard it wrong, that we

14   would have to return that one terabyte to get another

15   terabyte or provide another terabyte disk?  We can't

16   really return it because there's really no place to put

17   that terabyte once we get it on there.

18             THE COURT:  Okay.

19             MS. AMBROSIO:  And then I heard additionally

20   that, and maybe I wrote this down wrong, that we would

21   need two 3,000-gigabyte disks for the electronic

22   devices, which I think is another six terabytes.  Maybe

23   I'm wrong about that.

24             THE COURT:  Yeah, I think-- well, I-- so I

25   heard the same.  So 2 to 3,000 gigabytes for the image

1    devices.  There's also going to be some Secret Service

2    reports that will hopefully make that a little bit more

3    manageable.  But if you want the actual images of

4    everything, 2 to 3,000 gigabytes.

5              The 40 million e-mails I think you

6    estimated, Ms. Tomasic, that it could be three to four

7    terabytes, but that you intend to produce it in native

8    format that can be uploaded to Outlook, which would be

9    searchable.  And-- and that's one question I have, is

10   how does that work for the six of you, what are we going

11   to have to do to manage that piece of it?  And then,

12   yeah, I think that covers it for now, so--

13             MS. AMBROSIO:  Okay.  So it sounded to me

14   like I need to provide two individual one-terabyte disks

15   and then one that would hold up to three terabytes for

16   the 50,000-- or for the 50 electronic devices.  And then

17   we'd have to deal with the e-mails at some other time.

18             MS. TOMASIC:  Your Honor, as for the-- the

19   50 electronic devices, whether a defense attorney wants

20   to provide the 3,000-gigabyte drives, the two

21   3,000-gigabyte drives is entirely up to them.  That is

22   just an image, a complete, perfect mirror image of all

23   the devices that were downloaded.

24             Oftentimes defense attorneys do not want to

25   take on that extraction because they couldn't do

1    anything with it, they would have to send it off to some

2    sort of service to analyze how the device was

3    downloaded, whether they believe it was accurately

4    downloaded.  This comes up sometimes in child porn cases

5    and also in terrorism cases.

6              Whether defense counsel wants to undertake

7    that here, I take no position.  I'm just making it

8    available to them.  Otherwise, Secret Service is in the

9    process of providing reports, which are forensic

10   reports, which are easily readable and in PDF format,

11   which will summarize from where certain data was

12   extracted and then the nature of that particular data.

13   So that's generally what's provided, but I did want to

14   make that option available.

15             As far as the size of additional external

16   drives that will need to be provided, I should have a

17   better estimation of the total amount in the next week.

18   The agent who needs to look at that, the amount, the

19   volume of space that the 40 million e-mails takes on is

20   at the Republican National Convention and he is in a

21   supervisory position there and was not able to get away.

22             But as soon as he gets back, which I believe

23   is early next week, that will be his first order of

24   business.  I will send out an e-mail to defense counsel.

25   And I do not anticipate any additional large volumes of

1    discovery surfacing during the course of this case.

2              THE COURT:  All right.  So will you have

3    available in the U.S. Attorney's Office a way that they

4    can go in and at least view the entire mirror image

5    first before-- and then decide whether they want to

6    download it or copy it?

7              MS. TOMASIC:  It is not-- I just spoke with

8    Pauletta Boyd.  It is-- the images are not in a format

9    that our office can read.  The agents could.  And if--

10   if defense counsel did want to go to the Secret Service

11   and meet with the agents who undertook that image

12   process, I could make them available to assist them in

13   doing that.

14             Now, to the extent that defense counsel

15   wanted to spend several full days there reviewing it,

16   unless they have-- are extraordinarily computer savvy, I

17   don't know that that would be fruitful for them, but I

18   will make the agents available should they choose to at

19   least see the process by which the devices were

20   downloaded.

21             THE COURT:  Well, it sounds like the best

22   approach would be for them to start by looking at the

23   Secret Service reports themselves.  And when do you

24   anticipate those will be available?

25             MS. TOMASIC:  I have been in e-mail

1    communication with the agents, and the time frame I was

2    given was five weeks.  But that was contingent upon them

3    having headquarters cooperate with them to download

4    them, because so many of the Secret Service agents are

5    at the Republican National Convention and then the

6    Democratic National Convention.

7              I assure you I'm being very aggressive in

8    trying to get them to get it done in a timely manner

9    because I do understand the need to get this discovery

10   to defense counsel.  And I will continue to do so.  I

11   hope no more than five weeks.

12             THE COURT:  Okay.  I think maybe at our next

13   status conference I'll just see where you're at on that.

14   At this point I'd say don't go out and buy any

15   additional hard drives for the images.  Let's just get

16   the reports in your hands and then we'll go from there.

17   You've already spent money on one terabyte for the index

18   and you're going to need to keep that on hand.  The

19   videos we've talked about.  And then the e-mails being

20   produced in native format, we're going to have-- well,

21   when will those be ready to be disclosed in that format?

22             MS. TOMASIC:  They are ready.  The only

23   issue is I don't know the total size that they occupy,

24   and I will know that early next week.  And I will e-mail

25   defense counsel next week and let them know exactly what

1    size drive I need to provide them all of the e-mails.

2           THE COURT:  Okay.  So we're going to have a

3    similar issue with this as we have with the CCA videos.

4    And the question is whether it would make sense to have

5    some professionals deal with that, too.  If they're in

6    native format, the way the U.S. Attorney's Office uses

7    it is to download it into Outlook, which allows them to

8    search.  I don't know if all six of you have that

9    capability individually or not.  I know Outlook is a

10   pretty common software, but that doesn't mean everybody

11   has it.

12          Do any of you not have it or not have that

13   capability or not sure?

14          MS. DODGE:  I don't know.  I mean, I have

15   Outlook, but I-- I don't know how you can-- I don't know

16   how it handles that much.

17          MR. HOFFMAN:  Judge, Jason Hoffman on behalf

18   of Mr. Aiono.  We're kind of delving-- in my-- my mind,

19   we're delving over into issues related to some case

20   budgeting and defense counsel issues, as I see it.  And

21   I'm kind of wondering if maybe this might be more

22   appropriate for an ex-parte proceeding now that we know

23   what we're going to get, so that we can have that

24   conversation about whatever issues anybody may have with

25   regard to dealing with this discovery without the need

1    to have the government in the middle of it.

2         THE COURT: Okay. That's a good point. I

3    think it's a little premature, too, until they give you

4    all the information they have about the volume involved,

5    et cetera, so-- which it sounds like you'll-- they'll

6    know within the next week or two and you'll know within

7    the next week or two, at least on this.

8         So I think you're right, Mr. Hoffman. I

9    think this is probably as far as we can go today. But

10   let's plan on having a case budgeting conference

11   ex-parte in a month or so if-- if we're ready. We'll

12   kind of play that by ear.

13        Ms. Shaneyfelt, you can let me know when it

14   would make sense and not waste everybody's time so that

15   we can get some things accomplished. But at least for

16   now I'm going to approve how to handle the videos, so

17   that can proceed. If it takes 30 to 45 days, we want to

18   get going on that.

19        Okay. All right. Anything else?

20        MR. JACKSON: Your Honor, Mike Jackson on

21   behalf of Catherine Rowlette. I think this case meets

22   the criteria of appointing a coordinating discovery

23   attorney. And I think you may have just said that when

24   you said see if you can get the professionals involved.

25        THE COURT: That's not what I meant. I was

1    talking about like the company that's going to manage

2    the videos.  So let me hear from your-- on your idea on

3    having a-- sort of a lead discovery attorney.

4                MR. JACKSON:  I think it can be better done

5    through a motion.  But they, of course, would organize

6    the receipt and distribution of all discovery.  If we're

7    talking about a lot more defendants, it should-- we

8    should start immediately with organizing it.

9                This was used in the *Perez-Acala* case, which

10   was a 54-defendant case, and it cut a lot of attorney

11   time.  So I'm sold on that kind of an approach.  But

12   like I said, I think I can put that in a motion.

13               THE COURT:  And again, that's something I

14   think we can talk about at our next-- at our case

15   budgeting conference for that matter.  But if you want

16   to proceed by motion, that's good.  That's fine.

17               MR. JACKSON:  Thank you, Your Honor.

18               THE COURT:  Okay.  Are you volunteering for

19   that position, Mr. Jackson?

20               MR. JACKSON:  Yes.  I can't hardly turn you

21   down.  Could I have two weeks?

22               THE COURT:  No, I meant, are you

23   volunteering for the person that would serve as the

24   coordinator?

25               MR. JACKSON:  Oh, no.  You know, even what's

1   a docking station, I have to go to Google to figure that

2   out.  If we have 50 devices, each one of those devices

3   are run by a specific software.  So how would we even

4   approach looking at what was on those 50 devices?  You

5   know, it could be in Mac or it could be in Microsoft

6   Word, or-- and a coordinating discovery attorney, one of

7   them that we used in *Perez-Alcala* was Berkowitz Oliver.

8   They do this all the time.  They do it for huge civil

9   cases so that they could organize it and save an immense

10  amount of time.

11          THE COURT:  You're talking about Mr. Naseem.

12  He's got some sort of national position that he serves

13  in this capacity, so we probably ought to talk to him.

14          MR. JACKSON:  But I thought you were talking

15  about filing a motion, I'll do that.

16          THE COURT:  Okay.

17          MR. JACKSON:  All righty, thank you.

18          THE COURT:  All right.  Okay.  Anyone else

19  while we're all here?  I think this has been productive.

20  I'm glad we did this today rather than later.  Mr.

21  Jenab?

22          MR. JENAB:  Judge, I do have an issue, but

23  it pertains to Mr. Black only.

24          THE COURT:  I-- I wanted to talk to you

25  about that as well.  So we can recess with respect to

1  everyone else.  What's the next date that we had on the

2  docket?

3              COURTROOM DEPUTY:  The date that we have--

4              THE COURT:  September?

5              COURTROOM DEPUTY:  Yeah, September 19th at

6  9:00.

7              THE COURT:  Okay.  So I-- we're going to

8  have another status conference on September 19th with

9  everybody, government included.  But we'll figure out

10  later when we need to have a case budgeting meeting.

11  Okay?

12              All right.  So I'll excuse everyone except

13  Mr. Jenab and his client.

14              (Defense counsel and defendants were excused

15  from the courtroom).

16              THE COURT:  Mr. Jenab.

17              MR. JENAB:  Thanks, Judge.  Your Honor, Mr.

18  Black was recently transferred to-- he was taken out of

19  CCA and he was sent to the Leavenworth County jail.  I

20  know he wrote the Court a letter, and I think in that

21  he-- he thought I had something to do with it.  He and I

22  have talked since then and he understands that-- that

23  that move was not related to me.

24              I had asked that he be taken out of

25  segregation at CCA and allowed to go into the general

1    population.  The government made the decision, in

2    conjunction I believe with the marshals service, to

3    instead move him to Leavenworth County jail.  And the

4    difficulty with that facility is that it has literally

5    no federal materials there at all.  There's no ability

6    for Mr. Black to assist in his defense by reviewing, you

7    know, federal-- specifically federal legal materials the

8    way that an inmate at CCA, for example, can do.

9            And I-- I wanted to sort of again bring that

10   to the Court's attention, that Mr. Black feels that he

11   should be allowed to be at a facility where he can be of

12   more help to his own defense.

13           And, Judge, I would also just say right now

14   that this case is turning into such a hugely protracted

15   affair, I think he needs to be put on bond.  And I-- I

16   intend to file a motion.  I don't think it's fair in any

17   way that Mr. Black should have to sit in custody for

18   what looks like it may be three years or more before we

19   can-- we can realistically get to a trial of this

20   matter.

21           But in the meantime, while he is in custody,

22   and we wanted to ask the Court to-- to consider ordering

23   that he be sent back to CCA, even if-- even if that

24   means he has to be in segregation, he would much rather

25   put up with that if it means that he has the opportunity

1    to have a-- a meaningful law library at his disposal, or

2    moved to a-- a different facility where he would be able

3    to conduct legal research.

4          THE COURT:  I don't know if the government

5    has any response.

6          MS. TOMASIC:  Your Honor, I would oppose the

7    request that he be moved back to CCA.  The government,

8    in coordination with the marshals service, looked at the

9    hierarchical positions of the individuals involved in

10   this alleged conspiracy and also looked at the conduct

11   that we have learned these individuals have engaged in

12   since being put in the facility.  And based on those

13   factors, decided who needed to be moved out of CCA, what

14   types of separatees needed to be placed on particular

15   inmates.

16          With respect to Defendant Black, the

17   government has obtained information through cooperator

18   statements suggesting that Mr. Black has been

19   instructing his co-defendants and other individuals at

20   CCA not to proffer about methamphetamine, to proffer

21   specifically about synthetic cannabis and tobacco,

22   because his understanding of the guidelines, accurately,

23   is that methamphetamine carries a much heavier weight.

24          I-- as I discussed with Mr. Jenab before

25   this hearing, there's a fine line between instructing

1   and intimidating.  In the government's view, Mr. Black,

2   because of his position in the conspiracy and also

3   because of the nature of the statements he's making, I

4   view those as intimidating statements.  I view them as

5   obstructive statements.

6          And I have coordinated long-- I've

7   coordinated at length with the marshals service, like

8   playing a game of chess, to put cooperators in certain

9   pods, cooperators at certain facilities, perpetrators

10  who I see as intimidating perpetrators in other

11  locations.  I believe every contracting facility with

12  the United States marshals service in Kansas and

13  Missouri, in addition to CCA, has multiple defendants

14  and targets and cooperators housed in different

15  positions.  There's simply nowhere left for Mr. Black to

16  go because of the conduct that he has chosen to

17  undertake, both as part of his underlying case and since

18  he's been charged.

19          In addition, I would also note that just

20  recently, in fact today, I received reports suggesting

21  that Mr. Black was found in possession of tobacco and he

22  has been reprimanded at Leavenworth.  The exact same

23  conduct that he was helping to facilitate as part of his

24  underlying case.

25          So for all of those reasons, he-- I believe

1    that he lives by the conduct that he has chosen to

2    undertake, which is intimidating witnesses, obstructing

3    witnesses in his case, and also continuing to engage in

4    criminal activity.

5              THE COURT:  All right.  Mr. Jenab, I will

6    invite you to move in writing for the relief that you

7    seek.  And it sounds like you were planning to move in

8    writing for release on bond, I guess an appeal from the

9    detention order.  There's a detention order in this

10   case, is there not?

11             MR. JENAB:  There is, Judge.

12             THE COURT:  In the meantime, Mr. Black's

13   letters, or at least his grievance forms that I've been

14   provided, do ask for some specific things that I think

15   could surely be provided to him in paper form, assuming

16   that's something you could take to him at Leavenworth

17   and leave with him.

18             MR. JENAB:  Judge, I'm certainly in the

19   interim going to do what I can in terms of providing him

20   with what I think are the most relevant portions of the

21   federal sentencing guidelines, some basic case law

22   regarding, you know, drug conspiracy.  Obviously I can't

23   act as a substitute for a law library, but to the extent

24   that I can-- can help him with some of the more basic

25   resources, I certainly will do that.

1             THE COURT:  All right.

2             MS. TOMASIC:  And, Your Honor, not specific

3    to Mr. Black, I do want to put one additional factor on

4    the record.  I know as prosecutors we sometimes think--

5    say the sky is falling every time.  I don't think that

6    that's my character, but I do just want to add to the

7    record and let you know that the warden of CCA actually

8    called me yesterday and explained that she had certain--

9    a certain inmate and more who were completely out of

10   control that were intimidating other witnesses in this

11   case.  That she had moved him to segregation.  And in

12   response to moving this particular inmate to

13   segregation, another inmate who had voluntarily gone to

14   segregation after faking an illness multiple times,

15   asked to be moved out of the facility.

16             I have had no less than half a dozen inmates

17   write me letters, call me, saying, "Please get me out of

18   here.  I'm going to get killed because of this case."

19   So I-- I'm not exaggerating when I say that there are

20   significant danger issues in this case, intimidation of

21   witnesses.  And a lot of individuals are being impacted

22   by this case.

23             I know that you haven't accused me of

24   exaggerating.  I just want to let you know that the

25   government's position in this case is very sincere.  We

1   are looking out for the safety of the individuals

2   involved, and we're trying to move this case along as

3   quickly as we can, so that we can get these folks off to

4   BOP so that they're apart from each other.

5            THE COURT:  All right.  I understand.  It

6   sounds like this was a very difficult situation.  And

7   I'm not in a position to-- I mean, I'm just-- you're

8   providing me with information to give me some indication

9   of some of the challenges that are had in terms of

10  housing defendants.

11           And it's always difficult when they're--

12  it's a multiple-defendant case, and particularly when

13  there are witnesses that are incarcerated, defendants

14  incarcerated.  And perhaps, as you've indicated today,

15  additional potential defendants and probably potential

16  witnesses incarcerated all together.  And there's only

17  so many contract facilities available in the marshals'

18  contract that-- that would allow for them to be

19  separated.

20           So I-- if you want to take this up in

21  written motion, we can certainly do that.  And in the

22  meantime, I think it's advisable that you provide Mr.

23  Black with the specific things he asks for, as-- as well

24  as the statutes that he's charged under and the, you

25  know, sentencing guidelines that I think-- that you

1    think might be relevant.

2              And frankly, Mr. Black probably needs to

3    read the guidelines on obstruction and how that might

4    enhance one's sentence, because there are at least

5    allegations that he's doing that.  And, of course,

6    there's potential additional charges that may come from

7    that.

8              And I just caution you, Mr. Black, you need

9    to be very careful.  Because in my experience, what

10   happens is if someone-- if there's evidence developed

11   that someone is obstructing, intimidating, trying to

12   affect witness testimony, typically the grand jury will

13   supercede with a new indictment, add those charges in

14   with the-- the underlying charges.  And all of that is

15   tried together because it's related.

16             And it does not play well with juries.  I

17   mean, you know, a jury that might otherwise be inclined

18   to think that, you know, there's a reasonable doubt on

19   the underlying conduct is surely going to be influenced

20   by other evidence that shows that, you know, you're

21   trying to affect witness testimony on that.

22             That's something that I think reasonable

23   people might believe is the actions of a guilty person,

24   not an innocent person.  So you have to-- I'm just

25   cautioning you.  I hope you're not doing that.  There's

1    certainly allegations that you are, and there are

2    consequences if it's proven that you're doing that,

3    either by virtue of new charges being brought or just,

4    you know, a higher sentence in this case if it's proved

5    that you obstructed-- if you're convicted in this case

6    and it's proved that-- at sentencing that you

7    obstructed.

8            So all right.  We'll take up any motions you

9    file, Mr. Jenab, should you choose to file them.  And

10   otherwise, we'll see you back I think it's

11   September 19th for the next status conference.

12            All right.  We'll be in recess.

13            (4:29 p.m., proceedings recessed).

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Kelli Stewart, a Certified Shorthand Reporter and the regularly appointed, qualified and acting official reporter of the United States District Court for the District of Kansas, do hereby certify that as such official reporter, I was present at and reported in machine shorthand the above and foregoing proceedings.

I further certify that the foregoing transcript, consisting of 44 pages, is a full, true, and correct reproduction of my shorthand notes as reflected by this transcript.

SIGNED July 25, 2016.


/s/ Kelli Stewart
_____
Kelli Stewart, CSR, RPR, CCR, RMR