## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**
　　　　　　*Plaintiff,*

　　**v.**　　　　　　　　　　Case No. **2:16-cr-20032-JAR**

**LORENZO BLACK,**
**KARI CARTER,**
**ANTHON AIONO,**
**ALICIA TACKETT,**
**CATHERINE ROWLETTE,**
**DAVID BISHOP,**
　　　　　　　*Defendant.*

---

## REPLY TO GOVERNMENT'S RECOMMENDATION RELATED TO SCOPE OF SPECIAL MASTER (D.E. 120) AND GOVERNMENT'S RESPONSE TO MOTION TO IMPOUND EVIDENCE (D.E. 121)

---

Our reply proceeds in four parts. First, we review the state of the evidence. Second, we respond to the government's effort to enfeeble the Special Master's authority. Third, we reply to the government's defense of its decision to gather and disseminate recorded attorney-client phone calls. Fourth, we discuss other requested relief.

### 1.  The state of the evidence.

Much has transpired in a short time. The defense takes this opportunity to explain the relevance and interplay of the evidence before the Court, with citations to the record. Additional proposed defense exhibits, which include affidavits from ten defense attorneys, are attached for the Court's reference. The proposed exhibits follow the sequential numbering of the admitted exhibits. The transcript of the August 9, 2016, hearing will be referred to as *Black I Tr.* and the transcript of the August 16, 2016, hearing will be referred to as *Black II Tr.*

Because the defense proposes that the Special Master inquiry extend beyond the government's conduct in this case, we have incorporated relevant record facts from *United States v. Dertinger*, 14-20067-06, *United States v. Huff,* 14-20067-09, and *United States v. Benimon*, 12-20115. The relevance of these pending cases is explained below.

### 1.1  The chronology of events.

*** 

### April 8, 2016

The government executes a search warrant at CCA.[1]

---

[1] Complaint, Doc. 1, *United States v. Black, et al.*, 16-20032 at 25.

**April 12, 2016**

The United States Attorney's Office serves a grand-jury subpoena on CCA for "all video footage" recordings from July of 2014 to April of 2016.[2]

**April 13, 2016**

Criminal Coordinator Assistant United States Attorney Kim Flannigan files a motion for an order to show cause in *United States v. Huff*.[3] The motion claims that the government gave Ms. Huff's attorney discovery documents, covered by a protective order, and that the documents had Bates numbers 011820-011831 and 011836-011852.[4] The motion notes that these documents were found in Ms. Huff's cell when the search warrant was executed at CCA on April 8, 2016.[5] The motion then alleges that Ms. Huff's attorney must have given her the documents.[6]

**April 26, 2016**

Assistant United States Attorney Erin Tomasic contacts the defense attorneys in *United States v. Black* to advise that CCA surveillance footage spans 18 terabytes, and that they will need to provide hard drives if they want their own copies of that footage.[7] AUSA Tomasic also tells the defense

---

[2] Ex. 438.
[3] Case No. 14-20067-CM, D.E. 348, Apr. 4, 2016.
[4] *Id.* at 2.
[5] *Id.* at 3.
[6] *Id.* at 4.
[7] Ex. 447 at 6.

attorneys that the surveillance footage would be available to review in the
United States Attorney's Office.[8]

## May 16, 2016

AUSAs Flannigan and Tomasic appear before Judge Murguia in *United
States v. Huff*.[9] AUSA Tomasic tells the Court that the government knows
that Ms. Huff "has ***met*** with [her attorney] regarding his ineffective
assistance of counsel."[10] AUSA Tomasic goes on to tell the Court what was
discussed at this meeting between Ms. Huff and her attorney: "She claims
specifically that he failed to notify her of a plea offer made by the government
in a timely manner, and that he then apologized for failing to meet [a
deadline] . . .  Miss Huff then stated that [her attorney] hated the
government just as much as her, so she wanted to keep him."[11] Ms. Huff is
detained at CCA.

## May 17, 2016

CCA turns over its surveillance footage from its Leavenworth facility to
the government.[12]

---

[8] *Id.*

[9] Transcript of Hearing, Case No. 14-20067-CM, May 16, 2016, attached as
Proposed Defense Ex. 450 at 1.

[10] *Id.* at 10 (emphasis added).

[11] *Id.* at 10.

[12] *Id.* at 5; Letter, D.E. 124, *United States v. Black*.

**June 10, 2016**

The USAO prepares an index of the video cameras from which CCA video footage was recorded.[13] The index lists "Low Custody Attorney," "Attorney Room", "Attorney Room 4", "Attorney Room 5", "Attorney Room 6", "Attorney Room 7", "Attorney Room 8", and "Attorney Room 9."[14]

**July 21, 2016**

During a discovery hearing in *United States v. Black,* the Court asks the government whether there are cameras in the attorney-client rooms at CCA. AUSA Tomasic replies: "Yes, except that there is no — there are no audio in attorney/client unless someone at CCA, an employee, took it upon themselves to turn on the audio. But I don't believe it's recorded. It's just that *it would allow a particular CCA employee to listen in* without recording if — if the employee believes something was afoot that he needed to be aware of." AUSA Tomasic does not specify whether the cameras capture video.[15] AUSA Tomasic later identifies the source of this information as a "cooperating inmate" housed at CCA and his attorney.[16]  She does not identify the inmate or the date that the USAO received this information.

---

[13] Ex. 447 at 5.
[14] Ex. 439, 440.
[15] Gov't Rec. at 7-8, D.E. 120 at 7-8 (emphasis added).
[16] *Id.* at 8.

At that same hearing, AUSA Tomasic addresses the index of the video recordings. She explains that "**[w]e were not provided an index from CCA** and the U.S. Attorney's Office worked with the marshals service and CCA and created an index, which is available to defense counsel and I believe is being provided apart from the surveillance footage to defense counsel. So we — we actually created the index for defense counsel . . ."[17] In contrast, the government told the Court that "actually **the index itself was provided by CCA.**"[18]

### June 29, 2016

In an email to counsel, AUSA Tomasic relates that "our office is in the process of distributing CCA calls for approximately 50 inmates."[19]

### July 25, 2016

The government gives defense counsel in *Black* the camera index it created on June 10, 2016.[20]

---

[17] Ex. 447 at 5.

[18] *Black I Tr.* at 113, attached as Proposed Defense Exhibit 462; *see also* Ex. 446 ("We coordinated with CCA to provide a chart showing what is depicted on each camera angle (i.e., which pod, hall-way, etc.).")

[19] Ex. 446 at 2 ("On the 1 TB drives you each provided, our office is in the process of distributing CCA calls for approximately 50 inmates.")

[20] Ex. 446 at 1.

**August 1, 2016**

AUSA Flannigan sends an email to defense attorney Jacquelyn Rokusek, with a copy to AUSA Tomasic, asking to meet with Ms. Rokusek. The email is sent to an incorrect email address and Ms. Rokusek never receives it.[21]

**August 2, 2016**

AUSA Tomasic calls Ms. Rokusek and tells her that AUSA Tomasic and AUSA Flannigan have been trying to reach Ms. Rokusek.[22] AUSA Tomasic tells Ms. Rokusek that she needs to meet with AUSA Tomasic and AUSA Flanigan immediately at the United States Attorney's Office, but refuses to divulge the reason for the meeting over the phone.[23]

Later that afternoon, Ms. Rokusek meets with AUSA Tomasic and AUSA Flannigan at the USAO.[24] The two inform Ms. Rokusek that the meeting's purpose is to convince her to withdraw from a case because the USAO contends that Ms. Rokusek has a conflict.[25] Specifically, a cooperating

---

[21] *Black I Tr*. at 42..

[22] *Black I Tr*. at 32.

[23] *Id*. at 33.

[24] *Id*. at 33.

[25] *Id*. This was the third time the government had asserted a conflict of interest against Ms. Rokusek. It previously raised an issue arising from the employment of her husband during a hearing on Feb. 9, 2016 (D.E. 283), and another claim of conflict was raised at the hearing on a motion to quash on Feb. 17, 2016 (D.E. 288).

witnesses has informed the USAO that Ms. Rokusek passed a protected proffer statement to a client during a meeting at CCA and that Ms. Rokusek's client had shared that information with other people at CCA.[26] They tell Ms. Rokusek that they intend to pursue an obstruction charge against her client, which would cause Ms. Rokusek to have a conflict necessitating her withdrawal.[27] AUSA Tomasic and AUSA Flannigan direct Ms. Rokusek to contact the Kansas Disciplinary Administrator, and give her a one-week deadline to voluntarily withdraw.[28]

As the meeting wraps up, AUSA Flannigan tells Ms. Rokusek that a law enforcement officer is reviewing the video recordings of meetings between attorneys and clients at CCA.[29] The purpose of this review, AUSA Flannigan explains, is to determine whether Ms. Rokusek had given a specific document to her client when meeting with him at CCA.[30]

---

Transcripts of these hearings have not been prepared but the Movant can request transcripts, if it would be helpful to the Court in determining this matter.

[26] *Id.* at 34.

[27] *Id.* at 34.

[28] *Id.*

[29] *Id.* at 35.

[30] *Id.*

### August 3, 2016

Ms. Rokusek sends an email to AUSA Flannigan and AUSA Tomasic.[31] Ms. Rokusek writes: "You mentioned that you were reviewing video of my visits with [my client] at CCA. I would like an opportunity to review the same video footage before making a final decision [on whether to withdraw]."[32] AUSA Tomasic responds, telling Ms. Rokusek that the video is available for her to review at the United States Attorney's Office whenever she wants.[33] AUSA Flannigan also responds, urging Ms. Rokusek to view the video soon.[34]

The Federal Public Defender's Office sends a written inquiry to Debra Barnett, the USAO Criminal Chief, advising that the Defender's office has learned that CCA records attorney-client meetings and that the Defender's office will file motions seeking appropriate relief.[35]

---

[31] Ex. 441.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] Ex. 453.

**August 4, 2016**

USAO Criminal Chief Debra Barnett responds to the Defender's request by passing along an answer from the District of Kansas U.S. Marshal Service, which it had obtained from CCA: "There is no recording function associated with th[ese] camera[s] . . . To be more clear, there is no way to record visual (sic) or audio with th[ese] camera[s]."[36]

Ms. Barnett also sends an email to other prosecutors in the office: "[I]nformation is being circulated amongst the bar that CCA is recording privileged meetings between defendants and attorneys. I was asked about this earlier today, and made contact with the U.S. Marshals, who contacted CCA's new warden, who provided the following information . . . There is no recording function associated with the camera [in the CCA attorney-client visitation room] . . . To be more clear, there is no way to record visual or audio with this camera . . . ."[37]

There is no evidence in the record that either AUSA Tomasic or AUSA Flannigan ever responded to correct the information in this email.

---

[36] Ex. 443.

[37] *Id.*

10

Ms. Rokusek asks to view the video recordings of her attorney-client meetings but is told by AUSA Tomasic that the IT person who can set up the viewing is unavailable.[38]

That evening, the United States Marshal for the Western District of Missouri, which also houses pretrial detainees at CCA, sends an email to the WDMo Defender's office confirming that CCA *does* record meetings in its attorney-client visitation rooms, directly contradicting the information provided by the Kansas USAO, the Kansas Marshal, and CCA.[39] That email is then forwarded to the Defender in Kansas.[40]

### August 5, 2016

At about **1:30 p.m.:** in *United States v. Wright*, an Assistant United States Attorney unassociated with the *Black* case relies on Ms. Barnett's August 4 email to tell Magistrate Judge James that CCA does not record meetings in its attorney-client visitation rooms.[41]

At about **2:15 p.m.:** Ms. Rokusek arrives at the USAO to review CCA's recordings of her meetings with her client. Her review lasts roughly 45 minutes.[42]

---

[38] *Black I Tr.*at 37.

[39] Ex. 444.

[40] *Id.*

[41] Proposed Defense Exhibit 454, at 6-7 (excerpts of hearing transcript).

[42] *Black I Tr.* at 37.

At **2:57 p.m.**: While Ms. Rokusek is still watching video of her attorney-client meetings in the KCK USAO, AUSA Tomasic sends an email to the Court and defense counsel in *Black*. "[D]efense counsel has expressed concerns that the government may be in possession of video footage of attorney/client interactions at CCA, and that footage may contain privileged communications."[43] AUSA Tomasic repeats the information received from CCA's warden: "There is no recording function associated with the camera [in the CCA attorney-client visitation room] . . . To be more clear, there is no way to record visual or audio with this camera . . . ."[44]

Regarding the footage that the United States Attorney's Office already possessed, AUSA Tomasic represents to the Court: "[T]he government *is not certain* at this point whether any footage turned over by CCA . . . contains footage of attorney/client rooms . . ."[45]

AUSA Tomasic tells the Court that defense counsel's concerns were with "CCA's *former* surveillance system, which was in place prior to the new Warden's tenure, may have captured video and/or audio recordings in attorney/client rooms."[46]

---

[43] Ex. 445.

[44] *Id.*

[45] *Id.* at 3 (emphasis added).

[46] *Id.*

At **3:43 p.m.:** the defense receives an email from DUSM Craig Beam, who reports that he spoke directly with the Warden of CCA, Linda Thomas, and "[s]he advised me that the video from the camera in the attorney/inmate visitation rooms is not recorded, nor do they have audio capability."[47]

### August 9, 2016

The Court holds an emergency hearing. The United States Attorney's Office confesses that it has recordings of attorney-client meetings from CCA and turns them over to the Court.[48]

### August 15, 2016

The Federal Defender files a motion to impound recorded phone calls between detainees at CCA and their attorneys. The motion alleges that the government seized the recorded phone calls of approximately 50 detainees, and that the seized calls included communications between attorneys and their clients.[49]

### August 16, 2016

The USAO informs the Court that CCA continued to video record attorney-client meetings from May 2016 until the Court's order took effect on

---

[47] Proposed Defense Exhibit 458, attached.
[48] *Black I Tr.* at 26.
[49] D.E. 105 at 2.

August 9, 2016,[50] affirming that the video recording was not just a function of "CCA's *former* surveillance system."[51]

Michael Jackson, counsel for Cathy Rowlette, informs the Court that his partial review of the *Black* discovery provided by the government has disclosed 74 recorded phone calls between detainees at CCA and their counsel.[52] Some of these phone calls, such as Ms. Rokusek's 2013 phone calls with a client in a Topeka capital case, have no apparent connections to the investigation in this case.[53]

### August 18, 2016

In an email to the Court, Assistant United States Attorney Christopher Oakley discloses that the recorded phone calls, which included attorney-client calls, were distributed to John Jenab, David J. Guastello, Cynthia M. Dodge, Jason P. Hoffman, Michael M. Jackson, the Kansas Bureau of Investigation, the United States Secret Service, the United States Marshals Service, and the Internal Revenue Service.[54]

---

[50] *Black II Tr.* at 26, attached as Proposed Defense Exhibit 463.

[51] Id. at 11-12.

[52] *Id*. 18-19.

[53] Ex. 449.

[54] Attached Proposed Defense Exhibit 455.

**August 22, 2016**

AUSA Tomasic appears before Judge Murguia in *United States v. Huff*. Ms. Huff asks for confidential visitation and return of property.[55] AUSA Tomasic tells Judge Murguia: "The government *was uncertain* up until Jackie Rokusek came in to view inside the U.S. Attorney's Office whether we even had video recordings of attorney/client meetings . . ."[56] Though Ms. Huff never asked for the motion to be transferred to this Court, AUSA Tomasic tells Judge Murguia that United States Attorney's Office "would like this court to hear that matter, as the Black discovery was distributed to Ms. Huff in this case. It does seem as though a number of defendants are attempting to engage in forum shopping and have Judge Robinson hear all of these motions . . . [so] this Court should hear those motions, not Judge Robinson."[57]

AUSA Flannigan appears before Judge Vratil in *United States v. Benimon*.[58] She tells the court that "[w]hen we became aware that those attorney-client visiting rooms recordings existed, we were already in the process of discussing who would be our taint agent to review them to determine if there was any attorney-client confidentialities or any attorney-

---

[55] Case No. 14-20067-09, D.E. 397.

[56] Attached Transcript of Hearing, *United States v. Huff*, 4:15-5:25, Case No. 14-20067-CM (Aug. 22, 2016), Proposed Defense Exhibit 456 at 4.

[57] *Id.* at 5.

[58] Case No. 12-20115.

client privilege that was implicated."[59] She further states that the United States Attorney's Office "quarantined those videos as soon as we knew we had them . . . nobody looked at them . . ."[60]

## August 23, 2016

In an email to the Court, AUSA Tomasic discloses that the recorded phone calls, which included attorney-client calls, were also disclosed to the United States Probation Office and the Johnson County Sheriff's Office.[61]

### 1.2  The undisputed evidence.

This much is undisputed:

☐ CCA video recorded attorney-client meetings.

☐ CCA audio recorded some attorney-client phone calls.

☐ The USAO issued a grand jury subpoena requesting 22 months of "all video footage" maintained by CCA.

☐ CCA provided approximately four-months of video recordings to the USAO that included attorney-client meetings.

☐ CCA provided audio recordings to the USAO that included attorney-client phone calls, dating back as far as 2011.

☐ The USAO, through Criminal Coordinating Attorney Kim Flannigan and AUSA Erin Tomasic, informed defense attorney Jacquelyn

---

[59] Transcript of Hearing, *United States v. Benimon*, 4:04-09, Case No. 12-20115 (Aug. 22, 2016), attached as Proposed Defense Exhibit 457 at 4.
[60] *Id.* at 21-22.
[61] Attached, Proposed Defense Exhibit 452.

Rokusek that they had video recordings of her meeting with her client at CCA.

☐ AUSA Flannigan and AUSA Tomasic told Ms. Rokusek that their agent intended to watch those recordings, and had already seen video of her walking down a hallway of CCA.

☐ As of June 10, 2016, the USAO had an index of the video recordings that included seven entries entitled "Low Custody Attorney," "Attorney Room," "Attorney Room 4, 5, 6, 7, 8, 9."

☐ The USAO was preparing to disseminate the video recordings of attorney-client meeting to other attorneys as part of discovery in this and related cases.

☐ The USAO disseminated the audio recordings of attorney-client phone calls to law enforcement, defense attorneys, and the United States Probation Office.

### 1.3  Summary of the government's defenses.

The government's defenses are few and frail. First, glaringly absent from the government's responses is any attempt to explain the exchanges between Criminal Coordinator Kim Flannigan and AUSA Erin Tomasic and defense attorney Jacquelyn Rokusek between August 2 and August 5, 2016. The evidence stands undisputed: the prosecution tried to separate two defendants from their attorney using the existence, and the predicted content, of the video recordings that were in the USAO possession and in the

process of review.[62] This was a violation of the Sixth Amendment of the most invasive sort. This inaugurating episode remains unanswered at either hearing, in the government's pleadings, or by any remedial act.

Second, the government relies heavily on an unsworn assertion that no one in the USAO or its agents watched the video recordings during the three months that the government possessed them,[63] as if this somehow vindicates them.[64] But, assuming *arguendo* this is true, the USAO still used the existence of the recordings to attempt to separate two defendants from their attorney. Moreover, the government was preparing to disseminate the attorney-client video recordings to other defendants and their counsel to view. And the government's claimed disinterest is belied by its dogged effort to regain access: the videos *could* include unprotected communications, says the USAO, and the only function of a Special Master should be to parse the protected from the non-protected.[65]

Third, the government claims inadvertent possession. But its subsequent acts contradict this position, as explained by the testimony of

---

[62] See *Black I Tr.* at 33-40 (testimony of Ms. Rokusek); Ex. 441.
[63] D.E. at 120 at 3-4.
[64] "Viewing" the video is also a rather narrow disclaimer. One can know the content of the video without actually watching it, as the common practice is for law enforcement agents to prepare narrative reports on the key portions.
[65] *Black II* Tr. at 32-33.

Richard Ney and Professor Peter Joy and by ABA Rules of Professional Conduct 4.4.[66] The government notified neither the Court nor the parties, nor did it take any corrective action.

Fourth, the government asserts, *post hoc*, that as soon as it knew the recordings existed, on August 5, 2016, it summoned a "taint team."[67] That defies credibility and ignores the evidence, as the USAO knew of the video recordings as early as June 10, 2016; prepared to disseminate the recordings to others as early as July, 21, 2016; and explicitly threatened to use the recordings against Ms. Rokusek on August 2, 2016. And an internal "taint team" is just another violation of attorney-client confidentiality, serving little purpose in the law; instead, the law calls for review by a Special Master.

Fifth, the government now claims the recorded attorney-client phone calls were fair game, as it unilaterally and secretly determined that CCA chameleon-like policies served as an all-encompassing waiver of the Sixth Amendment, confidentiality, privacy, and privilege. Had the government

---

[66] Rule 4.4 Respect For Rights Of Third Persons: "(a) In representing a client, a lawyer shall not . . . . use methods of obtaining evidence that violate the legal rights of such a person. (b) A lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender."

[67] Proposed Defense Exhibit 457 at 4.

timely notified the affected parties and deferred to the Court, it would have

lost. It loses now, but with much more substantial consequences.

**2.    The Special Master should be invested with meaningful authority to assess the extent of the Sixth Amendment violations resulting from the government's possession of video recordings of attorney-client meetings.**

The government's almost singular response to the video recordings is this: "[t]he most important fact for the Court and the Special Master to consider is the simple fact that no employee of the United States Attorney's Office or law enforcement officer has viewed any recording of attorney-client meetings provided by CCA."[68] Except this unsworn assertion is not a "fact" for the Court to consider. Facts are developed from the presentation of evidence. The government has presented none. Statements in pleadings are not evidence. Secondarily, the government relies on the establishment of a "taint team," hoping to instill confidence in the Court that privileged material was handled appropriately. As we shall see, the "taint team" procedure only aggravates the problem.

**2.1    The government failed to provide the Court a factual basis to refute the defense evidence.**

The government fails to offer *evidence* in support of its narrow proposal concerning the authority of the Special Master. In contrast, the defense has given the Court sworn testimony, subject to cross-examination; subpoenaed witnesses and documents; and admitted exhibits, both photographic and

---

[68] D.E. 120 at 3.

documentary. And with this reply are sworn affidavits from defense

attorneys. There is no comparing the relative evidentiary value —

government representations are not evidence.[69]

The Tenth Circuit explained this in *Shillinger v. Haworth* — a case

that applies in a number of different ways to this one.[70] The *Shillinger* court

criticized the state court for using the same procedure that the government

urges here. "It is also evident from the record that the prosecutor's

statements are the only evidence that the Wyoming Supreme Court relied

upon in determining the extent of the prosecution's intrusion."[71] The court

---

[69] *United States v. Kelly*, 790 F.2d 130, 135 (D.C. Cir. 1986) (reversing district court
for denying motion for new trial based on government's "unsworn" representations;
defendant had supported new-trial request with sworn affidavits; district court
abused discretion by relying on government's unsworn declarations over defendant's
sworn evidence); *Johnson v. Colt Industries Operating Corp.*, 609 F.Supp. 776, 783
(D. Kan. 1985); *In re Lang*, 293 B.R. 501, 513 (10th Cir. B.A.P. 2013) ("Counsel's
statements in a brief or during a trial are not evidence."); *Project Release v. Prevost*,
722 F.2d 960, 969 (2d Cir. 1983) ("Conclusory allegations in legal memoranda are
not evidence, and cannot by themselves create a genuine issue of material fact
where none would otherwise exist."); *Exeter Bankcorporation, Inc. v. Kemper
Securities Group, Inc.*, 58 F.3d 1306, 1312 n.5 (8th Cir. 1995) ("Statements of
counsel are not evidence and do not create issues of fact."); *British Airways Bd. v.
Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("[L]egal memoranda and oral
argument are not evidence, and they cannot by themselves create a factual dispute
sufficient to defeat a summary judgment motion where no dispute otherwise
exists.") *United States v. Lombardo*, 2007 WL 4358341 at *2 (D. Utah 2007)
("However, these statements, found in the memorandum submitted by Kimberlie
Lombardo's counsel, are not evidence") (unpublished).
[70] 70 F.3d 1132 (10th Cir. 1995).
[71] *Id.* at 1137.

went on to explain the procedures that should have been used by detailing

the things the court had not done:

> (1) the court "never held a hearing beyond these in-chambers
> conferences";
>
> (2) the deputy was never asked to testify or to otherwise make a
> statement regarding the matter; and,
>
> (3) no other fact-finding procedure was employed beyond adopting the
> assertions made by the prosecutor — most of them arguably
> hearsay — at a conference in which he was not subject to the
> penalties of perjury."[72]

The *Shillinger* court tallied these failures to conclude that the district court's

fact-finding procedure "was not adequate to afford a full and fair hearing."[73]

The court took pains to "again emphasize that no sworn testimony was ever

taken, and most of what was relied upon . . . was hearsay. The procedures . . .

completely denied any opportunity to challenge or impeach the prosecutor's

assertions or those he attributed to the deputy."[74]

The Tenth Circuit's procedure in *United States v. Singleton*[75] tracks the

defense recommendations here. Faced with an allegation that the

government had come to possess privileged materials, the district court used

a "magistrate judge acting as a special master" to review the evidence and

---

[72] *Id.*

[73] *Id.* at 1138 (citing 28 U.S.C. § 2254(d)(2)).

[74] *Id.* (quotation and citation omitted).

[75] 52 Fed. Appx. 456, 459-60 (10th Cir. 2002) (unpublished).

"conduct[] an evidentiary hearing . . . "[76] The Tenth Circuit found that the district court provided the appropriate procedures through a special master.[77]

The contours of the condemnation in *Shillinger* and of the approval in *Singleton* give this Court a roadmap. By examining what the Tenth Circuit said should have occurred there, we can discover what should occur here. That includes a fact-finding procedure that grants authority to take sworn testimony, to access information (including impeaching information), to adhere to the rule against hearsay, and to exercise any other power needed to conduct a judicial inquiry.

The government's recommendation does not include these procedures, but rather invites a fact-finding procedure that is inadequate under Circuit law. The defense recommendation, on the other hand, requires testimony to be given to the Special Master under oath and provides the Special Master with both compulsory process and enforcement authority. As needed, the Special Master can compel statements from USAO employees, defense attorneys, interpreters, U.S. Marshals, and U.S. Probation officers if any have relevant information regarding the government's knowledge, possession, and dissemination of protected material.

---

[76] *Id.*

[77] *Id.* at 460.

24

And a Special Master with broad authority is called for because of the government's conduct in this case. It refused to present evidence at either evidentiary hearing before this Court; it has not requested another evidentiary hearing; it has provided no documentary evidence or affidavits; and its conduct and statements in other cases, such as *United States v. Huff*, at least suggests the possibility that similar violations have occurred outside of this case. The government has not taken any opportunity to provide this Court with evidence that would resolve the pending issues. In fact, the government has only created more confusion.

### 2.2   The government's fallback position—that the internal taint team will assuage concerns about the protected material— compounds the violations.

The government tries to inoculate its behavior by relying on the establishment of a "taint team." But "[f]ederal courts have taken a skeptical view of the Government's use of 'taint teams' as an appropriate method for determining whether seized or subpoenaed records are protected by the attorney-client privilege."[78] As the Sixth Circuit explained,

> taint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors. That is to say, the government taint team may also have an interest in preserving the privilege, but it also possesses a conflicting interest in pursuing the investigation, and, human nature being what it is,

---

[78] *United States v. SDI Future Health, Inc.*, 464 F.Supp.2d 1027, 1037 (D. Nev. 2006).

occasionally some taint team attorneys will make mistakes or violate their ethical obligations. It is thus logical to suppose that taint teams pose a serious risk to holders of the privilege, and this supposition is supported by past experience.[79]

The government's establishment of a taint team aggravates rather than mitigates its violation of the privilege. "While the parties dispute whether

---

[79] *In re Grand Jury Subpoenas 04–124–03 and 04–124–05*, 454 F.3d 511, 523 (6th Cir. 2006); *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D. N.Y. 1994) ("Resisting, as we do with great difficulty, the temptation to plagiarize, and take for our own the racist wisecrack about the Chinese Wall, and its inevitable apertures, found in *United States v. Sapere*, 531 F.2d 63, 66 (2d Cir.1976), this Court notes that reliance on the implementation of a Chinese Wall, especially in the context of a criminal prosecution, is highly questionable, and should be discouraged. The appearance of Justice must be served, as well as the interests of Justice. It is a great leap of faith to expect that members of the general public would believe any such Chinese wall would be impenetrable; this notwithstanding our own trust in the honor of an AUSA. Furthermore, in a case such as this the Chinese Wall attorney to perform the search required the physical assistance of agents, laborers, truckmen and others not bound by the ethical considerations which affect a lawyer. Those on the Mongol side of the Wall may well access the same information from other sources, and have difficulty convincing a defendant or the public that the information did not pass over or through the Wall."); *In re the Seizure of All Funds on Deposit in Accounts in the Names of National Electronics, Inc., at JP Morgan Chase Bank*, 2005 WL 2174052 at *3 (S.D. N.Y. 2005) ("This Court agrees that reliance on review by a 'wall' Assistant in the context of a criminal prosecution should be avoided when possible. Therefore, if the volume of the documents precludes review by this Court, the Court will appoint a special master to review the documents seized to determine if they are subject to any relevant privilege.") (unpublished); *United States v. Abbell*, 914 F.Supp. 519 (S.D. Fla. 1995) (rejecting taint team procedure in favor of special master). Even courts approving the use of a taint team have indicated that use of a special master would be a superior approach. *United States v. Hunter*, 13 F.Supp.2d 574, 583 n.2 (D. Vt. 1998) ("It may be preferable for the screening of potentially privileged records to be left not to a prosecutor behind a 'Chinese Wall,' but to a special master or the magistrate judge.").

courts have sanctioned the Department of Justice's 'taint team' procedures, it is clear that the government's affirmative decision to invoke these procedures constitutes a per se intentional intrusion" on the right to counsel.[80] When "the government chooses to take matters into its own hands rather than using the more traditional alternatives of submitting disputed documents under seal for in camera review by a neutral and detached magistrate or by court-appointed special masters, it bears the burden to rebut the presumption that tainted material was provided to the prosecution team."[81] No such showing has been attempted here. The government, by establishing a taint team, has intentionally intruded on the attorney-client privilege.

---

[80] *United States v. Neill*, 952 F.Supp. 834, 840-1 (D.C. 1997).

[81] *Id*. at 841 (internal citations omitted); *Briggs v. Goodwin*, 698 F.2d 486, 495 (D.C. Cir. 1983) ("[O]nce the investigatory arm of the government has obtained information, that information may reasonably be assumed to have been passed on to other governmental organs responsible for prosecution. Such a presumption merely reflects the normal high level of formal and informal cooperation which exists between the two arms of the executive."), *vacated on other grounds on reh.*, 712 F.2d 1444 (1983).

### 3.    The Special Master should be invested with meaningful authority to assess the extent of the Sixth Amendment violation resulting from the government's possession of audio recordings of attorney-client telephone calls.

The bottom line is this: the USAO determined, unilaterally and without notice to the affected parties, decided that defendants had waived their rights to confidential and privileged phone communications with their attorneys. This was wrong, both procedurally and substantively.

Without seeking judicial approval, the government seized recorded telephone conversations of at least 50 pretrial detainees. As the evidence demonstrates, an as-yet unknown number of these recorded phone calls were between detainees and their attorneys. The government then distributed those attorney-client conversations to at least six defense counsel, the Kansas Bureau of Investigation, the United States Secret Service, the United States Marshals Service, the United States Probation Office, the Johnson County Sheriff's Office, and the Internal Revenue Service. The government unapologetically admits the recording and disclosure of attorney-client phone conversations, but claims that the fact the calls were recorded waives the attorney-client privilege.

The government has claimed that defendants were informed of the policies to ensure their communications were protected. But other than counting on their attorneys, there appears to be no action a client can take to

protect phone calls on their end. Even in a case where a defendant has an

opportunity to protect calls – but fails to understand the system – that alone

is not sufficient for a waiver of privilege. Such responsibility does not fall on

the inmate; rather, "it was the responsibility of prison officials to clearly and

explicitly explain what that phrase did not say and what more was

required."[82] A defendant must be "fully and unequivocally advised of the

procedures which have been laid out."[83] Here, CCA tells defendants that their

attorneys will take care of it, and gives them no option other than to rely on

their attorneys.

The government's action violated the Sixth Amendment. "An

independent judiciary and a sacrosanct confidential relationship between

lawyer and client are the bastions of an ordered liberty."[84] To provide

effective assistance, "a lawyer must be able to communicate freely without

fear that his or her advice and legal strategy will be seized and used against

the client in a criminal proceeding."[85]

---

[82] *United States v. Noriega*, 764 F.Supp. 1480, 1487 (S.D. Fl. 1991), *aff'd United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997).

[83] *Id.*

[84] Edna Selan Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine* 2 (3d ed. 1997).

[85] *United States v. SDI Future Health, Inc.*, 464 F.Supp.2d 1027, 1039 (D. Nev. 2006); *see also United States v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978); *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973). Communications within the scope of the attorney-client privilege are "zealously protected." 8 C. Wright & A. Miller,

Incarcerated defendants retain the attorney-client privilege,[86] which only the client can waive.[87] The "monitoring of [a defendant's] calls to his attorney presents a significant Sixth Amendment issue."[88] When the government seizes potential evidence "based on confidential communications between the defendant and his attorney it also impinges on the Sixth Amendment right to counsel."[89]

To establish waiver of a constitutional right, the government "has the weighty obligation to show that the waiver was knowingly and intelligently made."[90] And even if the government had a good-faith basis to allege waiver, the proper process was to notify the parties and ask the Court to determine whether the detainees had waived their right to confidential and privileged

---

*Federal Practice and Procedure* § 2017 (1970); *Chore-Time Equipment, Inc. v. Big Dutchman, Inc.*, 255 F.Supp. 1020, 1021 (W.D. Mich. 1966) ("[I]t generally is acknowledged that the attorney-client privilege is so sacred and so compellingly important that the courts must, within their limits, guard it jealously."); *In re Grand Jury Subpoena Duces Tecum*, 391 F.Supp. 1029, 1034 (S.D. N.Y. 1975).
[86] *United States v. DeFonte*, 441 F.3d 92, 94 (2d Cir. 2006).
[87] *Martin Marietta Materials, Inc. v. Bedford Reinforced Plastics, Inc.*, 227 F.R.D. 382, 390 (W.D. Pa. 2005) ("Generally, 'the attorney-client privilege belongs to the client.'") (listing authorities); *Kevlik v. Goldstein*, 724 F.2d 844, 849 (1st Cir. 1984) ("The guiding principle in determining whether or not there exists a privileged attorney-client relationship is the intent of the client. The key question in determining the existence of a privileged communication is whether the client reasonably understood the conference to be confidential.").
[88] *United States v. Novak*, 531 F.3d 99, 102 (1st Cir. 2008) (O'Conner, J., by designation).
[89] *Bishop v. Rose*, 701 F.2d 1150, 1157 (6th Cir. 1983).
[90] *Brewer v. Williams*, 430 U.S. 387, 403 (1977).

communication.[91] Instead, the government just seized the recordings, without notice to counsel, and without the Court's approval.

### 3.1 Defense counsel reasonably believed phone calls with their clients were not monitored or recorded

The government theorizes that the detainees waived their attorney-client privilege by speaking to their counsel on recorded phone lines. In an apparent *post-hoc* rationalization, the government hypothesizes a world in which CCA consistently and openly communicated its recording policies and practices to both the detainee and the attorney, and the detainee understood and knew that her phone calls with her attorney were recorded and available to the prosecution.

---

[91] *See, e.g.*, *United States v. Salyer*, 2011 WL 677886 (E.D. Cal. 2011) (government petition for court determination of waiver and permission to examine recordings of attorney-client phone calls) (unpublished); KRPC 4.4(b) ("A lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender."); KRPC 1.6 n.5 ("The principle of confidentiality is given effect in two related bodies of law, the attorney-client privilege (which includes the work product doctrine) in the law of evidence and the rule of confidentiality established in professional ethics. The attorney-client privilege applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client. The rule of client-lawyer confidentiality applies in all situations other than those where evidence is sought from the lawyer through compulsion of law. The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source.")

31

This is not reality. Defense attorneys expected, and reasonably so, that their phone calls with clients at CCA were privileged.[92] Included with this pleading are a number of affidavits and declarations from experienced criminal-defense practitioners who represent clients detained at CCA.[93] These affidavits establish that there was no consistent practice by CCA in handling attorney-client phone calls. Most defense attorneys were unaware that CCA was monitoring or recording their phone calls. Most had never heard of a registry of phone numbers that would block recording of telephone calls. Not one of them has ever had a client ask whether their attorney was included on a no-record registry. Only one attorney has received discovery containing phone calls between attorneys and their clients. Several have never heard a recording indicating that a phone call with a client could be monitored or recorded. And several more affirmatively advised their clients that phone calls with their counsel are not monitored or recorded — advice upon which their clients had a right to rely.[94]

---

[92] *Black I Tr.* at 68 and 72.

[93] Proposed Defense Exhibit 459 (Affidavits and Declarations of CJA panel attorneys Christopher Joseph, Kathleen Ambrosio, Robert Calbi, Cynthia Dodge, John Jenab, Deb Vermillion, Michael Jackson, Jackie Rokusek, Tom Haney, Robin Fowler, Thomas Johnson, and Melanie Morgan.)

[94] KPRC 1.6 n.3: "Almost without exception, clients come to lawyers in order to determine what their rights are and what is, in the maze of laws and regulations, deemed to be legal and correct. The common law recognizes that the client's

Counsel could also reasonably rely on 18 U.S.C. § 3142(i)(3) for the expectation that their client communications would be confidential. That statute provides that when a detention order is issued, the judge shall "direct that the person be afforded reasonable opportunity for private consultation with counsel."

These counsel had every reason to believe that the attorney-client communications were confidential. Yet the government perseveres with the waiver defense despite the facts that the most affected defense attorneys:

- were unaware that their conversations were being recorded,

- had no idea that CCA required them to subscribe to a registry to prevent recording,

- had never been asked by a client whether they had subscribed to a registry,

- had, in many cases, never heard a recording indicating that their conversations with clients were being recorded, and

- had never received attorney-client phone calls in discovery.

Given these facts, defense attorneys reasonably concluded that their attorney-client conversations were *not* recorded.

Finally, the attached affidavits and declarations demonstrate that a number of defense attorneys advised their clients that — despite the warning

---

confidences must be protected from disclosure. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld."

33

that phone calls may be recorded — the government would never do such a thing when the call was between an attorney and a client. That trust in the government may have been misplaced, but it was certainly not unreasonable. After all, they were dealing with a correctional institution that guarantees detainees "confidential contact with their attorneys"[95] and promises that "[w]e do not record inmate/attorney telephone conversations at Leavenworth or any other CCA facility."[96]

### 3.2    Since the 2008 amendment to Federal Rule of Evidence 502(b), inadvertent disclosure of privileged information does not waive the attorney-client privilege.

The question for this Court "is whether the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence."[97]  Relying on defunct authority, the government asks this Court to hold that it was unreasonable for highly experienced defense counsel to believe that telephone conversations with their clients were confidential.

---

[95] http://www.cca.com/protecting-inmate-and-detainee-rights (Last visited August 29, 2016).

[96] Jonathan Burns, CCA Spokesman, http://kcur.org/post/discovery-video-recordings-leavenworth-detention-center-spurs-outrage#stream/0 (Last visited August 29, 2016).

[97] *In re Qwest Communications Inten. Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006); *see also United States v. Lopez*, 777 F.2d 543 (10th Cir. 1985).

This is an important distinction: the government makes no claim that any counsel for any of the detainees specifically intended to waive the attorney-client privilege. The absence of that claim defaults to inadvertent waiver and thus defeats the government's waiver defense. All of the government's authority predates the 2008 amendment to Federal Rule of Evidence 502, which profoundly altered how courts determine privilege-waiver questions. Before the amendment, even an inadvertent disclosure of privileged information operated as a waiver. After the amendment, inadvertent disclosures no longer waive the privilege as long as the disclosing party acts quickly to rectify the disclosure, which defense counsel did here.

Federal Rule of Evidence 502(b) provides:

Inadvertent Disclosure - When made in a Federal proceeding or to a Federal office or agency, the disclosure does not operate as a waiver in a Federal or State proceeding if:

1. the disclosure is inadvertent;

2. the holder of the privilege or protection took reasonable steps to prevent disclosure; and

3. the holder promptly took reasonable steps to rectify the error.

Subsection (b) was amended to address a "conflict over whether an inadvertent disclosure of a communication or information protected as privileged or work product constitutes a waiver."[98] The 2008 amendment

--------

[98] Fed. R. Evid. 502 Explanatory Note (Revised 11/28/2007).

explains that the amendment applies to matters pending on September 19, 2008, "insofar as is just and practicable."[99]

The amended version of Rule 502(b) substantially changed Tenth Circuit law regarding waiver. Before the amendment, the "attorney-client privilege [was] lost if the client disclose[d] the substance of an otherwise privileged communication to a third party. This is true even if the disclosure [was] inadvertent."[100] But after the amendment, "Rule 502 clearly abrogates previous Tenth Circuit law concerning subject matter waivers on disclosed documents otherwise protected by attorney-client privilege and work-product protection."[101] Since the Rule was amended in late 2008, inadvertent disclosures do not waive the privilege as long as: (1) the disclosure was inadvertent, (2), the privilege holder took reasonable steps to prevent disclosure, and (3) the privilege holder took prompt action to rectify the situation.[102]

### 3.2.1 Any disclosures here were inadvertent.

An unintentional disclosure is by definition inadvertent. "[T]he structure of Rule 502 suggests that the analysis under subpart (b)(1) is

---

[99] Act of Sept. 19, 2008, Pub.L. No. 110–322, § 1(c), 122 Stat. 3537, 3538.
[100] *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir. 1990) (internal citations omitted).
[101] *Silverstein v. Federal Bureau of Prisons*, 2009 WL 4949959 at *9 (D. Colo. 2009).
[102] Fed. R. Evid. 502(b).

intended to be much simpler, essentially asking whether the party intended a privileged or work-product protected document to be produced or whether the production was a mistake. To start, the parallel structure of subparts (a)(1) and (b)(1) of Rule 502 contrasts a waiver that is intentional with a disclosure that is inadvertent."[103] The government has presented no evidence to the contrary, precluding any argument that the disclosure was intentional. The worst that can be said of defense counsel is that they made a mistake by trusting CCA's assurances that attorney-client phone calls were confidential. But "[c]oncluding that a lawyer's mistake never qualifies as inadvertent disclosure under Rule 502(b) would gut that rule like a fish."[104] By relying on CCA's public and unqualified representation that attorney-client telephone

---

[103] *Coburn Group LLC v. Whitecap Advisors LLC*, 640 F.Supp.2d 1032, 1038 (N.D. Ill. 2009); *see also Silverstein*, 2009 WL 4949959 at *10 ("First, Rule 502(b) requires that this court determine if the disclosure of the October 2004 Document was inadvertent. The dictionary definition of the word inadvertent is, 'not attentive or observant; heedless; due to oversight; unintentional.' WEBSTER'S NEW WORLD DICTIONARY (3d College ed.1988)."); *Amobi v. District of Columbia Dept. of Corrections*, 262 F.R.D. 45, 53 (D. D.C. 2009) ("This interpretation seems to be in line with one of the goals of the drafting committee: to devise a rule to protect privilege in the face of an innocent mistake. Additionally, defining inadvertent as mistaken comports with the dictionary definition of the word: 'Of persons, their dispositions, etc.: Not properly attentive or observant; inattentive, negligent; heedless . . . . Of actions, etc.: Characterized by want of attention or taking notice; hence, unintentional.'"); *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 388 (7th Cir. 2008) (finding inadvertence when "[t]here is nothing clearly inadequate about the process described").
[104] *Amobi*, 262 F.R.D. at 54.

calls are confidential, at most, the defense bar's disclosure was inadvertent. The government does not contend otherwise.

### 3.2.2  Counsel took reasonable steps to prevent disclosure.

As the attached affidavits and declarations demonstrate, the defense bar was utterly unaware that CCA was recording attorney-client phone calls. The defense bar's reliance on CCA's promise that detainees would have "confidential contact with their attorneys"[105] and guarantee that "[w]e do not record inmate/attorney telephone conversations at Leavenworth or any other CCA facility"[106] seems eminently reasonable.

The decision to take CCA at its word is also reasonable because it conforms to our expectations that pretrial holding facilities respect the attorney-client privilege.[107] This is particularly true, as the affidavits and declarations note, when an attorney assures his or her client that a telephone call from a holding facility is confidential. "[P]eople generally believe conversations with their attorneys will be kept privileged and confidential. It

---

[105] http://www.cca.com/protecting-inmate-and-detainee-rights (Last visited August 29, 2016).

[106] Jonathan Burns, CCA Spokesman, http://kcur.org/post/discovery-video-recordings-leavenworth-detention-center-spurs-outrage#stream/0 (Last visited August 29, 2016).

[107] *See Black I Tr.* at 68-69 (testimony of Richard Ney).

38

is also objectively reasonable for a suspect to rely on his attorney's opinions regarding confidentiality and the attorney-client privilege."[108]

### 3.2.3 The privilege holders took immediate steps to protect their clients' interests.

The "single most important factor under Rule 502(b) is that prompt steps to retrieve the inadvertently produced privileged documents must be taken once discovery of that production has been made."[109] The Federal Defender became convinced of the government's attorney-client privilege violation late in the evening of August 4, 2016. That evening, counsel received a forwarded email from the Western District of Missouri U.S. Marshal that CCA did in fact video record attorney-client meetings.[110] That directly conflicted with the information that CCA, the District of Kansas

---

[108] *Gennusa v. Shoar*, 879 F.Supp.2d 1337, 1347-48 (M.D. Fl. 2012); *see also* Danielle Burkhardt, *Read, White, and Blue: Prosecutors Reading Inmate Emails and the Attorney-Client Privilege*, 48 J. Marshall L. Rev. 1119, 1135 n.123 (2015) ("Most commonly what happens is that a client will call from a phone at the federal detention center or prison and ignore the sign that says telephone calls are monitored. He or she can certainly reasonably believe that the facility has no authority to monitor attorney-client calls. Lawyers often have the same belief. The thought process is either that any recording will be minimized as required under the wiretap statutes or that it is illegal for a guard to eavesdrop on an attorney-client conversation."); *Evans v. Inmate Calling Solutions*, 2011 WL 7470336 at *15 (D. Nev. 2011) ("[I]t is objectively reasonable for confidential communication between an inmate and his attorney to remain private.") (unpublished).
[109] Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 109 (5th Ed. Supp. 2012).
[110] Ex. 444.

USMS, and the USAO had given the defense that same day: that CCA did

not, and could not video record attorney-client meetings at CCA. Once the

defense confirmed the conflicting representations, the present motion under

Federal Rule of Criminal Procedure 41(g) was filed the next day, requesting

an emergency hearing.[111] That prompt action stands as strong evidence that

no waiver of the attorney-client privilege can be found under Rule 502(b).[112]

 Considering a remarkably similar set of facts, the district court in

*United States v. Salyer* rejected the government's claim that the privilege was

---

[111] D.E. 82.

[112] *Smith v. Allstate Ins. Co.*, 912 F.Supp.2d 242, 248 (W.D. Pa. 2012) ("Upon
discovery of the inadvertent disclosures, Allstate immediately brought the issue to
the attention of Plaintiff's counsel by notifying Plaintiff's counsel of the inadvertent
disclosure."); *Heriot v. Byrne*, 257 F.R.D. 645, 658-9 (N.D. Ill. 2009) ("To determine
whether a disclosure was inadvertent, 'this Court has . . . look[ed] to factors such as
the total number of documents reviewed, the procedures used to review the
documents before they were produced, and the actions of producing party after
discovering that the documents had been produced.'"); *J.N. v. South Western School
Dist.*, 55 F.Supp.3d 589, 600-01 (M.D. Pa. 2014) (acting four days after disclosure
weighed in favor of non-waiver); *Preferred Care Partners Holding Corp. v. Humana*,
258 F.R.D. 684, 695 (S.D. Fla. 2009) (acting within ten days of determining privilege
violated was reasonable); *cf. In re Grand Jury*, 138 F.3d 978, 981 (3d Cir. 1998)
("While we cannot set an exact time within which such a motion must be made, we
hold that the district court did not abuse its discretion in holding that Capano
waived the privilege as we are satisfied that Capano acted unreasonably in waiting
nearly four months to seek a judicial vindication of his assertion of the privilege.");
*United States v. de la Jara*, 973 F.2d 746, 749-50 (9th Cir. 1992) (defendant's failure
to act within six months of letter's seizure by government operated to waive
attorney-client privilege); *Apex Mun. Fund. v. N–Group Secs.*, 841 F.Supp. 1423,
1433 (S.D. Tex. 1993) ("Simply put, a one-year delay in taking any action to attempt
to preserve the privilege exemplifies carelessness.").

waived.[113] Before the *Salyer* court was the government's motion to listen to and use recorded calls between a defendant and his attorney.[114] The government there made the same argument it does here: that the attorney-client privilege had been waived because the calls in issue were not made pursuant to the jail's procedure for making attorney client calls. In *Salyer*, there was a sign above the phones that read "Notice–Phones May be Monitored." The jail handbook distributed to inmates warned: "Keep in mind when talking on jail telephones that you have no right of privacy and the jail staff may monitor phone conversations." And a recording on telephone calls to numbers "not registered as attorney numbers" warned that the call was being monitored.[115]

The *Salyer* court rejected the government's argument that these warnings "ended the matter."[116] It began by noting that the "method for insuring that attorneys are familiar with the [phone registration] system is, at best, haphazard."[117] Mr. Salyer's counsel said they were unaware of the jail's phone registration system, and "it is clear from their behavior that Salyer's attorneys were unfamiliar with the jail's method of accommodating

---

[113] 2011 WL 677886 (E.D. Cal. 2011).
[114] *Id.* at *1.
[115] *Id.*
[116] *Id.*
[117] *Id.*

41

the attorney-client privilege."[118] Applying Federal Rule of Evidence 502(b),
the court identified the central question in the case as "whether Salyer
reasonably believed that his communications were made in confidence."[119]

The court held that Rule 502 controlled the outcome of the case.[120]
Concluding that Salyer's attorneys had a reasonable belief that their
communications were confidential, even in the face of audio warnings that
phone calls with their clients were recorded, the court found

> [w]hile the jail had a procedure for protected communications, it
> was not fairly made known, and was not known to the attorneys
> advising Mr. Salyer. Moreover, those attorneys assumed that an
> assertion of the privilege was sufficient to establish its protection
> even in a jail setting. Confidentiality is defined by the client's
> intent. It cannot be doubted that had the parties to the
> conversations known of the government's position of non-
> applicability, they would not have engaged in them. Given the
> totality of circumstances, the court concludes that the parties had
> the requisite intent, and under the circumstances, such intent
> was not unreasonable.[121]

---

[118] *Id.* at *2.

[119] *Id.*

[120] *Id.*

[121] *Id* at *3. *See also United States v. Noriega*, 764 F.Supp. 1480, 1487 (S.D. Fl.
1991), *aff'd* 117 F.3d 1206 (11th Cir. 1997) (rejecting waiver claim on grounds that
"it was the responsibility of prison officials to clearly and explicitly explain what
that phrase ['a properly placed phone call to an attorney is not monitored'] did not
say and what more was required" to make unmonitored phone call with attorney).

Finally, the court deemed an assertion of the privilege within a month of discovering that the government had recorded attorney-client phone calls a sufficiently prompt assertion to trigger Rule 502(b)'s protection.[122] The court concluded that "[i]f the government cannot succeed without invading the attorney client privilege, it should not proceed. If, as appears likely, no significant damage will accrue to the government by denying its motion, it ought to get on with it."[123]

### 3.3    The government's authority is inapposite.

The government unhelpfully cites a number of authorities that do not address calls between detainees and their attorneys, but between detainees and members of the public.[124] In "the prison setting, attorney-client communications generally are distinguished from other kinds of communications and exempted from routine monitoring."[125] While phone calls between detainees and members of the public usually lack an expectation of privacy, "it is objectively reasonable for confidential communication between

---

[122] *Salyer*, 2011 WL 677886 at *3.

[123] *Id*. at *4.

[124] *United States v. Madoch*, 149 F.3d 596, 602 (7th Cir. 1998) (phone call between detainee and non-attorney); *United States v. Van Poyck*, 77 F.3d 285, 290-91 (9th Cir. 1996) (same); *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989) (same); *United States v. Harrelson*, 754 F.2d 1153, 1169-70 (5th Cir. 1985) (same).

[125] *Lonegan v. Hasty*, 436 F.Supp.2d 419, 432 (E.D. N.Y. 2006).

an inmate and his attorney to remain private."[126] Courts draw a distinction between recorded calls to laypersons and recorded calls to attorneys because "the monitoring of [the defendant's] calls to his attorney presents a significant Sixth Amendment issue."[127] Unlike phone calls between detainees and members of the public, when the government seizes evidence of "confidential communications between the defendant and his attorney it also impinges on the Sixth Amendment right to counsel."[128]

The government does cite four cases addressing recorded phone calls between attorneys and their detained clients: *United States v. Hatcher*,[129] *United States v. Eye*,[130] *United States v. Lentz*,[131] and *Watson v. Albin*.[132] But *Watson* does little more than rehash *Hatcher, Eye,* and *Lentz*; it does not merit individual treatment. The rest we distinguish in turn.

*Hatcher* has little to do with our case. It determined the privilege was waived when "inmates and their lawyers were aware that their conversations were being recorded."[133] Those are not our facts. As the affidavits and

---

[126] *Evans*, 2011 WL 7470336 at *15.

[127] *Novak*, 531 F.3d at 102.

[128] *Bishop*, 701 F.2d at 1157.

[129] 323 F.3d 666 (8th Cir. 2003).

[130] 2008 WL 1701089 (W.D. Mo. 2008) (unpublished).

[131] 419 F.Supp.2d 820 (E.D. Va. 2005).

[132] 2008 WL 2079967 (N.D. Cal. 2008) (unpublished).

[133] 323 F.3d at 674.

declarations we submit show, defense counsel in this case were utterly unaware that their conversations were being recorded.[134]

In *Eye*, the government presented a great deal of evidence explaining how the detainee phone calls had been received and processed by its staff.[135] The court relied on that evidence to find that no Sixth Amendment violation had occurred. It relied on *United States v. Solomon*[136] for the proposition that the "burden of proof to establish a [Sixth Amendment] violation and resulting prejudice is on the defendant."[137] Here, of course, the government has presented no evidence, and the Tenth Circuit applies the opposite rule regarding prejudice.[138] Finally, *Eye*'s waiver holding suffers from the some disconnect as *Hatcher* — in both cases the attorney knew that calls were being recorded.[139] There is no such evidence in our case.

---

[134] *See Gennusa v. Shoar*, 879 F.Supp.2d 1337, 1347-48 (M.D. Fl. 2012) (no waiver when "[n]o reasonable attorney in Gennusa's position would have expected that her conversations with her client were being actively monitored and recorded"); *Cody v. Walter*, 2008 WL 4543042 at *8 (D. S.D. 2008) ("Here plaintiffs are asserting they are entitled to confidential conversations with their lawyers about post-conviction remedies and conditions of confinement. This is a different issue than addressed in *Hatcher*.") (unpublished).

[135] 2008 WL 1701089 at *3-8.

[136] 679 F.2d 1246, 1250 (8th Cir. 1982).

[137] 2008 WL 1701089 at *11.

[138] *Schillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995) ("a prejudicial effect on the reliability of the trial process must be presumed. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct.")

[139] *Eye,* 2008 WL 1701089 at *12 (finding waiver "because there is no question that he and his attorney knew the calls could be recorded").

45

The *Lentz* decision best highlights the impact of Rule 502's amendment on these facts. Decided in 2005 — before the 2008 amendment — *Lentz* applied the old rule and held that a phone call an inmate knew was recorded waived the privilege because the requirement "of confidentiality is so central to any claim of privilege that the privilege may be lost even by an *inadvertent disclosure* to a third party."[140] After 2008, such an inadvertent disclosure would no longer result in a valid waiver. The only role the *Lentz* decision has to play here is in demonstrating the evil that the amendment to Rule 502 was designed to protect against. In fact, none of the government's authority post-dates 2008, which makes it unhelpful in answering the present question before the Court.

In our case, highly experienced defense counsel reasonably relied on CCA's promise that their communications with their clients were confidential. They relayed that promise to their clients. Any disclosure of privileged information in the attorney-client phone calls was thus inadvertent, and counsel has acted immediately to remedy the disclosure. Rule 502(b) dictates that no waiver of the privilege occurred.

---

[140] *Lentz,* 419 F.Supp.2d at 827 (emphasis added).

### 4.    Other requested relief.

A Special Master with broad authority is necessary and urgent. Since the Court ordered Kansas facilities to stop recording, some jails have restricted attorney-client visitation in ways that interfere with meaningful attorney-client communication.[141] In other words, the price of confidentiality has been restricted access to counsel. For example, one jail now requires handcuffs and belly chains for clients during attorney visits. One jail downsized attorney contact visitation to one room for a facility that houses up to 230 detainees. Other visitation rooms are non-contact so that material cannot be effectively reviewed. Efforts to accommodate legitimate concerns about security and acceptable visitation[142]  have been unsuccessful. While we understand that some alterations are necessary, the "fallout" of

---

[141] CCA has been responsive to the Court's order and cooperative in accommodating defense attorneys.

[142] *See, e.g., Deck v. Missouri*, 544 U.S. 622, 631 (2005) ("Shackles can interfere with the accused's 'ability to communicate' with his lawyer.") (citation omitted); ABA Standards for Criminal Justice: Treatment of Prisoners, Standard 23-9.4(c)(ii)(A) (2011) ("absent an individualized finding that security requires otherwise, counsel should be allowed to have direct contact with a prisoner who is a client, prospective client, or witness, and should not be required to communicate with such a prisoner through a glass or other barrier."); Amber Baylor, *Beyond the Visiting Room: A Defense Counsel Challenge to Conditions in Pretrial Confinement*, 14 Cardozo Pub. L. Pol'y & Ethics J. 1 (2015) (discussing need for counsel to engage with client in "intensive and sensitive conversations" that must be both "clear and nuanced" in order to "cement trust, build elements of a defense, assess the case, and make quick decisions about plea offers"; detailing barriers to developing trust with detained clients).

confidentiality should not diminish access to meaningful attorney-client communication.

One other immediate concern: the Kansas City office of the USAO may be in the cyclical process of replacing computers and perhaps other electronic equipment. On August 31, 2016, the FPD asked the USAO to ensure that any such replacement does not destroy any information relevant to the Sixth Amendment issues currently before this Court. The replaced computers, hard drives, and other media may contain ESI that is relevant to a Special Master's inquiry into who may have accessed the video and audio recordings. That information should be preserved and available to the Special Master.

The Special Master must be given access to material in the USAO's control. Defense requests have gone unanswered. Here is one example:

> The government claims that it inadvertently came into possession of the attorney-client video recordings when it subpoenaed CCA for 22 months of "all video footage."[143]

> The government told the Court on July 21 that there were video cameras in the attorney-client rooms and "that there is no-- there are no audio in attorney/client unless someone at CCA, an employee, took it upon themselves to turn on the audio. But I don't believe it's recorded. It's just that it would allow a particular CCA employee to listen in  without recording if-- if the employee believes something was afoot that he needed to be aware of."[144]

---

[143] D.E. 120 at 5; Ex. 438.
[144] Ex. 447 at 11-12.

> The government then told the Court and counsel, by an August 5 email, that the source of this information was from a "cooperating inmate and his attorney." And that "based on the Warden's statements, counsel for the government now believes the information provided by the cooperator was incorrect."[145]

The defense asked the USAO to identify this cooperating inmate who knew of the video and recording practices at CCA. The cooperating inmate's identity and the date of the proffer are relevant facts. If the date of the proffer was before April 12, 2016, then the government knew that "all video footage" would include attorney-client visitation. That is a critical point that the government has not addressed and that the defense has not discovered. It is this sort of question that a Special Master can answer only if she has access to information in the government's control.

---

[145] Ex. 445.

## Conclusion

Both the evidence before the Court and the government's response compels a Special Master with authority to conduct a broad inquiry with the procedural protections commended by the Tenth Circuit. Just the history of the government's representations should give the Court pause, at least because its conduct with Ms. Rokusek cannot be squared with its later equivocations. Enough questions remain unanswered, or unsatisfactorily answered, to justify a Special Master to determine the scope of the constitutional, legal, and ethical violations.

Respectfully submitted,

s/Melody Brannon
MELODY BRANNON #17612
Federal Public Defender for the
District of Kansas
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785/232-9828
Fax: 785/232-9886
E-mail Address: melody_brannon@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2016, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Donald Christopher Oakley
Assistant United States Attorney
Office of the United States Attorney – Kansas City
chris.oakley@usdoj.gov

Erin S. Tomasic
Assistant United States Attorney
Office of the United States Attorney – Kansas City
erin.tomasic@usdoj.gov

Debra L. Barnett
Criminal Chief
Assistant United States Attorney
Office of the United States Attorney – Wichita
debra.barnett@usdoj.gov

Duston J. Slinkard
Assistant United States Attorney
Office of the United States Attorney- Topeka
duston.slinkard@usdoj.gov

John Jenab
Jenab Law Firm, PA
john.jenab@gmail.com

David J. Guastello
The Guastello Law Firm, LLC
david@guastellolaw.com

Jason P. Hoffman
Hoffman & Hoffman
jphoffman@sbcglobal.net

Kathleen A. Ambrosio
Ambrosio & Ambrosio Chtd.
kaambrosio@yahoo.com

Michael M. Jackson
jacksonmm@aol.com

Cynthia M. Dodge
Cynthia M. Dodge, LLC
cindy@cdodgelaw.com

Shazzie Naseem
Berkowitz Oliver LLP - KCMO
snaseem@berkowitzoliver.com

Jacquelyn E. Rokusek
Rokusek Law, LLC
rokuseklawoffice@yahoo.com

Jonathan L. Laurans
jlaurans@msn.com

s/ Melody Brannon
Melody Brannon