# EXHIBIT LIST

## United States v. Black, et al., Case No. 2:16-cr-20032-JAR

## Motion for Return of Property Pursuant to Fed. R. Crim. P. 41(g)

| Exh. # | Description | Offered | Admitted | Witness |
|---|---|---|---|---|
| 401 | Evacuation Diagram of rooms at CCA | x | x | Thompson |
| 402 | Room 107A Hallway | x | x | Thompson |
| 403 | Room 107A Intercom | x | x | Thompson |
| 404 | Room 107B & 107 Hallway | x | x | Thompson |
| 405 | Room 107B Intercom | x | x | Thompson |
| 406 | Room 107 Camera | x | x | Thompson |
| 407 | Room 107 Intercom | x | x | Thompson |
| 408 | Visitation hallway | x | x | Thompson |
| 409 | Visitation hallway | x | x | Thompson |
| 410 | Visitation hallway | x | x | Thompson |
| 411 | Room 4 Camera | x | x | Thompson |
| 412 | Room 4 Intercom | x | x | Thompson |
| 413 | Room 5 Intercom | x | x | Thompson |
| 414 | Room 5 Camera | x | x | Thompson |
| 415 | Room 6 Table | x | x | Thompson |
| 416a | Room 6 Table | x | x | Thompson |
| 416b | Room 6 Table | x | x | Thompson |
| 417 | Room 6 Intercom | x | x | Thompson |
| 418 | Room 6 Camera | x | x | Thompson |
| 419 | Visitation Hallway Intersection | x | x | Thompson |
| 420 | Room 7 Intercom | x | x | Thompson |
| 421 | Room 7 Camera | x | x | Thompson |
| 422 | Room 7 Light | x | x | Thompson |
| 423 | Room 8 Light button | x | x | Thompson |
| 424 | Room 8 Intercom | x | x | Thompson |
| 425 | Room 8 Camera | x | x | Thompson |
| 426 | Room 9 Camera | x | x | Thompson |
| 427 | Room 9 Intercoms & light button | x | x | Thompson |
| 428 | Visitation Hallway-Room 8 & 9 lights | x | x | Thompson |
| 429 | Visitation Hallway-Room 7 & 8 lights | x | x | Thompson |
| 430 | Visitation Hallway-end | x | x | Thompson |
| 431 | Foyer & bathroom area | x | x | Thompson |
| 432 | Foyer & bathroom area-camera 1 | x | x | Thompson |
| 433 | Foyer & bathroom area-camera 2 | x | x | Thompson |
| | | | | |

# EXHIBIT LIST

## United States v. Black, et al., Case No. 2:16-cr-20032-JAR

## Motion for Return of Property Pursuant to Fed. R. Crim. P. 41(g)

| Exh. # | Description | Offered | Admitted | Witness |
|---|---|---|---|---|
| 434 | Investigative Report of Zay Thompson | x | x | Thompson |
| 435 | CCA - Protecting Inmate Rights | x | x | " |
| 436 | CCA Policies Produced by 17(c) Subpoena | x | x | " |
| 437 | Affidavit of Michael Bussell | x | x | " |
| 438 | Grand Jury Subpoena | x | x | " |
| 439 | Index | x | x | " |
| 440 | Index w Properties | x | x | " |
| 441 | Email string: Rokusek/Tomasic/Flannigan re viewing videos of attorney-client conferences | x | x | " |
| 442 | Email string: Rokusek/Tomasic re asserting attorney-client privilege in videotaped conferences | x | x | " |
| 443 | Email from Barnett relaying information from USM Deputy Oberly | x | x | " |
| 444 | Email from USMS, WDMO re CCA videotapes attorney-client conferences | x | x | " |
| 445 | Email: Tomasic to Black counsel and Bonnie Wiest re videotapes of attorney-client conferences | x | x | " |
| 446 | Email string: Tomasic/Shaneyfelt re USAO created videotape index | x | x | " |
| 447 | Transcript of July 22, 2016 Status Conference, United States v. Black [pp 5-6: index] [pp 11-12: videos][pp 15, 23 additional defendants] | x | x | " |
| 448 | CV of Professor Peter Joy | x | x | " |
| 449 | Index of recorded attorney-client phone calls | x | x | Jackson |
| **PROPOSED DEFENSE EXHIBITS** | | | | |
| 450 | Transcript, *United States v. Huff* (May 16, 2016) | | | |
| 451 | Affidavit of Gary Hart (to be provided) | | | |
| 452 | Email from Tomasic to Judge Robinson (Aug. 22, 2016) | | | |
| 453 | Email from Brannon to Barnett (Aug. 3, 2016) | | | |
| 454 | Transcript, *United States v. Wright* (Aug. 5, 2016) | | | |
| 455 | Email from Oakley re: phone calls (Aug. 18, 2016) | | | |
| 456 | Transcript, *United States v. Huff* (Aug. 22, 2016) | | | |
| 457 | Transcript, *United States v. Benimon* (Aug. 22, 2016) | | | |
| 458 | Email from Craig Beam (Aug. 5, 2016) | | | |

| 459 | Affidavits from CJA attorneys – Christopher Joseph, Kathleen Ambrosio, Robert Calbi, Cynthia Dodge, John Jenab, Deb Vermillion, Michael Jackson, Jackie Rokusek, Tom Haney, Robin Fowler, Thomas | | | |
|-----|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|--|--|--|
| 460 | Email from CCA local counsel with CCA inmate intake form(Aug. 24, 2016) | | | |
| 461 | Docket sheet excerpts, *United States v. Dertinger* | | | |
| 462 | Transcript, *United States v. Black et al.* I (Aug. 9, 2016) | | | |
| 463 | Transcript, *United States v. Black et al.* II (Aug. 16, 2016) | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

1

1

2                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
3

   UNITED STATES OF AMERICA,        Docket No. 14-20067-CM
4

      Plaintiff,                    Kansas City, Kansas
5                                   Date: 5/16/16

        v.
6

   ASHLEY HUFF,
7

      Defendant.
8   ...................

9                         TRANSCRIPT OF
                          STATUS HEARING
10         BEFORE THE HONORABLE CARLOS MURGUIA,
               UNITED STATES DISTRICT JUDGE.
11

   APPEARANCES:
12

   For the Plaintiff:    Kim Flannigan & Erin Tomasic
13                        Asst. US Attorneys
                          360 US Courthouse
14                        500 State Avenue
                          Kansas City, KS  66101
15

   For the Defendant:    William Session
16                        The Session Law Firm
                          420 Nichols Road, #200
17                        Kansas City, MO  64112

18   Court Reporter:      Nancy Moroney Wiss, CSR, RMR, FCRR
                          Official Court Reporter
19                        558 US Courthouse
                          500 State Avenue
20                        Kansas City, KS  66101

21   Proceedings recorded by machine shorthand, transcript
    produced by computer-aided transcription.
22

23

24

25

EXHIBIT
450

| | | |
|---|---|---|
| 10:02:26 | 1 | THE COURT:  Court calls Case |
| 10:02:30 | 2 | Number 14-20067-09.  It's a case entitled United States |
| 10:02:34 | 3 | of America versus Ashley Huff.  The parties please enter |
| 10:02:37 | 4 | their appearance. |
| 10:02:40 | 5 | MS. FLANNIGAN:  Your Honor, the United |
| 10:02:41 | 6 | States appears by Kim Flannigan and Erin Tomasic. |
| 10:02:44 | 7 | MR. SESSION:  William Session on behalf of |
| 10:02:46 | 8 | Ashley Huff, Your Honor. |
| 10:02:47 | 9 | THE COURT:  Thank you.  Miss Huff, we're |
| 10:02:50 | 10 | here to take up a couple of matters.  The first one the |
| 10:02:52 | 11 | court's going to take up is Document 348, which is the |
| 10:02:57 | 12 | government's motion pursuant to 18 USC Section 401 A 2 |
| 10:03:07 | 13 | for order to show cause why defense counsel should not |
| 10:03:10 | 14 | be sanctioned for violation of the court's protective |
| 10:03:14 | 15 | order.  I've all ready reviewed what was filed with the |
| 10:03:19 | 16 | court.  Unless there's anything else counsel wants to |
| 10:03:25 | 17 | argue, the court is ready to make its ruling.  Anything |
| 10:03:27 | 18 | else from the government? |
| 10:03:28 | 19 | MS. FLANNIGAN:  Your Honor, the only thing |
| 10:03:31 | 20 | that I would note for the record is that in the |
| 10:03:35 | 21 | defendant's response to the -- to the government's |
| 10:03:38 | 22 | request, he did not address the issue that was raised by |
| 10:03:43 | 23 | the government.  In other words, the government is |
| 10:03:46 | 24 | asking the defense counsel to explain how |
| 10:03:51 | 25 | government-issued bates labeled discovery found its way |

| | |
|---|---|
| 10:03:55 | **1** |
| 10:03:59 | **2** |
| 10:04:03 | **3** |
| 10:04:07 | **4** |
| 10:04:11 | **5** |
| 10:04:14 | **6** |
| 10:04:17 | **7** |
| 10:04:20 | **8** |
| 10:04:24 | **9** |
| 10:04:26 | **10** |
| 10:04:30 | **11** |
| 10:04:33 | **12** |
| 10:04:35 | **13** |
| 10:04:37 | **14** |
| 10:04:41 | **15** |
| 10:04:43 | **16** |
| 10:04:45 | **17** |
| 10:04:49 | **18** |
| 10:04:55 | **19** |
| 10:04:58 | **20** |
| 10:05:01 | **21** |
| 10:05:07 | **22** |
| 10:05:10 | **23** |
| 10:05:14 | **24** |
| 10:05:17 | **25** |

1  into his client's cell at CCA and then was discovered

2  during a search warrant there.  During his response, he

3  talked about documents that he had prepared that were

4  self-generated, and because he did not address the

5  issue, he did not meet either of the prongs which would

6  excuse his compliance with the court's order, so he can

7  not show that he did not violate the order, and he can

8  not show that he was excused from compliance with the

9  court's order, and those are really the only two ways

10  that the defense counsel here can avoid being held in

11  contempt of this court's order, and that would be the --

12  what the government would have to add, Your Honor.

13       THE COURT:  Again, Mr. Session, I all ready

14  have reviewed what was all ready filed with the court.

15  If there's anything else additional?

16       MR. SESSION:  Yeah, just one comment, Your

17  Honor.  At the time I filed the response and made the

18  comments about the summary that I thought by mistake or

19  inadvertence I'd left with the defendant, I had not seen

20  the actual documents that were filed under seal that

21  were apparently seized from -- from Miss Huff's cell at

22  CCA.  I subsequently did look at them, and they were not

23  the summaries I prepared.  When I went up to talk to the

24  defendant about this whole matter, I asked what had I

25  possibly left with her, and she said summaries.  And I

10:05:20  1   thought it was -- it might have been the ones that I had

10:05:23  2   prepared, but apparently, they were interviews from late

10:05:27  3   February for witnesses that were to testify in this

10:05:31  4   case.  Both in the response and today, the government

10:05:37  5   says that I haven't explained what happened.  I don't

10:05:39  6   know how to explain any better than I did.  There was no

10:05:42  7   intent to leave these documents with Miss Huff.  It was

10:05:47  8   completely a matter of mistake and inadvertence.  I've

10:05:50  9   said that six, seven times in the pleadings, and all I

10:05:56  10  can say is it was a mistake.  It wasn't by intent.

10:05:58  11  There have been thousands of pages of -- or at least

10:06:01  12  hundreds of pages of similar documents, and I kept them

10:06:06  13  confidential as the court's order has required.  This

10:06:09  14  was just inadvertence, a mistake.  That's the only thing

10:06:14  15  I can say about it.

10:06:14  16          THE COURT:  Again, the court -- anything

10:06:17  17  else?

10:06:18  18          MS. FLANNIGAN:  Your Honor, I don't know

10:06:19  19  that that's sufficient based on the case law.  The

10:06:23  20  defendant has to show that he was somehow excused from

10:06:26  21  compliance, and he hasn't done that.  This is such a

10:06:30  22  serious issue, Your Honor, because the courts have

10:06:35  23  wanted the government to start providing these

10:06:38  24  un-redacted proffer reports rather than have them

10:06:40  25  reviewed in-house, and so, the government has changed

| | | |
|---|---|---|
| 10:06:44 | 1 | the way it does business, and we changed the way it |
| 10:06:48 | 2 | does -- the way we are doing business because there was |
| 10:06:52 | 3 | a representation that these protective orders would be |
| 10:06:54 | 4 | sufficient to protect our witnesses and the integrity of |
| 10:06:57 | 5 | the testimony that we might get, and if that is not |
| 10:07:00 | 6 | happening, then the integrity of those testimony that we |
| 10:07:05 | 7 | are getting from cooperators is in jeopardy, and the -- |
| 10:07:09 | 8 | the actual physical safety of the cooperators and their |
| 10:07:12 | 9 | families could potentially in jeopardy.  So, the |
| 10:07:15 | 10 | government is relying on the -- on the court and the |
| 10:07:17 | 11 | protective order and defense counsel to step into that |
| 10:07:21 | 12 | role, because defense counsel have asked that they be |
| 10:07:24 | 13 | given these un-redacted proffers earlier in the |
| 10:07:27 | 14 | system -- earlier in the proceedings, and so that they |
| 10:07:30 | 15 | can make better use of them.  Well, if we're going to do |
| 10:07:33 | 16 | that, if we're going to let them have these earlier in |
| 10:07:36 | 17 | the proceedings, then that information has to be kept |
| 10:07:40 | 18 | private, and cannot be left even through inadvertence or |
| 10:07:46 | 19 | through intent with defendants in jail.  I have seen -- |
| 10:07:50 | 20 | when I was doing the prison cases, I have seen agent |
| 10:07:54 | 21 | reports that have been given to prisoners that were |
| 10:07:56 | 22 | 15 years old.  They never leave the prison system, and |
| 10:08:00 | 23 | so, the severity of this cannot be understated, Your |
| 10:08:03 | 24 | Honor. |
| 10:08:04 | 25 | THE COURT:  I understand the seriousness, |

| | | |
|---|---|---|
| 10:08:08 | 1 | and appreciate the seriousness of the government's |
| 10:08:11 | 2 | argument, and the possible ramifications and |
| 10:08:15 | 3 | consequences it may have not only in this case but on |
| 10:08:19 | 4 | other cases as well.  But again, on its own, the court |
| 10:08:23 | 5 | reviewed what was filed, and this is actually going to |
| 10:08:27 | 6 | be more of a procedural ruling from the court.  Court |
| 10:08:30 | 7 | first takes up Document 348, the government's motion |
| 10:08:34 | 8 | pursuant to 18 USC 401 A 2 for order to show cause why |
| 10:08:40 | 9 | defense counsel should not be sanctioned for violations |
| 10:08:43 | 10 | of the court's protective order.  Again, the court set |
| 10:08:47 | 11 | the hearing, and I had received the response and the |
| 10:08:50 | 12 | government's reply, and again, the court would mention, |
| 10:08:53 | 13 | it conducted its own research.  The government requests |
| 10:08:57 | 14 | an order to show cause why Mr. Session should not be |
| 10:09:00 | 15 | sanctioned for violating the court's protective order |
| 10:09:05 | 16 | entered in this case after bate stamp copies of |
| 10:09:09 | 17 | cooperating individuals' interview reports were |
| 10:09:12 | 18 | recovered in the client's cell during a search. |
| 10:09:18 | 19 | Although the government requests that the court hold |
| 10:09:21 | 20 | Mr. Session in civil contempt, court believes that what |
| 10:09:26 | 21 | the government actually seeks is that Mr. Session be |
| 10:09:30 | 22 | held in indirect criminal contempt.  Civil contempt is a |
| 10:09:36 | 23 | sanction to enforce compliance with an order of the |
| 10:09:39 | 24 | court or to compensate for losses or damages sustained |
| 10:09:44 | 25 | by reason of non-compliance.  The usual civil contempt |

| | |
|---|---|
| 10:09:48 | 1 | sanction is coercive, designed to exact compliance with |
| 10:09:54 | 2 | a prior court order in which correction usually takes |
| 10:09:58 | 3 | the form of granting appropriate relief to the injured |
| 10:10:01 | 4 | party.  By contrast, punishment for criminal contempt is |
| 10:10:08 | 5 | imposed to vindicate the court's dignity.  Because |
| 10:10:13 | 6 | sanctioning Mr. Session cannot grant any relief to any |
| 10:10:16 | 7 | injured party, any contempt sanctions would be criminal |
| 10:10:20 | 8 | in nature.  While defendant's possession of the bate |
| 10:10:25 | 9 | stamp witness statements is concerning, the court does |
| 10:10:30 | 10 | not find sufficient basis to support that Mr. Session |
| 10:10:33 | 11 | should be held in criminal contempt.  The court denies |
| 10:10:38 | 12 | the government's motion.  Court next takes up Document |
| 10:10:48 | 13 | 354, the government's motion for additional time to |
| 10:10:52 | 14 | respond and motion to continue sentencing hearing. |
| 10:10:58 | 15 | Further argument? |
| 10:11:04 | 16 | MS. TOMASIC:  Your Honor, defense counsel |
| 10:11:07 | 17 | simply states that his client wants him to move forward |
| 10:11:10 | 18 | without reviewing the additional discovery based on |
| 10:11:13 | 19 | additional developments which suggest that Miss Huff was |
| 10:11:16 | 20 | aware that drug and contraband trafficking was taking |
| 10:11:21 | 21 | place inside CCA.  She was -- her then boyfriend Richard |
| 10:11:26 | 22 | Dertinger was involved, and she attempted to warn |
| 10:11:30 | 23 | Mr. Dertinger that he was being watched.  This is the |
| 10:11:32 | 24 | basis for taking away acceptance of responsibility in |
| 10:11:34 | 25 | the government's view, and will be possibly the basis |

| | | |
|---|---|---|
| 10:11:37 | 1 | for additional sentencing enhancements.  I cannot see |
| 10:11:39 | 2 | how Mr. Session believes he is in a position to move |
| 10:11:43 | 3 | forward and argue the merits of the government's |
| 10:11:45 | 4 | positions without having reviewed the discovery. |
| 10:11:50 | 5 | THE COURT:  How much additional time are you |
| 10:11:52 | 6 | asking for? |
| 10:11:53 | 7 | MS. TOMASIC:  Your Honor, the discovery in |
| 10:11:54 | 8 | that case at this point is 23 terabytes or more of data, |
| 10:11:59 | 9 | which is the largest discovery project that has ever |
| 10:12:02 | 10 | come out of our office on the criminal side.  I don't |
| 10:12:05 | 11 | know that Mr. Session needs to review all of that |
| 10:12:08 | 12 | discovery, but at a minimum, he needs to review the |
| 10:12:11 | 13 | calls made by his client under other inmates' pin |
| 10:12:15 | 14 | numbers, and also mail that his client was sending out |
| 10:12:18 | 15 | to a third party and then having that mail forwarded on |
| 10:12:21 | 16 | to her boyfriend Richard Dertinger who's also an inmate |
| 10:12:25 | 17 | at CCA. |
| 10:12:27 | 18 | THE COURT:  Mr. Session? |
| 10:12:29 | 19 | MR. SESSION:  Just briefly, Your Honor.  I |
| 10:12:33 | 20 | had been advised about the 23 terabytes of information |
| 10:12:36 | 21 | that relate to this investigation.  However, I've not |
| 10:12:40 | 22 | been advised that even one terabyte or any bytes |
| 10:12:46 | 23 | specifically involve Miss Huff.  I -- I don't know |
| 10:12:50 | 24 | what's in all of these documents.  I don't -- I don't |
| 10:12:54 | 25 | know.  Miss Huff has intimated to me or said explicitly |

10:13:00  1   she has no involvement with whatever this is that's gone

10:13:05  2   on up at CCA, and she asked me to proceed with asking

10:13:10  3   this court to go forward with her sentencing hearing in

10:13:15  4   part because of that statement from her.  She knows

10:13:18  5   absolutely nothing about whatever this investigation is,

10:13:22  6   and moreover, it appears to me that whatever needs to be

10:13:26  7   brought up could be raised with the court in the context

10:13:29  8   of the sentencing.  I -- I -- there's no charges brought

10:13:33  9   against her that I know of, at least not that I've been

10:13:36  10  appointed to represent her on, so I'm just not certain

10:13:40  11  why we can't go forward.  I understand there's an

10:13:44  12  investigation and a lot of documents, but I don't know

10:13:46  13  what they have to do with Miss Huff.

10:13:47  14          THE COURT:  Has Mr. Session been given

10:13:49  15  access to this discovery, or has that all ready been

10:13:52  16  released to him?

10:13:53  17          MS. TOMASIC:  He needs to provide a large

10:13:55  18  drive on which it will be placed.  It's being processed

10:13:58  19  and will -- the first round will be sent out tomorrow,

10:14:02  20  and then he needs to provide a one terabyte drive, and

10:14:05  21  then he can come in and review the additional 18

10:14:08  22  terabytes.  An 18 terabyte drive costs $3,000, and so, a

10:14:13  23  number of defense attorneys involved have decided to

10:14:16  24  just come in and review the surveillance footage.

10:14:18  25  Additionally, though, he would need to provide at least

10:14:21 **1**   the one terabyte drive on which that discovery can be

10:14:24 **2**   downloaded. I would like to point out, Your Honor,

10:14:26 **3**   while I do not at this stage wish to engage the merits

10:14:29 **4**   of Miss Huff's claim, she has made a number of claims on

10:14:33 **5**   CCA calls using her own pin number and other inmates'

10:14:37 **6**   pin numbers claiming that Mr. Session has been

10:14:39 **7**   ineffective in representing her. She has also met with

10:14:42 **8**   him regarding his ineffective assistance of counsel.

10:14:45 **9**   She claims specifically that he failed to notify her of

10:14:49 **10**   a plea offer made by the government in a timely manner,

10:14:52 **11**   and that he then apologized for failing to meet the

10:14:55 **12**   downward departure line, excuse me. Miss Huff then

10:14:57 **13**   stated that Mr. Session hated the government just as

10:15:00 **14**   much as her, so she wanted to keep him. What I see at

10:15:04 **15**   this point is that Miss Huff is attempting to take

10:15:07 **16**   advantage down the road of an ineffective assistance of

10:15:10 **17**   counsel claim by having Mr. Session move forward and

10:15:14 **18**   argue the merits of the government's potential

10:15:16 **19**   sentencing enhancements without having reviewed the

10:15:21 **20**   discovery. So, I don't want to give the court a basis

10:15:25 **21**   for finding that Mr. Session was ineffective down the

10:15:27 **22**   road because he's choosing not to review the discovery.

10:15:33 **23**         THE COURT: Anything else, Mr. Session?

10:15:35 **24**         MR. SESSION: It's the first I've ever heard

10:15:37 **25**   of what Miss Tomasic had to say. So, no, I have no

10:15:41  1    response to it.  First I've ever heard of it.

10:15:43  2            THE COURT:  Give me a moment please.  We're

10:19:06  3    back on the record.  Again, upon review regarding the

10:19:10  4    government's motion, in light of what was mentioned here

10:19:13  5    in the courtroom today, the court is going to find that

10:19:17  6    there's been a showing of good cause to extend the

10:19:21  7    deadline to respond to defendant's sentencing

10:19:23  8    memorandum, and also as a result, it's going to impact

10:19:29  9    defendant's sentencing hearing by having the court

10:19:32  10   continue -- continue it.  The court's going to set the

10:19:36  11   government's response deadline for the sentencing

10:19:39  12   memorandum to June 21st.  Mr. Session, you'll have to

10:19:46  13   July 5th to reply, and if it works with your calendars,

10:19:51  14   we're setting this for a sentencing hearing on July 18th

10:19:58  15   at 1:30 in the afternoon.  Unless there's anything else,

10:20:07  16   the only other comment I would make in regards to the

10:20:10  17   court's first ruling, court made a procedural ruling.  I

10:20:15  18   don't think I need to say it, but just so it's not

10:20:17  19   misinterpreted, of course, the court doesn't condone any

10:20:23  20   intentional violations of a protective order.  The court

10:20:27  21   did not even reach the merits of that argument, but that

10:20:31  22   should be clear to everyone that the protective order is

10:20:34  23   there for a reason.  If there's nothing else, this

10:20:38  24   hearing's adjourned.

10:20:39  25           MS. TOMASIC:  Your Honor -- Your Honor, I

10:20:40  1   just would like to state on the record that the

10:20:42  2   government does intend to treat Mr. Session differently

10:20:44  3   than other defense attorneys since he's shown himself to

10:20:46  4   be unreliable, and we do intend to maintain all

10:20:50  5   discovery in-house, and he can come in and view it, and

10:20:53  6   if he is not comfortable with that approach, then he

10:20:56  7   should file a motion, in the government's view.

10:20:59  8           THE COURT:  If there's nothing else, this

10:21:01  9   hearing's adjourned.  Thank you.

10:21:03  10          (Whereupon court recessed proceedings.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2               C E R T I F I C A T E

3

4

5      I, Nancy Moroney Wiss, a Certified Shorthand Reporter

6   and the regularly appointed, qualified and acting

7   official reporter of the United States District Court

8   for the District of Kansas, do hereby certify that as

9   such official reporter, I was present at and reported in

10   machine shorthand the above and foregoing proceedings.

11      I further certify that the foregoing transcript,

12   consisting of 13 typewritten pages, is a full, true, and

13   correct reproduction of my shorthand notes as reflected

14   by this transcript.

15      SIGNED May 23, 2016.

16

17                    S/_____

18                    Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25

**From:** Tomasic, Erin (USAKS)
**Sent:** Tuesday, August 23, 2016 5:26 PM
**To:** Oakley, Chris (USAKS), KSD_Robinson_Chambers
**Cc:** Bonnie Wiest, debra.barnett@usdoj.gov, Melody Brannon, Cynthia Dodge, david@guastellolaw.com, Duston.Slinkard@usdoj.gov, jacksonmm@aol.com, Jonathan Laurans, john.jenab@gmail.com, Jason P. Hoffman, Kathleen Ambrosio, kate@zigtemalaw.com, rokuseklawoffice@yahoo.com, snaseem@berkowitzoliver.com, Kirk Redmond

Judge Robinson:

Pursuant to the Court's Order, I am supplementing the notice provided by Mr. Oakley below. Recorded CCA-Leavenworth calls distributed in *United States v. Black* were made available to the United States Probation Office to assist in preparing Presentence Reports. Last week, our office contacted U.S. Probation Officer Michelle Caples and explained that the recorded calls would need to be returned to the U.S. Attorney's Office. Ms. Caples complied with that request. A copy of the Court's Order has been provided to Ms. Caples.

In addition, certain recorded calls were reviewed by employees of the Johnson County Sheriff's Office as part of related cases. Although the Court's order applies to the *Black* investigation, out of an abundance of caution, a copy of the Court's Order and the email previously sent to agents by Mr. Oakley was provided to the employees of the Johnson County Sheriff's Office who are handling related cases. These



EXHIBIT
452

employees were instructed to cease reviewing any recorded CCA calls in advance of Court's order, and they have complied.

Thank you,
Erin Tomasic

-----Original Message-----
From: Oakley, Chris (USAKS)
Sent: Friday, August 19, 2016 8:49 PM
To: ksd_robinson_chambers@ksd.uscourts.gov
Cc: Bonnie_Wiest@ksd.uscourts.gov; Barnett, Debra (USAKS) 1; Melody_Brannon@fd.org;
cindy@cdodgelaw.com; david@guastellolaw.com; Slinkard, Duston (USAKS); Tomasic, Erin (USAKS);
jacksonmm@aol.com; jlaurans@msn.com; john.jenab@gmail.com; jphoffman@sbcglobal.net;
kaambrosio@yahoo.com; kate@zigtemalaw.com; rokuseklawoffice@yahoo.com;
snaseem@berkowitzoliver.com; Kirk Redmond
Subject: 2:16-cr-20032-JAR USA v. Black et al

Dear Judge Robinson:

Pursuant to the Court's Order, attached please find letter and email communications sent to those persons and entities to whom recorded CCA-Leavenworth calls were made available.  The letters and emails were sent within 24 hours of the Court's Order.

The persons whom the calls were made available are the following Defense Attorneys:  John Jenab, David J. Guastello, Cynthia M. Dodge, Jason P. Hoffman, and Michael M. Jackson.

Additionally, the recordings were made available to the following entities:  Kansas Bureau of Investigation, United States Secret Service, United States Marshals Service, and Internal Revenue Service-Criminal Investigations.  We specifically notified Special Agents John Seubert (Secret Service), Glen Virden and Jeff Stokes (KBI), Henry Herron (IRS), and Zachary Howard (USMS), whom we know were provided access to the recordings.  However, as indicated in the email to the agents, we asked them to provide us with the names of any other agents from their respective agency who were provided access to the recordings.  As soon as we receive completed responses, we will notify the Court.

Chris Oakley
Assistant United States Attorney

| From: | Melody Brannon/KSF/10/FDO |
|---|---|
| To: | "Barnett, Debra (USAKS) 1" <Debra.Barnett@usdoj.gov>, "Dustin Slinkard" <Duston.Slinkard@usdoj.gov> |
| Cc: | Kirk Redmond/KSF/10/FDO@fdo, "Melanie Morgan" <mmorgan@morganpilate.com>, Laura Shaneyfelt/KSF/10/FDO@fdo |
| Date: | 08/03/2016 10:36 PM |
| Subject: | CCA Recording Attorney/Client Meetings |

Deb and Duston,

This is just a heads up on what we plan to file tomorrow. We learned today that CCA records--not just monitors--meetings between attorneys and clients in some, if not most, of the visitation rooms. And we understand that these recordings are available to the USAO for review, although we are not sure of the means.

After some research, it appears that we cannot ethically visit with our clients under these circumstances, we must let them know of the recording, and that we cannot fail to act immediately.

Tomorrow, at any Rule 5 hearing, we will ask the Court to set conditions of release for our clients, regardless of other circumstances, because they have no meaningful and confidential access to counsel at CCA. Further, we intend to file motions in pending cases before each of the District Courts with similar requests.

If we missed something about this or are wrong, please let us know, because we would rather fix it than fight a meaningless battle. Feel free to call if you want to talk before tomorrow at noon. Otherwise, talk to you then.

Melody and Kirk

Sent from Surface



EXHIBIT
453

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) District Court |
| vs. | ) Case No. |
| | ) 16-20075 |
| IMON L. WRIGHT, | ) |
| | ) |
| Defendant. | ) |

TRANSCRIPT OF PROCEEDINGS

On the 5th day of August, 2016, came on to be heard proceedings in the above-entitled and numbered cause before the HONORABLE TERESA J. JAMES, Magistrate Judge of the United States District Court for the District of Kansas, sitting in Kansas City, commencing at 1:34 P.M. Proceedings recorded by digital recording. Transcript produced by computer-aided transcription.

APPEARANCES:

The plaintiff appeared by and through:
        Mr. Tristram W. Hunt
        Office of the United States Attorney
        500 State Avenue
        Suite 360
        Kansas City, Kansas  66101

The defendant appeared by and through:
        Mr. Branden A. Bell
        Office of the Federal Public Defender
        117 SW 6th Avenue
        Suite 200
        Topeka, Kansas 66603

Also present:
        Marshal Michael Thibault

**EXHIBIT**

**454**

tabbies

```
 1              THE COURT:  Good afternoon.  The Court calls Case
 2    No. 16-mj-8578 and 04-cr-20101, United States of America versus
 3    Imon Wright.
 4              Could I have appearances, please.
 5              MR. HUNT:  If it please the Court, Tris Hunt
 6    appearing on behalf of the United States.
 7              MR. BELL:  Defendant appears in person and through
 8    counsel Branden Bell.
 9              THE COURT:  Very good.  Thank you.  We are here
10    again this afternoon on Mr. Wright's case today to take up the
11    issue of pretrial detention.
12              Mr. Hunt, are you ready to proceed?
13              MR. HUNT:  Yes, Judge, if I could proceed -- well,
14    actually, I think there's going to be a waiver --
15              THE COURT:  All right.
16              MR. HUNT:  -- of detention, so I don't think I
17    need to proceed.
18              THE COURT:  Okay.  Very good.  Mr. Bell.
19              MR. BELL:  Your Honor, there is going to be a
20    waiver under the statutory factors about regarding release
21    conditions.  However, we have an argument that there is no
22    facility at this point that the marshals could place Mr. Wright
23    in that would permit him to have reasonable opportunity for
24    private consultation with defense counsel.  Now, let me explain
25    what I mean by that.
```

1          THE COURT: You want to come up. I'm having real

2    trouble hearing you, so if you'd come up to the mic that might

3    be better.

4          MR. BELL: Sorry.

5          THE COURT: No problem.

6          MR. BELL: So under the statute, in part of the

7    Court's detention order it must order that wherever he go, that

8    it be a facility that allows as reasonable accommodation for

9    private consultation with counsel. We do not think that the

10   Court could -- that the Marshals Service could follow that

11   order at this point. And let me tell you why.

12          Within the last 24 to 48 hours, the Federal Public

13   Defender's Office has become aware that CCA and other

14   facilities under contract with the Marshals Service are

15   recording the attorney/client conferences that occur in those

16   rooms. That, as you might imagine, has -- raises a number of

17   issues for us as defense counsel. Number one, since we know

18   we're being recorded, we have to tell our clients. Number two,

19   after telling our clients, they might reasonably decide they

20   don't want to speak to us. And we can't blame them. And given

21   that if -- now that we know we're being recorded, anything we

22   say or our clients say in those meeting rooms would not have

23   attorney/client privilege 'cause they could be deemed as waived

24   since we have the knowledge that we're being recorded.

25          That essentially puts us at an impasse, where we

1  can't visit our clients if they're at CCA until the matter is

2  resolved.  We are currently running down the other contract

3  facilities the marshals uses, to see if those facilities

4  record.  We know that some of them do.  We've been able to

5  figure that out in the last few days.

6           So, given that, that evidence, we don't think that

7  there's anyplace that Mr. Wright could be sent that would

8  follow the conditions necessary that would permit reasonable

9  accommodations, private accommodations -- or reasonable

10 accommodations for private consultation with defense counsel.

11           THE COURT:  So what are you proposing?

12           MR. BELL:  We're proposing that he has to be

13 released or, in the alternative, if the Court -- and I

14 understand that puts the Court in a strange position, where the

15 defendant is admitting that the statutory factors weigh against

16 release and weigh in favor of detention, but the Court can't

17 comply with the statutory directive of putting him in a place

18 that -- detaining him in a place that allows for that sort of

19 communication.  In the alternative, if the Court is hesitant at

20 granting release, then we have an argument in the alternative.

21 But our primary argument would be that there simply isn't a way

22 to comply with the statutory directives in detaining him at

23 this point.

24           THE COURT:  All right.  Mr. Hunt?

25           MR. HUNT:  Judge, you know, this is something

1    that's been brought to our attention as of really last night.

2    I think that when all is said and done, this is going to be a

3    storm in a teacup.  There is some guidance that I've received,

4    and I've asked my agent to go and print out an e-mail from my

5    criminal chief, that essentially states what has actually

6    occurred.  And I'd like to have that in front of me before I

7    actually make a statement or representation because I think

8    this is a matter that's way out of hand, way overblown and way

9    overstated.

10           So if I could be permitted to review that before I

11   address what is and isn't allegedly occurring.  So assuming,

12   just assuming arguendo, that there are recordings being made or

13   there's a capability to record, there is no reason to release

14   this particular defendant, who should not be released, who's

15   actually waiving detention, because I think the Government has

16   a very good argument that he should be detained, based upon his

17   violation of supervised release, a very strong case against

18   him, to include confession on videotape and audiotape of

19   criminal conduct that would lead to his revocation, and his

20   recent indictment on those charges were basically on drug

21   trafficking, it's preposterous to contemplate releasing him.

22           In any event, even if that were to be true -- and

23   I do not represent that it is -- the Court could fashion an

24   appropriate detention plan for this particular defendant as

25   simply as this defendant shall be allowed to consult with their

1   lawyer, and the marshals shall make reasonable accommodation

2   that that appear and that it not be recorded, video or audio

3   recorded.  That is what should happen if, in fact, that is the

4   case.  I don't think it is.

5           Let me just check on my agent to see if he has

6   that e-mail, if I could.  Do you have an e-mail?

7           (Whereupon, a sotto voce discussion was had

8           between Mr. Hunt and the agent.)

9           MR. HUNT:  And, again, Judge, you know, this is

10  not something I'm coming prepared to discuss.  Mr. Bell just

11  raised this for the first time when I walked in the door.  The

12  information I have -- and this comes from my criminal chief

13  last night -- was that information is being circulating amongst

14  the bar that CCA is recording privileged meetings between

15  defendants and attorneys.  I was asked about this earlier

16  today, and made contact with the U.S. Marshals, who contacted

17  CCA's new warden, who provided the following information.  And

18  I'm not going to give the whole e-mail, but this information is

19  provided to the U.S. Attorney's Office.

20          In visitation rooms where attorneys meet with

21  their clients, there is a button.  I will call it, paren, a

22  panic button that can be pushed in order to contact Control --

23  Control being the people monitoring the facility -- if there is

24  an issue, and the attorney/client -- the attorney or client

25  needs help from prison personnel.  If the panic button is

1    activated, there is a camera in the visitation room that

2    Control can activate to see what's going on in the room.  There

3    is no recording function associated with this camera or the

4    panic button.  To be more clear, there is no way to record

5    visual or audio with this camera, so if someone is assaulted in

6    the visitation room, the contact will not be captured on video.

7                The reason the panic button was installed was due

8    to an incident when a Western District of Missouri Federal

9    Public Defender, something occurred with this individual a

10   couple of months ago.  The attorney needed assistance, and it

11   was later determined that a panic button and a camera were

12   necessary based on this incident.

13               I don't know what this incident was, but it

14   appears that the concerns that the Federal Public Defender have

15   are not based upon -- they're not factually accurate.  But this

16   is still in the stages where my management and people are

17   talking about this, but I don't think that it's something that

18   the facility is doing that is going to be violating and, in

19   fact, whatever they're doing appears to be done in reaction to

20   some assistance that was needed by a Federal Public Defender in

21   the Western District of Missouri, which maybe this public

22   defender's office is aware of.

23               I know in the past there was a Federal Public

24   Defender was assaulted at CCA by one of his clients.  I

25   believe -- I can't remember the name of that public defender.

 1   I can't remember his name, but there was an incident.  But it's

 2   been quite some time ago.

 3          So that would be my response.  And, again, I'm a

 4   Johnny-come-lately.  I have an e-mail from my criminal chief.

 5   But based upon what has been provided to me, it doesn't sound

 6   to me like there is a concern with CCA, and it doesn't appear

 7   to be that interactions between attorney and clients are being

 8   recorded; it's a function of security, to provide security, it

 9   would appear, from this e-mail, for the defendant, the

10   facility, and the attorney.

11          So setting that aside, I think that, at the very

12   least, until that is addressed in this particular case here

13   today, based upon the representations of a waiver under the

14   statute, that this court could resolve this case by saying

15   you're detained and, U.S. Marshals, make sure that any visits

16   that occur or whichever facility has them in custody, that

17   there will be no monitoring of any attorney/client

18   communications that are privileged.  And it's important to add

19   "that are privileged."

20          Does the court have any questions?

21          THE COURT:  Say the last part of what you said

22   about how the U.S. Marshals and how that might be --

23          MR. HUNT:  Just -- and obviously, you know, and I

24   think that, you know, I understand that the Federal Public

25   Defenders' concerns.  I would have appreciated some notice of

1    it before I came here today so I could come in with people who

2    have more juice than I do on issues of policy.  But I think for

3    purposes of where we stand here today, I think we take the

4    marshal -- the facility's warden at their word.  But,

5    obviously, I can't speak to other facilities the marshals have

6    contracts with, and I'm not the person of the final say here.

7              But what I suggest to the Court for this

8    particular defendant and this particular case, that the Court

9    direct that one of the conditions of his confinement be that

10   his privileged communications not be monitored.  How that's

11   done or not done is not something that I think, you know, I

12   could comment further on that, but I think that we are not in a

13   position where we would want anyone to violate the

14   attorney/client privilege.  It's just not our policy to do

15   that.  And I think that in this particular case, until this

16   issue is resolved, because obviously it needs to be resolved if

17   the Federal Public Defenders believe that this is occurring,

18   perfectly legitimate concern, but I don't believe it is.

19             But to just ensure the concerns for this

20   particular defendant, I think the Court can address that by way

21   of a condition, in this case of confinement, that his private

22   communications not be monitored between he and the client that

23   would otherwise legally be subject to a privilege.  And it

24   seems to me that mechanism they appear to have there is to

25   protect individuals from each other, from the -- yeah.

```
 1                THE COURT:  All right.  Thank you.

 2                MR. HUNT:  Uh-huh.

 3                THE COURT:  Mr. Bell?  And before you -- come on

 4    up.  You can --

 5                MR. BELL:  Let me speak with Mr. Hunt really

 6    quick.  I wanted to see it.

 7                THE COURT:  All right.

 8                (Whereupon, a sotto voce discussion was had

 9                between Mr. Bell and Mr. Hunt.)

10                MR. HUNT:  And, this -- Judge, he'll speak and

11    I'll follow up.

12                THE COURT:  Could I ask you a question first?  I

13    want to be sure I understand your position.  Mr. Bell, you're

14    saying that your client is willing to waive a detention

15    hearing; correct?

16                MR. BELL:  My client will stipulate that, as it

17    relates to the supervised release case, that he would not be

18    able to meet his burden that -- by clear and convincing

19    evidence -- that he was not a flight risk or a danger to the

20    community.

21                He's also willing to stipulate that the

22    Government, by virtue of the indictment alone, would be able to

23    show that there is probable cause that he committed the offense

24    and that they would have evidence which would also prove that

25    meet their burden that he is not a danger to the community or a
```

1    flight risk.

2              The part we are not waiving is that there is a

3    facility that would give him reasonable accommodations for

4    private attorney consultation.  So to the extent that -- and

5    we're in kind of uncharted waters here because we can't find

6    any cases where something like this happened.  But to the

7    extent that that is a prerequisite for ordering detention at

8    all, and the way the statute is constructed that certainly

9    seems like it is because the statute says it has to be in the

10   detention order --

11             THE COURT:  What has been to be in the detention

12   order?

13             MR. BELL:  The fact that he has to go to a place

14   that has reasonable accommodations for private attorney

15   consultation, so the way the --

16             THE COURT:  Can you give me that statute?

17             MR. BELL:  Sure.  It is at 18 U.S.C. 3143, and

18   then it's under subsection (i) subsection (3).

19             THE COURT:  Subsection (i).  Sorry, are you under

20   A, B, or C?  You said 3143; correct?

21             MR. BELL:  Yes.  And if I scribbled it down wrong,

22   I apologize.

23             THE COURT:  Do you want to look at my statute

24   book?

25             (Brief pause.)

```
 1                    THE COURT:  Okay.  Thank you.  Okay, so it's under

 2      3142 that you're referring to.

 3                    MR. BELL:  My apologies, Your Honor.

 4                    THE COURT:  That's okay.  All right.  I see it.  I

 5      see it.  And you're referring, just for the record, to 18

 6      U.S.C. 3142(h)(i), sub (3).

 7                    MR. BELL:  And, Your Honor, to the extent that the

 8      U.S. Attorney argues that this is not occurring, I would point

 9      the court to two things:  the first, this is a partial

10      transcript of a hearing in front of Judge Robinson two weeks

11      ago in the case U.S. v. Lorenzo Black.  And I have -- if I may

12      approach.

13                    THE COURT:  Sure.

14                    MR. BELL:  Give you a bit of background.  This is

15      a case where they're investigating wrongdoing at CCA.

16                    COURTROOM DEPUTY:  You need to stay by the

17      microphone.

18                    MR. BELL:  Okay.  This is the case where they're

19      investigating wrongdoing in front of CCA, and they're talking

20      about the discovery.  And the Court asks, in the part that we

21      highlight, Are you telling me that basically there are cameras

22      in the attorney/client rooms?  And Ms. Tomasic says -- the

23      Assistant United States Attorney prosecuting the case, Ms.

24      Tomasic says, Yes, but they don't record audio unless

25      essentially they're trying to do so.
```

1          We also have, late last night, we have an e-mail

2    from the marshals in the Western District of Missouri.  We

3    asked them for a list of facilities that did record visits or

4    the audio visits, and CCA is on that list.  Obviously, the

5    marshals in the Western District use CCA as a contract facility

6    as well.

7          I've just handed Mr. Hunt a copy of that.  And if

8    I might approach, I can hand the Court a copy of it as well.

9          THE COURT:  All right.

10          MR. BELL:  It's on the second page of the

11    document, towards the bottom.

12          I will also tell the Court that in that *Black* case

13    a member of the CJA panel was invited by Ms. Tomasic to review

14    video of her meeting with a client at CCA.  And that meeting

15    apparently never took place and panel counsel never reviewed

16    that video but the representation made to the panel attorney

17    was that the U.S. Attorney's Office was in possession of a

18    video recording of her meeting with a client in the interview

19    room at CCA.

20          THE COURT:  All right.  Anything further on that

21    point, Mr. Bell?

22          MR. BELL:  No, Your Honor.

23          THE COURT:  All right.  I don't think I need to

24    hear anything further.  Mr. --

25          MR. HUNT:  Judge, if I could, just very briefly.

1    I think that the public defender's office is taking this case

2    and this opportunity to make a point.  And I think that there

3    are things that are occurring -- I've never seen these

4    documents.  I haven't seen this transcript.  I'm generally

5    aware that there is some controversy including Ms. Tomasic,

6    Ms. Tomasic's case, the Federal Public Defender's Office and

7    some other attorneys.  Now there are e-mails from the various

8    public defenders to different facilities.  And what I think I

9    would ask the Court to do is, under the Bail Reform Act -- I'd

10   have to go and look for the exact citation -- that detention

11   hearings should occur within three days unless there's some

12   kind of special circumstance.  And I think that with --

13   essentially what is attempting to be litigated here today, that

14   the record should be more developed, it should be developed by

15   people other than the case attorney who has very little

16   relevant information about this, and that I would ask that this

17   hearing be carried over and that the Court not make a

18   determination until people with information in the appropriate

19   format, who have been provided information, are able to address

20   it.

21           And that's probably not going to be me, because

22   this appears to be a case that is being utilized to make a

23   point.  And I think that the Government needs to be able to

24   adequately respond to the situation that has been alleged.

25   And, again, the people involved in this are able to address the

1    court.  So I think these types of circumstances are ripe in

2    this particular case for at least a short continuance so people

3    can, you know, get their ducks in a row, so to speak.

4              In the meantime, we do not want the defendant out

5    on the street, so I think it would be reasonable, until this

6    matter is resolved in this case on a micro level, to order the

7    defendant to be held until that point, and to direct the

8    Marshals Service not to audiotape or record private, privileged

9    communications between the defendant and counsel.

10             And, again, I'm not here to litigate what is

11   privileged in a jail setting versus what is not.  I'm just not

12   prepared to do that.  But I think that a reasonable

13   accommodation can be reached in these circumstances.  But the

14   issues that have been presented and this vehicle is being used

15   as a case to do it, I think it probably shouldn't be resolved

16   here today.  That would be my request, Judge.

17             THE COURT:  All right.  The Court is ready to

18   rule.  I am not minimizing the concerns raised by the

19   defender's office.  And if private conversations,

20   attorney/client conversations, have been recorded

21   surreptitiously, that's an issue that should be addressed, but

22   I don't think it's appropriate to be addressed here today by

23   me, especially on the limited information I have in front of

24   me.

25             I do believe, as the Government has argued, that I

1  am in a position to make -- enter a detention order that does

2  what the law requires, and so I am going to order, given the

3  defendant's stipulation that he could not prove that he

4  wouldn't be a danger to society or to others or to other

5  persons if released or that he wouldn't be a flight risk, given

6  his stipulation to that I think it would be very unwise for me

7  to allow him to be released under those terms.

8          So I make those findings that the defendant has,

9  on the record, stipulated that he couldn't disprove or rebut

10  that he is a flight risk and/or would be a danger to the

11  community or to others if released.

12          And then I'm going to combine that with my order

13  of detention will specifically provide, as required under 18

14  U.S.C. Section 3142(h)(i)(3), that the defendant be afforded

15  reasonable opportunity for private consultation with counsel

16  while he's being detained.

17          And let me be a bit more specific about that.

18  One, my order will be that the U.S. Marshals instruct and

19  ensure at CCA that no attorney/client-privileged communications

20  occur that are being recorded with audio recording of this

21  defendant while he's being detained; and, two, if there is any

22  concern that that might be happening, that the marshals are to

23  report that and that the defendant can be brought here to the

24  courthouse, where he can have a private consultation with his

25  counsel.

1          I think those two provisions provide the

2   protection required under the statute, and I think that is the

3   proper way for me to ensure that the proper protections are

4   provided in this situation where the defendant has essentially

5   waived the detention hearing but there is this concern about

6   ability to have private attorney/client consultations.  And

7   I'm, by this order, ensuring that that happens.

8          And I'm sure that the marshals will do what's

9   necessary to ensure that Mr. Wright has the ability to have

10  private attorney/client consultation.

11          MARSHAL THIBAULT:  Your Honor, when you mention

12  that by your order you'll ask that no audio recording of the

13  conversation, would the court also include video recordings as

14  well of those meetings?

15          THE COURT:  Ensure that video recordings do not

16  happen?

17          MARSHAL THIBAULT:  Right, audio or video

18  recordings, prohibition on audio or video.

19          THE COURT:  I don't know if that's a

20  security concern.  What's the Government's position on that?

21          MR. HUNT:  Judge, and, again, I'm the wrong person

22  to be addressing it and that's why it's so unfortunate that

23  this case is being used as a vehicle as it is by the public

24  defender's office.  That said, I'm aware, and I want to --

25  Travis Poindexter, he was a classmate of mine in law school, I

1          THE COURT:  What do you mean by that, Mr. Hunt?

2   So there'd be video, but it wouldn't be recorded?

3          MR. HUNT:  That appears to be -- that Mr. Bell

4   does not have a concern that there is monitoring, but he

5   doesn't want the recording.  And I don't know if -- I don't

6   know the mechanics.  And, again, like I said, I'm not coming in

7   here prepared to talk about this.  It's just happened.  But it

8   seems reasonable to direct that this particular defendant be

9   permitted to meet with his attorney where it's not been audio

10  recorded and it's not been video recorded, and even if it is --

11  and maybe there's something that we all don't know about, I

12  don't know -- that that recording never be provided to the

13  Government, if there is such a recording.  Because, you know, I

14  do not want there to be anything like that occurring because he

15  has the right, under the law, the Constitution, to private,

16  confidential communications with his client.  Obviously, that

17  has to be balanced with the security of a facility.  So I

18  think, for this case here today, I think the Court's solution

19  is a reasonable solution.

20          The larger issue of what's going on, you know, I'm

21  just not prepared to address that.

22          THE COURT:  Okay.  Mr. Bell, do you have any

23  problem with what Mr. Hunt has suggested as far as there being

24  a video recording but my order being that it not be provided to

25  the Government, that it's there for security purposes?

 1    believe was a subject -- was a victim of assault at CCA by his

 2    own client.  The warden, in that -- in that communication that

 3    I read to the court, alleged another FPD, so I'm sure the FPD's

 4    office know that there have been some incidents with respect to

 5    security.  So I can only postulate that the camera is there to

 6    protect the PD and the client from each other, potentially.  I

 7    don't know.

 8              So, yes, it's probably a security feature of the

 9    facility, which obviously the facility would have a duty to

10    protect everybody.  So -- but I'm just not in a position to be

11    able to speak to that as to whether this should not be

12    audiotaped, but I think I can, unless I'm very mistaken, we

13    should not be in a position where privileged, private

14    communications should be being monitored.  But, again, I'm not

15    the person to address this at this point in time, but I do

16    understand the Court's order and I think it's reasonable.  But

17    as far as videotaping, I don't know.

18              THE COURT:  I don't know that a videotape is

19    attorney/client -- would be attorney/client privileged.

20              MR. BELL:  Your Honor, the rationale for the --

21    there are several reasons for a videotape of a meeting, even if

22    there is an audio, it's attorney/client privilege.  But the one

23    that jumped out most is any exchange of documents, for instance

24    if I have an investigator go interview somebody and I hand that

25    report to my client, then that gives, by just videoing the

 1    meeting, gives whoever's watching the video, especially if

 2    they're recording it, a composite, an opportunity to read that

 3    report.  The same thing with any other privileged material that

 4    I might hand to my client during that meeting.  It basically

 5    permits whoever's watching the video the ability to inspect

 6    those documents.

 7             And there's a host of other reasons as well given.

 8    Body language, if we show a certain document and he has a bad

 9    reaction to it, there are a number of different ways, through

10    nonverbal conduct that are still communication, and there's a

11    bevy of case law that talks about how in the co-conspirator

12    exception to the hearsay rule context, about how body language

13    and gestures are communications and are conduct.  While as a

14    Federal Public Defender, I agree largely with Mr. Hunt's

15    summation of the need, for safety reasons, to have the cameras

16    in the room.  And we're not talking about moving the cameras

17    out.  They can still be monitored, which that's all -- which

18    still protects all the safety reasons that Mr. Hunt's talking

19    about, but there's no reason to record them and preserve them

20    for later review.

21             THE COURT:  What is the marshal's policy or

22    what -- on audiotaping?

23             MARSHAL THIBAULT:  Your Honor, all the cameras,

24    just like here in the courthouse, are recorded on motion.  The

25    main reason we have cameras at CCA and here is strictly for

1   security.  The issue that Mr. Bell, the public defenders, are

2   beating to death about the camera in the attorney room was

3   specifically because a Federal Public Defender was ready to

4   leave, couldn't get anybody's attention, and started beating on

5   the door.  The Federal Public Defender stated she was -- he or

6   she, I don't know, was very pissed that she had to wait or they

7   had to wait.  That's why the camera was installed, along with a

8   panic button.

9           All people going in and out of CCA are videotaped,

10  manual recorded.  And it cuts two ways.  We also have video

11  evidence of attorneys doing things at CCA they shouldn't have.

12  So the cameras are there for security.  I can assure you, in 20

13  years of me doing this, that no video or audio recordings have

14  been made surreptitiously to be used against the public

15  defender or their defendants or anybody else.

16          MR. HUNT:  And if I could just interject.  Thank

17  you very much.

18          THE COURT:  Thank you.

19          MR. HUNT:  If I could interject.  I think, you

20  know, for purposes of this particular case, in trying to keep

21  this on this particular case, that the Court could very

22  reasonably direct that there be no recording of any meeting

23  with Mr. Bell or any other attorney with Mr. Wright.  And that

24  would allay any concerns that they have in this particular

25  case.

1          MR. BELL:  Your Honor, I guess my -- I took

2    Mr. Hunt's statement to be that there would just be no

3    recording, no recording at all, that there would be no audio or

4    video recording.  And I would be willing to do -- that would be

5    a reasonable accommodation.  The video can be monitored for

6    security reasons, for whatever reason, but not recorded for

7    later investigatory use.

8          Regarding whether it not be provided to the

9    Government in that order, while in spirit that would be a fine

10   way to compromise, under the practicalities of notifying CCA,

11   CCA not getting notice of it and it getting turned over to the

12   U.S. Attorney's Office without notice to us, there's too much

13   we wouldn't know to be able to bring it around to ask for

14   legitimate enforcement of that order.  If my words make any

15   sense.

16          It seems to me that the easier way is to just use

17   Mr. Hunt's first suggestion, which we agree with, is that there

18   can be video monitoring but there can't be any recording,

19   whether it be audio or video.

20          THE COURT:  Mike, and so that the record is clear,

21   would you state your full name and -- before you --

22          MARSHAL THIBAULT:  Michael Thibault,

23   T-H-I-B-A-U-L-T.

24          THE COURT:  Thank you.

25          MARSHAL THIBAULT:  I'm the supervisory deputy of

1    the U.S. Marshals, the marshals here in Kansas City, Kansas.

2              THE COURT:  Thank you.  And you're the same

3    marshal who spoke a few minutes ago; correct?

4              MARSHAL THIBAULT:  Yes, Your Honor.

5              THE COURT:  A follow-up question for you.  Is it

6    possible that, with the current system in place, to do as

7    Mr. Hunt suggested and have the video going for monitoring

8    purposes without recording?

9              MARSHAL THIBAULT:  That I do not know.  I can

10   speak for here.  Everything's recorded.

11             THE COURT:  "Here" being in the courthouse?

12             MARSHAL THIBAULT:  In the courthouse.

13             THE COURT:  Okay.

14             MARSHAL THIBAULT:  And after 30 or 45 days,

15   whenever the terabyte hard drive is full, it records over.  The

16   only way to retrieve it is to go back in and physically pull it

17   off.  I myself do not have a password that allows me to do

18   that.  Only my senior manager does.  I'm assuming it's the same

19   thing at CCA, but I don't know that for a fact.

20             THE COURT:  Okay.  All right.  Well, I don't -- I

21   don't know what the situation -- how CCA's set up.  I am not

22   going to enter an order today that might conflict with what the

23   standard procedure is for video recording at CCA and that might

24   impair security or lead to security problems.

25             So my order will be as previously stated.  That

1    will stand.  In addition, though, as an additional safeguard,

2    my order will be that no video recording that is taken, if

3    there is a video recording made of any attorney/client meetings

4    with the defendant here, no such recording will be provided to

5    the Government in this case.  All right.

6              Have I covered the base -- anything further for

7    the Government, Mr. Hunt?

8              MR. HUNT:  No, Judge.

9              THE COURT:  Mr. Bell?

10             MR. BELL:  No, Your Honor.

11             THE COURT:  Okay.  And bear in mind, Mr. Bell, if

12   there are concerns, you can always request that your client be

13   brought here and that you have the opportunity to meet with him

14   here at the courthouse.

15             MR. BELL:  Thank you, Your Honor.

16             THE COURT:  Okay.  Thank you.  We'll be in recess.

17             COURTROOM DEPUTY:  All rise.

18             (Whereupon, the proceedings were concluded at

19             2:11 P.M.)

20

21

22

23

24

25

CERTIFICATE

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled

matter.


                              s/ Johanna L. Wilkinson
                              Johanna L. Wilkinson, CSR, CRR, RMR
                              United States Court Reporter

**From:** "Oakley, Chris (USAKS)" <Chris.Oakley@usdoj.gov>
**To:** "ksd_robinson_chambers@ksd.uscourts.gov" <
ksd_robinson_chambers@ksd.uscourts.gov>
**Cc:** "Bonnie_Wiest@ksd.uscourts.gov" <Bonnie_Wiest@ksd.uscourts.gov>, "Barnett,
Debra (USAKS) 1" <Debra.Barnett@usdoj.gov>, "Melody_Brannon@fd.org" <
Melody_Brannon@fd.org>, "cindy@cdodgelaw.com" <cindy@cdodgelaw.com>, "
david@guastellolaw.com" <david@guastellolaw.com>, "Slinkard, Duston (USAKS)" <
Duston.Slinkard@usdoj.gov>, "Tomasic, Erin (USAKS)" <Erin.Tomasic@usdoj.gov>, "
jacksonmm@aol.com" <jacksonmm@aol.com>, "jlaurans@msn.com" <
jlaurans@msn.com>, "john.jenab@gmail.com" <john.jenab@gmail.com>, "
jphoffman@sbcglobal.net" <jphoffman@sbcglobal.net>, "kaambrosio@yahoo.com" <
kaambrosio@yahoo.com>, "kate@zigtemalaw.com" <kate@zigtemalaw.com>, "
rokuseklawoffice@yahoo.com" <rokuseklawoffice@yahoo.com>, "
snaseem@berkowitzoliver.com" <snaseem@berkowitzoliver.com>, "Kirk Redmond " <
Kirk_Redmond@fd.org>
**Subject: 2:16-cr-20032-JAR USA v. Black et al**

Dear Judge Robinson:

Pursuant to the Court's Order, attached please find letter
and email communications sent to those persons and entities
to whom recorded CCA-Leavenworth calls were made available.
The letters and emails were sent within 24 hours of the
Court's Order.



EXHIBIT

455

The persons whom the calls were made available are the
following Defense Attorneys: John Jenab, David J. Guastello,
Cynthia M. Dodge, Jason P. Hoffman, and Michael M. Jackson.

Additionally, the recordings were made available to the
following entities: Kansas Bureau of Investigation, United
States Secret Service, United States Marshals Service, and
Internal Revenue Service-Criminal Investigations. We
specifically notified Special Agents John Seubert (Secret
Service), Glen Virden and Jeff Stokes (KBI), Henry Herron
(IRS), and Zachary Howard (USMS), whom we know were provided
access to the recordings. However, as indicated in the email
to the agents, we asked them to provide us with the names of
any other agents from their respective agency who were
provided access to the recordings. As soon as we receive
completed responses, we will notify the Court.

Chris Oakley
Assistant United States Attorney

*(See attached file: Letter to counsel re Court's Clawback Order.pdf)(See attached file: Email to Agents re CCA Recorded Phone Calls.pdf)[attachment "Letter to counsel re Court's Clawback Order.pdf" deleted by Laura Shaneyfelt/KSF/10/FDO] [attachment "Email to Agents re CCA Recorded Phone Calls.pdf" deleted by Laura Shaneyfelt/KSF/10/FDO]*

1

1

2              UNITED STATES DISTRICT COURT
                  DISTRICT OF KANSAS
3

UNITED STATES OF AMERICA,        Docket No. 14-20067-CM
4

    Plaintiff,                   Kansas City, Kansas
5                                Date: 8/22/16

      v.
6

ASHLEY HUFF,
7

    Defendant.
8    . . . . . . . . . . . . . . . . . .

9                      TRANSCRIPT OF
                      STATUS HEARING
10         BEFORE THE HONORABLE CARLOS MURGUIA,
              UNITED STATES DISTRICT JUDGE.
11

   APPEARANCES:
12

   For the Plaintiff:   Kim Flannigan & Erin Tomasic
13                       Asst. US Attorneys
                         360 US Courthouse
14                       500 State Avenue
                         Kansas City, KS  66101
15

   For the Defendant:   William Session
16                       The Session Law Firm
                         420 Nichols Road, #200
17                       Kansas City, MO  64112

18 Court Reporter:       Nancy Moroney Wiss, CSR, RMR, FCRR
                         Official Court Reporter
19                       558 US Courthouse
                         500 State Avenue
20                       Kansas City, KS  66101

21 Proceedings recorded by machine shorthand, transcript
   produced by computer-aided transcription.
22

23

24                                      EXHIBIT

25                                        456

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
| 10:04:52 | 1  | THE COURT:  Court calls Case                            |
| 10:04:56 | 2  | Number 14-20067-09.  It's a case entitled United States |
| 10:05:01 | 3  | of America versus Ashley Huff.  Parties please enter    |
| 10:05:03 | 4  | their appearance.                                       |
| 10:05:03 | 5  | MS. TOMASIC:  May it please the court, the              |
| 10:05:05 | 6  | United States appears by Erin Tomasic and Kim Flannigan.|
| 10:05:08 | 7  | MR. SESSION:  The defendant is represented              |
| 10:05:11 | 8  | by William Session, Your Honor.                         |
| 10:05:12 | 9  | THE COURT:  Miss Huff, as you're aware, the             |
| 10:05:15 | 10 | court's all ready begun a sentencing hearing regarding  |
| 10:05:18 | 11 | your case.  As you know, at the last court appearance or|
| 10:05:22 | 12 | last notification from the court, that sentencing       |
| 10:05:25 | 13 | hearing was continued, and so, we want to keep track of |
| 10:05:30 | 14 | your case.  So, we're just going to ask, what is the    |
| 10:05:32 | 15 | status of the hearing at this point?                    |
| 10:05:36 | 16 | MR. SESSION:  Your Honor, at this point, as             |
| 10:05:38 | 17 | the court just recalled, we began a sentencing hearing I|
| 10:05:41 | 18 | believe on August 3rd.  It was set for a continuance to |
| 10:05:47 | 19 | be concluded on August 8th.  In the interim, Miss Huff  |
| 10:05:54 | 20 | through counsel filed a motion for a continuance of that|
| 10:05:57 | 21 | hearing, which was granted.  In addition, Miss Huff     |
| 10:06:01 | 22 | filed through counsel a motion for confidential         |
| 10:06:04 | 23 | visitation and a return of certain property.  I won't go|
| 10:06:11 | 24 | through significant detail about that, but the          |
| 10:06:13 | 25 | pleadings, of course, indicate that there may be issues |

10:06:18  1  involving defendant Huff's Constitutional rights

10:06:21  2  relating to matters that occurred in another case,

10:06:26  3  discovery matters, that is United States versus Black,

10:06:29  4  CR 20032.  So, the status of things, Your Honor, is that

10:06:34  5  we are in the middle of a sentencing hearing.  It has

10:06:37  6  been continued because of the issues I've just briefly

10:06:40  7  alluded to.  Miss Huff would like to have the status

10:06:45  8  conference continued for at least 60 days; the reason

10:06:49  9  being that in that companion case, US v Black, there is

10:06:54  10  pending a consideration of a request for a special

10:06:59  11  master to be appointed to interrogate -- to investigate

10:07:04  12  the nature and extent of potential recordings of

10:07:09  13  attorney/client contacts, including those that may have

10:07:13  14  occurred between myself and Miss Huff.  Miss Huff

10:07:19  15  believes and I believe that her Sixth Amendment right to

10:07:23  16  effective assistance of counsel is implicated by that

10:07:27  17  proceeding in US v Black.  In order to preserve her

10:07:32  18  Constitutional rights, we think it best that this

10:07:35  19  matter, that is, the sentencing and the status

10:07:38  20  conference, be continued until there is more clarity

10:07:41  21  about the potential or actual fact of any intrusion into

10:07:46  22  those attorney/client contacts.  That's essentially the

10:07:50  23  status as I see it of the case today, Your Honor.

10:07:54  24        THE COURT:  Anything from the government?

10:07:56  25        MS. TOMASIC:  Yes, Your Honor.  Your Honor,

| | |
|---|---|
| 10:08:03 | 1 |
| 10:08:06 | 2 |
| 10:08:08 | 3 |
| 10:08:12 | 4 |
| 10:08:15 | 5 |
| 10:08:18 | 6 |
| 10:08:21 | 7 |
| 10:08:25 | 8 |
| 10:08:28 | 9 |
| 10:08:31 | 10 |
| 10:08:34 | 11 |
| 10:08:39 | 12 |
| 10:08:42 | 13 |
| 10:08:45 | 14 |
| 10:08:50 | 15 |
| 10:08:54 | 16 |
| 10:08:57 | 17 |
| 10:09:00 | 18 |
| 10:09:02 | 19 |
| 10:09:05 | 20 |
| 10:09:10 | 21 |
| 10:09:13 | 22 |
| 10:09:17 | 23 |
| 10:09:20 | 24 |
| 10:09:24 | 25 |

the government has not yet responded in writing to
defendant's motion, and we would request a response
date, preferably a time period of between 14 and 30 days
from now to respond in writing.  I would just like to
clarify for the record, because I know that these
motions have been filed in a number of other cases.  I
am counsel of record, along with Chris Oakley, in United
States v Black, and so, given the flurry of excitement
and interest in this case, I wanted to clarify some
facts as relevant now for the court.  The government
issued a subpoena in April 2016 to CCA in Leavenworth
for all the surveillance footage in the facility for a
certain time period.  The government did not intend to
seek any video recordings of attorney/client meetings.
The government was uncertain up until Jackie Rokusek
came in to view the video inside the US Attorney's
office whether we even had video recordings of
attorney/client meetings, and I would just like to say
that those meetings are evidently video-recorded but not
audio-recorded.  But to be abundantly clear, no employee
of the United States Attorney's office and no agent or
law enforcement officer has viewed any of this footage.
The only persons who have viewed any recordings of
attorney/client meetings are Jackie Rokusek, her
investigator Mike Busell (ph), and Shazzie Naseem who

| | |
|---|---|
| 10:09:27 | 1 |
| 10:09:29 | 2 |
| 10:09:32 | 3 |
| 10:09:35 | 4 |
| 10:09:40 | 5 |
| 10:09:43 | 6 |
| 10:09:45 | 7 |
| 10:09:48 | 8 |
| 10:09:51 | 9 |
| 10:09:53 | 10 |
| 10:09:56 | 11 |
| 10:10:00 | 12 |
| 10:10:02 | 13 |
| 10:10:05 | 14 |
| 10:10:09 | 15 |
| 10:10:12 | 16 |
| 10:10:15 | 17 |
| 10:10:19 | 18 |
| 10:10:22 | 19 |
| 10:10:26 | 20 |
| 10:10:30 | 21 |
| 10:10:34 | 22 |
| 10:10:39 | 23 |
| 10:10:42 | 24 |
| 10:10:45 | 25 |

was in the room with them at the same time. So, to the
extent that the government did have this footage in its
possession, it intentionally did not view it once it
became aware that it may have the footage. A taint team
was in place regarding other attorney/client issues that
had all ready been presented in that case. Counsel for
the government was working with all counsel of record in
the Black case regarding potential privileged
information that had been seized as part of this
investigation, and there is simply no harm that has come
about, because no one apart from Jackie Rokusek, her
investigator, and Shazzie Naseem have viewed this
footage. So, I did just want the court to be aware of
those facts moving forward as the same motions have been
filed in a number of cases. Government will respond in
writing to defendant's motion, and we would like this
court to hear that matter, as the Black discovery was
distributed to Miss Huff in this case. It does seem as
though a number of defendants are attempting to engage
in forum shopping and have Judge Robinson hear all of
these motions, but the Black discovery was sent to Miss
Huff, Miss Rokusek, and a third attorney, Rick Johnson,
as part of the Rapp/Dertinger case, and this court
should hear those motions, not Judge Robinson. Thank
you, Your Honor.

10:11:19  1          THE COURT:  Here's what I'm inclined to do.

10:11:21  2   I'm inclined to grant defendant's request for reasons

10:11:24  3   mentioned here in the courtroom to continue our

10:11:26  4   sentencing hearing to either have it be a sentencing

10:11:28  5   hearing or status hearing on October 24th at 10:00 AM in

10:11:38  6   the morning.  You had asked for a response date, is that

10:11:44  7   correct, Miss Tomasic?

10:11:45  8          MS. TOMASIC:  Yes, Your Honor.

10:11:45  9          THE COURT:  September 12th.  If there's

10:12:00  10  nothing else, this hearing's adjourned.  Thank you.

10:12:02  11          (Whereupon court recessed proceedings.)

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

C E R T I F I C A T E

    I, Nancy Moroney Wiss, a Certified Shorthand Reporter and the regularly appointed, qualified and acting official reporter of the United States District Court for the District of Kansas, do hereby certify that as such official reporter, I was present at and reported in machine shorthand the above and foregoing proceedings.

    I further certify that the foregoing transcript, consisting of 7 typewritten pages, is a full, true, and correct reproduction of my shorthand notes as reflected by this transcript.

    SIGNED August 23, 2016.


                    S/_____

                    Nancy Moroney Wiss, CSR, CM, FCRR

12-20115  USA v James Benimon, II  8.22.16  Vol. I                1

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4     Plaintiff,                      Docket No. 12-20115

 5     v.

 6   JAMES BENIMON, II,                Kansas City, Kansas
                                       Date:  August 22, 2016
 7     Defendant.
                                       Volume I
 8

       .........................
 9
               PARTIAL TRANSCRIPT OF REVOCATION HEARING
10                        MOTIONS EXCERPT
               BEFORE THE HONORABLE KATHRYN H. VRATIL
11         SENIOR UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   For the             Kim I. Flannigan
     Plaintiff:          United States Attorney's Office
14                       500 State Avenue
                         Suite 360
15                       Kansas City, KS 66101

16
     For the             Branden A. Bell
17   Defendant:          Office of Federal Public Defender
                         117 SW 6th Avenue
18                       Suite 200
                         Topeka, KS 66603
19

20

21

22
        Proceedings recorded by machine shorthand, transcript
23   produced by computer-aided transcription.
     _____
24            Kimberly R. Greiner, CSR, RMR, CRR
             Federal Official Court Reporter
25                    500 State Avenue
               Kansas City, Kansas  66101
```

**EXHIBIT**

tables'

**457**

12-20115  USA v James Benimon, II   8.22.16  Vol. I          2

 1              (Court called to order.)

 2              THE COURT:  Good morning.  Court calls

 3  *United States versus James Benimon, II*, Case

 4  No. 12-20115-01.  Will counsel state their appearances,

 5  please.

 6              MS. FLANNIGAN:  Your Honor, the United

 7  States appears by Kim Flannigan.

 8              MR. BELL:  Mr. Benimon appears in person and

 9  through counsel Branden Bell.

10              THE COURT:  Thank you.  We are here on a

11  violation report which was prepared May 4, 2016 and

12  revised on August 17, 2016.  I think there's some

13  preliminary issues that we need to look at, but this

14  whole issue with regard to CCA communications is sort of

15  a moving target because things have been happening

16  quickly.

17              Is it possible to put down this monitor

18  because -- this one right here?

19              MS. FLANNIGAN:  Is this good enough, judge?

20              THE COURT:  Yeah, well, sit down and we'll

21  see.

22              MS. FLANNIGAN:  Better?

23              THE COURT:  So do we have any reason to

24  believe that, in the case of this particular defendant

25  and this particular counsel or any prior counsel for

 1   Mr. Benimon, that there were confidential and privileged

 2   communications at CCA that were intercepted?

 3          MS. FLANNIGAN:  Your Honor, if I might just

 4   address that.  I think that some of the -- some of the

 5   issues surrounding the case is because the facts have

 6   not yet been fully developed.  And what I can tell the

 7   court is that, as part of the CCA investigation which is

 8   a Judge Robinson case, the *Black* case, our office

 9   subpoenaed, I believe in April, all of the video

10   recordings from that facility as part of the

11   investigation.  So we received the information pursuant

12   to a grand jury subpoena.  We did not know at the time

13   that CCA was recording the attorney-client rooms, so our

14   obtaining those videos was inadvertent.

15       What happened next, Your Honor, that we became

16   aware that those were recorded.  We were trying to

17   determine whether or not they were just monitored or

18   whether they were recorded.  We got some conflicting

19   information from the Marshal Service and from CCA

20   itself, which I think the Marshal Service got the

21   information from CCA.

22       We had already put in place a taint team because

23   of other attorney-client issues that were going to

24   arise; for example, we issued a search warrant for the

25   CCA facility and that included the law library

1    computers.  The attorneys of record were working with

2    the other attorneys of record on the case to deal with

3    those attorney-client issues and how to deal with them.

4         When we became aware that those attorney-client

5    visiting rooms recordings existed, we were already in

6    the process of discussing who would be our taint agent

7    to review them to determine if there was any

8    attorney-client confidentialities or any attorney-client

9    privilege that was implicated.  To date -- and I can --

10   and put this on the record -- not a single employee of

11   the United States Attorney's Office has reviewed the

12   attorney-client video portions.  Not a single case agent

13   who's working on the *Black* case has reviewed any of the

14   video footage related to the attorney visiting rooms.

15   And so there can be no prejudice really at this point.

16        The government's response in this case was the

17   way it was because I believe Mr. Bell was asking me to

18   confirm whether or not there had be any videos, and I

19   can't do that because I have not reviewed it.  Nobody on

20   my staff has reviewed it.  No case agents have reviewed

21   it.

22        So my response was to ask Mr. Bell tell me why

23   you think that there would be video in here.  And

24   without going in and looking at it, obviously we're not

25   going to be able to know whether he was visiting his

1    client during this time frame that we requested the

2    subpoena.

3         As the court knows, Judge Robinson has now

4    impounded all those videos in any event.  So even if I

5    wanted to go back and look through them to see if

6    Mr. Benimon had been videotaped, I wouldn't be able to.

7         So it's the government's position that we did not

8    receive any confidential communications from

9    Mr. Benimon, or anyone else for that matter, because

10   nobody has looked at it.  And so therefore there can be

11   no prejudice to Mr. Benimon or any of the other

12   defendants at CCA at this point.

13             THE COURT:  Mr. Bell.

14             MR. BELL:  Thank you, Your Honor.  There are

15   sort of a known-known and known-unknown here.  The

16   known-known is what Miss Flannigan referred to are the

17   videos they obtained as a result of, or in response to,

18   the grand jury subpoena -- grand jury subpoena in the

19   *Black* case.  Those videos and that subpoena covered a

20   finite amount of time.  We have no reason to believe

21   that within those finite materials that there are any

22   recordings of Mr. Benimon's attorney-client meetings,

23   and we put that in our reply.

24        The known-unknown is whether this is the only

25   instance which these videos have been obtained or are

1   there other instances where the United States Attorney's

2   Office has obtained videos of attorney-client meetings.

3          What we do know is the recording system has been

4   in place since 2008 and that it has been recording those

5   rooms since that installation.  We also know from

6   testimony from CCA that if there is a request, rather,

7   through the Marshal Service for any of those videos,

8   that CCA does not require a subpoena because they

9   consider it to be Marshal's property and simply turn it

10  over.

11         So your question was whether -- do we have any

12  reason to think that Mr. Benimon's visits were recorded?

13  The answer's in two parts.  Not among the finite

14  materials that were produced as part of the *Black* case.

15  Second part is we don't know the answer to that without

16  an assurance from the United States Attorney's Office

17  speaking for the office that never before had they

18  reviewed any of the videos in the attorney-client room.

19              THE COURT:  So you're talking about was

20  there -- outside the scope of the grand jury subpoena?

21              MR. BELL:  Yes, Your Honor.

22              THE COURT:  And what would be the dates and

23  so forth that would be covered by that?

24              MR. BELL:  The recording system started in

25  2008.  So any time between then and present day.

1   Specifically as it relates to Mr. Benimon, he was housed

2   in CCA during his underlying case where there were

3   attorney-client visits by Mr. Bartee in my office.

4           THE COURT:  But what -- I mean, I don't

5   understand.  You said you're talking about materials

6   that wouldn't -- that would have been outside the scope

7   of the grand jury subpoena.  So what was the scope of

8   the grand jury subpoena?

9           MR. BELL:  I see, Your Honor.  I think the

10  subpoena -- and I'll rely on Miss Flannigan to correct

11  me if I'm wrong on the dates -- asked for videos from

12  April 2014 through March 2016.

13          THE COURT:  Is that -- is that right?

14          MS. FLANNIGAN:  I think that's correct, Your

15  Honor.  I do not have those dates in front me, but I

16  certainly can get them if the court wants them, but I

17  think that's approximately correct.

18          THE COURT:  Okay.  So this would pertain to

19  Mr. Benimon's initial conviction?

20          MR. BELL:  Yes, Your Honor.

21          MS. FLANNIGAN:  And, Your Honor, I guess my

22  response would be to that, I have been the attorney of

23  record on Mr. Benimon's case since the outset.  I can

24  represent that I have never requested any CCA videos in

25  my entire career.  The only time we've ever had the need

 1    to request -- I shouldn't say that because we've had

 2    some assaults at CCA and we may have requested pod video

 3    of the actual assault.  But I can say most of those had

 4    to do with USP Leavenworth in my career.

 5         I can represent to the court that I did not ask

 6    for any CCA videos as it relates to Mr. Benimon in his

 7    underlying case or in any -- any time during the whole

 8    pendency of this case.  So whether or not the

 9    government --

10         And I will say, just -- just so the court's

11    aware, we are in the process of polling our prosecutors.

12    I believe, based on my recollection, that there won't --

13    there will be a negative answer.  We're polling all our

14    prosecutors to see if anyone has ever requested CCA

15    videos in the past as it relates to attorney visiting

16    rooms.  I would almost bet my paycheck that the answer's

17    going to be no that nobody's ever asked for them.

18         But as it relates to this defendant in this

19    particular case, I can represent that I did not request

20    them and have never viewed any of them in his prior case

21    or since.

22              MR. BELL:  Your Honor, ordinarily that would

23    be sufficient.  The problem here is that the case law

24    says the Sixth Amendment violation doesn't stop with

25    Miss Flannigan.  If some other member of the office, for

1  whatever reason, was even in possession of those

2  recordings, it becomes a Sixth Amendment violation.  And

3  so it's a structural error.  We wouldn't even have to

4  show prejudice.  But we don't know if that structural

5  error has occurred until we know whether the office

6  itself has ever been in possession of those recordings.

7            THE COURT:  The recordings involving

8  Mr. Benimon, not just recordings in general?

9            MR. BELL:  Correct, recordings that involve

10  Mr. Benimon.

11            THE COURT:  So who else -- if Miss Flannigan

12  did not request them, has anybody else ever been

13  involved in this case from the government?

14            MR. BELL:  I don't think so, Your Honor, and

15  I would -- ordinarily that would end the inquiry.  The

16  reason I'm hesitant to say that's sort of the ball game

17  is that, in the *Black* case, what was requested and what

18  was produced involved attorney-client meetings that had

19  nothing to do with the *Black* case, right.  It was a

20  blanket request for the videos.

21        And so even if, let's say, another prosecutor in

22  the office said, well, I never requested the videos for

23  the person I was prosecuting, the fact that the office

24  itself got those videos even by requesting them and

25  having possession of them still constitutes a Sixth

1   Amendment violation.

2          So even though Miss Flannigan -- and I take her

3   at her word she never asked for, nor sought, recordings

4   of Mr. Benimon in this case.  If another prosecutor in

5   the office made a blanket request and ended up with

6   videos of Mr. Benimon's meetings, that would -- the

7   office would then be in possession of those recordings

8   which would constitute a Sixth Amendment violation.

9          MS. FLANNIGAN:  Your Honor, I just want to

10  disagree that our mere possession of these videos

11  constitutes a Sixth Amendment violation.  There can be

12  no Sixth Amendment violation if nobody has looked at

13  them.  And I have a case here.  I didn't know this was

14  going to be an issue here today.

15         But essentially what the case talks about is that

16  an unintentional interference with the attorney-client

17  relationship may violate a defendant's Sixth Amendment

18  rights where the government gains confidential

19  information and prejudice results.  So if nobody has

20  viewed these video recordings, we were not able to gain

21  any confidential information.  And if we don't gain any

22  confidential information, then no prejudice can result.

23         So the mere -- the mere fact that we have these

24  videos does not necessarily make it a Sixth Amendment

25  violation.  I think that -- I think that it's clear in

1  many other contexts we come in contact with

2  attorney-client or potential attorney-client information

3  all the time.

4      We have -- I have personally issued search

5  warrants to law offices.  That doesn't make me

6  interfering with an attorney-client relationship because

7  we do take steps to put in place a taint team to make

8  sure that the prosecutors who are involved in the

9  prosecution don't gain confidential information.  And

10  that's what we were in the process of doing before the

11  Federal Public Defender stepped in and filed their

12  motions.  So I do not agree with Mr. -- Mr. Bell that

13  the mere fact that we are in possession of this material

14  makes it a Sixth Amendment violation.

15      And I will say, too, I think part of the duties

16  of the special master will be to determine whether the

17  videos themselves actually contain attorney-client

18  privilege material.  Because I think that there are --

19  there are some case law out there that indicates that if

20  it's just a video of the two people sitting there

21  without more, that may not equate to even

22  attorney-client privilege.

23          MR. BELL:  Your Honor, a brief response

24  regarding the law.  The Tenth Circuit -- we cited this

25  case in our original motion.  The Tenth Circuit in

 1    *Schillinger*, 70 F.3d 1132 at page 1142 says in these

 2    cases prejudice is presumed; that there's no need to

 3    show a case -- make a case by case prejudicial showing;

 4    that the problem with the -- the recording, or in this

 5    case just monitoring the communications, is so grave

 6    that you don't -- prejudice is presumed and there's no

 7    -- there's no duty on the defendant's part to show they

 8    were specifically prejudiced in that case by the

 9    violation.

10              THE COURT:  But is it a rebuttable

11    presumption?  You're just saying it's conclusive.

12              MR. BELL:  It's conclusive.

13              THE COURT:  That's what you're saying.

14              MR. BELL:  That's what the Tenth Circuit

15    says.  It's essentially structural error.

16              THE COURT:  And what would be the remedy?

17              MR. BELL:  Well, that depends on whether

18    they did -- whether those recordings were in the

19    possession of the government.  Assuming that they

20    were --

21              THE COURT:  Well, if they weren't, there

22    wouldn't be a violation.

23              MR. BELL:  That's correct, Your Honor.

24              THE COURT:  So --

25              MR. BELL:  The issue becomes -- we're not

 1   even sure the government has told us whether or not they

 2   have any reason to think they were.  But if they were in

 3   possession of them, the remedy would most likely be that

 4   Mr. Benimon has that vehicle to attack his underlying

 5   conviction and that he may have a -- a remedy to dispose

 6   of the supervised release case.

 7              THE COURT:  So what specifically are you

 8   proposing in the way of discovery?  I mean, there's --

 9   there's this survey, I guess, that the U.S. Attorney's

10   Office is doing.  So when will the survey results be in?

11              MS. FLANNIGAN:  Well, Your Honor, I had

12   hoped to have them by now.  Honestly, I had this down

13   for 1:30.  But when I got to the office this morning, I

14   was locked out of my computer and haven't been able to

15   do it.

16              But, Your Honor, the defendant, in his reply --

17   first of all, I want to address the *Schillinger* case.  I

18   think the *Schillinger* case is so factually opposite of

19   our case.  In that case I believe there was a law

20   enforcement officer that sat in the room during

21   attorney-client meetings and he passed that information

22   on to the prosecution.  And in that circumstance

23   obviously there was a violation of a Sixth Amendment

24   because the confidential information was being passed

25   on.

1          In this particular case, the mere presence of

2     these recordings does not a Sixth Amendment violation

3     make.  Again, if we have quarantined these videos and no

4     one -- no investigator, no prosecutor, no staff member

5     of the prosecution has viewed them, there's no

6     possibility -- there's zero possibility that we have

7     obtained confidential information.

8          So -- and I noted in the defendant's reply that

9     he -- he made the argument that because we could get

10    these videos on demand, that we had constructive

11    possession of them.  And, again, because we issued a

12    grand jury subpoena in this case, we got this through a

13    lawful court proceeding, through a lawful court process

14    by issuing a grand jury subpoena.  And I don't think

15    that the Bank of America would think that I'm in

16    constructive possession of all of their documents just

17    because I can subpoena them.

18          Your Honor, I think that there is no basis for

19    the defendant to file this motion because he has to

20    show, as I said in that my reply -- in my response, he

21    has to show -- he has to make some *prima facie* showing

22    that there's a recording that exists and that the

23    government then somehow either viewed it or obtained

24    confidential information.

25          Now the defendant could have gone to CCA and got

 1   -- gotten the attorney visiting logs to see when he

 2   visited or when Mr. Bartee visited the defendant and see

 3   what is the time range of this.  I can tell you just

 4   because CCA recorded them doesn't mean the government

 5   has them.  And I've made the representation that I have

 6   never requested them.  There would be no reason for

 7   anybody else on my staff to request them because it

 8   wasn't their case.

 9        So there's just no basis for the court to grant

10   the defendant's motion at this time.  He hasn't provided

11   enough facts to indicate that the evidence or the

12   discovery that he's wishing to obtain even exists.

13             MR. BELL:  I'll respond, Your Honor.  In our

14   original motion, we said our contentions were as

15   follows:  That CCA had recorded all the attorney-client

16   visits since 2008; that -- and that CCA turned those

17   over on demand, not just by grand jury subpoena, but on

18   demand from the U.S. Attorney's Office.  That was our

19   information.

20             THE COURT:  And what was the source of that

21   information?

22             MR. BELL:  The hearing at the -- the *Black*

23   hearing transcript.

24             THE COURT:  Okay.

25             MR. BELL:  The government, in its response,

 1   didn't rebut either of those propositions.  So since

 2   Mr. Benimon has been at CCA since 2008 and he did meet

 3   with his attorney since 2008 at CCA, the unrebutted

 4   premises that we had would go to show that the U.S.

 5   Attorney's Office at the very least had access to his

 6   recorded attorney-client communications.

 7          Again, the government could very easily put that

 8   conclusion to rest by saying we never got any videos of

 9   Mr. Benimon's attorney-client meetings back from 2008.

10   I understand that Miss Flannigan is polling the office

11   to see what other people have done in the office, and

12   that's fine.  I understand that.

13          But I take issue with the argument that we

14   haven't made a *prima facie* case because, as we argued in

15   our reply, I think that we have until the government has

16   some evidence to rebut either of those two allegations.

17          I will also say that I don't think that the

18   *Schillinger* case is not quite as on point as Miss -- the

19   government would have the court believe.  Because in

20   that case there was information -- attorney-client

21   information that was given to the prosecution's office

22   and they said -- the Tenth Circuit said that's enough;

23   you don't have to show that the government actually used

24   the information in any way; you don't have to show how

25   they used it to prejudice the defendant; it's enough

12-20115  USA v James Benimon, II   8.22.16  Vol. I          17

 1   that they have it.

 2        So unless we know whether they have it or had it

 3   at some point, then we can't know what sort of error, if

 4   any, occurred.

 5             THE COURT:  All right.  But, I mean, this

 6   seems to me like we're about 90 percent of the way there

 7   because Miss Flannigan says she didn't request it and

 8   she hasn't seen it.  So she doesn't have actual or

 9   constructive possession of any of that information.  So

10   the only loose end that we need to tie up is whether

11   somebody else in her office did, which it seems to me we

12   can nail that down very easily, maybe even today.

13             MS. FLANNIGAN:  We certainly could do that,

14   Your Honor, but what the defendant is asking you to do

15   is to speculate that some other attorney or some staff

16   member would request videos on my case and I would be

17   unaware of it.  I think that's a very far stretch.  I

18   have represented to the court that I have not requested

19   any.  I haven't seen any.  I have no reason to believe

20   that anybody else on my staff, certainly no other

21   attorney, would do that on my behalf and there wouldn't

22   be some record of it in my file.

23        So I think what the defendant has requested I've

24   given.  I can -- I'm going back and I'm polling the

25   attorneys for a broader response, not just for

1    Mr. Benimon's.  But I can tell you there's no indication

2    in my file, there's no indication in the history of this

3    file that anyone has ever requested any CCA videos as it

4    relates to Mr. Benimon.  I think that should satisfy the

5    court.

6              MR. BELL:  Your Honor, I don't want to be

7    repetitive, but the reasons that wouldn't satisfy

8    Mr. Benimon and shouldn't satisfy the court is that a

9    blanket request for the videos on behalf of the U.S.

10   Attorney's Office -- not the one that occurred in the

11   *Black* case but one that happened before that -- could

12   have turned up Mr. Benimon's recorded attorney-client

13   videos and put them in the possession of the U.S.

14   Attorney's Office.  It's not necessary that someone

15   necessarily targeted Mr. Benimon for those recordings to

16   end up there.

17             THE COURT:  So you want to know if the U.S.

18   Attorney's Office ever made a blanket request that would

19   have somehow swept up.  And it's your position that,

20   even if the government came into possession accidentally

21   and doesn't know that it has possession and has never

22   used or taken that information into account, that that

23   would still be a constitutional violation.

24             MR. BELL:  Yes, Your Honor.  Under

25   *Schillinger*, once they have it, regardless of what use

1    they put it to or whether they put it to no use at all,

2    again speaking in the words of the Tenth Circuit,

3    prejudice is presumed.

4           MS. FLANNIGAN:  But, Your Honor, again, what

5    he's talking about is when they have it, when they have

6    confidential information.

7           THE COURT:  Right.

8           MS. FLANNIGAN:  And it's not just that we

9    have the video.  We would have to have some -- for

10   example, if these videos had audio and we were able to

11   determine what their trial strategy would be, then we

12   would be -- and -- I would have to say -- and I looked

13   at it or somebody from my staff looked at it, then we

14   would be in possession of confidential information.  At

15   this point we're not in possession of any confidential

16   information.

17          THE COURT:  So what it says in that case is

18   this is a case in which the prosecutor proceeded for the

19   purpose of determining the substance of the

20   attorney-client conversations and attorney-client

21   communications were actually disclosed and it was a

22   purposeful intrusion on the attorney-client

23   relationship.

24          MR. BELL:  Yes, Your Honor.

25          THE COURT:  Okay.  So I don't understand how

 1    that could apply in the situation you're talking about

 2    if -- if communications with -- with regard to

 3    Mr. Benimon accidentally got caught up in some broader

 4    sweep of --

 5              MR. BELL:  Well, I guess I want to

 6    distinguish the term "accidentally" with "not

 7    purposefully" targeting Mr. Benimon.  So if a -- some

 8    member of the office asked for all the video recordings

 9    at CCA at some time prior to the *Black's* subpoena and

10    Mr. -- and that attorney making that knew or should have

11    known that as a result of that request they were going

12    to get attorney-client videos even if they didn't target

13    Mr. Benimon specifically, that would qualify as again a

14    knowing intrusion into the attorney-client privilege.

15              THE COURT:  Well, I don't think that's the

16    test.  Because if they accidentally got communications

17    involving Mr. Benimon, that would not be a purposeful

18    intrusion on his attorney-client privilege.  And if it

19    was a purposeful intrusion on somebody else's

20    attorney-client communications, that's really not

21    Mr. Benimon's issue.

22              MR. BELL:  Your Honor, again, my response

23    would be that the purposeful intrusion occurs once the

24    request is made for the videos with the knowledge of

25    what the videos are going to contain.  I don't think

1    that the purposeful intrusion language requires an

2    individual determination in each particular case by --

3    showed by viewing the videos that a Sixth Amendment

4    violation has occurred.

5              MS. FLANNIGAN:  Your Honor, again, the

6    purposeful intrusion has to do with the obtaining of

7    confidential communications.  And in *Schillinger* the

8    prosecutor purposefully obtained the confidential

9    communications between an attorney and a client.  And

10   what we have here is an unintentional obtaining of

11   videos and we have zero obtaining of confidential

12   communication because nobody has looked at it.

13        So if we -- if we're looking at the videos

14   themselves, whether they do or do not contain

15   confidential information at this point is irrelevant

16   because the issue is whether anybody from the government

17   has interfered with this defendant or, frankly, any

18   other defendant's Sixth Amendment privilege by gaining

19   confidential information.

20        And because we quarantined those videos as soon

21   as we knew we had them, because nobody looked at them,

22   there is absolutely zero chance that confidential

23   communication between an attorney and a client that was

24   recorded on those videos was passed on to the government

25   whether intentionally or unintentionally because nobody

1    from the government has looked at it.

2         And I would submit that what we have is we have a

3    subpoena, much like we do in many cases, that may

4    encompass attorney-client.  In those cases, we segregate

5    out those potentially attorney-client communications and

6    we put in place a taint team.  What we have now is a

7    special master who is going to look through those.  It's

8    going to be segregated and a special master is going to

9    check through those.

10        But what I'm representing to the court is that

11   the government has not obtained either intentionally or

12   unintentionally any attorney-client confidential

13   communication because nobody's looked at it.  It's not

14   the videos themselves.  It's the communications that

15   they contain.  And, I mean, just like a priest, penitent

16   is privileged.  The fact that they go to the priest is

17   not privileged.  In this case, the fact those are

18   recorded doesn't make it a violation of the Sixth

19   Amendment unless the government obtains that

20   communication by looking at the video, and we haven't

21   done it.

22             THE COURT:  And I assume you're representing

23   to the court -- I think this was implicit but you didn't

24   say it directly -- that if anybody else in your office

25   had requested communications from CCA with regard to

 1   Mr. Benimon, that, as the responsible agent, you would

 2   have known about that and it would be documented some

 3   place?

 4               MS. FLANNIGAN:  Yes, Your Honor.  I just --

 5   there's no reason for anybody -- I mean, I was the sole

 6   person.  I'm the only person who worked on this case.  I

 7   don't think anybody even covered any hearings for me

 8   during the pendency of this case but there was

 9   absolutely no reason.  Mr. Benimon's case is a sex

10   offender case and so there would be no reason for me to

11   ask for his CCA videos -- CCA videos of him for any

12   reason.

13               THE COURT:  Well, I do think that the Tenth

14   Circuit in *Schillinger* has made it very clear that its

15   holding is limited to a situation where the state

16   becomes privy to confidential communications, number

17   one; number two, because of its purposeful intrusion

18   onto the attorney-client relationship.  And I don't

19   think you have met the threshold showing in that regard.

20   So I don't think we should delay these proceedings in

21   order for you to conduct discovery.

22         But isn't that moot to some extent because isn't

23   -- won't you be able to find out from the special master

24   if there was some kind of general blanket request that

25   possibly could have ensnared Mr. Benimon's

 1    communications in that?

 2         MR. BELL:  Well, not if the government

 3    prevails on its request for the scope of the special

 4    master.  Judge Robinson hasn't decided the scope of the

 5    special master's duties yet.  What we're proposing is

 6    what the court has just said, a basically historic look

 7    back and see if this has ever happened before in the

 8    past.

 9         The government's position, as I understand it, is

10    that they want the special master to focus solely on the

11    *Black* case and not do a historical inquiry to see if

12    this has happened in other cases.  If the government

13    prevails on the scope of that special master, then the

14    answer to the court's question is no because we wouldn't

15    discover whether it occurred in the past.

16         I just -- I think the easiest way to settle the

17    question is to permit Miss Flannigan and notify the

18    court of the results of the poll of the office to see if

19    it's happened before, that way we wouldn't have to wait

20    for months for a special master report to occur or

21    anything like that.  That's the fastest and cleanest way

22    to sort of end our inquiry what happened with

23    Mr. Benimon.

24         MS. FLANNIGAN:  We are also -- we are

25    polling three offices, Your Honor.  It may not be today.

1    That's -- I think there's no reason to hold up these

2    proceedings based on speculation that may have happened

3    some time in the past.  I've been in this district for

4    over 25 years and this is the first time that, in my

5    experience that I've been aware, that there was such a

6    big investigation into a corrections facility that this

7    kind of evidence was needed.  So I -- obviously I don't

8    have the results of the poll, but I would be very

9    surprised if there had ever been a request for all video

10   from any facility, whether that be CCA or Leavenworth or

11   any other place.

12          MR. BELL:  Let me clarify, Your Honor, I'm

13   not asking that we hold these proceedings up until we

14   discover it.  However these proceedings pan out, if

15   Miss Flannigan has a response within the next few days,

16   which is what it sounds like she would, then if the

17   response is that it's never happened before, then that

18   will be the end of the inquiry.  If her response is it

19   may have happened before, then we'll file an appropriate

20   motion to renew our request.

21          THE COURT:  All right.  So can you get back

22   to me by the close of business on Thursday?

23          MS. FLANNIGAN:  I will do my best, Your

24   Honor.  And, Your Honor, the case I was citing, I didn't

25   say it out loud, I couldn't pronounce the name, was

 1    *United States versus* and it's A-U -- *A-U-L-I-C-I-N-O*, 44

 2    Fed. 3rd 1102, 1117.  It's a Second Circuit case from

 3    1995, and it was relating to a joint defense agreement.

 4    And the issue came up as regard to one defendant who

 5    wanted to cooperate, provided information to the

 6    prosecution, and so that issue came up about whether we

 7    had a purposeful or unintentional gaining of

 8    confidential information.  But I wanted the record to be

 9    clear what the -- what the case citation was.

10              THE COURT:  Okay.  All right.  So I'm going

11    to deny defendant's motion for discovery.  Are you

12    concerned about your ability -- you asked for a

13    confidential legal visitation.

14              MR. BELL:  Your Honor, that request was made

15    before Judge Robinson's order to CCA to remove the

16    cameras.  So I don't --

17              THE COURT:  That's moot.

18              MR. BELL:  I think it's moot, Your Honor.

19              THE COURT:  Okay.  I mean, I would be

20    surprised, after all the events that have ensued in the

21    last couple weeks, if people are still engaged in that

22    conduct.

23         You have a motion for return of property?

24              MR. BELL:  Yes, Your Honor.  I think that,

25    again, will be -- if the court wants to deny that

1   without prejudice and then we'll see what the results of

2   Miss Flannigan's inquiry are.  She represents that to

3   her knowledge the property hasn't been requested; so

4   they don't have it, so they can't turn it over.  I think

5   we'll know the definitive answer to that question once

6   the results of Miss Flannigan's poll comes in.

7        If the results are we've never asked for it

8   before, then they don't have it.  If the results are

9   we've asked for it a time or two, then it will depend on

10  what the -- what that response is to see if they still

11  have possession of the property.

12            MS. FLANNIGAN:  And, Your Honor, and I'm

13  happy to do that, Your Honor.  But based on case law

14  that I cited in my response, that's a little backwards.

15  It's really incumbent upon the defendant to come forward

16  and with proof that this does exist, that for some

17  reason the government has copies of his client's

18  privileged communications with him.  In order for him to

19  get a return of property, he has to make some showing

20  that it exists, and I don't know that he does.

21            THE COURT:  That's true.  Let's not go too

22  far down this rabbit hole.

23            MS. FLANNIGAN:  I understand.

24            THE COURT:  There's no reason to think

25  there's any property to return at this point.  So you

1    can renew your motion if you're not satisfied with the

2    government's response after Thursday

3                    MR. BELL:  Thank you, Your Honor.

4                    THE COURT:  Okay.  And subject to that then,

5    your motion, which is Document 40, is overruled.

6                    (End of requested excerpt.)

7

8

9

10

11

12

13

14

15                    CERTIFICATE

16         I certify that the foregoing is a correct

17    transcript from the record of proceedings in the

18    above-entitled matter.

19       DATE August 24, 2016

20

21                    /s/Kimberly R. Greiner
                       KIMBERLY R. GREINER, CSR, RMR, CRR
22                    United States Court Reporter

23

24

25

**From:** Beam, Craig (USMS)
**Sent:** Friday, August 5, 2016 3:43 PM
**To:** Melody Brannon
**Cc:** Kirk Redmond, Miller, Ronald (USMS), Barnett, Debra (USAKS) 1

Melody,

None of our USMS visitation rooms are recorded in any manner.

I'd also like to take this opportunity to clear up some confusion that seems to be circulating regarding the CCA attorney/inmate visitation rooms.

I've just spoken to CCA Warden Linda Thomas. She advised me that the video from the camera in the attorney/inmate visitation rooms is not recorded, nor do they have audio capability. She advised that they can be visually monitored in the CCA control room. There is also a panic button installed in the visitation room. It was installed for the purpose of it being available in the case of an emergency. When pushed, the Correctional Officer in the control room would be alerted to a problem, and a monitor in the control room will automatically pull up the video from the visitation room camera so the Correctional Officer in the control room can immediately see what is occurring .

I'm not sure where all of the confusion has come from, but i wanted to make sure you had this information.

**EXHIBIT**

**458**

tablies

Thanks,


Craig Beam

Chief Deputy

U.S. Marshals

District of Kansas




**From:** Melody Brannon [mailto:Melody_Brannon@fd.org]
**Sent:** Friday, August 05, 2016 3:09 PM
**To:** Beam, Craig (USMS)
**Cc:** Kirk Redmond
**Subject:** Recordings


Craig, sorry for the last blank email.


I just wanted to confirm in writing that the US Marshal professional visitation rooms are not subject either visual or audio recordings.


If I am wrong, please let me know.

Thanks and have a good weekend.

Melody

Sent from Surface

### DECLARATION OF MELANIE S. MORGAN

I, Melanie S. Morgan, hereby state as follows under the penalty of perjury:

1. I am an attorney licensed in Kansas and Missouri as well as in the District of Kansas and the Western District of Missouri. My practice is primarily federal criminal defense.

2. I have been on the CJA Panel in both districts for many years.

3. Many of my clients in the District of Kansas are or have been incarcerated at CCA Leavenworth. My clients are able to call me collect at my office when they need to speak with me or, if I need to speak with them, I can arrange for a call to be set up.

4. With respect to unscheduled, client-initiated phone calls, it is my understanding those calls are not recorded based on my provision of my telephone number to CCA for purposes of excluding it from the recording system.

5. Specifically, several years ago I was advised that I needed to provide CCA with my telephone number in order to make sure my calls with my client were not recorded. I do not recall how I learned of that necessity but I sent a letter to CCA with my office telephone number. As a result, it has been my understanding that as to unscheduled, client-initiated phone calls, calls to my number were not recorded.

6. When my office relocated to Kansas City, Missouri from Olathe, Kansas in 2012 and my office number changed, a similar letter was sent. Again, it was my understanding that the purpose of this correspondence was to ensure that calls to my number were not recorded.

7. Sometime in August 2016 I became concerned attorney-client phone calls were being recorded. Soon thereafter, I was notified by CJA Resource Counsel Laura Shaneyfelt that there was a potential issue regarding recordings and CJA counsel were advised to

1

EXHIBIT

459

send a letter to CCA to make sure it had attorney phone numbers. Though I had already

sent the previously described letters, out of an abundance of caution, I sent another letter

to CCA that contained my telephone numbers (this time including my cell phone

number).

8. I have never heard a recording indicating that my telephone calls were recorded.

9. As to scheduled calls which I arrange for a client to call me, I request in writing that my

client be permitted to make an unrecorded and unmonitored legal call. It is my

understanding that in those situations, my client is taken to a phone outside of his or her

pod and the call is placed by the corrections facility to my number, free of charge.

10. I have never heard a recording indicating that my telephone calls were recorded.


I hereby swear under penalty of perjury that the foregoing statements in this Declaration

are true and accurate.


_Sept 2, 2016_

Date

Melanie S. Morgan

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

I, Kathleen Ambrosio, being first duly sworn on oath, hereby depose and state the following:

1. I am an attorney licensed in Kansas. I am on the CJA panel in the District of Kansas and am frequently assigned to represent criminal defendants in the District of Kansas who are housed at the Corrections Corporation of America facility in Leavenworth, Kansas ("CCA").

2. Clients of mine have made telephone calls to me to discuss their cases and seek legal advice regarding the same while they were housed at CCA. I was never informed, and was completely unaware, that an attorney registry existed at CCA. I did not learn of the existence of such a registry until earlier this month.

3. In the calls I received from CCA, I never heard any message indicating that my conversation would be recorded.

4. I have never had a client housed at CCA advise me I need to place my name and number on an attorney registry.

**FURTHER AFFIANT SAYETH NAUGHT**.

Dated this 29th day of August, 2016.

Kathleen Ambrosio

Subscribed and sworn to before me by Kathleen Ambrosio, this 29th day of August, 2016.


Maria Perry
NOTARY PUBLIC – STATE OF KANSAS
MY APPT EXP: 09/27/2018

Notary Public

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

I, Robert N. Calbi, being first duly sworn on oath, hereby depose and state the following:

1.    I am an attorney licensed in Missouri and the Federal Courts of Kansas. I am on the CJA panel in the District of Kansas and am frequently assigned to represent criminal defendants in the District of Kansas who are housed at the Corrections Corporation of America facility in Leavenworth, Kansas ("CCA").

2.    Clients of mine have made telephone calls to me seeking legal advice while housed at CCA. I was never informed and was completely unaware that an attorney registry existed at CCA. I did not learn of the existence of such a registry until earlier this month.

3.    In the calls I received from CCA, I never heard any message indicating that my conversation would be recorded.

4.    In 31 years of practicing criminal law I have never been informed by a client at the CCA or any other facility in which my clients informed me that they were instructed by the facility that our calls with them were being recorded unless I proactively contacted the facility and informed them not record these calls and took steps with the facility to stop these recordings.

5.    To my knowledge, upon information and belief, I have never received as part of discovery in any case copies of recordings of calls made by inmates at CCA of conversations between inmates and their lawyers. I have received copies calls recorded by CCA of my clients' conversations with non-lawyers.

**FURTHER AFFIANT SAYETH NAUGHT.**

Dated this 29 day of August, 2016.

Robert N. Calbi

Subscribed and sworn to before me by Robert N. Calbi, this 29 day of August, 2016.

Notary Public

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DECLARATION OF COUNSEL

I, John Jenab, submit this Declaration as an officer of the Court:

1. I am an attorney licensed in Kansas. I am a member of the CJA panel in the District of Kansas and have been assigned dozens of cases in which my clients were/are housed at CCA-Leavenworth ("CCA").

2. I have received numerous telephone calls from clients at CCA. I sometimes receive calls that begin with a recorded message advising that all calls from the facility are subject to recording and monitoring. My understanding has always been that the recorded message is for non-legal calls. Frequently (but not always), when I have received a call that begins with the recorded message, I have announced that the call is an attorney-client communication and is not subject to recording or monitoring. I did not, however, think that such an announcement was necessary because, until August 2016, my understanding was that attorney-client telephone calls with CCA clients were never recorded or monitored.

3. I was unaware until August 2016 that CCA kept a registry of attorney phone numbers to exclude from recording or monitoring.

4. Prior to *United States v. Lorenzo Black et al.*, I do not recall ever receiving attorney-client telephone calls as part of discovery in any case.

5. The foregoing is true and correct to the best of my knowledge and belief.


Date: August 29, 2016                              s/John Jenab
                                                   John Jenab

## DECLARATION OF CHRISTOPHER M. JOSEPH

Christopher M. Joseph declares:

1.      I am an attorney licensed in Kansas. I am on the CJA panel in the District of Kansas, and I am frequently assigned to represent criminal defendants who are housed at the Corrections Corporation of America facility in Leavenworth, Kansas ("CCA").   I am also routinely retained to represent clients housed at CCA.

2.      Including travel time, an in-person visit with a CCA client takes up nearly a half work day.  Because of this, I regularly communicate with CCA clients by telephone.  I am not aware of any way to have telephone communication with a client that does not involve the recorded statement that "calls may be monitored or recorded."   Client calls from CCA to my office are answered by staff.  By the time the call is transferred to me, the recording has already concluded. But I hear the recording on direct calls, and my staff reports that the recording plays on calls that they answer.  The recording plays even when I fax a request to CCA, on my firm's letterhead, requesting that my client call me.  To the best of my knowledge, there is no process for having calls "outside of the system" that triggers the recorded disclaimer.

3.      I have represented clients housed at CCA since 2003.  I have always believed, despite the recorded disclaimer, that attorney-client calls were not monitored or recorded.  Given that I have been communicating with clients at CCA via phone for roughly 13 years, I cannot identify specific statements made by CCA employees that led me to that belief.

4.      Many of my clients are concerned by the recorded disclaimer and are initially reluctant to talk by phone.  I routinely assure clients that it is my understanding that attorney-client calls are not recorded.  I further assure them that, even if the calls were inadvertently recorded or monitored, any listener who realized that the call was an attorney-client communication would immediately stop listening and notify me of the situation.

5.    Because of (1) the time required for an in-person visit, (2) the scheduling restrictions for visits at CCA, and (3) my work schedule, which has a limited number of days that I can commit a half of a day to communicate with a client, telephone communication with clients at CCA is critical to effective representation of my clients.

I declare under the penalty of perjury that the forgoing is true and correct.

_____          8-30-16
Christopher M. Joseph                                Date

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

I, Cynthia M. Dodge, being first duly sworn on oath, hereby depose and state the following:

1.    I am a Missouri licensed attorney and CJA panel attorney in the District of Kansas and Western District of Missouri.  Since 2007, I have routinely been appointed as defense counsel on criminal cases out of both jurisdictions.  Over the years, a large portion of my clients have been denied pretrial release, and as such, held in-custody at facilities including Corrections Corporation of America in Leavenworth, Kansas ("CCA").

2.    Clients have made telephone calls to me to discuss matters related and unrelated to case strategy while housed at CCA and other custodial facilities.

3.    As protocol, I inform every in-custody client that though they are welcome to call me, I will not discuss their case over the phone, largely due to being recorded.

4.    When clients have called and upon hearing the recording warning, I have consciously stated that the conversation is between attorney-client and therefore is privileged communication before allowing my client to speak to me.

5.    I believed that in the event someone was listening in real-time or later, my warning would caution the listener that a privileged and protected communication was taking place and could not be heard.

6.    I was never informed by any US Marshal, holding facility agent, colleague or client that my number could be provided and blocked from recording devices.

7. To my knowledge, upon information and belief, I have never before received as part of discovery in any case, copies of call recordings made by inmates at CCA, or any other facility, of conversations between inmates and their lawyers.

8. I have never listened to or observed any audio or video communication, including USA v. Black et al, between an attorney and his/her client.

9. I have received as government discovery out of both jurisdictions, phone call audio of clients and/or co-defendant conversations with non-lawyers.

**FURTHER AFFIANT SAYETH NAUGHT**.

Dated this ___30___ day of August, 2016.


Cynthia M. Dodge


Subscribed and sworn to before me by Cynthia M. Dodge, this ___30 th___ day of August, 2016.


Notary Public

LAURA A. BAX
Notary Public, Notary Seal
State of Missouri
Cole County
Commission # 14999039
My Commission Expires July 26, 2016

## AFFIDAVIT

I, Debra A. Vermillion, am an attorney licensed in Kansas. I am on the CJA panel in the District of Kansas.  As a CJA panel member I represent criminal defendants charged with crimes in the United States District Court for the District of Kansas.   Many of my clients have been / are housed at the Leavenworth Detention Center in Leavenworth, Kansas, which is operated by Corrections Corporation of America ("CCA").

2.      My clients have made telephone calls to me or to my agents (such as investigators) from CCA to discuss pending case issues and in general, to facilitate attorney client privileged communications.  I was never informed by anyone from CCA nor did I know before August 15, 2016, that CCA required defense counsel to provide CCA with telephone numbers that could be used for attorney client communications.   Accordingly, my clients have never indicated to me, in anyway, that during an orientation at CCA the client was informed his /her attorney had to register telephone numbers to ensure attorney client privileged communications with the lawyer and lawyer agents.  While I believed CCA monitored and recorded client calls with non lawyers (such as relatives etc.), I believed client telephone calls, with me or with my agents (such as an investigators, etc) from CCA were privileged communications.

3.      In the calls I received from CCA, I never heard any message indicating that my conversation was being recorded.

4.      To the best of my knowledge I have never received as part of discovery in any case, copies of recordings of calls made by inmates at CCA between an inmate and his / her

1

lawyer. I have received copies of calls recorded by CCA of my clients' conversations with non-

lawyers.

_____
Debra A. Vermillion


VERIFICATION


STATE OF KANSAS            )
                          ) ss.
COUNTY OF JOHNSON          )

Debra A. Vermillion, being of lawful age and first duly sworn upon oath states that she is the Affiant herein and states and verifies that she is familiar with the contents of the foregoing Affidavit and that the statements, allegations, and other matters contained in it are true and correct.

_____
Debra A. Vermillion

Subscribed and sworn to before me, a notary public, on this 26th day of August, 2016.

_____
Notary Public

MARILYN THOMAS
NOTARY PUBLIC STATE OF KANSAS
MY APPT. EXPIRES 7-23-2019

2

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

I, Michael M. Jackson, being first duly sworn on oath, hereby depose and state the following:

1.    I was admitted to practice law in the Federal Court for the District Court of Kansas in 1980.

2.    I have been on the CJA panel for criminal appointments for the District of Kansas since approximately 1985.

3.    I have been counsel of record for over 130 defendants in federal court. Many of these defendants were detained pending trial at CCA LVN.

4.    I have received 100s of calls from CJA clients housed at CCA LVN.

5.    Upon answering a call from an inmate it is my practice to state, "this is a phone call between a client and attorney and is covered by the attorney client privilege."

6.    The first time I was informed that recording of attorney client conversations could be blocked by notifying CCA of the attorney's phone number was from an email received from Laura Shaneyfelt on 8/15/16.

7.    None of my clients housed at CCA have ever informed me that recording of their attorney conversations could be stopped by notifying CCA of the attorney's phone number.

1

8.     I reviewed my monthly statements from Correctional Billing Services a/k/a Securus beginning in October of 2002 and ending January of 2012, which statements contain collect call charges from my clients housed at CCA, LVN.

9.     Nowhere in any of these monthly billing statements is notice, of any kind, that any conversations are recorded.

10.     These monthly billing statements also do not include a notice of any kind that attorney calls can be blocked from recording by contacting the facility.

FURTHER AFFIANT SAYETH NAUGHT.

Dated this 29 day of August, 2016.

Michael M. Jackson

Subscribed and sworn to before me by Michael M. Jackson , this 29 day of August, 2016.

Notary Public

GEORGIA N. TAYLOR
Notary Public - State of Kansas
My Appt. Expires 5-31-17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

I, Robin D. Fowler, being first duly sworn on oath, hereby depose and state the following:

1.    I am a Kansas licensed attorney and CJA panel attorney in the District of Kansas and Western District of Missouri.  From 1985 through 2002, except for approximately two years in the U.S. Army, I was employed as an Assistant U.S. Attorney in the District of Kansas, and handled criminal cases.  Since 2002, I have routinely been appointed as defense counsel on criminal cases in both jurisdictions. Over the years, a large portion of my clients have been denied pre-trial release, and as such, held in custody at facilities including Corrections Corporation of America in Leavenworth, Kansas ("CCA").

2.    While in custody at CCA and elsewhere, clients have made telephone calls to me to attempt to discuss matters related to their criminal cases.

3.    In speaking with clients who are in custody, I routinely inform them that although they are welcome to call me, I will not discuss substantive issues over the phone due to the fact that these calls are being recorded; and my knowledge of the existence of some legal authority which holds that attorney/client calls from CCA are not privileged.

4.    I am aware that CCA, and perhaps other institutions, have a program where attorneys can provide their phone number(s) so that the institution could block that number from being recorded.  I have never attempted to use that procedure, because I was concerned that my calls might still be inadvertently recorded.  I do not recall when or how I first learned this information.

5.    To the best of my knowledge I have never received, as part of discovery from the government in any case, copies of telephone recordings made by CCA, or any other facility, of conversations between inmates and their lawyers.

6.    I have received, in at least one and perhaps two cases, as discovery in the District of Kansas, copies of recorded phone calls between my client and me.  It was

represented to me in at least one of those cases that the government attorneys and agents had not listened to those calls, and those calls were not used as evidence at trial in either case.

**FURTHER AFFIANT SAYETH NAUGHT.**

Dated this 1st day of September, 2016

_____

Robin D. Fowler

Subscribed and sworn to before me by Robin D. Fowler, on the ___st___ day of September, 2016.

_____

Notary Public

My appointment expires:

_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

I, Jacquelyn E. Rokusek, being first duly sworn on oath, hereby depose and state the following:

1.      I am an attorney licensed in Kansas. I am on the CJA panel in the District of Kansas and the Western District of Missouri and am frequently assigned to represent criminal defendants in both the District of Kansas and the Western District of Missouri who are housed at the Corrections Corporation of America facility in Leavenworth, Kansas ("CCA").

2.      Since 2003, counsel has represented over 100 clients who were indicted in the District of Kansas. Many of those clients were housed, at some point in time, at CCA. Those clients have called counsel seeking legal advice while housed at CCA. Counsel was never informed and was completely unaware that an attorney registry existed at CCA. Counsel did not learn of the existence of such a registry until earlier this month.

3.      Counsel was never informed that attorney/client phone calls were being recorded for investigative purposes. Further, counsel was not informed that attorney/client phone calls would be disseminated as discovery in any investigation.

4.      To my knowledge, upon information and belief, I have never received as part of discovery in any case copies of recordings of calls made by inmates at CCA of conversations between inmates and their lawyers. I have received copies of phone calls recorded by CCA of

Inmate's conversations with non-lawyers.

**FURTHER AFFIANT SAYETH NAUGHT**.

Dated this ~~29th~~ 2nd day of ~~August~~ Sept, 2016.

_(signature)_

Jacquelyn E. Rokusek

Subscribed and sworn to before me by Jacquelyn E. Rokusek, this ~~30th~~ 2nd day of ~~August~~ Sept., 2016.

_(signature)_

Notary Public

PATRICIA A. DEWITTE
My Appt. Exp. 8/8/18
NOTARY PUBLIC
STATE OF KANSAS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

I, Thomas D. Haney, being first duly sworn on oath, hereby depose and state the following:

1.      I am an attorney licensed in Kansas.  I am on the CJA panel in the District of Kansas and am frequently assigned to represent criminal defendants in the District of Kansas who are housed at the Corrections Corporation of America facility in Leavenworth, Kansas ("CCA").

2.      Clients of mine have made telephone calls to me seeking legal advice while housed at CCA.  I was never informed and was completely unaware that an attorney registry existed at CCA until August of 2016.

3.      I was advised by officials at CCA that I would have to provide telephone numbers for clients to call associated with my law firm, which I did on August 16, 2016.  On August 23, I received correspondence from Sgt. Wayne Bigelow at CCA stating "[A]ll phone numbers listed in your request letter have been restricted so they may not be monitored or recorded as requested."

4.      In the calls I received from CCA, I never heard any message indicating that my conversation would be recorded.

5.      To my knowledge, upon information and belief, I have never received as part of discovery in any case copies of recordings of calls made by inmates at CCA of conversations between inmates and their lawyers.  I have received copies of calls recorded by CCA and transcripts of my clients' conversations with non-lawyers.

FURTHER AFFIANT SAYETH NAUGHT.

Dated this 26ᵗʰ day of August, 2016.

_____
Thomas D. Haney

STATE OF KANSAS      )
                              ) SS:
COUNTY OF SHAWNEE    )

       Subscribed and sworn to before me by Thomas D. Haney, on this 26ᵗʰ day of August, 2016.

Jill B. Chappell
NOTARY PUBLIC—STATE OF KANSAS
MY APPT EXP: 4/2/18

_____
Notary Public

My Commission Expires:

4/2/18

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

I, Thomas H. Johnson, being first duly sworn on oath, hereby depose and state the following:

1.      I am an attorney licensed in Kansas and Missouri. I am on the CJA panel in the District of Kansas and am frequently assigned to represent criminal defendants in the District of Kansas who are housed at the Corrections Corporation of America facility in Leavenworth, Kansas ("CCA").

2.      Clients of mine have made telephone calls to me seeking legal advice while housed at CCA. I was never informed and was completely unaware that an attorney registry existed at CCA. I did not learn of the existence of such a registry until earlier this month.

3.      In the calls I received from CCA, I never heard any message indicating that my conversation with my client would be recorded.

4.      To my knowledge, after diligent inquiry, I have never received as part of discovery in any case recordings made by CCA of conversations between inmates and their attorneys. I have received copies of calls recorded by CCA of my clients' conversations with non-lawyers.

**FURTHER AFFIANT SAYETH NAUGHT.**

Dated this 26 day of August, 2016.

_____
Thomas H. Johnson

Subscribed and sworn to before me by Thomas H. Johnson, this 26 day of August, 2016. in Douglas County, Kansas

_____
Notary Public

TERENCE E. LEIBOLD
Notary Public - State of Kansas
My Appt. Expires 3/28/20



**FW: Follow up from hearing re CCA recordings**
Alyssa Brockert   to: laura_shaneyfelt@fd.org                    08/24/2016 11:03 AM

History:                    This message has been replied to and forwarded.

9 attachments



J Pod.jpg    C Pod on the phone.jpg    W Pod 3.jpg    C Pod.jpg    C Pod 2.jpg

W pod.jpg    C pod position on phone.jpg    W pod 2.jpg

Intake attorney client correspondence.pdf


Ms. Shaneyfelt,

I apologize - I thought I had included you in the below e-mail, but apparently
did not add you as a recipient.  I am sorry for that oversight, but my
response to your questions are below.

Please let me know if you need anything else.

Thanks,

Alyssa Brockert

-----Original Message-----
From: Alyssa Brockert
Sent: Friday, August 19, 2016 5:05 PM
To: 'Shew, Dianna' <Dianna.Shew@cca.com>; 'linda.thomas2@cca.com'
<linda.thomas2@cca.com>
Subject: FW: Follow up from hearing re CCA recordings

Ms. Shaneyfelt,

When an inmate first arrives at CCA, he or she goes through an intake process,
during which he or she is given a handbook of CCA policies and procedures.
Included in that intake is instruction concerning the procedures for phone
calls with attorneys.   The handbook states provides that:

"Your attorney may request of our facility that calls to their office not be
recorded to ensure Attorney/Client privilege.  They may request this by way of
sending CCA/LDC a fax on their office letterhead.  This request must include
contact information and signature.  They may fax it to (913) 727-2231.  IT IS
YOUR RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF THIS PROCEDURE;
THEIR TELEPHONE CALLS ARE SUBJECT TO BEING RECORDED IF THEY DO NOT REQUEST
THEY BE RESTRICTED."

While Chief of Security Roger Moore will process a request to restrict
attorney phone calls if he receives one, it is CCA's preference that the
request go to the front office via the above-referenced fax number.

As noted in the handbook, CCA does not proactively provide this information to

EXHIBIT

tabbies®

460

attorneys, although if asked they are happy to refer them to the procedure.

Inmates are NOT allowed to provide attorney names and numbers at intake - the request must come from the attorney's office on office letterhead in order to verify that the person making the request is, in fact, an attorney.  It would be difficult to verify the veracity of the inmate's information otherwise.

Even if an attorney has not requested his or her calls be blocked, he or she can still schedule an unmonitored call by contacting the facility and scheduling an unmonitored call with the inmates corrections counselor.  In the alternative, the inmate may also request an unmonitored phone call from their corrections counselor.  At intake, after receiving information pertaining to phone privileges, inmates sign an acknowledgment form, also attached, which provides:

"Corrections Corporation of America reserves the authority to monitor...conversations on any telephone located within its institutions....[a]n inmate's use of institutional telephones constitutes consent to this monitoring.  A properly placed phone call to an attorney is not monitored.  You must contact your unit team to request an unmonitored attorney call."

Finally, I am attaching several pictures of the signs posted in the various telephone areas, including those posted on the actual phones.

I believe this answers all of your questions, but if you need anything further, please don't hesitate to contact me.


-----Original Message-----
From: Laura Shaneyfelt [mailto:Laura_Shaneyfelt@fd.org]
Sent: Wednesday, August 17, 2016 1:08 PM
To: Mike Crow <MikeCrow@crowlegal.com>
Subject: Follow up fr om hearing re CCA recordings


Mr. Crow,

Thank you for attending the hearing in Kansas City yesterday and inviting counsel to contact you with questions. As the CJA Resource Counsel in the District of Kansas I provide information to many attorneys who represent clients housed at CCA-Leavenworth. I would like to tell them what, if anything, they and/or their clients need to do to ensure that their attorney-client telephone calls are not recorded. I have received conflicting information about this and hope that you can clarify.

I have been told that if the attorney sends his phone number(s), on letterhead, to Chief of Security Roger Moore, that the numbers will be added to the Securus system and all calls--incoming and outgoing--to the listed numbers will be exempted from recording. Is that accurate? Have there been postings or publications or correspondence to notify attorneys of this requirement?

We heard in court yesterday, that clients may provide their attorney's phone numbers during orientation. Is that accurate? Please send me a copy of that form so that we can advise our clients about the requirement. Has this form been used for very long?

Also, we heard yesterday that clients just have to tell someone, prior to making the call to an attorney, that it should be a confidential call, and the

call will not be recorded. Is that accurate? Please send the orientation
materials/instructions/handbook/signs or whatever else tells inmates about
this requirement.

Finally, can you send me a copy or photograph of the signs or notices that
have been, or are now, by the phones that are used by inmates to make outside
calls?

Again, I'm glad that you were able to attend the hearing yesterday. Please do
not hesitate to call me if you have questions. My cell number is below.


Laura Shaneyfelt
 CJA Resource Counsel
 Federal Public Defender Office
 laura_shaneyfelt@fd.org
 (316) 269-6126 (office)
 (316) 761-3652 (cell)

**LEAVENWORTH DETENTION CENTER**

Print Date: 8/15/16   2:41PM

**MONITORING OF INMATE/DETAINEE TELEPHONE CALLS**

Inmate Name: _____    _____    AGENCY #: _____

Corrections Corporation of America reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public.  An inmate's use of institutional telephones constitutes consent to this monitoring.  A properly placed phone call to an attorney is not monitored.  You must contact your unit team to request an unmonitored attorney call.

I have read or had read to me (cross out one) the above notification on the monitoring of inmate telephone calls. I understand that telephone calls I make from institution telephones may be monitored and recorded.

Signature of Inmate Detainee: _____    Date: _____08/15/2016_____

Printed Name of Staff Member: _____

Signature of Staff Member: _____    Date: _____08/15/2016_____

facility and visual strip search will occur after any contact visit including attorney visits. Staff will conduct routine unscheduled searches of the facility, inmates/detainees and property as deemed necessary.

Evacuation drills: Per local, state and federal laws, the facility is required to perform at least one (1) practice evacuation drill per quarter, per shift for every department of the facility. These drills are not designed to inconvenience you, but rather to insure that you know where the exits are located in case of an actual danger such as a fire, gas leak, or other damages. Fire exit diagrams are posted throughout all buildings, and are not to be tampered with.

Access to telephone: Telephones are provided for inmates/detainees in the housing unit dayroom. Dayroom telephones are subject to monitoring. For access to a Telecommunications Device for the Deaf (TDD), contact the Unit Manager or Case Manager, or Correctional Counselor. The Shift Supervisor should be notified if any of the unit staff are not available.

Procedures for telephone use include:

1. You will be issued a pin number during the intake/booking process, which will be activated within 3 business days after 12:00 p.m. not including weekends and holidays. Your pin number is required to gain access to an outside line. Your pin number is your inmate issued federal number plus four (4) random numbers selected by the computer on the top of your ID badge. Wyandotte County inmates will add a zero (0) to the front of their number and drop the "W". Using another inmate/detainees pin number is not allowed and will result in disciplinary action.

2. CCA Leavenworth Detention Center uses the Securus phone company. Their contact number is 1-800-844-6591, Spanish speaking 1-866-561-6718

3. Outgoing telephone calls may only be made collect or by phone card.

4. Use of the telephones will be on a first come first serve basis. Phone calls are limited to 15 minutes; overuse of the phones will result in disciplinary actions and can result in loss of privileges.

5. Three-way phone calls are not permitted. If detected, your call will be terminated by the phone company and/or phone number blocked. Repeated violations of this rule will result in disciplinary actions and loss of telephone privileges.

6. Your attorney may request of our facility that calls to their office not be recorded to ensure Attorney/Client privilege. They may request this by way of sending CCA/LDC a fax on their office letterhead. This request must include contact information and signature. They may fax it to (913)727-2231.  IT IS YOUR RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF THIS PROCEDURE. THEIR TELEPHONE CALLS ARE SUBJECT TO BEING RECORDED IF THEY DO NOT REQUEST THEY BE RESTRICTED.

7. Telebranch lines are not permitted. Any inmate caught doing so will be subject to a disciplinary report and may lose their telephone privileges.

8. 40-minute phone cards are available for purchase from the Commissary on assigned commissary days.

9. You may purchase a maximum of five phone cards each week. The cost of phone cards is not counted against your weekly commissary limit.

10. Incoming telephone calls are not authorized at this facility.

11. Emergency messages will be accepted through the Chaplain during duty hours, Monday through Friday; if the Chaplain is unavailable the Unit Management staff or Shift Supervisor will relay the message to the inmate.

12. Attorney/Legal Aids may fax a message to the Facility to have their client contact them. This call will be made from the dayroom phone by the inmate, unless it requires a three-way call.

13. A copy of the faxed message will be provided to you after you have signed and verified that you have received the message.

14. Do not tamper with or cause damage to telephone equipment.

15. Do not try to contact a victim or alleged victim of another detainee on his/her behalf.

16. Do not place calls for another detainee, do not allow another detainee to use your PIN.  Report all telephones not working properly to an officer.

17. 911 services are not allowed and do not work using the telephone equipment.

18. International telephone calls: Using a calling card purchased from the commissary you are able to call the following countries from the pod phones:

| AB | Cape Verde | Ghana | Libya | Norway | Sudan |
|---|---|---|---|---|---|
| Afghanistan | Central African | Gibraltar | Liechtenstein | NS | Suriname |
| AI | Chad | GN | Lithuania | NT | Swaziland |
| Albania | Chile | Greece | Luxembourg | Oman | Sweden |
| Algeria | China | Greenland | Macao | ON | Switzerland |
| American Samoa | Christmas Island | GU | Macedonia | Pakistan | Syria |
| AN | Colombia | Guadeloupe | Madagascar | Palau | Tadjikistan |
| Andorra | Congo | Guatemala | Malawi | Panama | Taiwan |
| Angola | Cook Island | Guinea | Malaysia | Papua New Guinea | Tanzania |
| Antarctica | Costa Rica | Guinea Bissau | Maldives | Paraguay | TC |
| Argentina | CQ | Guyana | Mali | Peru | Thailand |
| Armenia | Croatia | Haiti | Malta | Philippines | Togo |
| Aruba | Cuba | Honduras | Marshall Islands | Poland | Tokelau |
| Ascension Island | Cyprus | Hong Kong | Mauritania | Portugal | Tonga |
| Australia | Czechoslovakia | Hungary | Mauritius | PQ | TR |
| Austria | Denmark | Iceland | Mayotte Island | Qatar | Tunisia |
| Azerbaijan | Diego Garcia | India | MB | Reunion Island | Turkey |
| BA | Djibouti | Indonesia | Mexico | Romania | Turkmenistan |
| Bahrain | DM | Iran | Micronesia | RT | Tuvalu |
| Bangladesh | DR | Iraq | Moldova | Russia | Uganda |
| BC | Ecuador | Ireland | Monaco | Rwanda | Ukraine |
| BD | Egypt | Israel | Mongolia | SA | United Arab Emir |
| Belarus | El Salvador | Italy | Morocco | San Marino | United Kingdom |
| Belgium | Equatorial Guine | Ivory Coast | Mozambique | Sao Tome | Uruguay |
| Belize | Eritrea | Japan | MX | Saudi Arabia | Uzbekistan |
| Benin | Estonia | JM | Myanmar/Burma | Senegal | Vanuatu |
| Bhutan | Ethiopia | Jordan | Namibia | Seychelles | Vatican City |
| BM | Faeroe Islands | KA | Nauru | Sierra Leone | Venezuela |
| Bolivia | Falkland Islands | Kenya | NB | Singapore | Vietnam |
| Bosnia | Fiji Islands | Kiribati | Nepal | SK | Wallis/Funana |
| Botswana | Finland | Korea North | Netherlands | Slovakia | Western Samoa |
| Brazil | France | Korea South | Netherlands Anti | Slovenia | Yemen |
| Brunei | French Antilles | Kuwait | New Caledonia | Solomon Island | Yugoslavia |
| Bulgaria | French Guiana | Kyrgyzstan | New Zealand | Somalia | Zaire |
| Burkina Faso | French Polynesia | Laos | NF | South Africa | Zambia |
| Burundi | Gabon | Latvia | Nicaragua | Spain | ZF |
| BV | Gambia | Lebanon | Niger | Sri Lanka | Zimbabwe |
| Cambodia | Georgia | Lesotho | Nigeria | St Helena | |
| Cameroon | Germany | Liberia | Niue | St Pierre/Miquel | |

COMPLEX,PROTO

**U.S. District Court**
**DISTRICT OF KANSAS (Kansas City)**
**CRIMINAL DOCKET FOR CASE #: 2:16-cr-20032-JAR All Defendants**

Case title: USA v. Black et al                                    Date Filed: 05/04/2016
Magistrate judge case number: 2:16-mj-08080-TJJ

Assigned to: District Judge Julie A. Robinson

**Defendant (1)**

**Lorenzo Black**                          represented by   **John Jenab**
*CUSTODY*                                                   Jenab Law Firm, PA
                                                           110 South Cherry Street, Suite 103
                                                           Olathe, KS 66061
                                                           913-390-5023
                                                           Fax: 913-764-5539
                                                           Email: john.jenab@gmail.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*
                                                           Designation: CJA Appointment

**Pending Counts**                                         **Disposition**

21:846 and 18:2 CONSPIRACY TO DISTRIBUTE AND
POSSESS WITH INTENT TO DISTRIBUTE A
CONTROLLED SUBSTANCE (Indictment filed 5/4/16)
(1)

18:179(a)(1)(b)(1) and 2 PROVIDING OR POSSESSING
CONTRABAND IN PRISON (Indictment filed 5/4/16)
(2-4)

18:666(a)(2) and 2 GIVING, OFFERING, ACCEPTING OR
AGREEING TO ACCEPT A BRIBE (Indictment filed 5/4/16)
(9)

**Highest Offense Level (Opening)**

Felony                                                                                    New

| 02/17/2016 | 288 | SEALED MOTION for Leave to File Under Seal *Response to Defendant's Motion to Quash* by USA as to Richard Dertinger. (Attachments: # 1 Proposed Sealed Document, # 2 Exhibit 1, # 3 Exhibit 2)(Tomasic, Erin) (Entered: 02/17/2016) |
| 02/09/2016 | 283 | MINUTE ENTRY for proceedings held before District Judge Carlos Murguia: MOTION HEARING/JAMES HEARING as to Gregory L. Rapp, Richard Dertinger held on 2/9/2016. (Court Reporter Nancy Wiss.) (Attachments: # 1 Witness List, # 2 Exhibit List) (ss) (Entered: 02/09/2016) |

**EXHIBIT**

tabbies

**461**

```
 1                   UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,      Docket No. 16-20032-JAR

 4        Plaintiff,                Kansas City, Kansas
                                    Date:  08/09/2016
 5   v.

 6   LORENZO BLACK,
     KARL CARTER,
 7   ANTHON AIONO,
     ALICIA TACKETT,
 8   CATHERINE ROWLETTE,
     DAVID BISHOP,
 9
          Defendants.
10   ....................

11
                         TRANSCRIPT OF
12      AMENDED MOTION FOR RETURN OF PROPERTY PURSUANT TO
            FEDERAL RULES OF CRIMINAL PROCEDURE 4(g)
13                       (Doc. #85)
             BEFORE THE HONORABLE JULIE A. ROBINSON
14                UNITED STATES DISTRICT JUDGE

15   APPEARANCES:
     For the Government:  Ms. Debra L. Barnett
16                        United States Attorney's Office
                          301 North Main Street
17                        Suite 1200
                          Wichita, Kansas 67202-4812
18
                          Mr. Duston J. Slinkard
19                        United States Attorney's Office
                          444 Southeast Quincy
20                        Room 290
                          Topeka, Kansas 66683-3592
21
     For the Defendant Lorenzo Black:
22                        Mr. John Jenab
                          Jenab Law Firm, P.A.
23                        110 South Cherry Street
                          Suite 103
24                        Olathe, Kansas 66061

25   (Appearances continued on next page).
```

**EXHIBIT**

**462**

16-20032-JAR   USA v. Lorenzo Black, et al.   08.09.16          2

1     APPEARANCES:

2     (Continued)

3
      For the Defendant Karl Carter:
4                          Mr. David J. Guastello
                           The Guastello Law Firm, LLC
5                          4010 Washington Street
                           Suite 501
6                          Kansas City, Missouri 64111

7     For the Defendant Anthon Aiono:
                           Mr. Jason P. Hoffman
8                          Hoffman & Hoffman
                           CoreFirst Bank & Trust Building
9                          100 East Ninth Street
                           Third Floor East
10                         Topeka, Kansas 66612

11    For the Defendant Alicia Tackett:
                           (Appeared not)
12
      For the Defendant Catherine Rowlette:
13                         Mr. Michael M. Jackson
                           Attorney at Law
14                         727 South Kansas Avenue
                           Suite 2
15                         Topeka, Kansas 66603

16    For the Defendant David Bishop:
                           (Appeared not)
17
      For the Movant Federal Public Defender:
18                         Ms. Melody Brannon
                           Mr. Kirk C. Redmond
19                         117 Southwest Sixth Street
                           Suite 200
20                         Topeka, Kansas 66603

21

22
      Court Reporter:      Kelli Stewart, RPR, CRR, RMR
23                         Official Court Reporter
                           259 U.S. Courthouse
24                         500 State Avenue
                           Kansas City, Kansas 66101

25

16-20032-JAR    USA v. Lorenzo Black, et al.    08.09.16          3

```
1                    I N D E X

2

3    Defendant's Witnesses:                           Page

4    ZAY THOMPSON
        Direct Examination By Ms. Brannon            16
5
     STATEMENT BY MS. JACQUELYN ROKUSEK               31
6       Questions by Ms. Brannon                      43
        Questions by Ms. Barnett                      49
7
     MICHELLE JENSEN-SCHUBERT
8       Direct Examination By Ms. Brannon            53

9    RICHARD NEY
        Direct Examination By Ms. Brannon            58
10      Cross Examination By Ms. Barnett             73
        Redirect Examination By Ms. Brannon          78
11
     QUESTIONING OF MR. RANDY RATHBUN
12      Questions by Mr. Redmond                      82
        Questions Ms. Barnett                         88
13
     PROFESSOR PETER JOY
14      Direct Examination By Mr. Redmond            91

15
                     E X H I B I T S
16
        Defendant's
17      Exhibits              Offered        Received

18         401                  89              90
           402                  89              90
19         403                  89              90
           404                  89              90
20         405                  89              90
           406                  89              90
21         407                  89              90
           408                  89              90
22         409                  89              90
           410                  89              90
23         411                  89              90
           412                  89              90
24

25
```

```
 1

 2                    E X H I B I T S

 3                     (Continued)

 4      Defendant's
        Exhibits              Offered          Received
 5
            413                89                90
 6          414                89                90
            415                89                90
 7          416                89                90
            417                89                90
 8          418                89                90
            419                89                90
 9          420                89                90
            421                89                90
10          422                89                90
            423                89                90
11          424                89                90
            425                89                90
12          426                89                90
            427                89                90
13          428                89                90
            429                89                90
14          430                89                90
            431                89                90
15          432                89                90
            433                89                90
16          434                30                30
            435                30                30
17          436                30                30
            437                30                30
18          438                30                30
            439                30                30
19          440                30                30
            441                30                30
20          442                30                30
            443                30                30
21          444                30                30
            445                30                30
22          446                30                30
            447                30                30
23          448                30                30

24

25
```

1              (1:34 p.m., proceedings commenced).

2              THE COURT:  All right.  You can be seated.

3    All right.  We're here in United States versus Lorenzo

4    Black, et al.  The case number is 16-20032.  Your

5    appearances.

6              MS. BARNETT:  Debra Barnett, Assistant

7    United States Attorney, appearing on behalf of the

8    United States of America.  Also with me at counsel's

9    table is Duston Slinkard, Assistant United States

10   Attorney.  And then also joining us at the table is

11   Emily Metzger, Assistant United States Attorney.

12             THE COURT:  All right.

13             MR. JENAB:  Your Honor, Lorenzo Black is

14   present in person with counsel, John Jenab.

15             MR. GUASTELLO:  May it please the Court.

16   Mr. Carter appears in person and in custody with

17   counsel, David Guastello.

18             MR. HOFFMAN:  Mr. Aiono appears not but

19   through counsel, Jason Hoffman, Your Honor.

20             MR. JACKSON:  If it please the Court.  Your

21   Honor, Catherine Rowlette appears in person and by

22   counsel, Mike Jackson.

23             MS. BRANNON:  Your Honor, Melody Brannon and

24   Kirk Redmond appear on behalf of Jermaine Rayton.  Also

25   in Brenda Wood's case I filed a motion because-- to

1    participate in this hearing on her behalf because she

2    has overlapping issues.  Both Mr. Rayton and Ms. Wood

3    would waive their appearance.

4              THE COURT:  What's Mr. Rayton's first name

5    again?

6              MS. BRANNON:  Jermaine.

7              THE COURT:  Jermaine Rayton.

8              MS. BRANNON:  And he's actually in BOP

9    custody now.

10             THE COURT:  All right.  And then I think Ms.

11   Ambrosio - could I see the notice, Bonnie - Ms. Ambrosio

12   has indicated that this doesn't pertain to her client.

13   She's never been in custody at CCA, so she's not here.

14   And then Ms. Dodge on behalf of Mr. Bishop could not be

15   here, but has joined in the motions and asked for leave

16   to perhaps have a hearing at a later date if she finds

17   that necessary.

18             All right.  So we are here on the amended

19   motion of the Federal Public Defender for return of

20   property.  And I think it was amended to attach a

21   transcript from a hearing that we had in this case, a

22   status conference and discovery hearing that we had in

23   this case last week or perhaps the week before.

24             So are you ready to proceed?

25             MS. BRANNON:  Your Honor, if we may just

1    give a little bit of context to the Court about what's

2    developed in the last week and why there are so many

3    defense lawyers here perhaps.

4            Last week we discovered that the United

5    States Attorney's Office as part of the Black case had

6    subpoenaed from CCA all external and internal videotape

7    for a period from July of 2015 until April of 2016.  We

8    have that subpoena marked and to be offered into

9    evidence.

10           That videotape includes video of all

11   attorney-client meetings in that time, not just

12   pertaining to Mr. Black, but every attorney-client

13   meeting that occurred at CCA in that 10-month period,

14   whether they're FPD, CJA, or retained.  We understand

15   that the videotape-- or the video was there.  We don't

16   know that there's audio.  We know that there's a

17   capacity for audio.

18           This is why it's a problem, Judge.  When we

19   go to CCA, every attorney that meets there had an

20   expectation of privacy.  We expected that those meetings

21   with our clients were confidential.  We expected that

22   those meetings with our clients were privileged.  That's

23   always how it has been.  That's what we understood from

24   CCA.  And that was, in fact, not the case.  CCA since I

25   believe 2008 has recorded every attorney-client meeting

1    at their facility.

2            Now, I take that back, because I believe

3    there are ten meeting rooms and I think two of them are

4    not videotaped, but the other ones are. And so if there

5    was a camera available to CCA, it was on and being

6    recorded. Notice to the defense counsel was never given

7    of this from CCA. The fact that the United States

8    Attorney has available to it this sort of legal

9    communication was never made known to the defense. We

10   only found out about it because it came out in the

11   Lorenzo Black case.

12           It's another problem because we don't know

13   if and when they've done it in any other case that the

14   defense has had with a client at CCA. So we'd like to

15   present evidence regarding this.

16           It came to light last week when Jackie

17   Rokusek was summoned to the U.S. Attorney's Office. And

18   she was told that - by I believe Erin Tomasic and Kim

19   Flannigan - that they had videotape of her meeting with

20   her client in another case, that their investigator was

21   going to review it, that they intended to review it.

22   And it was going to provide them with a basis to have

23   her conflicted off the case.

24           And so Ms. Rokusek asked for an opportunity

25   to view it a few days later. That was made available to

 1   her.  She confirmed that there is a videotape of her

 2   meeting with a client.  She confirmed that she was able

 3   to view other attorney-client visitation that was going

 4   on during this time.

 5          The other problem that we have in this case

 6   - and there are a lot of them - but the other problem is

 7   not only does the U.S. Attorney have these, they were

 8   ready to disseminate them to all of the defendants in

 9   this case so far.  We know from what they told the Court

10   that they intend to add more defendants.  I think the

11   numbers were-- there may be up to 90 other inmates

12   involved.  There may be up to 60 people outside.  We

13   don't know how many of them would be indicted in this

14   case.  All of them, all of those defendants, all of

15   those counsel would be given videotape or video of every

16   attorney-client meeting that happened at CCA in those

17   ten months.

18          So when I meet with my client who has an

19   interest in this, Ms. Wood, who has nothing to do with

20   this investigation, nothing to do with these

21   indictments, when I meet with her, what I review, what I

22   do with her, all of that would be available to every

23   other defense attorney that represents anybody related

24   to this case.  That's why we're here.  We want to figure

25   out what to do about this.

1          I think at the end of this hearing, which I

2    don't expect to be particularly adversarial, I think the

3    parties are going to propose to the Court appointing an

4    outside special master to investigate this.  I think we

5    will have some protective orders that we will ask the

6    Court to consider, including taking into custody the

7    video and any copies of the video that are now in the

8    United States Attorney's possession to preserve them, to

9    preserve the data that is on them.  There will be other

10   matters that we would ask the Court to take up in the

11   protective orders.

12         And finally, we will be asking the Court,

13   and I think the government joins in this, for an order

14   that all federal pretrial detainees will only be housed

15   at facilities that do not record attorney-client

16   communications, legal communications.  And so that's

17   kind of an overview of the evidence and the context that

18   we have for the Court today.

19         THE COURT:  Well, I'm a little unclear about

20   a couple of things that you said, and I suppose I can

21   wait to hear the evidence on this.  But as far as the

22   recordings that you say have been occurring as far back

23   as 2008 and as they pertain to this case that we're here

24   today on from July of 2015 to April of 2016, you've

25   expressed concern that-- that the defense was not on

1    notice that the United States Attorney's Office had

2    access to this sort of information.

3            What I-- I guess what I'd like to focus on

4    is, is it-- do you have evidence that the United States

5    Attorney's Office has been getting access to this kind

6    of information outside the context of this case?

7    Because, of course, the context of this case has to do

8    with alleged transactions and contraband at CCA.  And

9    when we were having this discovery conference last week,

10   the week before, whenever it was, I was trying to get

11   some sense of how-- how the defense might go about

12   discovering what they needed to discover in this huge

13   volume of recordings.

14           And so we had this whole-- if you read the

15   transcript, this back and forth about, you know,

16   presumably most detainees are going to be housed in

17   their pod most of the time and counsel can see what they

18   were doing while they were there.  But as they moved

19   around the facility to medical or otherwise, would their

20   movements be recorded?  And then there was a suggestion

21   that there are, you know, at least video-recordings,

22   recordings, something, as they moved around to meet with

23   their attorneys.  And that this-- whatever their

24   movements were, all of the videos were-- were produced

25   or were going to be produced to the defense.

 1            So my question is:  Are the concerns because
 2   of this huge volume of discovery in this case or do you
 3   have some-- some indication that the U.S. Attorney's
 4   Office has discovered tapes in unrelated cases for
 5   unrelated cases?  Is it just all about what's happened
 6   in this case and discovering the whole body of
 7   recordings?
 8            MS. BRANNON:  There are two problems.  The
 9   first is that CCA is recording this in the first place.
10   Not monitoring, but recording.  That right there is a
11   violation, we believe, of the attorney-client privilege
12   of the legal communications going on in that room.  Just
13   that they're recorded.  They keep it for a number of
14   days.  We don't know how long.  We've heard from 30 to
15   120 days.
16            We do not know when-- if or when the U.S.
17   Attorney has asked for those recordings in other cases.
18   What we do know is they asked for it in this case.  And
19   we were not aware, No. 1, that the recordings existed
20   ever, and No. 2, that the government had such ready and
21   easy access to them.
22            So the fact is, we don't know.  And we think
23   that that would be one of the things for a special
24   master to investigate.  Whether this was a routine
25   practice in Kansas City, Kansas, to do that and whether

 1    it's been determined or used in any case.

 2            We have evidence today about how CCA handles

 3    those subpoenas and how they handle these requests.  But

 4    the point is, we're never given notice.  We're never

 5    given notice of the recordings.  We're never given

 6    notice of the subpoenas.  It's by happen chance in this

 7    case because the U.S. Attorney was actually using the

 8    videotapes against counsel and against defendants that

 9    it really came to light and began to develop.  That's

10    the evidence that we believe the Court will hear.  So

11    that's the issue with CCA.

12            The issue in this case is that they have ten

13    months of attorney-client legal communications videoed

14    in those rooms that the U.S. Attorney has in their

15    possession that until now they could've reviewed, they

16    could've used in any case.  Any attorney in their office

17    would've had access to it in any case, including-- and

18    this is no accusation in my case.  But, for example, in

19    Brenda Wood, if there was something about that case that

20    the U.S. Attorney wanted to use in that case, they have

21    possession of this now.  They don't even have to go.  So

22    it's preserved and in their custody.  That's of great

23    concern to every lawyer in here.

24            The other part of that is that not only do

25    they have it and were they ready to review it and were

1    they-- they were ready to use it in their case, they

2    were ready to disseminate that to every other attorney

3    in that case or in any cases coming up.

4              So what the evidence will be today, Your

5    Honor, is we've got some evidence sort of laying out

6    what is going on at CCA, what the rooms are about,

7    issues of security.  Ms. Rokusek is going to make a

8    statement to the Court explaining how she came to know

9    that they had possession of this, that they knew they

10   had possession.  This was not inadvertent.  They had

11   indexed it, they were-- had identified it, they were

12   using it in their case.  This was not an inadvertent

13   seizure by the government.

14             We are going to ask that at some point Ms.

15   Rokusek, with protective orders from the Court, will

16   show the Court exactly what is on those tapes and how

17   she could access every other attorney-client visit that

18   is on those recordings.  We will present evidence to

19   explain why, even if it is video communication, why that

20   is a great threat to us, why that is a violation of the

21   attorney-client privilege.

22             We will present evidence how this U.S.

23   Attorney access to confidential privileged information

24   between attorney-clients should not and is not, by DOJ

25   standards or other standards, that accessible.  We will

1    present evidence about why this is a constitutional and

2    these are ethical violations against our clients and

3    against the attorneys by the U.S. Attorney's Office and

4    by CCA.

5              I don't know if that answers the Court's

6    questions or clarifies.

7              THE COURT:  Somewhat.  But let's proceed

8    with the evidence.

9              MS. BRANNON:  Yes, Your Honor.

10             THE COURT:  Ms. Barnett, or anyone at your

11   table, do you want to make any opening statement?

12             MS. BARNETT:  Your Honor, I think the only

13   thing that I would say to the Court at this point is

14   that we do have the-- what we'll call the original copy

15   of the videotaped footage that was provided by CCA here

16   with us today, as well as a copy of that that was made.

17   We are prepared today to turn those items over to the

18   Court.

19             We agree that a special master should be

20   appointed to review those items and determine whether or

21   not they contain attorney-client privileged material,

22   because we feel that that determination needs to be made

23   before then we can adequately respond to and address to

24   the Court the other issues that are raised by the

25   Federal Public Defender's Office and the other defense

1    attorneys in this case.  Thank you.

2            THE COURT:  All right.  Thank you.  All

3    right.  Ms. Brannon.

4            MS. BRANNON:  Your Honor, if I may approach.

5    I have copies of the exhibits that we have today.

6            Your Honor, we call Zay Thompson to the

7    stand.

8                    ZAY THOMPSON,

9    called as a witness on behalf of the Defendant, having

10   first been duly sworn, testified as follows:

11                  DIRECT EXAMINATION

12   BY MS. BRANNON:

13     Q.   Please state your name for the record, please.

14     A.   Zay Thompson.

15     Q.   And, Mr. Thompson, what do you do for a living?

16     A.   I'm an investigator with the Federal Public

17   Defender's Office here in Kansas City.

18     Q.   And how long have you been doing that?

19     A.   Since-- I've been with the Federal Public

20   Defender since 2009.  I've been up here since 2012.

21     Q.   How long have you been an investigator?

22     A.   Since 2000.

23     Q.   All right.  As part of your job as an

24   investigator, do you go to CCA routinely?

25     A.   Yes, I do.

1     Q.   And can you describe where that is?

2     A.   It's in Leavenworth, Kansas.

3     Q.   All right.  Did you go there this week?

4     A.   Yes, I did.

5     Q.   On I believe was it yesterday?

6     A.   I went yesterday, yeah.

7     Q.   Yesterday.

8     A.   Uh-huh.

9     Q.   What did you do there yesterday?

10    A.   I took photos and video of the professional

11    visitation rooms.

12    Q.   And who else was with you?

13    A.   David Magariel.

14    Q.   That's how you say his name.

15    A.   Good.  Glad I got that right.

16    Q.   Were there any-- anyone from CCA or the marshals

17    office with you?

18    A.   Yes.  The chief of security, Roger Moore, was

19    there.  The warden was there for part of the time.

20    Craig from the U.S. Marshal's Office, a couple other

21    people I don't know.

22    Q.   And what were you able to do while you were

23    there?

24    A.   I inspected all of the professional visitation

25    rooms, took pictures of the cameras and the intercom

1    systems, and took some pictures of the rooms and the

2    hallways and took video of all of that.  And also tested

3    the intercoms to see if they were all working.

4        Q.  How long did it take you to do that?

5        A.  We were there for about an hour, hour-and-a-half.

6        Q.  How many visitation rooms are there?

7        A.  There are nine.

8        Q.  In the course of your work, have you been in all

9    of them for attorney-client visits?

10       A.  Yes.

11       Q.  While you were in there, did you have an

12   expectation that those were confidential communications?

13       A.  Yes.

14       Q.  But you knew that there were cameras in those

15   rooms?

16       A.  In some of the rooms, yeah.

17       Q.  Some of those rooms?

18       A.  Uh-huh.

19       Q.  You took-- you mentioned you took some videos--

20       A.  I did, yeah.

21       Q.  -- is that right?

22            MS. BRANNON:  If it's all right with the

23   Court, we'd like to go through a couple of those videos

24   just to set the context.

25            THE COURT:  That's fine.  Are those marked

1   for-- as exhibits?

2          MS. BRANNON:  They are not, Your Honor.  We

3   thought-- we have photographs that basically capture

4   what's in the videotapes, but it's a little bit easier

5   to understand what's going on by videotape.  We've made

6   all of them available to the U.S. Attorney's Office.

7          THE COURT:  All right.  So I-- I think that

8   the entire set of videotapes were-- I don't know if

9   they're audio and video, but the tape-recordings that

10  Ms. Barnett has indicated they have, the so-called

11  original set and the copies, need to be made part of the

12  record under seal at this point.  So I think essentially

13  what you're going to be playing are excerpts of

14  something that's under seal.  Or no, this is-- oh, no.

15  I'm sorry.  This is created differently.

16         MS. BRANNON:  Yeah.  This is just a tour

17  sort of to let the Court know where the cameras are.

18         THE COURT:  Demonstratively, okay.  That's

19  fine.

20         MS. BRANNON:  Exactly.  And we certainly can

21  mark and put into evidence these videos.  We have them

22  on a jump drive, I believe.

23         THE COURT:  I'll leave that up to you.  If

24  you just want to use it for demonstrative purposes,

25  that's fine, too.

16-20032-JAR   USA v. Lorenzo Black, et al.   08.09.16      20

 1              MS. BRANNON:  All right.  Thank you, Judge.

 2      Q.  (BY MS. BRANNON)  All right.  What's the first

 3   one that we have here?

 4      A.  It's all on one video file and I have it divided

 5   up, so...

 6              MS. BRANNON:  And if it's acceptable with

 7   the Court, I'm just going to ask Mr. Thompson to sort of

 8   narrate as he's going through the video.

 9              THE COURT:  That's fine.

10              (Video was played).

11      A.  So this is Room 107A.  It's one of the first

12   rooms you encounter when you come into CCA.  And there's

13   no cameras in this room.  There's two intercom systems.

14      Q.  (BY MS. BRANNON)  Do they both work?

15      A.  Yes.

16      Q.  Okay.  Are those phones used as part of

17   attorney-client communications?

18      A.  I've never used them.

19      Q.  And when you're there, you and the client are

20   placed into that room together for a contact visit; is

21   that correct?

22      A.  Correct, yeah.  These are contact visit rooms.  I

23   just wanted to get all the-- every corner of the room to

24   show that there's no camera there.

25              And then this is one of the secure hallways.  It

 1  has three rooms, Rooms 4 through 6.  And there is a

 2  camera pointing to the east.

 3       And this is a little intersection hallway that

 4  connects that first hallway to the visitation area and

 5  to a back hallway that has three more rooms.  There's no

 6  cameras in this intersection hallway.

 7    Q.  So looking down that hallway, is there a camera

 8  that you saw that would monitor what happens in that

 9  hallway?

10    A.  No.  The-- there's no camera.  That's an

11  intersection hallway and then there's no camera in that

12  back hallway.  And the video will go down there here in

13  a minute.

14       So what's up on the wall are lights over every

15  room.

16    Q.  What do those lights do?

17    A.  You can push a button in the room and it lights

18  up.  And then when a guard walks by and sees a light on,

19  they can come check on you.  And then they push a button

20  and turn the light off when they've checked.  So I-- I

21  got both corners of that hallway.  This is the-- this is

22  looking the other direction.  And there's no cameras in

23  that hallway at all.

24    Q.  In any of the rooms, the monitors, the audio

25  boxes, or the lights, are they labeled in any way?

1    A.  Some of the intercoms say "Push for Service,"

2    something like that.  But they don't-- the light button

3    doesn't say what it does.

4        This is Room 6.  Just an example of one of the

5    rooms.  It's a bigger room and it does have a camera in

6    it.  It's got two intercoms and a light switch.  And one

7    of the-- the intercom on the left doesn't work at all.

8    Chief Moore explained that.  And it's not marked that it

9    doesn't work.

10        Yeah, you can see the camera in the back corner

11    over the door.

12    Q.  Are you able to tell whether they are fixed

13    cameras or whether they can--

14    A.  No, they had a dark dome around them, so I

15    couldn't tell what the actual camera was doing.

16    Q.  All right.  Is there more video that you wanted

17    to go through?

18    A.  No.

19    Q.  Okay.  So you said there are nine total rooms and

20    seven of them have video cameras?

21    A.  That's correct, yeah.

22    Q.  Do all of them have some sort of intercom system?

23    A.  Yes.

24    Q.  And you mentioned that some of them have rooms

25    where the intercoms don't work.  All of them have some--

1    one intercom that works; is that right?

2    A.  Yeah, that's correct.  And then some have another

3    one that doesn't work in there.  And it's not marked

4    which one works or doesn't work.

5    Q.  All right.

6         MS. BRANNON:  If I could have just one

7    moment, Your Honor.

8    Q.  (BY MS. BRANNON)  All right.  You took a series

9    of photographs; is that right?

10   A.  Yeah, that's correct.

11   Q.  Okay.  If we can go to the first one, which I

12   believe is--

13   A.  It should be 401 on there.

14   Q.  You took-- okay.  Very good.  Can you describe

15   that photograph?

16   A.  Yeah.  These diagrams of the facility are hanging

17   in the hallways and it's for fire evacuation purposes so

18   any visitors know how to get out.  So I took a picture

19   of it because it helps just explain where all the rooms

20   are at so I wouldn't have to draw it myself.

21   Q.  I see I think six attorney rooms--

22   A.  Yeah.

23   Q.  -- on this.

24   A.  These are-- the hallway where I took the most

25   video, the-- the hallway on-- on the top of the diagram

16-20032-JAR    USA v. Lorenzo Black, et al.    08.09.16    24

1    there with three rooms coming off of it, that one has a

2    camera.  Then you have the-- the little intersection

3    between the hallways and then the back hallway with the

4    three rooms.  And neither the intersection nor the back

5    hallway have cameras.  And then the-- the little dark

6    lines coming out show the doors and show them opening.

7        Q.  So can you indicate the three attorney rooms that

8    are not reflected on this chart, where they would be in

9    relation to the others?

10       A.  Yeah.  So there's a long hallway to the right and

11   with a door in the middle of it.  The very right-hand

12   side of the-- the diagram.  And that's 107A.  And then

13   you go down in the down-- in the right-hand corner at

14   the bottom, you go through those doors and then there's

15   a long hallway with a control center there and then the

16   other two rooms, 107B and 107.  And so those aren't

17   shown on the diagram.  And they would be off the diagram

18   to the right at the bottom.

19       Q.  The photographs that we have pulled to introduce

20   into evidence, they reflect every room that you went

21   into?

22       A.  Yes, that's correct.

23       Q.  And they reflect all of the cameras in those

24   rooms?

25       A.  Yes, if they had cameras.

1    Q.  If they had cameras.  And they reflect all of the

2  audio communication devices in those rooms?

3    A.  That's correct.

4    Q.  Was there any signage outside these rooms saying

5  that there was any recording going on?

6    A.  No, there wasn't.

7    Q.  Did you see any signage at all while you were at

8  CCA or have you ever noticed any saying that legal

9  communications or attorney-client visitations were being

10  recorded?

11    A.  No, I haven't.

12    Q.  Did you have an opportunity to do some

13  investigation just online about CCA?

14    A.  Yeah, I checked out their website.

15    Q.  And what did you find on the website?

16    A.  There were several places where CCA's website

17  said that clients are provided-- that inmates are

18  provided with confidential access to their attorneys.

19    Q.  Was there anything on their website that

20  indicated there was any recording?

21    A.  No, there wasn't.

22    Q.  Okay.  I'm going to refer you to Defendant's

23  Exhibit 435.

24         MS. BRANNON:  If I may approach Mr.

25  Thompson, Your Honor.

1      THE COURT:  Yes.

2      Q.  (BY MS. BRANNON)  Is that a copy of what you

3  pulled off of the website?

4      A.  Yes.

5      Q.  And does it include the representations from CCA

6  that you just talked about?

7      A.  Yes.  On Page 2, it says, "Access to the court

8  system and confidential contact with their attorneys."

9      Q.  Have you found in your research and investigation

10 of this case anything that publicly notifies any

11 attorneys or anyone associated with attorneys, such as

12 investigators, that these visitation rooms are recorded?

13     A.  No.  Nothing public.

14     Q.  Now, as part of this, did you call CCA and just

15 ask?

16     A.  Yes, I did.

17     Q.  And when was that?

18     A.  Could I refer to my report?

19     Q.  Sure.

20     A.  I believe it was-- I believe it was 8-5, but I'm

21 not sure.

22     Q.  And this has been marked as Exhibit 434.

23     A.  Okay.  So I-- I called on August 4th this year

24 and I called the chief securities office.  He was on

25 leave.  I talked to his administrative assistant, Betty

1    Rumas, and she talked to Sergeant Wayne Bigelow.  Wayne

2    said that the visitation rooms were not subject to video

3    or audio-recording.  I called back to make sure that

4    they knew I was talking about the legal visitation

5    rooms, and they confirmed that those are not subject to

6    video and audio-recording.

7         So then on the next day, on the 5th, I called

8    back to CCA and spoke directly with Sergeant Bigelow,

9    thinking maybe, you know, wires got crossed, it was a

10   game of telephone or something since I hadn't talked to

11   him directly.  I told him that we received information

12   that the attorney rooms were actually recorded and asked

13   him about that.  He again said that they weren't and--

14   but asked the maintenance supervisor, who then corrected

15   him and said that six of the attorney rooms had video

16   cameras in them, that CCA does record the video footage

17   but not the audio footage.  And they keep the

18   video-recordings for 30 days, and they've been doing

19   this since 2008.

20   Q.   Before you called them back on that Friday, did

21   you have other conflicting information about whether

22   they were recording or not?

23   A.   Yes.  We-- I-- I saw an e-mail from the U.S.

24   Marshals in Missouri who said that CCA-- that CCA told

25   them that they are video-recording the legal visitation

1    rooms.

2    Q.  And could you identify each of those exhibits

3    that I've just handed you?

4    A.  Yeah.  443 is an e-mail that's from Debra Barnett

5    of the U.S. Attorney's Office saying that U.S. Marshal

6    Deputy Troy Oberly agreed to find out what's going on at

7    CCA.  That the visitation rooms have a panic button in

8    order to contact Control if there's an issue and the

9    attorney or client needs help.  If the panic button is

10   activated, there's a camera in the visitation room that

11   Control can activate to see what's going on in the room.

12   There's no recording function associated with this

13   camera or panic button.  And there's-- she reiterates

14   there's no way to record visual or audio with this

15   camera.  And then goes on to explain why the panic

16   button was installed.

17   Q.  So at that point you had called CCA and they had

18   said that there was no recording and we had this

19   particular e-mail assuring that there was no recording?

20   A.  That's correct.

21   Q.  And then the next exhibit that you have, the

22   Western District e-mail, that-- where was that in the

23   timeline of these exhibits that we're talking about?

24   A.  So the e-mail from Deb Barnett is 2:51 p.m. on

25   August 4th.  And there's an e-mail from Scott Seeling at

1   3:37 on August 4th.  And that's Defendant's Exhibit 441.

2       Q.  And what information do we get from Scott Seeling

3   about CCA recording?

4       A.  He said that attorney visits were not

5   audio-recorded, they were video-recorded.  Attorney

6   phone calls were not recorded.  Video-conferences, they

7   don't do video-conferencing with the federal defender.

8   And then let's see-- actually, I'm sorry, that's

9   Caldwell County, let me go down to CCA.  He gave a

10  variety of information about different facilities in

11  Missouri.  CCA attorney visits not audio-recorded,

12  attorney visits are video-recorded, phone calls not

13  recorded.  What the attorney--

14              THE COURT:  Can you slow down, please,

15  because I'm not finding-- this is Exhibit 441?

16              THE WITNESS:  444.

17      A.  Video-conference with attorneys not recorded.

18      Q.  (BY MS. BRANNON)  Going back to Exhibit 434,

19  which is your investigative report, did you also survey

20  the other facilities in Kansas that hold pretrial

21  detainees, federal pretrial detainees.

22      A.  Yes.  I called Atchison jail, Leavenworth jail,

23  and Wyandotte jail.  And Atchison and Leavenworth do

24  record-- video-record the attorney rooms.  Wyandotte

25  does not.  Atchison and Leavenworth do keep the

1   recording for a period of time, and Wyandotte said they

2   don't because it's attorney-- attorneys meeting with

3   their clients.

4      Q.  In all of this investigation when you were

5   talking to any facility, did you distinguish in your

6   questioning between mere monitoring by video and actual

7   recording?

8      A.  Yes.

9          MS. BRANNON:  Your Honor, we would go ahead

10  and move for admission, in fact, of all the exhibits

11  before the Court.  We've reviewed them with the

12  government, I believe they have no objection.

13         THE COURT:  That's Exhibits 434 through 448?

14         MS. BRANNON:  Yes.  And we will also provide

15  the Court with hard copies of the photographs that Mr.

16  Thompson reviewed.

17         THE COURT:  All right.  Exhibits 4-- 434

18  through 448 admitted.

19         MS. BRANNON:  We have no further questions

20  for Mr. Thompson.

21         MS. BARNETT:  I have no cross examination,

22  Your Honor.

23         THE COURT:  All right.  You can step down,

24  Mr. Thompson.  All right.  You can call your next

25  witness.

1          MS. BRANNON:  Your Honor, we'd call Jackie

2    Rokusek.  And while she's coming forward, Your Honor, in

3    talking with the U.S. Attorney's Office, because she's,

4    in fact, an officer of the court, I think we've agreed

5    to offer and ask the Court to allow her to make a

6    statement.  If we have follow-up questions, we can

7    certainly let the Court know.  We've also-- I think Ms.

8    Rokusek can address any concerns about privileged

9    information as part of her statement, but we've reviewed

10   it and I-- I think we've resolved most of those issues.

11         THE COURT:  All right.  No objection to that

12   procedure?

13         MS. BARNETT:  No objection, Your Honor.

14         THE COURT:  All right.  That's fine.

15         STATEMENT BY MS. JACQUELYN ROKUSEK

16         MS. ROKUSEK:  Judge, as an initial matter,

17   obviously I will be testifying to matters that pertain

18   to a client of mine, actually several clients of mine,

19   Richard Dertinger and Petsamai Phommaseng, and would ask

20   that the Court order that my testimony be allowed today

21   without creating a conflict of interest.

22         There's also the videotape that we're asking

23   to review with the Court in chambers, and I would ask

24   that the Court order that we review that for the limited

25   purpose of showing the Court what is on that video,

1    again, without creating conflicts on the case.

2              THE COURT:  All right.  So the videotape has

3    to do with you visiting one or both of these clients?

4              MS. ROKUSEK:  Correct.

5              THE COURT:  I will review-- review those in

6    camera.  And then you're asking that your statement not

7    be deemed to place you in a conflict of interest with

8    respect to representation of-- of either client?

9              MS. ROKUSEK:  Correct, Your Honor.

10             THE COURT:  All right.  I'm not entirely

11   clear the nature of your statement and how that would

12   impact the conflict.  But for now, that's fine, you can

13   proceed.

14             MS. ROKUSEK:  Okay.  Your Honor, the way

15   that this initiated was on August 2nd of 2016, in the

16   morning, I received a phone call from Special Assistant

17   United States Attorney Erin Tomasic.  Ms. Tomasic

18   indicated that Kim Flannigan had been e-mailing me for

19   the past three days, she inquired of whether I had taken

20   some extended leave of absence because I hadn't

21   responded to their e-mails.

22             I indicated to them that I had not received

23   any e-mails, and she indicated to me that she was cc'd

24   on them, so she knows that I did, and that they needed

25   to meet with me on either August 2nd or August 3rd

1    pertaining to the Richard Dertinger case.  I asked them

2    what this meeting would be about.  They indicated it

3    needed to be in their office and that they weren't going

4    to disclose what it was about over the phone.

5             Mid-morning that day, I received a phone

6    call from a co-defendant on the Dertinger case, William

7    Session, who provided me with some information that led

8    me to believe that perhaps I should go to this meeting

9    at 3:00 that we had scheduled at the U.S. Attorney's

10   Office to figure out what was happening on the Dertinger

11   case.

12            At 3:00 I met with Kim Flannigan and Erin

13   Tomasic at the U.S. Attorney's Office in the large

14   conference room.  I was told that they were holding this

15   meeting at-- at the U.S. Attorney's Office instead--

16   instead of filing a motion to ask to have me withdrawn

17   from the Dertinger case due to an alleged conflict of

18   interest that I had on the case based on information

19   they had in their possession at that time.

20            They indicated that they wanted to do this

21   because Erin Tomasic said that I had perceived some of

22   her actions in the past as something that was intended

23   to have me conflicted off the case, such as when they

24   were alleging that my fee may have been improper--

25   improperly taken in the Dertinger case.

1          I asked them what this was regarding.  They

2     told me that there were two proffers that they had

3     received on another case, the Black case, the case

4     we're-- that is before the Court at this time.  They

5     told me that in one of the proffers an individual had

6     told them that I had provided a-- a report from another

7     case to my client.  That Court [sic] was subject to a

8     protective order and that my client had provided

9     information allegedly to other people in the pod, which

10    had jeopardized their investigation in the Black case

11    and that they intended to pursue an obstruction charge.

12          The second defendant allegedly proffered

13    that I had reviewed in-house proffers and shared that

14    information with my client, Richard Dertinger, who had

15    then shared information at the-- with others in the pod.

16    I confirmed with them that, in fact, I hadn't reviewed

17    the proffers in-house yet.  I had been reviewing the

18    other volumes of discovery we had been provided.

19          They acknowledged that, in fact, they

20    reviewed not only my visitation log at CCA but also the

21    in-house proffer log and, in fact, I had not reviewed

22    the in-house proffers as of that time, but they had

23    reason to believe that it would-- it would create a

24    conflict of interest under Rule 3.7, and that I should

25    contact Stan Hazlett to discuss that and let them know

1  within a week as to whether or not I intended to

2  withdraw.

3          At the-- near the conclusion of this

4  conversation, I was informed by Ms. Flannigan that they

5  had a case agent on the case who was reviewing

6  attorney-client meetings from CCA to determine whether

7  or not this document had been provided to Richard

8  Dertinger, which I told them it had not.

9          I left there and contacted Laura Shaneyfelt

10 to talk about the fact that I believed now, in fact, we

11 had attorney-client privileged meetings which had been

12 recorded.  I confirmed that by contacting--

13          THE COURT:  If I could stop you just for

14 clarification.  So what was represented to you was that

15 an investigator on behalf of the U.S. Attorney's Office

16 was reviewing your contacts with Mr. Dertinger.

17          MS. ROKUSEK:  Dertinger, uh-huh.

18          THE COURT:  I mean, were they specific logs,

19 recordings, what was told to you at that point?

20          MS. ROKUSEK:  That the case agent was

21 reviewing the videos to determine whether or not I had

22 provided the document and that all he had seen so far

23 was me walking down the hall.  That was the-- what they

24 had told me, but that he would be reviewing those.

25          I then followed up and e-mailed both of them

1    back, indicating that I would like to review the videos

2    myself before making any decision on how to proceed with

3    the case, because I wanted to confirm whether, in fact,

4    they had attorney-client meetings videotaped from CCA.

5           It was August 3rd, 2016, Ms. Flannigan then

6    responded, asking me why it is-- telling me I didn't

7    have to respond, but why would I need to see that before

8    I made a decision?  And I told her I just-- I wanted to

9    see the videos.

10          I then received an e-mail from Erin Tomasic

11   indicating that I could come up and review those, that

12   they would be made available to me.  I received a

13   separate e-mail from Ms. Flannigan indicating that

14   because I had a deadline on another case, she was urging

15   me to come up right away and review those videos.

16          I then told them that I had a plea on

17   August 4th, which would've been the next day, at 9:30 in

18   front of Judge Murguia, that I was available to review

19   the videos after that time.  I came up to court to do

20   the change of plea hearing at-- during the change of

21   plea hearing, there was an e-mail sent to me from Ms.

22   Tomasic indicating that Pauletta Boyd, who was-- who's

23   the IT person in the office, could not be located, that

24   the agent was on vacation, and that no one else in the

25   office knew how to operate the system.  And, therefore,

1   I would have to wait until another date to review the

2   video.

3           I then told them that I would be in the

4   courthouse.  I gave them my cell phone number and told

5   them to contact me when they located Ms. Boyd and that I

6   would come at that time.  I later received a phone call

7   and an e-mail from Ms. Tomasic indicating that they

8   didn't believe she was there that day, they didn't know

9   where she was, and that I would have to come back at

10  another time.

11          The very next day, on August 5th, I

12  contacted them again.  Ms. Boyd was in the office.  I

13  went up to the U.S. Attorney's Office at approximately

14  2:00 in the afternoon, 2:15, with Michael Bussell, who's

15  my private investigator on the Richard Dertinger case.

16  At the same time in the lobby, Shazzie Naseem was

17  present.  He was also there to review the videos on that

18  date, but I had already made the appointment to view

19  those, and so Mr. Bussell and I went into the conference

20  room at the U.S. Attorney's Office.

21          Ms. Boyd showed us how to use the system,

22  which is designed-- I had pulled my logs from CCA to

23  determine when I visited my client, so I knew what dates

24  and what time I would've been in the facility.  I then

25  was-- we were then shown how to use the system.  And we

1    would go to the date in question and the time in

2    question.  And you could pull up multiple panels, if you

3    will, or windows to look at different visitation rooms

4    or different locations within the facility, whatever you

5    were looking at.

6            We were provided an index by Ms. Boyd, which

7    was left in the room.  That there were six boxes and she

8    showed us the boxes.  And the boxes, they're like a

9    large VCR box, but they're metal.  You place it into a

10   white box, which is on the prosecution table, the

11   reader.  And then once it's in the reader, you can pull

12   up information.

13           And on the index of the six boxes, the first

14   box contained information that didn't pertain to

15   attorneys, as did the second, third, and fourth.  The

16   fifth box had one attorney room and then the sixth box

17   had Attorney Room and then Attorney Room 1 through 6.

18   We chose that box based on the limited amount of time we

19   had in the courthouse to review the video.

20           We were able to ascertain where on the

21   system my visitation occurred.  And we opened up several

22   windows so we could try to look at several at a time.

23   We were able to view visits with two of my clients at

24   the same time.  And then inadvertently, the-- once you

25   watch the video for a period of time, it stops, you must

1   then - it's complicated - but go to another-- click on

2   another icon, which will take you back, and then you

3   restart it where it picks up.

4           At one point, we inadvertently hit the wrong

5   date and we were watching somebody else entirely

6   different.  It wasn't my client, it wasn't the room we

7   were in.  It was another attorney-client meeting room.

8   So I could've watched anybody that was in the facility

9   at any time which is contained on Box 6.

10          The video itself is in color.  The-- the one

11  room we were in had pan, tilt, and zoom functions.  So

12  we could zoom in, zoom back, move around the room.  But

13  at-- the room we were in was the larger room at the far

14  end of the hallway, which was described on the exhibit.

15  I was on one end of the table, my client was on the

16  other end of the table, and Mr. Bussell was in the

17  middle of the two of us at the table.  And you could see

18  everything in the room, what you were wearing, who was

19  in the room, it-- it was very good quality.

20          THE COURT:  Could you-- could the camera

21  train on people's faces and could it also train on

22  documents that were being shown or shared or-- assuming

23  there were any?

24          MS. ROKUSEK:  You can.  When we did use the

25  zoom function, it was somewhat pixelated, which, of

1    course, can be I'm sure sent off and-- and fixed.  But

2    it wasn't pixelated when it wasn't zoomed all the way

3    in.  If you tried to zoom all the way in, you could not

4    do so based on the pixelation.  But I can tell you that

5    I could tell that certain documents were Excel

6    spreadsheets.  I could tell that certain documents were

7    reports.  And you could see everything else in the room

8    very clearly.

9            It became very obvious to me at that point

10   what had occurred, so I then responded back to the U.S.

11   Attorney's Office in an e-mail, asked that no staff

12   member, attorney, agent of the government be allowed to

13   view, edit, or otherwise have access to those videos

14   until a decision was made by the Court.  And there--

15   there was an agreement that they would not review those.

16           I was made aware at a later date that a case

17   agent did have a copy of the videos himself.  The U.S.

18   Attorney has-- has indicated that they asked that agent

19   not to review that as well, but that those particular

20   copies were not held in the vault that the U.S. Attorney

21   agreed to hold the in-house copy in during that same

22   time frame.

23           I don't know the full extent of what was

24   reviewed by the U.S. Attorney's Office, but I know that

25   they knew it existed.  That apparently someone was

1    reviewing it to-- to determine what happened during an--

2    an attorney-client meeting between my client and I.  It

3    was the first time that I was made aware of it was in

4    early August.  And further, I-- I felt like it was used

5    to leverage a conflict of interest and have me removed

6    from a case.

7              It was for those reasons that I brought it

8    to the attention of Ms. Shaneyfelt and, ultimately, it

9    became before the Court.

10             THE COURT:  And again, this is in a case

11   totally unrelated to this case, the Lorenzo Black case?

12             MS. ROKUSEK:  My client's name is-- is

13   listed on the indictment as an unindicted

14   co-conspirator.

15             THE COURT:  And you represent that client.

16   Is that a case in front of Judge Murguia that has

17   charges that are similar to the charges in this case?

18             MS. ROKUSEK:  My client, in front of Judge

19   Murguia, he is indicted on a marijuana conspiracy case.

20             THE COURT:  It's not having to do with

21   contraband at CCA, it's a-- it's a--

22             MS. ROKUSEK:  No.  But he is-- what I can

23   inform the Court is that I was told by Ms. Flannigan

24   prior to his plea that he was-- that they had

25   information that he had been distributing K2 and that he

1    had better stop.

2            Later, I was informed that they intended--

3    they weren't certain whether he would be indicted in

4    this case or not, in the Black case, that that decision

5    had not yet been made, but they did intend to use

6    information from that investigation to pursue

7    obstruction.  Whether it's a new charge or an

8    obstruction on the sentencing, I'm not certain.  And so

9    I've been-- I've been given access to the discoverable

10   material because of their intent to use it to enhance my

11   client's sentence.

12           THE COURT:  And the first time you had

13   contact from the U.S. Attorney's Office about the

14   situation with this client concerning-- I mean, that at

15   all talked about your visitations with him and

16   recordings or whatever was August 2nd or was it earlier

17   than that?

18           MS. ROKUSEK:  Technically it was earlier.

19   Ms. Flannigan sent an e-mail to an iCloud account that

20   I-- I don't know where that-- I don't know if that's

21   something that is on my phone or something, but it's

22   not-- it's not my ECF e-mail.  It's not an e-mail system

23   that I even use.

24           So there were-- there were two or three

25   e-mails, Ms. Tomasic said three, Ms. Flannigan said two

1   e-mails, had been sent to me on the Thursday prior and

2   the Friday prior and then that same-- it must've been

3   Thursday, Friday, Monday.  And they finally called me on

4   Tuesday because I had not received any e-mails from

5   them.

6              THE COURT:  All right.  Are there any

7   questions?

8              MS. BRANNON:  May I approach Ms. Rokusek?

9   Would you please go through those exhibits and describe

10  them and their significance to you?

11             MS. ROKUSEK:  Defendant's Exhibit No. 441 is

12  an e-mail that's from Kim Flannigan in the U.S.

13  Attorney's Office indicating to me-- and I'll back up.

14  Oh, I'll start-- I'll start from when the e-mails

15  initiated.

16             At 11:47 a.m. on August 3rd, 2016, I

17  e-mailed both Kim Flannigan and Erin Tomasic, indicating

18  that I wanted to contemplate how to move forward

19  regarding the potential conflict of interest discussed

20  at their office on the day prior.  Particularly as it

21  related to reviewing the video visits between Mr.

22  Dertinger and myself at CCA.  And I asked for an

23  opportunity to review that video footage before making

24  any final decisions, and I asked them if that could

25  happen within the next few days.

1        I did receive a response at 5:41 p.m. from

2   Ms. Tomasic on August 3rd, same date, indicating that it

3   was available in-house anytime that I wanted to view it.

4   The agent had looked through the video for my visits and

5   said he has to locate the time and date of the visits

6   but hadn't paired them up to the video yet.  And she

7   also indicated that the agent was on vacation this week

8   and was preparing for a hearing the next week, and it

9   may take him a while to pull the video for me.

10        At 6:10 on the same date, August 3rd, Ms.

11   Flannigan e-mailed me and stated that she knew I had a

12   deadline on my other case and indicated that she thought

13   I should try to come over and find the video myself.

14        Defendant's Exhibit 442 is another e-mail

15   exchange between the parties, first initiated on August

16   4th at 6:52 p.m., where I reached out to both Ms.

17   Tomasic and Ms. Flannigan indicating to them that I was

18   asserting the attorney-client privilege, as I had never

19   waived it due to the fact that I had never known that I

20   was being recorded while visiting my clients at CCA.

21   And this is the e-mail where I asked that they refrain

22   from reviewing the videos and prevent anyone else, to

23   include staff, case agents, or other agents of the

24   government, from reviewing the video before I had an

25   opportunity to review them and to make a decision

1    regarding any dissemination of the videos.

2            I received the response from the U.S.

3    Attorney's Office the next morning at 9:19.  Ms. Tomasic

4    indicated that she understood the position and didn't

5    intend to review it until the matter was resolved and

6    that she would instruct all pertinent parties, to

7    include the case agent.

8            And then again, she clarified at 9:33, just

9    a few-- or a few minutes later, that they intended to

10   continue to review the CCA footage, but the agent and

11   staff will refrain from viewing any video depicting

12   attorney-client exchanges if any such videos exist.

13           Defendant's Exhibit 439 is a copy of the

14   index that was provided when I was present with Mr.

15   Bussell at the video viewing room at the U.S. Attorney's

16   Office.  And highlighted on this defendant's exhibit are

17   the attorney rooms.  DVR No. 5 has a Low Custody

18   Attorney, and then DVR No. 6 has Attorney Room and then

19   Attorney Room 4, 5, 6, 7, 8, and 9.

20           The other DVRs are of other areas located

21   within CCA.

22           MS. BRANNON:  And, Ms. Rokusek, those

23   highlights were not on the index you saw in their

24   office?

25           MS. ROKUSEK:  No.

 1              MS. BRANNON:  That's what we did.  Right?

 2              MS. ROKUSEK:  Correct.  The highlights were

 3    not on that.

 4              MS. BRANNON:  And I-- I don't know if you

 5    can-- what number are you looking at?

 6              MS. ROKUSEK:  Oh, Defendant's Exhibit

 7    No. 440 is a document which was provided by the U.S.

 8    Attorney's Office on today's date indicating that the

 9    index was created by Pauletta Boyd with the U.S.

10    Attorney's Office on June 10th, 2016 at 12:24:48 and

11    later modified on August 8th, 2006 at 4:58:45.

12              And I would note that, for the Court, that

13    in looking at the actual video itself, if you were

14    looking at that, you wouldn't know that was an

15    attorney-client room unless you were actually looking to

16    see what was going on in the room because, otherwise,

17    when the room is empty it's just a table and some chairs

18    that you're looking at.  So someone would actually have

19    to look at this to determine what it's actually

20    depicting in order to make the index.

21              MS. BRANNON:  There's not a caption saying

22    this is an attorney-client visitation room?

23              MS. ROKUSEK:  No.

24              MS. BRANNON:  If I could just have a couple

25    of follow-up questions.  The iCloud e-mails that they

1   referenced, did you ever locate those or did they ever

2   provide those to you?

3           MS. ROKUSEK:  One was forwarded to me from

4   Ms. Flannigan, which is how I determined it was an

5   iCloud account.  I have an iCloud-- something on my

6   phone.  I've looked in it.  I didn't receive those

7   e-mails from them, I don't know why.  But I don't use

8   that e-mail, so...

9           MS. BRANNON:  And just to be clear, was it

10  your understanding from Ms. Tomasic and from Ms.

11  Flannigan that they intended to view the video and to

12  look for a particular document that you were handing a

13  client?

14          MS. ROKUSEK:  By-- if by "they" you mean an

15  agent working for them, yes, their case agent.

16          MS. BRANNON:  Their case agent.  And to look

17  for a specific action on your part in handing a document

18  to your client?

19          MS. ROKUSEK:  Correct.

20          MS. BRANNON:  Do you have any information

21  that the videos that were made available to you were

22  limited to defendants either in this case or in a

23  related case?

24          MS. ROKUSEK:  I have no idea who they were

25  made available to.

1          MS. BRANNON:  When you were able to open up

2     the video, was there-- I think you mentioned, but

3     there's a further index of dates once you go into the

4     video; is that right?

5          MS. ROKUSEK:  Yes.  And it-- it's not the

6     most user-friendly process.  But once you open it,

7     because-- and without Mr. Bussell, I may have never

8     found it myself.  But once you open it, you can look for

9     a date and a time that is close enough that you know

10    you're going to be present in the room and you can go to

11    it and wait until your client enters the room.  But

12    there-- it's always being taped.  So some of the rooms

13    are empty until someone enters them, or you can just

14    watch someone sitting there waiting for an attorney to

15    appear or waiting for a guard to take them out.

16         MS. BRANNON:  Just to give context to these

17    logs, these visitation logs, what happens when you call

18    to ask to see a client at CCA?

19         MS. ROKUSEK:  They note what date and time

20    you intend to meet with your client and then you check

21    in when you arrive, and they know that.  And you check

22    out when you leave, and they know that.

23         MS. BRANNON:  And was that the log that they

24    were comparing against the videos to determine which

25    ones were yours?

 1          MS. ROKUSEK:  That's the log we used.

 2          MS. BRANNON:  Okay.

 3          MS. ROKUSEK:  We brought our own log of my

 4    visits that I obtained from CCA.  It would've been very

 5    easy for the case agent to do the same, because I was

 6    told by the prosecutors that, in fact, they had already

 7    pulled my logs to note when I had visited my client.

 8          MS. BRANNON:  All right.  Thank you.

 9          MS. BARNETT:  Ms. Rokusek, when you said

10    that the case agent was looking for you handing a

11    document, you've mentioned that a prosecutor said that,

12    do you remember who specifically said that?

13          MS. ROKUSEK:  Ms. Flannigan is the one that

14    told me that the agent was looking at the video.

15          MS. BARNETT:  And with regard to the videos,

16    I believe that you indicated or said that you had opened

17    up two of them, one with you and your client, and then

18    one where another person was sitting there; is that

19    correct?

20          MS. ROKUSEK:  We actually opened up more

21    than two at a time.  You can open up I think 16 at a

22    time and drag and drop into the windows to watch more

23    than one room at a time.  So we actually opened up more,

24    because we had a very limited amount of time before we

25    were going to have to leave the building.  It was Friday

1    afternoon and it was nearing 5:00.  So we were able to

2    watch visits with one of-- one of my clients.

3            And the reason that happened is because when

4    we pulled the log, we actually visited another client

5    prior to meeting with the client in question.  So when

6    you go up there, they may have somebody else in place

7    first if you're meeting with more than one client.  So I

8    met with that client first.  And so when we opened up

9    that date and time, he was the person in the room.

10           When we opened up the next one, my other

11   client was in the room waiting for us.  And then we--

12   when we finished the first visit, we were moved to a

13   different room and he was moved to meet with us.

14   Inadvertently, in going back we hit a wrong date and

15   opened up a different room with somebody else's client

16   sitting in there.  So I could've opened up any window of

17   any room from the dates in question and watched anyone's

18   attorney-client meetings had we chosen to do so.

19           MS. BARNETT:  But with regard to the ones

20   that you opened up, there was no audio associated with

21   them.  Correct?

22           MS. ROKUSEK:  Not that we were able to--

23   there is an audio button.  When we clicked on it,

24   nothing happened.

25           MS. BARNETT:  And did you click on it with

1    regard to your clients?

2            MS. ROKUSEK:  Yes.

3            MS. BARNETT:  You didn't click on it with

4    regard to anybody else's clients?

5            MS. ROKUSEK:  We didn't even watch the

6    videos regarding anyone else's clients once we figured

7    out it wasn't a client of mine.

8            MS. BARNETT:  Now, when Judge Robinson had

9    asked you earlier in your testimony about the case agent

10   and reviewing the videos, you had mentioned that you

11   were told that the case agent saw you walking down a

12   hall.  Who said that to you?

13           MS. ROKUSEK:  I believe-- I believe, and

14   don't quote me, but I believe it was Ms. Flannigan as

15   well.  If not, it was Ms. Tomasic.  But I believe it was

16   Ms. Flannigan.

17           MS. BARNETT:  But there was no indication

18   that your client was with you as you were walking down

19   the hall.  Correct?

20           MS. ROKUSEK:  Well, typically your client

21   wouldn't be with you walking down the hall.

22           MS. BARNETT:  Okay.  You don't--

23           MS. ROKUSEK:  They don't let us walk our

24   clients around, so no.

25           MS. BARNETT:  You don't meet with your

1    clients in the hallways at CCA, do you?

2              MS. ROKUSEK:  I do not.  But I meet with

3    them in rooms where I was videotaped.

4              MS. BARNETT:  Okay.  Thank you.  I have no

5    further questions, Your Honor.  Thank you.

6              THE COURT:  Thank you, Ms. Rokusek.

7              MS. ROKUSEK:  Thank you.

8              MS. BRANNON:  Your Honor, we also have Mr.

9    Bussell here, and we have an affidavit in evidence from

10   him.  I don't know that there's any need to call him to

11   testify.  We asked him to be here because I think, as

12   Ms. Rokusek indicated, he is the one that is more-- can

13   manipulate the videotape that they saw and can show how

14   it zooms and so forth.  So we wanted him to be available

15   when the Court wants to review that with the two of

16   them.  I don't know if the Court wants to do that and--

17   take a break and do that now or wait until the end of

18   the hearing, but that's why we wanted him to be

19   available.

20             THE COURT:  Okay.  How-- how much-- how much

21   longer a hearing are you anticipating with your other

22   evidence?

23             MS. BRANNON:  Judge, we have a custodian

24   from-- of records from CCA, which I think will be very

25   short.  We have two witnesses by Skype.  And then Mr.

1   Ney is present here.  So we think cumulatively that

2   testimony would take about an hour, hour and 15 minutes.

3              THE COURT:  All right.  Why don't we go for

4   say another 20 minutes, we'll take a break.  I'm

5   inclined to look at those at the end, unless Mr. Bussell

6   needs to leave for some purpose.

7              MS. BRANNON:  All right.

8              THE COURT:  Okay.

9              MICHELLE JENSEN-SCHUBERT,

10  called as a witness on behalf of the Defendant, having

11  been first duly sworn, testified as follows:

12                    DIRECT EXAMINATION

13  BY MS. BRANNON:

14     Q.  Please state your name for the record.

15     A.  Michelle Jensen-Schubert.

16     Q.  And what do you do for a living?

17     A.  I work at CCA.  I'm the inmate records clerk.

18     Q.  Did you receive a subpoena from us?

19     A.  Yes, yesterday.

20     Q.  Okay.  And on that subpoena, what records did you

21  gather together to bring to us today?

22     A.  I gathered three individual files that I copied.

23     Q.  Uh-huh.

24     A.  And then I also received some of our policies

25  that you requested.

 1    Q.  Why was it that you gathered those particular

 2  inmate files?

 3    A.  Because normally when I receive a subpoena, it is

 4  for inmate records' files.

 5    Q.  All right.  And you understood from our subpoena

 6  we were looking for subpoenas or records requests from

 7  the government; is that right?

 8    A.  I was unclear on that.

 9    Q.  Okay.  If you receive a subpoena related

10  specifically to an inmate at CCA, what do you do with

11  that subpoena?

12    A.  I store it in their file.  Or if I get it

13  electronically through e-mail, I have a folder in my

14  e-mail that I put it to.

15    Q.  So it would be a-- in both possibly?

16    A.  Correct.

17    Q.  Did you look through-- well, first of all, can

18  you say the names of the inmates on those files?

19    A.  Ms. Rowlette.  I can't think.  Mr. Bishop and--

20    Q.  Mr. Black?

21    A.  Yes.

22    Q.  All right.  Did you look through those inmate

23  files for us today?

24    A.  Yes.

25    Q.  Did you find any subpoenas--

1    A.  No.

2    Q.  -- anywhere in their inmate files?

3    A.  No.

4    Q.  All right.  If a subpoena or a records request is

5  received by CCA that is not particular to an inmate, do

6  you know what happens to it?

7    A.  It goes to whoever it needs to go to.  If it's

8  for video, it would go to that person.

9    Q.  There's no central repository at CCA that you

10  know of--

11    A.  No.

12    Q.  -- that all records requests go to?

13    A.  No.

14    Q.  All right.  Would you ever provide records or

15  video or anything else just upon request?

16    A.  No.

17    Q.  Would there be an exception for the marshal's

18  office?

19    A.  Yes.

20    Q.  And what is that exception?

21    A.  Because we have a contract with the marshals and

22  that is their property.

23    Q.  All right.  Do you know-- well, you've heard the

24  testimony here about video.  Do you know how that was

25  provided to the U.S. Attorney's Office?

1    A.  I do not.

2    Q.  You had no involvement in that at all?

3    A.  No.

4         MS. BRANNON:  Okay.  Thank you very much.

5    We have no further questions.

6         MS. BARNETT:  Nothing else, Your Honor.

7    Thank you.

8         THE COURT:  All right.  You can step down.

9         MS. BRANNON:  Your Honor, in looking at the

10   exhibits that have been admitted before the Court, 438

11   is a grand jury subpoena which is, in fact, the subpoena

12   that led these videos to be provided to the U.S.

13   Attorney's Office.  It's-- was I believe issued three

14   days after the complaint was filed in this case and

15   spans, as we mentioned, from July to-- of last year to I

16   believe April of this year.

17        THE COURT:  So it's for-- this says July,

18   2014 through April 12, 2016.

19        MS. BRANNON:  I misspoke, that's right.

20        THE COURT:  All video footage or still

21   images currently retained by the CCA depicting any

22   internal or external surveillance video or still image

23   taken between those dates at the CCA facility in

24   Leavenworth, Kansas.

25        Do you know what-- how they distinguish -

1    maybe I should've asked this witness - internal and

2    external surveillance, or is somebody going to testify

3    to that?

4             MS. BRANNON:  I don't know that someone is

5    going to testify.  I can say that there are yards

6    outside of CCA where they go for exercise and other

7    things, and I assume that's what external is.

8             Also, when you get to CCA, if you're a legal

9    visitor, you-- and I don't know if the Court has been

10   there, but there is one gate that you go through first.

11   They open that and close it behind you.  There's a

12   second gate that you go through, they open and close

13   that.  And then you go into the lobby.  I believe there

14   are cameras out at that area, the gate area, that would

15   record who's going in or out.

16            Those are the external cameras that I would

17   contemplate.  But no, we don't have any specific

18   testimony as to that.  I'm sure we could get it for the

19   Court.

20            THE COURT:  Okay.  That's fine.

21            MS. BRANNON:  The other thing on the exhibit

22   list relevant to this last witness is 436, which are the

23   CCA policies that were produced by the 17(c) subpoena.

24   I think those policies-- we're not going to go through

25   those line-by-line here today, Your Honor, but I think

1   those policies address when recordings of attorney

2   visitation, attorney-client visitation rooms can be

3   made, who was authorized to make them, when they can

4   make audio-recordings I believe is in there as well.

5              THE COURT:  Okay.

6              MS. BRANNON:  Your Honor, next we'll call

7   Richard Ney to testify, please.

8                        RICHARD NEY,

9   called as a witness on behalf of the Defendant, having

10  first been duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12  BY MS. BRANNON:

13     Q.  Would you state your name for the record, please.

14     A.  Richard Ney, N-E-Y.

15     Q.  And, Mr. Ney, what do you do for a living?

16     A.  I'm an attorney in private practice in Wichita,

17  Kansas.

18     Q.  Can you describe the nature of your practice?

19     A.  It's criminal defense.

20     Q.  And in-- how long have you been practicing?

21     A.  Practicing law, 38 years.

22     Q.  Can you give a quick overview of what you've done

23  in those 38 years?

24     A.  Certainly.  I was a first assistant and then

25  chief public defender in Vermillion County, Illinois.  I

1    worked briefly with the Vermont Defender General's

2    Office.  I established and ran the Public Defender's

3    Office in Wichita for eight years.  I was then appointed

4    chief federal public defender for the District of

5    Hawaii.  Two years later we added Guam to that.  So I

6    was chief federal defender for Hawaii and Guam for three

7    years.  And then in the last 20 years, I've been in

8    private practice in Wichita.  And I should say for six

9    years I served as a federal resource counsel with the

10   Death Penalty Project.

11      Q.  Have you heard the testimony presented here

12   today?

13      A.  I have.

14      Q.  Have you reviewed the pleadings that have been

15   filed in this matter?

16      A.  I have done so.

17      Q.  All right.  Let's talk a little bit about what

18   you've done in your experience in visiting with clients.

19   Have you ever been to CCA?

20      A.  I have not.

21      Q.  Okay.  Have you been to other facilities to visit

22   your clients in custody?

23      A.  Very many, yes.

24      Q.  In those facilities, describe what your

25   understanding or expectation was regarding your legal

1    visitation with your client.

2        A.   Certainly.  In the various prisons and jails that

3    I visited, there is rarely cameras.

4        Q.   Uh-huh.

5        A.   I-- I certainly look for that when I meet with a

6    client.  If there are cameras, I find out very quickly

7    whether those are just for safety monitoring or they're

8    there for recording.

9        Q.   What's the difference to you there?

10       A.   A great difference.  There's a difference between

11   a guard occasionally looking in to see that everything

12   is going all right in a visitation and there's no harm

13   to either individual, as opposed to a recording of my

14   visitation with a client, which is in my belief

15   privileged.  And it could be kept and used by

16   prosecutors or-- or agents at a later time.

17       Q.   Have you in your experience had to take steps to

18   ensure that there was not recording going on in

19   attorney-client visitation?

20       A.   Yes.

21       Q.   And what was that?

22       A.   Well, it-- I have, for example, when responding

23   to a jail situation where my client is being interviewed

24   and I've asked-- been asked to come in, obviously I

25   believe that those rooms are monitored, I ask to be

1    removed to another room so I can consult with my client,

2    as opposed to where the interview was taking place.

3         In various situations I've asked jails if

4    recordings are going on, to be assured they're not.

5         When I was federal defender in Hawaii, we had an

6    interesting situation that many of our clients-- because

7    there was no federal detention center in Hawaii, many of

8    our federal clients were on the mainland in Alameda

9    County.  We set up a closed-circuit situation where we

10   could talk to the client, this was back in 1991 through

11   '96, we could talk to the client through closed-circuit

12   in California.  This was through the GSA.  And we took

13   many steps to make sure that these communications were

14   not recorded, could not be monitored on either end.

15   Q.   You heard Ms. Rokusek describe her situation.

16   Has anything like that ever happened to you?

17   A.   No, it has not.  I have never found that I have

18   been recorded when I visited a client.

19   Q.   Not only not recorded, but have you ever had an

20   experience of a U.S. Attorney having access to

21   attorney-client communication?

22   A.   Of that sort-- of that sort, no.  I certainly had

23   situations where prosecutors got privileged material

24   that I've litigated, but not of this sort.

25   Q.   What exactly-- well, let's talk about this aspect

 1    of it.  The evidence is that right now we know there are

 2    video-recordings, but we're not sure about audio.  If it

 3    were such that these recordings were limited to video,

 4    is that still a problem?

 5        A.  It's a huge problem as far as I'm concerned.

 6        Q.  How so?

 7        A.  Well, the video as been described by counsel is

 8    pretty good quality, it's--

 9        Q.  Uh-huh.

10        A.  You can zoom in on it.  What would stop anybody

11    from hiring a lip reader or, if they have that capacity

12    themselves, reading the lips of the individuals and

13    gaining the information that was passed from lawyer to

14    client.  Certainly, and it's not just the government, if

15    co-counsel-- or if a co-defendant's counsel are

16    receiving these videos, would they not be obligated to

17    try and learn what is on them?

18        I'm defense counsel and I see a video of someone

19    who's an informant against my client, wouldn't I love to

20    know what's going on there and don't I have an

21    obligation, if I can reasonably find out what that

22    individual is saying, to find out.  A lip reader would

23    do that.  I mean, and that's not far-fetched.

24        I'm a baseball fan and every time the catcher

25    goes to the mound, the pitcher and catcher cover their

 1    mouths with their gloves.  Why?  Because television is

 2    there and their conversation could be found.

 3         But there's a number of other problems as well.

 4    Let's suppose I'm doing a-- there's a non-verbal

 5    communication.  If I'm doing a self-defense case, let's

 6    say, and my client is showing me how the assault took

 7    place, are we talking about that and acting it out,

 8    that's certainly something that a prosecutor would have

 9    access to and I-- and I assume would love to have.

10         Again, the quality here, as been described, you

11    could see the documents both counsel and his client are

12    reviewing.  I've been in a number of trials where

13    prosecutors ask the defendant, "Look, you went over

14    material with your attorney, did you not?  Did you not

15    see the photographs," et cetera.  Certainly that would

16    be fodder for that, and fodder for impeachment if the

17    client said no.  They'd say, "Well, let's go to the

18    videotape and look."

19         There's a number of-- even relationships between

20    attorneys and clients.  I mean, you can watch a

21    videotape of someone and understand whether they're

22    having a good conversation or an unpleasant

23    conversation.  A prosecutor would have the ability to

24    see if my client and I are getting along or not getting

25    along.

1          Competency issues.  If I raise an issue that my

2     client is incompetent to stand trial, let's go to the

3     videotape.  Look, he's talking with you, he's doing

4     this.  Again, which would go into the issue and a

5     violation of the lawyer/client privilege in-- in my

6     belief.

7     Q.  Same thing perhaps with whether the client is

8     literate or not?

9     A.  Certainly.  Or speaks English.  Again, if-- to

10    show the attorney-client communication, just not the--

11    the content of it, but the quality of it.  And in

12    post-conviction obviously, you could-- only the

13    imagination would stop at how that could be used in a

14    2254 or 2255 proceeding.

15    Q.  Who else do you consider to be a member of the

16    legal team that is within this privileged, confidential

17    communication with a client?

18    A.  Well, certainly investigators.  In capital cases,

19    mitigation specialists, anybody who's working for the

20    defense, experts in certain situations.  In capital

21    cases, many times I will be on a team and we hire an

22    expert who is only an advisory expert, like mental

23    health expert, not to testify but to give us advice.

24    That person would certainly be a part of the team.

25    Paralegals, the list goes on and on.

1    Q.  Let's talk about experts for just a minute,

2  because there are all sorts of experts.  But based on

3  this, for example, a psychological expert, there's

4  psychological testing that goes on between the expert

5  and the client.  Right?

6    A.  Certainly.

7    Q.  And that includes things on paper and things that

8  they're presented to look at?

9    A.  Not just on paper.

10    Q.  Uh-huh.

11    A.  A couple of the experts I use use laptop

12  computers, have permission to take those in.  And

13  certainly those screens would be visible to these

14  cameras, or at least it seems like they would.

15    Q.  There are also psychological tests that require a

16  client to either handle something or look at photographs

17  and respond; is that right?

18    A.  Right.

19    Q.  Okay.  When-- in your experience, whether we're

20  in state or federal, capital or not, when we ask to have

21  an expert meet with a client, do we do that ex-parte?

22    A.  We do.

23    Q.  And if the U.S. Attorney was made privy to a

24  visit with a particular expert that had been ex-parte,

25  are there times that they could identify what kind of

1  expert it was?

2     A.   Not only identify the expert, identify the tests

3  that were being done, even have their own expert review

4  the testing.  As you said, there's manipulative testing

5  that can be seen in how a client would do that.

6         I recently had a case in-- it was a state court

7  case out of Johnson County, my expert was going to be

8  placed in a room with cameras.

9     Q.   Uh-huh.

10    A.   And we specifically made an arrangement that that

11 not be done for these reasons.

12    Q.   Let's talk about what obligations one would have

13 if they-- if you inadvertently came into what you could

14 identify as privileged material.

15    A.   Yes.

16    Q.   What are the obligations of an attorney?

17    A.   I've litigated this issue and it's-- I think the

18 law is clear that if I were-- as a defense attorney or

19 prosecutor, if I have something in our hands that we

20 should not have, our obligation is to-- immediately to

21 alert the other side and the Court.  To hold onto that

22 information, to use that information in any way I think

23 is a violation of ethics and - and certainly by a

24 prosecutor - violates the client's Sixth Amendment right

25 to private consultation with his attorney.

1    Q.   There are times, in fact, that a prosecutor may

2   have reason to have access to privileged or confidential

3   information, at least under the law.  The law might

4   recognize that; is that right?

5    A.   There are limited times, yes.

6    Q.   What's your experience with that?

7    A.   Well, one of the things is the SAMs.

8    Q.   Can you say what SAMs is?

9    A.   Sure.  Special administrative management.  In

10   1995 I think the first SAMs Act was passed.  It was

11   beefed up after 2001.  I haven't personally tried cases,

12   but I've been involved with trial teams as federal death

13   penalty resource counsel in teams that have had SAMs

14   restrictions.

15        SAMs can be a whole range of things.  But Part D

16   of the SAMs regulation allows certain intrusion into the

17   attorney-client process.  It can be such as limiting who

18   can see the client, that investigators cannot come in

19   for some reason, or paralegals.  It can also extend to

20   attorneys.

21        The most extreme cases where there are terrorist

22   suspects, attorneys' conversation with the clients can

23   be monitored.  But that requires an act by the Attorney

24   General.  A prosecutor, a line prosecutor or a U.S.

25   Attorney cannot do it.  The Attorney General has to

 1    issue that order and, more importantly, the counsel

 2    involved has to be informed.  And that can be litigated

 3    before the Court.  I've been privy to several cases

 4    where there's been litigation on SAMs regulations.

 5       Q.   Uh-huh.

 6       A.   Or SAM impositions before the Court.

 7       Q.   Let's talk for a moment about phone calls that

 8    hasn't been brought up so much here.  But if the

 9    government were to have access and listen to recorded

10    attorney-client phone calls, what is the significance of

11    that to you?

12       A.   Well, it's tremendously significant.  Phone calls

13    between attorney and client have traditionally been held

14    to be privileged.  There's a great import for attorneys

15    to make sure their clients are talking with them on a

16    secure line.  I think-- I think that's required.  For--

17    for the government to have those calls under-- except in

18    the most exceptional circumstances unless, for example,

19    I and my client are plotting a crime, that may do away

20    with the exception.  But beyond that, I-- I cannot see a

21    difference.

22            Because, understand, we're talking about people

23    that can't come to my office, that I can't have a

24    conversation with in privacy that I've arranged.  It has

25    to be through a telephone, which is run by the-- the

 1   government or the-- the correctional facility, or in a

 2   visitation room.  Again, run by the correctional

 3   facility.  And we, as attorneys, rely on those to be

 4   private.  We can't have them brought to our office to

 5   make sure of that.

 6       Q.  So in our situation right now where we know that

 7   CCA has or is recording our meetings with our-- our

 8   clients, what is our obligation as their attorney?  Can

 9   we meet with them in that situation?

10       A.  Well, I mean, it really proposes a dilemma.  Do

11   you not meet with your client or do you meet with them?

12   I think that first you have to litigate that issue.  But

13   secondly, if I were talking to my client in CCA today,

14   I'd file an objection.  And then when I'm talking to my

15   client, he and I would be holding this in front of our

16   face when we talked.

17       Q.  Would you have an obligation to tell the client

18   that it was no longer confidential or privileged?

19       A.  Absolutely.  And certainly having a file in front

20   of your face while you talk to your client and for him

21   to have a file in front of his face certainly I think

22   harms the lawyer/client relationship.

23       Q.  Just to be clear; from what you know in this

24   case, the recording by CCA of the meetings between the

25   legal team and a client is a violation of the

1   confidentiality and privilege that is expected of that

2   communication?

3       A.   In my year-- 38 years of practice and running

4   offices and dealing with public defenders and defense

5   counsel, I believe absolutely it is.  Even if there is

6   no sound, as I said, there's nothing that-- the

7   non-verbal statements and then the ability to read lips

8   certainly violate that privilege to an incredible

9   extent.

10      Q.   Again, limiting this to the video without

11  audio-recording of these meetings and the production of

12  that to the U.S. Attorney's Office, can you talk about

13  the constitutional implications?

14      A.   I-- yes.  I-- I think it violates the Sixth

15  Amendment.  There are a number of cases-- in fact, I'm

16  litigating a case before the Kansas Supreme Court right

17  now on a violation, not this, but the prosecutor coming

18  into possession of a defense investigator's notes.  I'm

19  litigating that now as a violation of the Sixth

20  Amendment.  It-- when that came to our-- light in the

21  Douglas County case, we moved to have the prosecutor

22  recused.  The judge refused.  But that is an issue on

23  the appeal of that case.

24          I don't think there can be a more important issue

25  than a prosecutor interfering with the confidential

1    relationship, attorney and client.

2      Q.  Let's talk for a moment about the effect on the

3    client who has expected the confidentiality and

4    privilege of this communication and that has been

5    stripped away.  Can you talk about the attorney-client

6    relationship and how that might be affected?

7      A.  I can.  There is no question that if I've told my

8    client, you know, "What you say to me is privileged, you

9    know, it's between you and I."  And then, "Oh, sorry.  I

10   just found out everything we have done here has been

11   recorded," at least on a video-recording, I mean, that's

12   a great breach of faith.

13        But even entering a relationship and saying,

14   "Everything we say is going to be recorded by these

15   cameras, you know, hold your hand over your mouth or

16   hold something over your mouth," that is not the way for

17   ideal client relationships.  Obviously appointed

18   attorneys, public defenders, and retained counsel even,

19   have a difficult road to hoe here to gain a client's

20   confidence.  In this kind of-- you know, in serious

21   cases, in capital cases, to put this barrier in between

22   the lawyer and client I think is a disaster.

23     Q.  Can you think of any other particular problems

24   that would attend the situation that is before us?

25     A.  Well, again, the-- the ability for the

1    information, especially co-counsel-- or co-defendants'

2    counsel, excuse me, to get this information I think is a

3    huge problem.  Even if the prosecutor says, "Well, I'm

4    not, you know, going to have lips read," again, what

5    is-- what is the duty on me as-- as another defendant's

6    counsel to do it if I know there's important information

7    there just staring me in the face?  I think that's a

8    huge issue.

9         But I think we're-- it's a point where we're

10   going down this slope.  If-- if the attorney-client

11   room, the one place in the world I can meet with a

12   client, is not secure from government intrusion and

13   recording, then what does attorney-client privilege

14   mean?  It's a slope.  Then why-- then why not the phone

15   calls and why not anything else and why can't they be

16   recorded?  I mean, it's stunning to me, if you think

17   about it.  Even under SAMs restrictions, even in

18   Guantanamo, I know lawyers have represented people in

19   Guantanamo, they're not being recorded.  They may be

20   being monitored by outside individuals, but recordings

21   aren't being made.

22             MS. BRANNON:  If I could have just one

23   moment, Your Honor.  Thank you, Mr. Ney.

24             THE COURT:  Any questions?

25             MS. BARNETT:  Yes, Your Honor.

 1          THE COURT:  All right.  I-- I had one

 2  question.

 3          THE WITNESS:  Yes, Your Honor.

 4          THE COURT:  You talked about-- and I know

 5  you're not familiar with CCA.  But just as a general

 6  proposition, when you have experts go see your clients

 7  there in custody, that would include polygraphers.

 8  Correct?

 9          THE WITNESS:  It would.

10          THE COURT:  And so are those the rooms that

11  polygraphers use if you want to have your client

12  polygraphed?

13          THE WITNESS:  I'm assuming.  But again, what

14  I have done-- I have made sure whenever I've sent an

15  expert or anyone in that it's in a private setting, that

16  there is not either audio or video-recording, yes.

17          THE COURT:  All right.  Ms. Barnett.

18          MS. BARNETT:  Thank you, Your Honor.

19                    CROSS EXAMINATION

20  BY MS. BARNETT:

21     Q.  Good afternoon, Mr. Ney.

22     A.  Ms. Barnett.

23     Q.  You had started out with your testimony talking

24  about how, and I think you've kind of ended it here on

25  the same note, that if you go into a facility, you're

 1   paying attention as to whether or not there are cameras

 2   or there's some type of monitoring device in the room.

 3   Correct?

 4       A.  I am.

 5       Q.  And if you see something that you think might

 6   indicate that somebody could be listening or could be

 7   watching what you or your client are doing or saying in

 8   that room, you make an inquiry, don't you?

 9       A.  I probably would.  In this case, obviously if I

10   had looked at the website, apparently the website says

11   I'm not being recorded.  If I had asked even their

12   security people, I would've been told no.  But yes, if I

13   have questions, I do inquire.

14       Q.  So if you go in and you see these big, you know,

15   I'm going to call it a bubble, a partial bubble in the

16   middle of the room or even up in the corner like that

17   over there, a camera, you're going to ask about it.

18   Correct?

19       A.  That's always been my policy.  I've been in jails

20   across the country with federal capital defendants and I

21   always ask starting out if I see a camera, "Tell me

22   about this."  But I rely on what is being told to me,

23   too.

24       Q.  Likewise, if I were to tell you that at CCA there

25   are, in fact, two interview rooms where there are no

 1   cameras, there's no monitoring, there's no videotaping

 2   or recording of any sort, if you were aware of that,

 3   would you have asked to meet with your clients in those

 4   rooms?

 5       A.  If I were given the choice of, yes, you're going

 6   to be recorded here and not here, I guess I wouldn't

 7   understand why there's a difference, but yes, I would.

 8       Q.  Okay.  So that is something that you pay

 9   attention to when you're meeting with your clients or in

10   custody?

11       A.  I do.  But certainly like every other-- once I

12   understand what's going on or not-- supposedly not going

13   on, I rely on that for the foreseeable future.

14       Q.  Now, during your testimony you also talked about

15   the video that's been described by counsel.  Were you

16   referring to Ms. Rokusek's testimony earlier?

17       A.  I was.

18       Q.  Have you had any other descriptions of what might

19   be on these DVRs or these videos given to you by anyone

20   else?

21       A.  Just what was in the pleadings and what I heard

22   in court today.

23       Q.  So you haven't actually seen them yourself?

24       A.  I have not.

25       Q.  And so when you talk about what might be on them,

1    it's really just based on what you've heard, it's not

2    based on anything you've seen at all.  Correct?

3        A.  That's correct.

4        Q.  And so then you went on in your testimony, you

5    talked about that there are a number of problems

6    associated with watching an attorney-client interview or

7    encounter, meaning the non-verbal communication, the

8    material going over, the relationship.  Do you kind of

9    recall that line of testimony?

10       A.  I do.

11       Q.  You don't know if any of that type of

12   communication is contained on these recordings, do you?

13       A.  I don't.  But over a space of time with hundreds

14   of attorneys, I assume there are situations like that.

15   But I have not seen the recordings, no.

16       Q.  And even with regard to the space in time and

17   hundreds of attorney, you don't even know how many

18   attorneys or their clients and their meetings are

19   actually contained on these videos, do you?

20       A.  I do not.  But one is one too many, in my

21   opinion.

22       Q.  Well, so it would be important then, if such

23   evidence came to light, to hand that evidence over to a

24   special master, an independent third party, to review it

25   and determine exactly what's on it, wouldn't it?

 1    A.  I would say no.  I think if a prosecutor, in my

 2   opinion, sees that, they raise their hands and say, "Oh,

 3   my," and tells counsel and the Court and gets rid of it

 4   immediately.  I-- again, I-- I can't see, especially if

 5   it's not a security issue, I can't see the import of

 6   that information unless it's to be used against the

 7   defendant in some way, as it-- as it apparently was

 8   here.

 9    Q.  Well, you have no evidence that it was used

10   against a defense attorney or defendant, do you?

11    A.  Just counsel's testimony that it was used to

12   attempt to get her off the case.

13    Q.  Counsel's testimony was that a case agent had

14   seen her walking in a hallway.  Do you recall hearing

15   that?

16    A.  Well, yes.  I-- I do recall hearing that.

17    Q.  Okay.  Now, going to when you were talking about

18   experts and visiting in a facility with a client, a

19   hypothetical client and the use of a laptop.  Screens

20   would be visible you said.  But without seeing actually

21   where the cameras are at in these rooms or what's

22   contained on the videotape, you don't know whether or

23   not there were any laptops that were presented, whether

24   there were any screens that were seen or anything of

25   that nature, do you?

16-20032-JAR    USA v. Lorenzo Black, et al.    08.09.16    78

1      A.  No, I don't.

2      Q.  And with regard to the psychological examinations

3  or the polygraph examination, as the judge has recently

4  asked you about, you again don't know whether any of

5  those types of contacts are contained on these

6  videotapes, do you?

7      A.  I don't.  But over the years, I assume that

8  happened.  I can only assume.

9      Q.  And it would be just an assumption, wouldn't it,

10 Mr. Ney?

11     A.  It would.

12          MS. BARNETT:  May I have just a moment,

13 please, Your Honor?

14          THE COURT:  Yes.

15          MS. BARNETT:  I have nothing else.  Thank

16 you, Mr. Ney.

17          THE WITNESS:  Thank you.

18                 REDIRECT EXAMINATION

19 BY MS. BRANNON:

20     Q.  Mr. Ney, if a jail tells you those

21 attorney-client visitations are not recorded, do you

22 rely on that?

23     A.  Of course.  I-- I have to, because I assume

24 they're telling me the truth.  I cannot do an

25 independent investigation unless I litigate the issue.

1    Q.  And referring to Defendant's Exhibit 435, if that

2    jail publicly says that attorney-client visitations are

3    confidential, do you rely on that?

4    A.  I rely on it, one, because they've told me, and

5    two, because I believe-- I guess I would believe that no

6    jail is going to record attorney-client conversations.

7    Q.  And referring to Defendant's Exhibit No. 443, if

8    the U.S. Marshal tells you that these are not recorded,

9    would you rely on that?

10    A.  I would rely on that.

11    Q.  And referring to the same exhibit.  If the U.S.

12    Attorney's Office tells you that it's not recorded,

13    would you rely on that?

14    A.  Absolutely.  Because my experience is I have

15    never been in a institution which tells me that they're

16    going to record my visit with my client.  So certainly

17    I'd rely on that being the case.

18    Q.  So if you have the institution telling you

19    directly it's not recorded, if they publicly say it's

20    not recorded, if the U.S. Marshal says it's not

21    recorded, and the U.S. Attorney's Office says in writing

22    it is not recorded, do you feel that you have any

23    obligation to research further or question further, or

24    are you going to rely on what-- those four sources?

25    A.  No. 1, I'm going to rely on it.  And two, I'm

1    going to rely on it because it's stunning to me it ever

2    would be recorded.  It just hasn't been my experience in

3    over 38 years that attorney-client meetings are

4    recorded.  I mean, the opposite is true.

5         I have-- in a police interrogation setting, I

6    certainly have my antenna up and I move the

7    interrogation-- the conference.  But in a prison or a

8    jail, interview rooms specifically set aside for

9    attorneys, I have no belief that there's a recording

10   device going, unless I'm told otherwise.

11   Q.  And so if the jail-- if the jail says it's not

12   recorded, if they publicly say it's not recorded, if the

13   U.S. Marshal is telling you it's not recorded, and the

14   U.S. Attorney is telling you it's not recorded, would

15   you have any reason to think that the U.S. Attorney

16   would have recordings of your meetings with your client?

17   A.  No reason--

18        MS. BARNETT:  Objection, asked and answered,

19   Your Honor.

20        THE COURT:  I think it's a different

21   question.

22   A.  No reason at all.

23        MS. BRANNON:  Thank you.

24        THE COURT:  All right.  Anything more?

25        MS. BARNETT:  No, Your Honor.

1            THE COURT:  All right.  Mr. Ney, you can be

2    excused.

3            THE WITNESS:  Thank you, Your Honor.

4            THE COURT:  Let's take a break until 3:30.

5    And I think you said you have a couple more witnesses by

6    Skype?

7            MS. BRANNON:  Yes, Your Honor, if I can.  We

8    have two witnesses by Skype.  There's one other matter

9    the Court brought up.  I would like to say that if

10   there's a polygrapher, those meetings do happen in the

11   rooms, there are no place else for those meetings to

12   take place.  If we bring a polygrapher, it is in those

13   attorney-client rooms.  Further, we understand-- we

14   haven't done this, but sometimes there are debriefings

15   by police officers at CCA, and we believe those are

16   conducted in those rooms as well.  And we--

17           THE COURT:  Debriefings of cooperators?

18           MS. BRANNON:  Yes.  We just wanted to put

19   that on the record as well.

20           THE COURT:  All right.  I understand.  All

21   right.  We'll be in recess until 3:30.

22           (Recess).

23           THE COURT:  All right.  You can be seated.

24   All right.  Ms. Brannon, Mr. Redmond.

25           MR. REDMOND:  Thank you, Your Honor.  We'd

1    call Randy Rathbun.  It's over a Skype connection.  If

2    there's any problems with the sound, just let me know.

3                 QUESTIONING OF MR. RANDY RATHBUN

4                 MR. REDMOND:  All right.  Mr. Rathbun, are

5    you there?

6                 MR. RATHBUN:  Yeah.

7                 MR. REDMOND:  Can you-- can you hear us?

8                 MR. RATHBUN:  I can.  Can you hear me?

9                 MR. REDMOND:  Yes, sir.  There's a lot of

10   folks in this room.  Can you familiarize us with your

11   professional history?

12                MR. RATHBUN:  I graduated law school in '78.

13   Went to work for Curfman, Brainerd, Harris, Bell,

14   Weigand & Depew.  Worked for them for two years, which I

15   did mostly-- I did not-- there's 22 members in that firm

16   and nobody wanted to do appointment work, and there was

17   no public defender at that point.  So I did everybody's

18   criminal appointments.  So I did mostly defense work for

19   the first-- criminal defense work for the first couple

20   of years.

21                And then I left with a couple of partners

22   and practiced with Depew & Gillen, which became Depew,

23   Gillen & Rathburn, which is now Depew, Gillen, Rathbun &

24   McInteer ever since, except for three years in which I

25   was U.S. Attorney from August of '93 to January of '96.

 1              MR. REDMOND:  What courthouse were you based

 2    out of?

 3              MR. RATHBUN:  Well, actually I was-- I live

 4    in Wichita, so I spent most of the time in the Wichita

 5    office, but I tried to get around to all of the offices.

 6              MR. REDMOND:  As part of your role as U.S.

 7    Attorney, you had to become familiar with DOJ policy; is

 8    that fair to say?

 9              MR. RATHBUN:  I did.  I got to know the U.S.

10    Attorney's manual maybe better than I would like.

11              MR. REDMOND:  And during that time, did any

12    of the training that you received and the materials that

13    you reviewed relate to protection of the attorney-client

14    privilege?

15              MR. RATHBUN:  I don't know that I can say

16    that.  I know that the U.S. Attorney's Office is-- is

17    very good about training U.S. Attorneys.  So I'm certain

18    that we spent time on the Sixth Amendment.  So I can't

19    imagine that I did not receive training on that.  I was

20    also blessed to be on the Attorney General's Advisory

21    Committee, and we spent a lot of time talking about

22    those sorts of issues.

23              MR. REDMOND:  Okay.  And we won't go into

24    the specifics of that policy, but can you generally

25    describe the Department of Justice's attitude toward the

1    attorney-client privilege?

2          MR. RATHBUN:  Well, you know, the-- the

3    thing that I always emphasize is our job is to make

4    certain that all the amendments to the Constitution are

5    enforced, including the Sixth Amendment.  And I-- I felt

6    strongly about that and still do feel strongly about it.

7    And I'm-- so I certainly believe that that was just as

8    important as any of the other amendments that we had to

9    protect.

10          MR. REDMOND:  Were you-- did you believe

11   yourself able to subpoena material that contained

12   material protected by the attorney-client privilege?

13          MR. RATHBUN:  There's procedure to do that.

14   You have to go to the DAG.  You have to make a showing

15   somehow that there's a conspiracy involving with the

16   attorney and-- but obviously I couldn't-- (reporter

17   interruption).

18          THE COURT:  We're having trouble hearing,

19   including the court reporter, who's the most important

20   person.  Can we plug it into a microphone?

21          COURTROOM DEPUTY:  You have to have that--

22   the sound will come in our speakers, but it can't do it

23   over here, I just found out.

24          THE COURT:  Just a minute, Mr. Rathbun.

25          (The technical issue was corrected).

1                    MR. REDMOND:  All right.  Randy, can you say

2       something to test things for the court reporter?

3                    MR. RATHBUN:  Sure.  Testing 1, 2.  Check 1,

4       2.

5                    MR. REDMOND:  Is that better?  Okay.  Thank

6       you very much.

7                    So if-- you said that you'd have to go to

8       the DAG.  Can you explain what the DAG is?

9                    MR. RATHBUN:  The Deputy Attorney General.

10                   MR. REDMOND:  So the second in command for

11      the entire U.S. Department of Justice?

12                   MR. RATHBUN:  Yes.

13                   MR. REDMOND:  And that's whose permission

14      you would need to retain privileged information?

15                   MR. RATHBUN:  Yes.

16                   MR. REDMOND:  Okay.  If you-- maybe you can

17      speak from experience here.  If you accidentally came

18      into the possession of potentially privileged materials,

19      what would you do?  Would that change the calculus?  Do

20      you still have to go to the DAG?

21                   MR. RATHBUN:  You know, I-- I probably ought

22      to back up and say that I-- I had an open file discovery

23      policy.  And I always thought that we needed to share,

24      and so that kind of maybe colors my opinion.  But

25      certainly to the extent that if we ever came into-- into

1    access of attorney-client privileged information,

2    obviously we would've notified the Court.

3              The-- the closest thing I could think is

4    perhaps overheard conversations, I had a little bit of

5    experience with this, overheard conversations with

6    defense counsel.  The U.S. Attorney's Office manual

7    requires you to notify the Court and obviously defense

8    counsel that you've overheard those conversations.

9              MR. REDMOND:  Okay.  And so-- and is that

10   true of all attorney-client privileged communications?

11   There's a duty to notify the Court if you come into

12   possession of them?

13             MR. RATHBUN:  Certainly.

14             MR. REDMOND:  Okay.  What were-- what was

15   the detention facility in Wichita when you were U.S.

16   Attorney?

17             MR. RATHBUN:  Oh.  You realize that's 20

18   years ago.  I think we had-- there was some people

19   detained in Harvey County, Sumner County, and over in El

20   Dorado.

21             MR. REDMOND:  Okay.  And in your knowledge,

22   did any of those facilities record the visits between

23   attorneys and their clients?

24             MR. RATHBUN:  You know, I have to tell you,

25   I was never over there.  But I certainly wouldn't have

1  had any idea that that was going on, and-- and I

2  would've taken a dim view of it.

3          MR. REDMOND:  If you-- if there had been a

4  recording made of an attorney-client visit, you would've

5  notified the Court and talked to the DAG; is that fair

6  to say?

7          MR. RATHBUN:  You know, it depends on-- I--

8  I don't have much background about what actually went on

9  here.  I-- I made the unfortunate mistake of answering

10  my phone Saturday morning when Laura Shaneyfelt called,

11  and so I don't have a whole lot of background.

12          But based upon what I know of it in terms of

13  the camera would've allowed anybody to watch to

14  distinguish between Excel spreadsheets and pictures and

15  things like that, that would obviously concern me.  And

16  it would concern me for a couple of reasons.  It would

17  concern me for Sixth Amendment reasons.  And I had

18  some-- I had some great assistants working, and I'd be

19  nervous about OPR problems.  And so I would've been all

20  over that.

21          MR. REDMOND:  Okay.  And you have not been

22  able to be present for the testimony this afternoon, so

23  allow me to ask this question in a hypothetical form.

24          First, assume that there's a video that

25  shows an attorney meeting with a client.  Okay?  And

1    also that you can see the documents that are being

2    passed back and forth and that you can roughly identify

3    some of those documents as spreadsheets or photographs.

4    You can see how the client would react to some of those

5    documents being passed back and forth.  Is that video,

6    in your opinion, covered by the attorney-client

7    privilege?

8                MR. RATHBUN:  First, that never happened to

9    me.  And secondly, if it had, I would've called the DAG

10   immediately because I'm afraid that that would be

11   attorney-client privilege, or at least close enough that

12   I would-- I would've been on the phone immediately with

13   the Deputy Attorney General.

14               MR. REDMOND:  Just one moment, Your Honor.

15               Just to clarify the record on one point.

16   Could you explain what OPR is?

17               MR. RATHBUN:  Office of Professional

18   Responsibility.

19               MR. REDMOND:  All right.  Mr. Rathbun,

20   that's all the questions that I have.  Thank you very

21   much for making the time.

22               MR. RATHBUN:  You bet.

23               THE COURT:  All right.  Any questions?

24               MS. BARNETT:  Just very briefly, Your Honor.

25               Mr. Rathbun, you haven't seen any of the

 1    videotaped materials that were obtained from CCA in this

 2    case, have you?

 3                MR. RATHBUN:  I have not.

 4                MS. BARNETT:  You're not aware of what is

 5    contained on any of those tapes, are you?

 6                MR. RATHBUN:  I have no idea.

 7                MS. BARNETT:  Thank you, sir.  I have no

 8    further questions, Your Honor.

 9                MR. REDMOND:  Nothing based on that, Your

10    Honor.

11                THE COURT:  All right.  Thank you, Mr.

12    Rathbun.

13                MR. REDMOND:  Your Honor, we need to make

14    the next Skype linkup, it may take just a second.

15                THE COURT:  Okay.

16                MR. REDMOND:  If you don't mind, I would

17    like to move for the admission of the still photographs

18    that were shown during Mr. Thompson's testimony.  The--

19    the exhibit lists them as Exhibits 401 to 403.  If I

20    could approach.

21                THE COURT:  Yes.  Exhibits 401, 402, and 403

22    admitted.

23                MR. REDMOND:  And inclusive up to--

24                THE COURT:  Or no, I'm sorry, this is many

25    more than this.  It's through 433?

 1              MR. REDMOND:  To 433, I'm sorry.

 2              THE COURT:  Okay.  401 through 433 admitted.

 3              MR. REDMOND:  Your Honor.

 4              THE COURT:  Yes.

 5              MR. REDMOND:  As much as everybody enjoys

 6     testimony over Skype, this isn't working very well.  We

 7     propose that we proceed by telephone, if that's okay

 8     with the Court.

 9              THE COURT:  Who is this?

10              MR. REDMOND:  This is Professor Peter Joy

11     from the University of Washington in St. Louis.

12              THE COURT:  All right.  Is there any

13     objection to swearing him over the telephone call?

14              MS. BARNETT:  No, Your Honor.

15              THE COURT:  All right.  It's Professor Joy?

16              MR. REDMOND:  Professor Joy, yes, Your

17     Honor.  His CV is Exhibit 448?  448.

18              THE COURT:  All right.  Proceed.

19              (A phone connection was established).

20              THE WITNESS:  This is Peter Joy.

21              MR. REDMOND:  Hi, Professor, this is Kirk

22     Redmond and a courtroom full of folks.

23              THE WITNESS:  Yes.

24              MR. REDMOND:  Professor, we are having

25     problems with the Skype linkup, would you be willing to

 1   testify via telephone call?

 2            THE WITNESS:  Sure.

 3            MR. REDMOND:  Okay.  Thank you very much.

 4   You're going to be sworn in now.

 5                 PROFESSOR PETER JOY,

 6   called as a witness on behalf of the Defendant, having

 7   been first duly sworn, testified as follows:

 8                 DIRECT EXAMINATION

 9   BY MR. REDMOND:

10     Q.  Professor, could you spell your name for the

11   record and introduce yourself?

12     A.  Yes.  My name is Peter Joy.  P-E-T-E-R.  J-O-Y.

13   I'm a lawyer admitted to practice in the state of

14   Missouri and Ohio.  I'm on inactive status in the

15   District of Columbia.  I'm also a law professor and I

16   teach at Washington University in St. Louis.

17     Q.  What do you teach, Professor?

18     A.  Well, I teach a number of courses.  I teach a

19   course called Legal Profession, which is the basic legal

20   ethics or professional responsibility course.  I teach

21   Trial Practice and Procedure, and I also teach in a

22   criminal justice clinic, where I go to court with

23   students.  We partner with the state public defender

24   office on matters in state court at the trial level.

25            I also have taught, but I haven't taught it now

1   in some years, a Comparative Legal Ethics seminar, which

2   looks at various legal ethics issues from a U.S.

3   perspective and then also from a perspective in other

4   countries.

5     Q.  Do you read-- do you write on professional--

6   excuse me.  Do you write on professional responsibility?

7     A.  Yes, I do.  Most of that writing is at the

8   intersection of legal ethics and criminal law or

9   criminal procedure.

10     Q.  Okay.  In your scholarship and from your

11   knowledge of the law, could you give the Court sort of a

12   working definition of the attorney-client privilege?

13     A.  Attorney-client privilege is a communication

14   between attorneys and their clients or those working on

15   behalf of attorneys in-- someone that might be an agent

16   in order to obtain legal assistance.  So the key things

17   are it's between these privileged persons, it's a

18   communication, sharing of information in order to obtain

19   legal assistance.

20     Q.  So it's in service of the Sixth Amendment right

21   to counsel?

22     A.  I'm sorry, I didn't quite hear you.  Could you

23   speak a little bit louder?

24     Q.  I certainly can.  I was in the wrong place.

25     A.  Oh, okay.  Thank you.

 1    Q.  So the-- is there a relationship then between the

 2    attorney-client privilege and the Sixth Amendment to the

 3    federal constitution?

 4    A.  Yes, there is.  I-- it's well-recognized that

 5    attorneys, both criminal-- and I'll just focus on

 6    criminal law here.  That defense attorneys need to have

 7    full disclosure of the facts to be able to be effective.

 8    And so if you can't have confidential communications,

 9    which would include attorney-client communications, it

10    would make it impossible to render effective assistance

11    of counsel, which would thereby be a denial of the Sixth

12    Amendment right to effective assistance of counsel.

13    Q.  Is that true even if you're in jail waiting for

14    your trial?

15    A.  Yes, it's absolutely true.  Whether a person is

16    in jail or on bail, unable to meet in an attorney's

17    office, you need to be able to have confidential

18    meetings in order to adequately prepare a defense.

19    Q.  Okay.  Now, Professor, I'm not going to ask you

20    about any of the facts that have been developed here

21    today because you were not-- you were not able to be

22    present.  So we're going to talk about these things in

23    sort of a hypothetical way.

24         What is the impact of recording simply visually

25    an attorney-client privilege on the-- I'm sorry,

1  recording a legal visitation on the attorney-client

2  privilege?

3      A.  Well, it-- it intrudes on the meeting between the

4  client and the lawyer.  And so it has an effect of

5  tampering down that full and frank discussion.  It would

6  be, you know, an extra pair of eyes or several pairs of

7  eyes in observing what's going on.  How the lawyer and

8  client are interacting to provide information that may

9  be-- possibly be useful for a prosecutor.

10     Q.  You said usable to a prosecutor, but what if it's

11  only a visual recording?

12     A.  Well-- well, I mean, lots of things can be

13  disclosed simply by a visual recording.  So, for

14  example, you could have a defendant who is acting out

15  something, like pointing their finger as though they're

16  shooting a gun.  And if there's a case involving a

17  shooting, that might be some indicia of-- of like how

18  something was done, almost like an admission, you know.

19  Or maybe putting their finger across their throat and if

20  there was somebody who had their throat cut.  So the

21  acting out of things.

22         Also visual recordings sometimes, depending on

23  the camera angle and what-- what it shows, sometimes you

24  could actually make out words that are being spoken.  Or

25  if there were papers being passed between the attorney

1    and the client or papers being reviewed between the

2    attorney and-- and the client, depending, again, on the

3    camera, it might show actually the written words.  So it

4    would be revealing the communications that are going on

5    between the client and the attorney.

6        Q.  Has the Kansas Supreme Court actually spoken to

7    this issue?

8        A.  Yes, they have.

9        Q.  Could you tell us about that case?

10       A.  Well, it's a case that I was unfamiliar with

11   until I read the pleading that was filed in this matter,

12   but it's *Case versus Andrews,* it's a Kansas Supreme

13   Court case.  And it's one that talked about the

14   intrusion, the visual surveillance on attorney-client

15   conferences.  And there, the Supreme Court found that it

16   was not justified and that the state hadn't proved a

17   compelling state interest.  And this was an unreasonable

18   interference that deprived the-- in that case the

19   petitioner, the criminal defendant, his Sixth Amendment

20   right to effective assistance of counsel.

21       Q.  Had there been audio-recording in that case?

22       A.  I don't believe that there was audio-recording in

23   that case at all.

24       Q.  Professor, is there a difference between the

25   scope of the attorney-client privilege and a lawyer's

1    duty under the Rules of Professional Conduct to protect

2    confidential information?

3    A.   Yes.   There-- the duty of confidentiality, which

4    in Kansas is spelled out in Rule 1.6 of the Kansas Rules

5    of Professional Conduct, covers all information relating

6    to the representation of the client.   And so that would

7    include everything that's covered by attorney-client

8    privilege, but it would also include everything else the

9    lawyer learns during the representation of the client.

10        And so that would be, for example, interviewing

11   witnesses or doing records research or anything that the

12   lawyer learns.   And it also would cover things like the

13   temperament of the client.   That's information that one

14   learns.

15        And so confidentiality is much broader than

16   attorney-client privilege.   In fact, when I teach the

17   course, I draw a big circle for client confidentiality.

18   And inside that big circle, I have a smaller circle for

19   attorney-client privilege.   I find that's pretty

20   effective to-- to have students grasp what we're talking

21   about here.

22   Q.   Professor, you referred to a couple of Kansas

23   Rules of Professional Conduct.   Can you tell-- tell us

24   how those are impacted in terms of the processing of

25   confidential information by a visually-recorded

1    statement made by-- or a video of an attorney-client

2    meeting?

3        A.    Okay.  Well, again, I mentioned Rule 1.6.

4    There's another rule, which is Rule 8.4, which is one

5    that defines professional misconduct.  And an aspect of

6    professional misconduct is engaging in conduct that

7    tries to-- or attempts to or does violate one of the

8    Rules of Professional Conduct.

9            So an example that I sometimes use in teaching it

10    in a civil-- derives from a civil case where during a

11    deposition one attorney steps out in the hall to talk

12    with his client and leaves his folder on the table.  And

13    opposing counsel looks inside that folder.  In that

14    particular instance, opposing counsel was found to have

15    violated both the-- the ethics rule concerning

16    confidentiality, but also intruding into attorney-client

17    privilege for any privileged information that's there.

18    So that's Rule 8.4.

19            And another aspect of 8.4, based on at least my

20    initial understanding of the facts in this case, that

21    things were done surreptitiously or unknowingly or

22    secretly.  Rule 8.4 makes it an ethical violation to

23    engage in conduct involving dishonesty, fraud, deceit,

24    or misrepresentation.

25            And so a reasonable lawyer would assume that

1    their meetings with their clients are ones that are not

2    being recorded.  And absent a sign or some notice that

3    it's being recorded, there's also this aspect of

4    dishonesty, fraud, deceit, or misrepresentation taking

5    place.

6        Q.  Professor, my final question.  I'd like you to

7    amplify your last answer a little bit, because we've

8    been talking about how-- the impact of simply recording

9    an attorney-client visit.  How is the attorney-client

10   privilege and the confidential-- the information

11   confidentiality, how is that affected by the further

12   action of turning that information over to a

13   prosecutor's office?

14       A.   Okay.  Well, in terms of attorney-client

15   privilege, even the Federal Rules of Evidence Rule 502

16   talks about disclosure being made in either a federal

17   proceeding or to a federal office or agency, so turning

18   over the recordings to a U.S. Attorney's Office or state

19   prosecutor's-- well, not state, but U.S. Attorney's

20   Office, at least in terms of the federal rules.

21            In terms of the ethics rule, by turning it over,

22   you know, if I was using this as a hypothetical in

23   class, I would say that-- that a prosecutor coming into

24   possession of these tapes and knowing that they were

25   being done secretly would've had both an obligation to

1    inform whoever was doing it that they should stop doing

2    it, would have an obligation not to look at them, and

3    then would have a further obligation to disclose to the

4    lawyers who had been filmed that they had been

5    surreptitiously filmed so that those lawyers could, you

6    know, take whatever action might be necessary to protect

7    their client's rights.

8         You know, every-- every lawyer, prosecutor and

9    defense lawyer, is also an officer of the court and has

10   an ethical obligation to try to promote justice.  And in

11   this instance where a Sixth Amendment right is involved

12   and also the ethics rules, promoting justice would mean

13   taking those kind of actions.  That concludes that

14   answer.

15         MR. REDMOND:  I appreciate your patience.

16   That's all I have, Professor.

17         THE WITNESS:  Okay.  Thank you.

18         THE COURT:  Do you have any questions, Ms.

19   Barnett?

20         MS. BARNETT:  No, Your Honor.  Thank you.

21         THE COURT:  All right.  I-- I have one

22   question, Professor Joy.  This is Judge Robinson.

23         Have you examined at all the intersection

24   between legal ethics, professional responsibility, and

25   the obligations under Rule 6(e) of the Federal Rules of

 1    Criminal Procedure?

 2            THE WITNESS:  I-- not in terms of Rule 6(e).

 3    I have not looked into that.

 4            THE COURT:  All right.  So you've spoken

 5    about the obligations of a prosecutor who comes into

 6    possession of attorney-client privileged information.

 7    If they come into possession of that information by

 8    virtue of a grand jury subpoena, such that it's Rule

 9    6(e) information, and then use that information in an

10    unrelated case, sharing attorney-client privileged

11    information to an attorney or perhaps at least giving

12    that attorney access to their own privileged

13    information, but maybe-- maybe even access to other

14    attorney-client communications, but in an unrelated case

15    to the grand jury investigation, do you see a potential

16    Rule 6(e) violation as well?

17            THE WITNESS:  I-- as I mentioned, Your

18    Honor, I-- I have not examined that closely.  But based

19    on the scenario that-- that you've set forth, I would

20    say yes, because it's my understanding and it's-- you

21    know, it's been a while since I've looked at Rule 6(e),

22    but I believe that that is all supposed to be kept

23    confidential in connection with whatever the grand jury

24    was examining.

25            And so if it goes beyond the case or cases

 1    that the grand jury was examining, then I believe it

 2    would be a violation.  But I'm saying that based on my--

 3    my now somewhat dated recollection.  So I-- I say that

 4    with that qualification.

 5            THE COURT:  All right.  Thank you.  I don't

 6    have any other questions.  Does anybody else have any

 7    questions?

 8            MS. BARNETT:  No, Your Honor.  Thank you.

 9            MR. REDMOND:  No.  Thank you, Your Honor.

10            THE COURT:  All right.  Thank you, Professor

11    Joy, for your time.  We'll disconnect.

12            THE WITNESS:  Okay.  And thank you very much

13    for letting me testify via the telephone call.

14            THE COURT:  All right.  All right.  So, Ms.

15    Brannon, are you prepared now to play the videotapes or

16    at least some of them?  Obviously some of them.

17            MS. BRANNON:  Yes, Your Honor.  And I'm not

18    sure how the Court wants to set this up.  It's-- what we

19    think is that Ms. Rokusek, Mr. Bussell, the Court, and

20    the court reporter should be the ones to actually view

21    what is on there and to be shown how it works with the

22    index and so forth.

23            Anybody else viewing it I think would be a

24    violation and just compound the problems that we have.

25    So I-- I might leave it to the prosecution about how

 1   to-- how to set that viewing up, whether the Court wants

 2   to go in chambers or do it here.  Either way.

 3           THE COURT:  What-- what equipment?  I mean,

 4   is it on a PC that you can bring to my chambers or--

 5           MS. BARNETT:  I believe that we have a

 6   laptop here, Your Honor, that the Court can use, and the

 7   device that the-- I guess the DVRs go into.  I guess I

 8   would have to defer to Ms. Boyd for her expertise on

 9   what will be required then to set it up for the Court to

10   view it.

11           MS. BOYD:  All I need to do is reconnect it

12   back there for you and then they can take over and run

13   it.

14           THE COURT:  Okay.  Well, it probably would

15   be better to just stay in place and clear the courtroom.

16   Is this the last thing you intend to present?

17           MS. BRANNON:  It is, Your Honor.

18           THE COURT:  And do you all intend to present

19   any argument?

20           MS. BARNETT:  Your Honor, the only thing

21   that I was going to ask the Court was maybe to allow us

22   to have a recess to decide whether or not we have any

23   additional evidence that we would want to present on

24   this issue or whether we simply want to ask the Court to

25   allow us to present some briefs or memorandums, at least

 1    at this early juncture.

 2              But quite frankly, we feel from our position

 3    that until there's a review of these items and a

 4    determination made as to whether or not they are, in

 5    fact, privileged information, that that determination

 6    then will help guide us and then how to further brief

 7    and address issues that the Court may have.

 8              THE COURT:  All right.  So what I was

 9    intending to do is-- and I think it makes sense to give

10    you all time, and if we need to reconvene the hearing

11    before, for example, I issue a comprehensive order about

12    what relief and what to do next.  But at a minimum, my

13    intention was at the close of the hearing today, and I

14    could certainly do it now in everyone's hearing and

15    before we otherwise close the courtroom, is I wanted to

16    make sure that I have-- have the original and all copies

17    of the recordings at issue from CCA.

18              I heard something during the hearing, some

19    suggestion that perhaps an investigator still had a copy

20    or something and I just wanted assurance that what

21    you're prepared to present-- provide to the Court, Ms.

22    Barnett, is everything.  So there's no-- nothing else in

23    CCA's possession and nothing else in anyone's possession

24    at this point?

25              MS. BARNETT:  Your Honor, I've been told

1    that there is simply two sets.  One we received from CCA

2    and then I think a copy that was made.  And we have both

3    sets here.  What we believe in talking to the public

4    defender is that we are just confining this examination

5    or review to DVR 5 and DVR 6.  There are four other

6    DVRs.  But in looking at the index, we do not believe

7    that there are any questionable video-recordings on

8    them.  So we do have those two sets here and I am

9    prepared to turn those over to the Court.  Would you

10   like for me to mark them in any way?

11            THE COURT:  Yes.  I mean, identify them by 5

12   or 6.  And I think we should put an exhibit number on

13   them.

14            MR. SLINKARD:  They are marked.

15            THE COURT:  They are marked?

16            MS. BARNETT:  They are marked.  The first

17   set, two boxes marked or titled Seagate Desktop DVR 5,

18   DVR 6.  They are three-terabyte.  And that's how the

19   boxes are labeled.  And then there are two more boxes,

20   Seagate Expansion DVR 5, DVR 6.  And on the outside of

21   each of these it says, "May contain attorney-client

22   material," which is the way that the agent was

23   instructed to mark these.

24            THE COURT:  And from what I heard, I can't

25   review those unless I have the-- the reader that CCA

1    has?

2                    MS. BARNETT:  That is my understanding, Your

3    Honor.

4                    THE COURT:  And did they provide you with

5    that?

6                    MS. BOYD:  And I have it loaded on this

7    computer and we can-- I can give you a copy if you'd

8    like, too, Your Honor, to load on your own.  However you

9    want to do it.

10                   THE COURT:  Okay.  Well, I don't know that

11   I'm going to review the entire things anyway.  I just

12   want to see what you have to show me, but-- so you're

13   providing them to me.  They're going to be in the

14   Court's custody.  I don't have access to them, in other

15   words.  I can't view them without getting equipment

16   either from the U.S. Attorney's Office or from CCA.  And

17   if I decide I need to do that, obviously I'll do that.

18                   The other concern I wanted to address this

19   evening, and that is that, you know, there's an exhibit

20   that is an e-mail I think from Mr. Saburling (phonetic),

21   I can't remember his name, but anyway, it lists a number

22   of jails, county jails in Missouri, as well as CCA, and

23   what those institutions have told you all about what

24   they do and don't record.

25                   There weren't any counties in Kansas, I

 1   believe, that are used by our U.S. Marshal here in

 2   Kansas, but I wanted to have some assurance going

 3   forward that the U.S. Marshal would, if he hasn't

 4   already, contact all of the jail-- all of the detention

 5   facilities that are contracted in Kansas or contracted

 6   with-- for Kansas defendants, that might include

 7   Missouri counties as well, and assure that they are no

 8   longer from this point forward doing any audio or

 9   video-recording of any attorney-client visits or

10   communications.  And that would include jail calls of

11   attorney-clients.

12           Because that particular e-mail tends to

13   indicate that some of these institutions are doing-- are

14   audio-recording all jail calls, including attorney

15   clients.  And some of them are audio and video-recording

16   attorney-client visits.  CCA is-- has been, according to

17   this, video-- video-recording attorney-client visits but

18   not audio-recording.  And is audio-recording jail calls

19   between attorneys and clients if the call is initiated

20   by the-- by the detainee and the detainee doesn't tell

21   the jail that they're calling their attorney.  And I

22   don't know, maybe that's zero calls or maybe it's a lot

23   of calls, I don't know.

24           But in other words, a sort of injunction I

25   want to put into effect this evening that the U.S.

 1    Marshals Service will tell all of these facilities they

 2    are to cease to desist immediately from any audio or

 3    video-recording of any attorney-client communications,

 4    whether it's by phone or face-to-face, so that we can be

 5    assured that there's no further violations of the Sixth

 6    Amendment going forward.

 7                And-- well, I had some other thoughts, but

 8    at least for now, that's what I intended to orally say.

 9    And I certainly can follow that up with a short order

10    tomorrow if there's any question about exactly what I'm

11    ordering the U.S. Marshal to do, as well as making sure

12    the U.S. Attorney's Office has provided all of the

13    copies of such recordings from CCA.

14                All right.  I'm prepared to clear the

15    courtroom.  The one other thing that I'll want to

16    address with you, and I think I will wait, though, until

17    you've had a chance to tell me whether you're going to

18    respond, Ms. Barnett, is appointment of a special

19    master.  And my initial thought at this point is I think

20    it's a good idea to appoint a special master, but not

21    just to start digging in and going through everything.

22                I first-- I think I would only authorize

23    appointment just for that person to tell us the scope of

24    the review and how much-- and I'm still real unclear

25    about this, maybe you can tell me, clarify this for me

1    now, but does this involve going through the whole

2    universe of recordings and segregating out all

3    attorney-client communications from that? Or are they

4    already segregated on 5 and 6?

5              And in other words, I'm trying to get some

6    sense of how much work and how much money would be

7    involved in going through thousands of communications

8    and trying to segregate out attorney-client

9    communications in this case and other cases, I mean, any

10   that happened in the facility itself. Mr. Slinkard?

11             MR. SLINKARD: Your Honor, I don't know that

12   we can give you an exact estimate. It's-- it's our

13   understanding DVR 5 is being included because it lists

14   on the index "Low Custody Attorney."

15             Now, we asked the question and the

16   information that we received from the security staff,

17   the same security staff at CCA that had spoken with

18   the-- with the defenders I believe yesterday at the

19   interview, was that that actually is just the hallway

20   outside the attorney visiting rooms. Okay? That's the

21   only camera depicted on DVR 5 that, because of its

22   labeling, had an arguable issue. And for now, until

23   that can be run down, we've agreed to provide it to the

24   Court.

25             DVR 6 contains feeds from numerous other

 1    cameras, and then includes one labeled Attorney Room,

 2    Attorney Room 4, Attorney Room 5, 6, 7, 8 and 9 in

 3    sequence.

 4                 THE COURT:  Okay.  So it does-- it does

 5    include cameras in other areas of the jail--

 6                 MR. SLINKARD:  Yes.

 7                 THE COURT:  -- that would not presumably

 8    have privileged communications?

 9                 MR. SLINKARD:  Yes.

10                 THE COURT:  Okay.

11                 MR. SLINKARD:  And based on what was-- was

12    described to us by-- by CCA, as we've continued to try

13    and inquire about this, it's our understanding that they

14    have-- you know, these digital video-recorders, not

15    these particular ones, but the digital video-recorders

16    at the facility are set up in such a way that it would

17    be recording feed automatically.  The machine is

18    recording feed.  And when it gets full, it starts over

19    at the beginning and it writes over.

20                 So there's-- depending on the number of

21    cameras feeding in, the capacity of the DVR, they

22    suggested that there was something like a 30- to 60-day

23    window before data would be overwritten.  Now, of

24    course, if it starts overwriting with the oldest first -

25    and we don't know that 100 percent because, again, we

1    haven't-- don't want to look at these until we've-- the

2    Court has resolved whether there's a privilege issue -

3    there may be slightly more than that time period

4    because, you know, something that was recorded before--

5    right at the end of it starting over that it hasn't

6    gotten to erasing it yet.

7              THE COURT:  Okay.

8              MR. SLINKARD:  So that's sort of the-- the

9    landscape in terms of the actual volume of recordings

10   that are directly applicable to the camera feeds that

11   the Court may be concerned with.  That's about as exact

12   as we can be, not having reviewed them.

13             THE COURT:  All right.  So it sounds like at

14   the very least if we just talk about DVR 5, is you say

15   three terabytes of information somebody would have to go

16   through, plus what-- I guess the other one as well.

17             MR. SLINKARD:  Each DVR-- DVR 5 and DVR 6

18   are three-terabyte drives.  I don't know if we can say--

19             MS. BOYD:  They're not necessarily full.

20             MR. SLINKARD:  -- that they're full.

21             THE COURT:  Okay.  Potentially as much as

22   six terabytes between the two, but probably not that

23   much, in other words.

24             MR. SLINKARD:  And again, it's our belief--

25   but out of an abundance of caution, we're giving them

 1    both up.  It's our belief that DVR 5 doesn't actually

 2    contain any video from any feeds within an

 3    attorney-client meeting room at CCA.

 4                 THE COURT:  Okay.

 5                 MR. SLINKARD:  That those would all be on 6.

 6                 THE COURT:  Okay.  And what does a-- one

 7    terabyte translate into in terms of time of a

 8    video-recording, any idea?

 9                 MS. BOYD:  You can't really determine that.

10    It's multiple cameras, Your Honor, so there could just

11    be just a few minutes even because of it being a room

12    that's not used very often, as opposed to the rest of

13    the rooms that are on 5 that are representative of pods

14    or whatever.

15                 THE COURT:  But essentially CCA has told you

16    that they video-record all these areas in the jail 24/7.

17    And depending on the capacity of the DVR, there's a sort

18    of overwrite every 30 days, so-- or more.  So it could

19    be that maybe, at a minimum, 30 days, 24/7 recordings of

20    many areas, the entire jail, in other words.  Correct?

21                 MS. BOYD:  That's my understanding.  And

22    it's also my understanding that the original literally

23    was their original.  They removed them and gave them to

24    us as is because they didn't know how to segregate

25    anything out for us specifically.  So they just gave us

1    a whole dump of everything that they had.  So then they

2    put new drives in and started over.  That was my

3    understanding.

4              THE COURT:  All right.  Which again

5    illustrates why I need to make it clear that they are

6    not to have any recordings going on in those attorney

7    rooms from this point forward.  I'll issue a written

8    order tomorrow, but somebody needs to tell them that

9    tonight.

10              MS. BRANNON:  Your Honor, may I?  Regarding

11    the other facilities in Kansas, Exhibit I think 434 by

12    Mr. Thompson, he's tried to do a survey that should give

13    the Court some indication about what the practices are.

14    I think the parties would also-- may have a proposal for

15    the perhaps scope and scale and procedure that we think

16    might be helpful to any special master.  And we'll try

17    to provide that to the Court as soon as possible.

18              We-- I will tell the Court that there have

19    been times that we have received other attorney-client

20    phone calls in discovery.  So we know that this

21    happened.  Not, you know, in this case, but in other

22    cases where that happens.  So we know they are recorded

23    and provided and we don't know how, so that would

24    certainly be part of it.

25              And we did talk to the prosecution about

1  sequestering two of these, 5 and 6.  However, Ms.

2  Rokusek points out that we really don't know what's on

3  the other videotapes.  We have an index from the

4  prosecutor.  We know what CCA-- or we don't actually

5  know what CCA says exactly.  So all six of these boxes,

6  we believe, should be preserved right now, both copies

7  turned over to the Court, until we actually know what's

8  on them.  That doesn't mean that somebody is going to

9  have to go through everything on all of them, but at

10 least until we have some verification that it does not

11 include any attorney-client communication.  There's some

12 things listed on the index we simply don't know what

13 they are.

14          So as Ms. Rokusek points out, we're really

15 not in a position to say that the other four should be

16 left with the U.S. Attorney and be disseminated to

17 everybody else.  So we would ask that be taken in.  And

18 if we could have-- get some written confirmation from

19 CCA that they no longer have these copies, I think that

20 would be helpful.

21          MS. BARNETT:  Your Honor, I might also

22 clarify that Ms. Boyd has informed me that this index,

23 although there is an exhibit presented by the defense

24 that shows metadata that this document was created,

25 actually the index itself was provided by CCA.  So CCA

 1   is the one that told us that DVR 1, the camera names

 2   are... and lists.  And DVR 2, and the same for all of

 3   them.

 4          So this isn't a matter of our office or Ms.

 5   Boyd actually looking at the tapes and creating this

 6   index.  CCA provided that in a file format and then Ms.

 7   Boyd took that and turned that into this document from

 8   their information that they provided.

 9          THE COURT:  And that was back in June that

10   CCA provided the index?

11          MS. BARNETT:  When did they provide the

12   index?

13          MS. BOYD:  I would have to look, Your Honor,

14   because they gave it to me in a spreadsheet format is

15   what they did, they e-mailed it to me, so-- because we

16   asked for it.  We were in the same position, we didn't

17   know what camera was what, so we asked for that and

18   that's what they sent me.

19          THE COURT:  All right.  So we want to secure

20   all original and all copies of recordings in the Court's

21   custody at this point of all six DVR boxes.  We want

22   written assurance from CCA that they have no additional

23   copies.  And I want the United States Marshal to contact

24   all detention facilities contracted with for Kansas

25   detainees and tell them the Court has ordered no further

1  audio or video-recordings of any attorney-client visits,

2  no recordings of any attorney-client phone calls, no

3  audio or visual recordings of video-conference calls.

4  Obviously those are videoed as they go, but no

5  recordings of such.  And a further order to follow on a

6  special master.

7         What I'll ask is after today, you all advise

8  the Court within seven days whether you intend to file

9  anything else or need an additional hearing.  And if you

10 all can stipulate as to some sort of process for a

11 special master or the scope of the special master

12 review, I'd ask you to submit that to me as well, and

13 then I'll do as quickly as I can an order appointing a

14 special master.

15        All right.  Anything else we need to talk

16 about before we clear the courtroom to look at these

17 videos?

18        MS. BARNETT:  The only other thing I would

19 tell the Court is that with regard to the copies of the

20 DVRs that we had in our office, we have all six and

21 we're prepared to turn those over to the Court today.

22 We had only asked the agent to provide us with DVR 5 and

23 6.  So we will get DVRs 1 through 4 from him as soon as

24 possible and provide those to the Court as well.

25        THE COURT:  Okay.

1           MS. BARNETT:  Nothing else, Your Honor.

2    Thank you.

3           THE COURT:  All right.  You're ready, Ms.

4    Brannon?

5           MS. BRANNON:  Yes.  I didn't know if the

6    Court expected or wants us to stay for the Court to

7    adjourn the hearing after viewing this or--

8           THE COURT:  It sounded like I'll need some

9    assistance in playing them.  And I don't know if

10   everyone needs to stay or whether Ms. Boyd and Mr.

11   Bussell can help me enough.  If they can, then everyone

12   else can leave, including the parties.

13          MS. BRANNON:  Thank you, Judge.

14          THE COURT:  Okay.  So we'll recess and I'll

15   ask Ms. Boyd and Mr. Bussell to stay.  All right.

16          MR. SLINKARD:  Judge, I guess Ms. Boyd has

17   the equipment set up.  She believes it's working.  With

18   your permission, we'll just all withdraw and leave you

19   with Ms. Rokusek and her investigator and the--

20          THE COURT:  Okay.  Thank you, Mr. Slinkard.

21          MR. SLINKARD:  And I told Bonnie the-- the

22   drives are all over there.  The white box set are the

23   originals, as I understand it, from the agents.  And we

24   only have 5 and 6 at this time.  We'll work on getting 1

25   through 4 as soon as we can.

1          THE COURT:  Okay.  And the black are the

2     copies?

3          MR. SLINKARD:  The black are the copies from

4     our office and all 1 through 6 are there.

5          THE COURT:  Okay.  Got it.  All right.

6     Thank you.

7          (The remaining proceedings are sealed and

8     will require a Court order to be transcribed).

9          (4:33 p.m., proceedings recessed).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3

4       I, Kelli Stewart, a Certified Shorthand Reporter and

5    the regularly appointed, qualified and acting official

6    reporter of the United States District Court for the

7    District of Kansas, do hereby certify that as such

8    official reporter, I was present at and reported in

9    machine shorthand the above and foregoing proceedings.

10       I further certify that the foregoing transcript,

11   consisting of 117 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14       SIGNED August 11, 2016.

15

16

17

18            /s/ Kelli Stewart
              _____

19            Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25
```

```
 1                  UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,      Docket No. 16-20032-JAR

 4        Plaintiff,                Kansas City, Kansas
                                    Date:  08/16/2016
 5   v.

 6   LORENZO BLACK,
     KARL CARTER,
 7   ANTHON AIONO,
     ALICIA TACKETT,
 8   CATHERINE ROWLETTE,
     DAVID BISHOP,
 9
          Defendants.
10   ....................

11
                          TRANSCRIPT OF
12                       MOTIONS HEARING
          BEFORE THE HONORABLE JULIE A. ROBINSON
13              UNITED STATES DISTRICT JUDGE

14   APPEARANCES:
     For the Government:  Ms. Debra L. Barnett
15                        Ms. Annette Gurney
                          United States Attorney's Office
16                        301 North Main Street
                          Suite 1200
17                        Wichita, Kansas 67202-4812

18   For the Defendant Lorenzo Black:
                          Mr. John Jenab
19                        Jenab Law Firm, P.A.
                          110 South Cherry Street
20                        Suite 103
                          Olathe, Kansas 66061
21
     For the Defendant Karl Carter:
22                        Mr. David J. Guastello
                          The Guastello Law Firm, LLC
23                        4010 Washington Street
                          Suite 501
24                        Kansas City, Missouri 64111

25   (Appearances continued on next page).
```

**EXHIBIT**

**463**

tabbies

```
 1   APPEARANCES:

 2   For the Defendant Anthon Aiono:
                         Mr. Jason P. Hoffman
 3                       Hoffman & Hoffman
                         CoreFirst Bank & Trust Building
 4                       100 East Ninth Street
                         Third Floor East
 5                       Topeka, Kansas 66612

 6   For the Defendant Alicia Tackett:
                         Ms. Kathleen A. Ambrosio
 7                       Ambrosio & Ambrosio, Chartered
                         800 Southwest Jackson
 8                       Suite 817
                         Topeka, Kansas 66612
 9
     For the Defendant Catherine Rowlette:
10                       Mr. Michael M. Jackson
                         Attorney at Law
11                       727 South Kansas Avenue
                         Suite 2
12                       Topeka, Kansas 66603

13   For the Defendant David Bishop:
                         Ms. Cynthia Dodge
14                       Cynthia M. Dodge, LLC
                         233 Southwest Greenwich Drive
15                       Suite 10
                         Lee's Summit, Missouri 64082
16
     For the Movant Federal Public Defender:
17                       Ms. Melody Brannon
                         Mr. Kirk C. Redmond
18                       117 Southwest Sixth Street
                         Suite 200
19                       Topeka, Kansas 66603

20   For the Interested Party David Lougee:
                         Mr. Jonathan L. Laurans
21                       Attorney at Law
                         1609 West 92nd Street
22                       Kansas City, Missouri 64114

23   Court Reporter:        Kelli Stewart, RPR, CRR, RMR
                            Official Court Reporter
24                          259 U.S. Courthouse
                            500 State Avenue
25                          Kansas City, Kansas 66101
```

1                          I N D E X

2

3

4                        E X H I B I T S

5   Court
    Exhibits                 Offered              Received
6
         1                      10                   10
7
    Defendant's
8   Exhibits                 Offered              Received

9      449                      14                   14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

16-20032-JAR    USA v. Lorenzo Black, et al.   08.16.16          4

```
 1                (1:38 p.m., proceedings commenced).
 2                THE COURT:  All right.  You can be seated.
 3    All right.  We're here in United States versus Lorenzo
 4    Black, et al., 16-20032.  Your appearances, please.
 5                MS. BARNETT:  Debra Barnett, Assistant
 6    United States Attorney, appearing on behalf of the
 7    United States of America.
 8                MR. JENAB:  Your Honor, Lorenzo Black is
 9    present in person with counsel, John Jenab.
10                MR. GAUSTELLO:  Karl Carter in person and in
11    custody with counsel, David Guastello.
12                MR. HOFFMAN:  Mr. Aiono appears not but
13    through counsel Jason Hoffman, Your Honor.
14                MR. JACKSON:  Catherine Rowlette appears in
15    person and by counsel, Mike Jackson.
16                MS. DODGE:  Cynthia Dodge on behalf of David
17    Bishop, who appears in person.
18                MS. AMBROSIO:  Your Honor, Ms. Tackett does
19    not appear but appears by counsel, Kathleen Ambrosio.
20                MS. BRANNON:  Your Honor, the Federal Public
21    Defender appears by Melody Brannon and Kirk Redmond.
22                THE COURT:  All right.
23                MR. LAURANS:  Judge?
24                THE COURT:  Yes.
25                MR. LAURANS:  Interested party David Lougee
```

1  appears by Jonathan Laurans, but he's not present.  He's

2  detained, but not present.

3           THE COURT:  Lougee?

4           MR. LAURANS:  Lougee, L-O-U-G-E-E.

5           THE COURT:  All right.  All right.  Of

6  course, we were here last week on August 9th to hear on

7  an emergency basis the Rule 41(g) motion filed by the

8  Federal Public Defender's Office as intervenor and there

9  were a number of-- of you that joined in that motion.

10          I'd like to start just by making a record of

11  the motions to join and, just to clear up our docket, to

12  grant those motions.  So I think they are Motion 92

13  filed by Richard Dertinger, Motion 94 filed by David

14  Lougee, Motion 96 filed by Lorenzo Black, Motion 97

15  filed by Karl Carter, Motion 108 filed Alicia Tackett,

16  Motion 109 filed by Anthon Aiono, Motion 89 filed by

17  Catherine Rowlette, Motion 96 and 99-- no, I'm sorry,

18  Motion 96 filed by Lorenzo Black, Motion 99 filed by

19  David Bishop.

20          I think that's all of them.  Those motions

21  will be granted.  They're simply motions to join or

22  motions to preserve objection or related to the motion

23  that was filed by-- and the amended motion filed by the

24  Federal Public Defender.

25          So a number of things to take up today.  I

1    have not obviously fully ruled on the amended motion for

2    Rule 41(g) relief filed by the Federal Public Defender.

3    That's Document 85.  Nor have I ruled-- it's actually a

4    newly-filed motion that's Document 105 filed by the FPD

5    as a motion for Court to impound additional government

6    evidence.  That was just filed yesterday I believe, so

7    the government hasn't had an opportunity to respond to

8    that one.

9           Also, in Document 105, the FPD and defense

10    asked for appointment of a special master.  That is a

11    request that was made before that I do think the

12    government has responded to in its-- in its response,

13    which I'm trying to find, because the government filed

14    an omnibus response, although I don't think it was a

15    complete response to everything yet.  Yes, it's

16    Document 110, United States' first response to motion

17    and amended motion for Rule 41(g) return of information

18    and numerous motions to join.

19           And I have granted those motions to join,

20    but I-- I understand the government's position at least

21    on some individuals in terms of, you know, raising

22    standing arguments, including the arguments with respect

23    to the public defender as well.  Nonetheless, without

24    deciding that issue, I think this issue is properly

25    before me in terms of the defendants in the Lorenzo

1  Black case, so I intend to proceed with the motions and

2  the relief sought, at least with respect to those

3  defendants and perhaps with respect to everyone

4  ultimately.

5          All right.  So I provided to you all an

6  e-mail that I received and an attached letter that I

7  received from United States Marshal Ron Miller.  I had

8  requested that he be in contact with CCA and the county

9  jails that house pretrial detainees in the District of

10  Kansas.  And Marshal Miller, through considerable effort

11  and with a sense of urgency, has been in communication

12  repeatedly with those facilitates, as well as with his

13  national office and CCA and others.  And in a letter

14  authored today sets forth the current status of the

15  detention centers that the marshals use in this state.

16          And essentially, they are in compliance with

17  the Court's order in the sense that they are no longer

18  video-recording attorney-client conference rooms, they

19  are not recording, audio-recording attorney-client

20  communications either through phone, face-to-face, or

21  video-conferencing.  They have confirmed with Marshal

22  Miller that they are not going to do this, that they

23  understand the problems with this, they intend to comply

24  with the Court's order.

25          There was one facility that indicated some

1    reluctance to follow the Court's order and the Marshals

2    Service has removed the five persons that were housed

3    there from that county jail and is not going to put

4    anyone else in that county jail.

5             I don't have copies, but Marshal Miller has

6    written compliance verification from all Kansas county

7    detention facilities that they are in compliance and/or

8    have amended practices to ensure compliance.  CCA has

9    taken out all of the cameras in the six recording

10   rooms-- or the six conference rooms that they have them

11   in.  They've taken the video cameras out altogether.

12            Other jails that had-- of the eight jails in

13   Kansas that house our detainees, six of them weren't

14   recording at all.  But those that had cameras in the

15   rooms are shrouding the cameras, their plan is to shroud

16   the cameras with some sort of cloth cover so that while

17   there are attorney-client visits, those non-verbal

18   communications cannot be seen because they won't show up

19   on the camera.  And they're going to keep track of the

20   time and when they take it on and off and pursuant to

21   which visitations.

22            They've all assured that they will not allow

23   unmonitored attorney-client phone calls-- they will not

24   allow recording of attorney-client phone calls.  Most of

25   them have a system that allows the attorney, and I'm

 1  sure you all are aware of this, to provide their number

 2  or numbers that either their client will be calling them

 3  at or that the attorney will initiate a call from.  And

 4  the system allows those numbers to actually be input and

 5  blocked in the system so that when calls are made to or

 6  from those numbers, the systematically shuts off the

 7  camera.

 8       CCA is different in the sense that when an--

 9  a detainee places an outgoing call to their lawyer, that

10  call will be recorded unless the detainee tells CCA that

11  that's who they're calling, that they're calling an

12  attorney.  And if they tell them that, CCA turns off the

13  recording with respect to that particular phone for the

14  duration of that call.

15       So I've tried to summarize, you all have

16  what I've said and more in the letter from Marshal

17  Miller, and I wanted to make a record of that to start,

18  including-- Bonnie, if you will mark this as Court

19  Exhibit 1.  It's the original Marshal Miller's letter to

20  the Court that I provided to all of the counsel in the

21  Lorenzo Black case.  And I've also provided it to all of

22  the district and magistrate judges in the District of

23  Kansas so they're aware, because I know that some of

24  them have already had motions pertaining to these issues

25  filed in their-- in their cases.  So I'll admit Court

 1   Exhibit 1 into the record.

 2            And so there's a number of things that I'd

 3   like to talk to you all today about, including the

 4   appointment of a special master.  Before that, though,

 5   I'd just be interested in hearing from you procedurally

 6   about anything else that you think needs to be heard

 7   today, other than the appointment of special master and

 8   what the parameters of that might be.  Ms. Barnett.

 9            MS. BARNETT:  Your Honor, I was hoping we'd

10   just take up the issue of the appointment of a special

11   master today.  With regard to the motions that have been

12   filed to impound evidence, and I-- I can't recall now,

13   but I think there was one other maybe yesterday, I would

14   ask for time to respond to those in writing.  And then

15   if we need to have another hearing, setting that on down

16   the road.  But otherwise, I'm prepared to talk about the

17   special master in terms of what we can agree to today,

18   but that would be about all I would want to address

19   today.

20            THE COURT:  All right.

21            MS. BARNETT:  Thank you.

22            THE COURT:  Ms. Brannon.

23            MS. BRANNON:  Your Honor, there were two

24   other things that we would like to bring to the Court's

25   attention outside of the special master, which I-- I

1    think the Court can fashion a procedure that would allow

2    the government to-- to respond in some way.

3            The first is we would like to add to the

4    record regarding the phone calls.  What has developed in

5    the last week is it is very clear that, in the past at

6    least, CCA recorded phone calls between attorneys and

7    clients.  And those recordings were provided to the

8    United States Attorney in this case.  We don't know how,

9    whether it was by a grand jury subpoena or other means,

10   we just know that they were turned over.  And that, in

11   turn, those phone calls have already been disseminated

12   to co-defendant counsel.

13           THE COURT:  In the Lorenzo Black case?

14           MS. BRANNON:  In the Lorenzo Black case.

15   I'm not sure about the other three that are interested

16   and have sentencing issues, I don't think that they've

17   got those, but I-- I think Mr. Redmond and Mr. Jackson

18   can address that more fully.

19           We provided the Court with a demonstrative

20   exhibit basically that sort of is a chart that lays out

21   some of-- some of this information.  So we'd at least

22   like to make a record on that today and understand that

23   the government may need time to respond.

24           The other matter is something that also came

25   to light in the last couple of days regarding Ms.

 1    Rokusek that relates very much to the statement that she

 2    made last week to the Court.  Because of the sensitive

 3    nature of that information, it's not something that we

 4    are prepared to present in open court.  I think Ms.

 5    Rokusek would probably ask the Court, too, to hear this

 6    in camera and ex parte.  But I will represent to the

 7    Court I think it bears very much on the Court's

 8    consideration of the special master and the scope of the

 9    special master.

10             But beyond that, what we have is essentially

11    we are ready to discuss the special master and-- and

12    those issues before the Court.

13             THE COURT:  So essentially you want to make

14    a record on the phone calls, and allowing obviously the

15    government time to respond.  But in that interim-- and

16    have you given Ms. Barnett a copy of this demonstrative

17    exhibit?

18             MS. BRANNON:  (Nods head up and down).

19             THE COURT:  I would like you or Mr. Redmond

20    to walk me through that.  But I assume what you're

21    asking for is a clawback order to get this material,

22    whatever it is, that's in the hands of the defense or

23    otherwise, back into someone's hands, whether it's the

24    government or into the Court's vault?

25             MS. BRANNON:  Exactly, Your Honor.  What

1  we're asking is for the government to identify what

2  copies they have, whether CCA still has originals of

3  those phone calls, and to whom it has been disseminated.

4  And to have those returned hopefully to the Court or

5  some other entity outside the U.S. Attorney's Office.

6          We would point out for the Court, and I know

7  Mr. Redmond can address this in more detail, that by

8  disseminating these attorney-client phone calls to other

9  defendant attorneys, that creates an ethical conundrum

10  for them because they have received what they believed

11  to be and what is, in fact, privileged, confidential

12  information between another attorney and their client.

13  They have that in their possession.

14          And how to proceed from this point, I think

15  we'll certainly be asking for guidance from the Court.

16  But by returning that-- being able to return that

17  information and take it out of their custody, I-- I

18  think that that would answer or remedy some of the

19  problem.  And Mr. Redmond could certainly address the

20  phone calls at this time if the Court wants to take that

21  up.

22          THE COURT:  All right.  Thank you.  Mr.

23  Redmond.

24          MR. REDMOND:  Thank you, Your Honor.  I

25  think maybe the easiest way to start is we would ask

 1    permission to mark this exhibit as Exhibit 449, just for

 2    record purposes.

 3              THE COURT:  It's a demonstrative exhibit

 4    that's a table pertaining to attorney-client phone

 5    calls?

 6              MR. REDMOND:  Yes, Your Honor.

 7              THE COURT:  All right.  Exhibit 449 admitted

 8    for demonstrative purposes.

 9              MR. REDMOND:  Your Honor, what this chart

10    depicts is not something of which I have personal

11    knowledge, because we obviously do not have the

12    discovery in the Black case.  What it is is some of the

13    attorneys who do have the discovery, they have 198

14    gigabytes of inmate phone calls.

15              THE COURT:  All right.  So these are

16    attorneys that aren't counsel of record in the Black

17    case?

18              MR. REDMOND:  That's correct, Your Honor.  A

19    number of them are here, but-- and I can't speak to why

20    those phone calls were provided in discovery.  But what

21    I can tell the Court is some of the defense counsel when

22    they opened the folder that's marked "CCA Phone Calls,"

23    what they're able to do is search those phone calls by

24    the attorney's telephone number.  I think people tried

25    to take care not to actually violate the privilege

 1    themselves.  And so I-- you know, we don't know what is

 2    discussed on these phone calls, we just know that there

 3    is a phone call between a client at CCA and an attorney

 4    who is listed in this chart that has been recorded and

 5    provided to the Lorenzo Black defendants in discovery.

 6                THE COURT:  Okay.  I-- again, I just need--

 7    want to be clear on this.  So 449 lists a number of

 8    attorneys and defendants who are defendants in other

 9    cases?

10                MR. REDMOND:  Yes, Your Honor.

11                THE COURT:  And the attorneys on-- and these

12    conversations you say have been audio-recorded at CCA,

13    only CCA, not other jails, just CCA?

14                MR. REDMOND:  I have no information about

15    other jails, yes, Your Honor.

16                THE COURT:  Okay.  All right.  But in any

17    event, they've been recorded.  And these particular

18    calls have been provided as part of the discovery in the

19    Black case?

20                MR. REDMOND:  That is what I'm told, yes.

21    Maybe just an example of one of the defendants.  The

22    client's name is Lamar Steele, Mr. Steele's attorney is

23    Chris Joseph.  We provided the case number for the Court

24    in the third column.  The fourth column lists the dates

25    between the first and the last recorded phone call, here

 1    10-24 of 2014 to January 21st of 2015.  The fifth column

 2    is the file location on the-- the disks that were

 3    provided to the counsel in the-- in the Black

 4    prosecution.  And the last column is the number of calls

 5    that were recorded between that inmate's PIN number at

 6    CCA and the attorney's telephone number, which in this

 7    case is 43 calls.

 8              THE COURT:  All right.  Anything more?

 9              MR. REDMOND:  No, Your Honor.  Thank you.

10              THE COURT:  All right.  Ms. Barnett, can you

11    speak to this?  Are you prepared to speak to this?

12              MS. BARNETT:  No, Your Honor, I'm not.

13              THE COURT:  Well, Mr. Redmond, I don't know

14    if you can tell me more.  So the defendants in the

15    Lorenzo Black case have discovered a number of

16    audio-recordings on it looks like several disks, maybe

17    more than the ones listed on here.  And those

18    audio-recordings purported to be-- I mean, what they

19    thought they were discovering was conversations they

20    were having with their own clients?  I'm not

21    understanding what it is they thought they were

22    discovering.

23              MR. REDMOND:  Which is exactly what Ms.

24    Brannon just asked that I sort of supplement the record

25    on.  They did not-- I mean, like, for example, Mr.

1    Joseph did not receive these recordings.  The Lorenzo

2    Black counsel did.  He's only aware of them because the

3    counsel in Lorenzo Black notified him that we have

4    attorney-client phone calls-- presumably attorney-client

5    phone calls between CCA and your office and we're just

6    not going to listen to them.

7            And which is why-- I mean, this is our

8    concern in the litigation is that our phone calls, just

9    like our video-- video of our visitation is out there as

10   well, which is why we intervened under Rule 41(g).  I--

11   I wish I could be more helpful.  I'm certainly not in a

12   position to expand on the contents of the phone calls or

13   anything more about the mechanism by which they were--

14   or the reasons that they were provided in discovery.  I

15   just don't know.  I just know that counsel in this case

16   are receiving discovery that certainly appears to be

17   subject to the privilege.

18           THE COURT:  Well, counsel in this case that

19   are receiving this, are they receiving this mixed in

20   with other discovery that they think is appropriately

21   received by them?

22           MR. REDMOND:  I think so, Your Honor, the--

23   but I'm not certain.  Traditionally, just from--

24   speaking from my experience, I will get dumps of phone

25   calls from clients.  And typically what I think the

1    government is looking for is inculpatory statements made

2    in a non-privileged fashion to attempt to use against my

3    client.  But here, apparently those weren't filtered

4    out.  It looks-- presumably, it looks like that's the

5    case.  And so I think that there's a number of

6    non-privileged phone calls just based on my experience,

7    not based on my knowledge of the discovery, and those--

8    those were not segregated out from the privileged phone

9    calls.

10              THE COURT:  All right.  Are there-- is there

11    anyone on behalf of one of the defendants in the Lorenzo

12    Black case that wants to provide any further explanation

13    of what you received and how you discovered this?

14              MR. JACKSON:  Yes, Your Honor.  Mike Jackson

15    on behalf of Cathy Rowlette.  Let's see, the easiest way

16    to explain this is there was a directory or a folder

17    contained in the hard drive that we received from the

18    government.  And the name of that directory was "CCA

19    Calls."  The subdirectories within that consisted of 39

20    inmates at CCA.

21              And then so you would pick an inmate, such

22    as Richard Dertinger, which is the top one.  And you

23    would then have access to MP3 files.  And there was an

24    index below them that would take you right to Securus

25    through the Internet.  And that would list all of the

1  phone calls that Mr. Dertinger had made in-- while he

2  was incarcerated at CCA.

3           Okay.  Now, I knew that he was represented

4  by Jackie Rokusek.  So I used her-- the last four digits

5  of her phone number and did a search within that index

6  limited to Dertinger.  And sure enough, I came up with

7  her phone number.  And it was an audio file and I

8  started it and immediately figured out that it was

9  covered by the attorney-client privilege.

10          I did the same thing with a Mr. Webb, Virok

11 Webb, who had real serious charges against him in this

12 court, and I believe you were the judge.  And I was able

13 to find Mr. Virok calling Rokusek 11 times.  And they

14 were all privileged communications owned only by the

15 client.

16          And so in the time I worked on it, I found

17 nine, nine inmates who had called their attorney who

18 that recording turned up in the hard drive disk - which

19 I have in my office right now, and the other five

20 defendants have at their office - in discovery in Black.

21          And as Kirk said, there's 198 gigs in that

22 CCA file.  And so that I'm sure there's many more

23 instances of this than the 74 I was able to find in a

24 few hours.

25          But that "CCA Calls" is part of that hard

1    drive.  So there's a lot of other information on there.

2    And I'm particularly concerned that this is now-- this

3    is in the custody of Securus, who keeps that

4    information.  When you get it, you access Securus by the

5    Internet.  And so this disclosure or publication by the

6    government has now expanded internationally.

7              THE COURT:  I'm not understanding that

8    argument.

9              Mr. JACKSON:  All right.  Securus is the

10   company that handles all phone calls from CCA.  Securus

11   bills the inmate for these calls.  I received MPG files

12   which are audio files, like music, but below that there

13   was an index.  And if you hit the index, you then point

14   your database at the Securus database that's in the

15   Cloud.  It's off-- offsite.  And that will then give you

16   a lot more information about the date and the identity

17   and the number.

18             So when I say, well, it went international,

19   that's because it's on Securus' database organized

20   according to each defendant's PIN number.  And, you

21   know, it would be subject to-- somebody could get at

22   what attorney-client privilege is meant to protect.  Did

23   that come-- did you understand where I was going?

24             THE COURT:  Yeah, I understand what you're

25   saying.  I guess it depends on how Securus-- well, I

1    don't know.  I mean, it depends on how they preserve it

2    and-- and how it is that you were able to access it.

3    You didn't have-- it wasn't encrypted, it wasn't-- you

4    didn't have to use a password, that you clicked on a

5    link provided to you by an index that was provided by

6    the U.S. Attorney's Office and were able to access your

7    own client's calls, but also able to access other

8    attorney-client calls.

9            MR. JACKSON:  39 of them.  Now, I couldn't

10   get my client's calls because she has not been in CCA.

11   And when you hit the index, it just took you to that

12   particular inmate's file, but the file--

13           THE COURT:  So in 39 inmates that are listed

14   in the subdirectory, those 39 inmates include-- do they

15   include the-- the defendants in this case, in the

16   Lorenzo Black case that are in custody, plus others?

17           MR. JACKSON:  That's correct.  They include

18   Steve Rowlette, who initially was a part of this case

19   and been removed, and then they also include Mr. Karl

20   Carter.

21           THE COURT:  All right.  So did anyone-- did

22   the prosecutors represent to you why they were providing

23   you with calls for other inmates as part of the

24   discovery?

25           MR. JACKSON:  No.  No, they didn't consult

```
 1   us as far as I know, but--
 2             THE COURT:  I mean, did you ask?  Did any of
 3   you ask, "Why am I getting calls from 39 inmates?  Why
 4   am I not just getting my own client's calls?"
 5             MR. JACKSON:  No.  I didn't ask.
 6             THE COURT:  But some of these calls are not
 7   privileged in the sense that they're a detainee that's
 8   calling somebody else.
 9             MR. JACKSON:  Oh, a majority.  Like in--
10   there would be 1,000 calls, and four of them would be to
11   the attorney.  The rest would be, you know, to family
12   members or whatever.  And that was all in one-- well,
13   let's just call it all in one file.
14             THE COURT:  All right.  So presumably, and
15   I-- I don't know if Ms. Barnett can answer this, but you
16   thought what you were discovering were non-privileged
17   phone calls of your-- of the defendants in this case and
18   perhaps others that may or may not be unindicted
19   co-conspirators, something like that?
20             MR. JACKSON:  Exactly.  I was looking for
21   what exculpable evidence I could find.  And then all of
22   a sudden it became apparent that there was privileged
23   communications being published.
24             THE COURT:  All right.  I understand.
25             MR. JACKSON:  And I created this
```

1    spreadsheet, and so I stand by what's in it, Judge.

2              THE COURT:  Okay.  Thank you.

3              MR. JACKSON:  Thank you.

4              THE COURT:  All right.  And again, Ms.

5    Barnett, do you have any knowledge about the audio

6    calls?

7              MS. BARNETT:  With regard to the specific

8    ones that we're talking about in the demonstrative

9    spreadsheet, no, Your Honor, I don't.  I do know from

10   talking to the people at CCA and their attorney earlier,

11   that in the intake process when an inmate goes into CCA,

12   that they actually will give them the opportunity to

13   tell them - if they have an attorney - the attorney's

14   phone number, so that that can be put into their system.

15   And somehow, and I'm not electronically bright, but

16   somehow then that allows that phone call to be exempted

17   from the recording system.  I think that's even kind of

18   mentioned in Marshal Miller's letter to the Court that

19   you previously discussed.

20             So I don't know whether these particular

21   inmates designated these attorneys, before or during or

22   after these calls were made, as their attorneys so they

23   wanted their calls exempted from recording or not.  That

24   would be something that I could certainly look into, if

25   the Court would give me time.

1          But I would just suggest to the Court that

2    there are circumstances under which calls between

3    inmates and their attorneys are not confidential,

4    attorney-client privileged phone calls.  And I don't

5    know whether that applies to this situation, but

6    certainly in situations where at the beginning of the

7    call people are forewarned, "Your call is being

8    monitored, it's being recorded," and they go ahead and

9    talk, there is the argument, and I would advance that

10   argument, that they've waived any privilege that they

11   have if they then continue to speak with their attorney

12   and talk about otherwise confidential matters.

13          So that's why I would like additional time

14   to not only brief-- file a brief with the Court and

15   respond to the defendant's motion that was filed

16   yesterday, but I can, if the Court would like, go ahead

17   and look at these specific instances.  I don't want to

18   listen to the calls, but find out the circumstances

19   surrounding each of these clients' phone calls, when

20   they were made, and what they conveyed to CCA as far as

21   whether they had representation and they wanted their

22   calls exempted.

23          THE COURT:  All right.  Are you-- similar to

24   agreeing to surrender the video-recordings until we can

25   sort all this out, do you oppose a clawback order to

1    gather all these audio-recordings?  Because it sounds

2    like if there's a mix of non-privileged and privileged

3    calls, and it could be that you take the position that a

4    call is not privileged, even though it's between an

5    attorney and client for some reason, I mean, that's

6    something that would have to be handled through a

7    privilege log and litigation and perhaps a special

8    master figuring that out.  But in the meantime, it makes

9    sense to me that, similar to the video-recordings, we

10   need to claw back everything from everywhere until we

11   can figure it out.  Would you agree?

12           MS. BARNETT:  Yes.

13           THE COURT:  All right.  So in terms-- and,

14   well, I was going to start asking this about the video

15   as well, but we'll need to know where it is, who has it,

16   and-- and then, you know, how to go about getting it all

17   back and into the Court's custody pending further order.

18           MS. BARNETT:  All right.

19           THE COURT:  Okay.

20           MS. BARNETT:  Thank you.

21           THE COURT:  All right.  Ms.-- yes.

22           MS. BARNETT:  May I have just a moment,

23   please, Your Honor?

24           THE COURT:  Sure.

25           (Counsel confer).

1          THE COURT:  And we can take a break if you

2    want-- if you all want to confer, that's fine.  Would it

3    be helpful to take a break?

4          MS. BRANNON:  Your Honor, I think we have

5    resolved it.  There were some outstanding videos at CCA,

6    I think those are being taken care of.  Well--

7          MS. BARNETT:  When I had met with the warden

8    last week and spoke to her, she had indicated that they

9    had DVRs that were continuing to collect video feed

10   recordings from the various cameras out there.  She

11   asked about whether or not they needed to hang on to

12   those for us.

13          In checking further into that, what I

14   learned from speaking to their attorney, who understands

15   the issue and the Court's order and everything, she told

16   me that when the original DVRs that the Court has were

17   pulled from their system, six other DVRs were put into

18   CCA's system back in May.  And they have continued to

19   run and record on everything out there except the

20   attorney rooms until last week when they stopped

21   recording the attorney rooms.

22          These DVRs will record, and I'm just going

23   to give a guesstimate, for about 90 days and then they

24   overwrite or record over the old stuff.  And they-- they

25   just are kind of circular in that way in the way they

1    record.

2          So what the attorney has told me is, is that

3    these-- the second set of DVRs that went in in May,

4    that's all there is.  Those DVRs.  No copies of those

5    have been produced for us since May.  We haven't been

6    given access to those DVRs to make copies.  Nobody has

7    made copies for us.  And I told her that we're not

8    asking you to make copies for us.

9          So there are no extra copies out there

10    floating around.  It's just the DVRs that are out there

11    right now in their system that are recording their

12    camera feeds on everything except the attorney rooms.

13    Does that make sense?

14          THE COURT:  All right.  So this is

15    post-subpoena--

16          MS. BARNETT:  Yes.

17          THE COURT:  -- DVRs, it includes both

18    attorney rooms and everything else in the facility?

19          MS. BARNETT:  Up until last week when the

20    Court ordered them to stop recording in the attorney

21    rooms.

22          THE COURT:  Attorney rooms, okay.  So can

23    they segregate the attorney room camera recordings?  I

24    mean, because obviously my order didn't go to the

25    facility-wide recordings, only the attorney rooms.

1           MS. BARNETT:  I don't know if they can or

2    not.  I'm not sure, again, how these DVRs actually work.

3    But I know that they're-- I know they're not making

4    recordings of those-- that video for anybody, it's just

5    now-- it will be rewriting over that if that-- I'm not

6    sure I'm explaining that very well, but--

7           THE COURT:  And I'm not-- I don't-- well, I

8    think it's beyond the purview of the order to ask that

9    they turn over-- I know right now you-- you all

10   subpoenaed or the grand jury subpoenaed, or whoever, the

11   universe of recordings for obvious reasons.  I mean,

12   they have perhaps evidentiary value in the CCA case.

13   But there's no reason-- well, you didn't subpoena the

14   universe of recordings after that particular grand jury

15   subpoena that issued in April, so you're not entitled to

16   it.

17          MS. BARNETT:  Correct.

18          THE COURT:  But there's-- then but with

19   respect to the subset of attorney-client, we've got an

20   issue similar to what we had with those you took

21   possession of, because at least for now they exist.

22   They may ultimately be recorded over, but for now they

23   exist on some DVR server or whatever.  Correct?

24          MS. BARNETT:  Correct.

25          THE COURT:  Okay.  What-- so what have you

1    all discussed about this?

2              MS. BRANNON:  Well, Your Honor, part of it

3    is we were just trying to sort out what is actually

4    there.  It's our position that-- that I believe that CCA

5    could do the same thing.  They could pull those DVRs,

6    provide those to the Court in order to preserve it.  And

7    certainly-- you know, for this limited purpose, I think

8    they could pull that sixth DVR that has the

9    attorney-client visitation and give it to the Court.

10             Another alternative is that if the Court

11   would order CCA not to produce those to a third party

12   and order the U.S. Attorney's Office in Kansas not to

13   subpoena or request those recordings in any way.  So

14   there-- there are a couple of ways I think to protect it

15   if it's being recorded over.  But the cleanest way would

16   just have-- be to have CCA pull those and provide them

17   to the Court.

18             THE COURT:  All right.  Ms. Barnett, do you

19   have a position on which alternative?

20             MS. BARNETT:  Well, with regard to the order

21   that we not be allowed to issue a subpoena for or

22   request copies of what's on their DVRs, if the Court is

23   inclined to do that, I don't object to the Court saying

24   that with regard to the footage from the attorney rooms.

25   But I do think that we have the right to subpoena or

 1    obtain a court order to get video footage and recordings

 2    from the other locations that cameras are at out at CCA,

 3    as long as they are not in the attorney rooms.  And

 4    we're asking-- we would not ask for that type of a

 5    visitation recording.

 6            THE COURT:  All right.  So I think probably

 7    the cleanest way to do this is for me to issue an order

 8    that orders CCA to provide recordings only from the

 9    attorney-client rooms that span the time period from

10    when they responded to the last subpoena until the day

11    they cut off the cameras, which was yesterday or last

12    week or something.  So I'll issue an order to CCA to

13    that effect.  Hopefully, again, they're just segregated

14    on one or two drives.

15            Okay.  All right.  Anything else before we

16    talk about special master?

17            MS. BARNETT:  No, Your Honor.

18            THE COURT:  Okay.  So-- and as I understand

19    it, you want the record to include an in camera-- my in

20    camera hearing of additional information from Ms.

21    Rokusek; is that correct?

22            MS. BRANNON:  That's correct.  It would sort

23    of be a continuation of her statement from the last

24    hearing with new information.

25            THE COURT:  All right.  I think what we'll

1  do is we'll go through everything we're going to do.

2  We'll do that last, and I'll ask you all to stick around

3  outside of the courtroom in the event I determine that

4  something that she's telling me in camera is better

5  taken up with-- with you all in your hearing.  I'll

6  discuss that with Ms. Rokusek, make a record of it, and

7  then bring you back at the end of the hearing for that.

8  But we'll-- we'll do that at the end of this hearing, at

9  least hearing from Ms. Rokusek.

10            So let's talk about the special master.  So

11  a lot of issues here, but from what I gather from what

12  you all have filed, you don't agree on the scope and the

13  duties of the special master, except that it sounds like

14  you do agree that the special master should go through I

15  would guess the two drives for sure, maybe sample the

16  other drives, and ascertain-- first of all, ascertain

17  that there's-- whether or not there's privileged

18  material on them, and secondly, ascertain how to go

19  about segregating out non-discoverable, privileged

20  information from privileged information, if-- if there's

21  any divide to be made.

22            So, for example, on the one drive, as I

23  understood it from the last hearing, that was only

24  attorney-client rooms.  So presumably, everything on

25  those recordings on that particular drive, the sixth

1    drive I think, would be privileged and maybe there's no

2    slicing and dicing to do.  But there was another one

3    that was sort of a mix, at least that's the way the

4    index looked, something that a special master would need

5    to figure out.  Would you agree?

6            MS. BARNETT:  Actually, I-- sorry, Your

7    Honor.  Actually, I think on the index on DVR 6, there

8    were a number of other camera angles that were reflected

9    on the index that might not be privileged.  And quite

10   frankly, we're not necessarily agreeing that every

11   contact in one of those rooms, however it's recorded,

12   wouldn't be an attorney-client privileged conversation

13   or a meeting I guess that we're just looking at the

14   video on.

15           I think there's a possibility, and I haven't

16   looked at the video so I don't know how good it is, but

17   depending on the quality, where the camera is at, the

18   angle, whether or not you can zoom it or not zoom it, I

19   think there is a possibility that some of those

20   recordings may not be of a confidential communication or

21   confidential in nature.  And so we feel like with regard

22   to those, a special master needs to look at them

23   specifically, each session or each meeting, and make

24   that determination.

25           There may be also some interviews taking

 1    place of inmates by people who are not their attorneys.

 2    And so we would think that the special master might need

 3    to know that and determine that as well.  But I don't

 4    think that all of the camera angles captured on DVR 6

 5    are of the attorney-client rooms.  I think there's other

 6    images captured there that would not be privileged or

 7    confidential.

 8              THE COURT:  Well, I don't know if I said the

 9    wrong exhibit number, but I thought there was one drive

10    where there was some sense that there was a mix and then

11    there was another drive that was only attorney-client

12    rooms.

13              MS. BARNETT:  DVR 5 has the one reference to

14    I think it's a "low attorney room," and I don't think

15    that that actually turns out to be a room where there

16    were confidential communications taking place, but I do

17    think the special master should look at that and make

18    that determination.  And it does list a lot of other

19    camera angles.

20              DVR 6 had quite a few different camera

21    angles that were listed on it.  And towards the middle

22    and the end, then it talked about a number of attorney

23    rooms that it had recordings from.

24              THE COURT:  So when you say the camera

25    angles, do you mean outside of the attorney-client

1    conference room?

2                MS. BARNETT:  Yes.

3                THE COURT:  So what you're telling me is you

4    think for DVR 5 and 6, a special master is going to need

5    to go through each of those?

6                MS. BARNETT:  Yes.

7                THE COURT:  And then what about the other 1

8    through 4?

9                MS. BARNETT:  I didn't-- and I don't think

10   Ms. Brannon had actually asked the Court to take those

11   into custody last week, but I believe Ms. Rokusek had

12   asked for those to be taken into custody.  I don't have

13   any reason to believe there's privileged material or

14   even arguably privileged material on those DVRs.  But I

15   think to put everyone's mind at rest, it would probably

16   be helpful if a special master could spot-check them

17   and-- and could probably do that fairly quickly.  And

18   then if there's a determination that there isn't

19   anything privileged on them, push those out so that they

20   can be then copied and provided to defense counsel.

21               THE COURT:  All right.  And beyond that,

22   what you've just described, the special master's review

23   of these spot-check of DVRs 1 through 4 and complete

24   check and sorting and I guess creation of a privileged

25   log on 5 and 6, is that the extent of what you want the

1  special master to be ordered to do at this point?

2          MS. BARNETT:  Yes.

3          THE COURT:  All right.

4          MS. BARNETT:  Thank you.

5          THE COURT:  All right.  Ms. Brannon, I know

6  that you want that plus, so let's talk about the plus.

7          MS. BRANNON:  Well, a couple of things we

8  would point out from Exhibit 439, which is a listing of

9  all the camera recordings - although this isn't really

10  in the purview of our-- our challenge to the

11  attorney-client privilege - these videos include the

12  medical back hallway, medical female holding, the

13  nurse's station, a lot of things that might be protected

14  in other ways.  I would also point out it takes videos

15  of a number of hallways and tiers.  There are areas that

16  may be included in here that I-- that could well include

17  video of strip searches of our clients, which I think

18  they have a privacy interest in.

19          We would remind you that these are-- people

20  are pretrial detainees still entitled to the presumption

21  of innocence.  And they have not forfeited all of their

22  privacy rights, they're not convicted of anything.  And

23  to-- to look through these and see if there are things

24  like strip searches, if you can tell what medications

25  they are getting, if you know that they've gone to

 1   medical and having certain procedures, I-- I think those

 2   are concerns that perhaps a special master should look

 3   into as well.

 4            As far as the attorney rooms, the idea of a

 5   special master going through all of those videos, first

 6   of all, and trying to match the video up with the

 7   attorney or the inmate, I mean, that's sort of clerical

 8   work.  And I'm not sure that it can actually be done.  I

 9   don't know that CCA actually records which attorney is

10   in which rooms.  You know, I know when I get there, they

11   have my name on the list, my name is on a chart.  But as

12   I'm going back, there's just a radio communication, you

13   know, "We put him in Room 6."  We don't know if that's

14   recorded.  I think there are a number of problems for a

15   special master in doing that.  There are a number of

16   problems, too, with a special master looking at this and

17   saying, yes, there is privileged information on this, or

18   no, there is not privileged information on this.

19            There are so many details about these cases

20   and so many nuances, a special master might not be able

21   to-- to identify that.  You know, a lawyer walking in

22   with a pile of trial notebooks to go through with a

23   client is different than a lawyer walking in with a plea

24   agreement, for example.  And that has significance, it

25   could have significance to a prosecutor, about whether

 1   to go get a deal with a co-defendant because they're

 2   going to trial, as opposed to this case is going to work

 3   out.

 4           I-- I-- the fact that the government is not

 5   agreeing simply to abandon all of the videos of the

 6   attorney-client rooms I don't understand.  Why would

 7   they not at least make that remedial offer to the Court,

 8   saying if it is a videotape of that room, we're not

 9   going to bother with it at all.  Because if there is

10   nothing in that room that is privileged, if there's

11   nothing going on there, what possible value could it

12   have to them?  If it's a video of a defendant sitting

13   there alone because a lawyer didn't show up, what

14   possible value could it have to the government?  And why

15   would we have a special master spend time doing that

16   instead of just telling the government, "Give this up"?

17           To not even offer that and to want to go

18   through and-- and sort of parse out and try to identify

19   which defendant this is and whether anything happened in

20   that room, perhaps the Court wants-- wants the special

21   master to do that, and I'm-- you know, that might be a

22   minor point.  I just don't know that it's productive.  I

23   think--

24           THE COURT:  Well, to-- to the extent there's

25   a mix of privileged and non-privileged things on a

 1  particular recording, you do think it is the role of a

 2  special master, or perhaps somebody they hire at a lower

 3  rate, to go through and say if-- and I-- frankly, I

 4  don't even know if the system would allow for sort of a

 5  slice and dice of the tape because it's driven by a

 6  camera, it's not necessarily driven by time slots.  I

 7  mean, that's going to have to be figured out.

 8          But assuming there's a mix, you don't have a

 9  problem with somebody going through and, if they can,

10  saying here's-- here's what is not privileged that the

11  government can have, and then disseminate, versus here's

12  what is privileged-- or at least here are the

13  attorney-client contacts.  You can tell it's an attorney

14  and a client or a psychologist and a client or a

15  polygrapher and a client, et cetera, and-- and those

16  need to be withheld.  You don't have a problem with that

17  sort of culling out and sorting process?

18          MS. BRANNON:  I don't, with the exception

19  that I think the attorney should be able to look at

20  those before there is a call made that this simply has

21  no attorney-client communication value.

22          THE COURT:  What attorney?

23          MS. BRANNON:  Whoever is identified on these

24  tapes.  If I have a meeting with a client on there that

25  is identified by the special master and the special

1    master has said, "I deem that there's no value to this,

2    an attorney-client privilege," I don't know that I'm

3    willing just to say we'll rely on that without knowing

4    exactly what is on that tape.  And perhaps if there

5    needs to be another level of-- of review, I don't know.

6              THE COURT:  But why would it matter?  I

7    mean, if the special master's recommendation is this was

8    a meeting between you and your client, the government

9    can't discover it, no one else can discover it, why does

10   it matter that you don't see it?  I mean, it's not-- it

11   doesn't have evidentiary value.  Even if it did, it was

12   privileged, no one is going to discover it.  So why

13   would we need another level of review for your benefit

14   at that point?

15             MS. BRANNON:  You know, if that's the line

16   that is given to the special master, that if an attorney

17   and client are in that room, it's deemed privileged, or

18   an attorney-- or a client and a psychologist are in that

19   room communicating with each other, I-- I think the rest

20   of it may not matter.

21             THE COURT:  Is there any-- is there any time

22   when in these attorney-client conference rooms a client

23   is going to be in there with another individual when it

24   wouldn't be privileged?  I mean, are they ever in there

25   where they're talking to the prosecutor or FBI agent or

 1    someone other than a member of the defense team?

 2           MS. BRANNON:  I remember one occasion where

 3    I think there was a debriefing taking place at CCA.  I

 4    don't think that happens.  And I don't know that it

 5    happens in those rooms necessarily.  Clearly, doing that

 6    creates a great danger to the client who's being

 7    debriefed because it becomes so readily accessible.

 8    That's the only thing I can think of.  I don't know that

 9    that happens.  Surely if the government knows about the

10    debrief, they could pinpoint that for the special

11    master.  But it would be such a rare thing, I don't know

12    what in the world it would be.

13           The only other scenario would be a client

14    who is sitting in the room alone either waiting to be

15    picked up or a lawyer had to cancel and they had already

16    been brought down, so there may be that footage.  But I

17    can't imagine that there's any value in that to the

18    government, which-- I mean, it gets me back to the point

19    that it's either attorney-client privileged

20    communication or it's a client sitting in there by

21    himself or talking to a guard or whatever, that I can't

22    imagine has any value to the government.

23           And so again, the fact that they're not just

24    saying, "Take this, we don't want it, we acknowledge

25    that there-- that this video is problematic and

1  privileged and confidential," that seems a lot easier

2  way to go.  But, no, we-- we would not have any

3  objection to a special master sorting through that I

4  suppose.

5        THE COURT:  Do you have any idea how many

6  hours of video the DVR holds?  I know I've heard this

7  sort of-- it loops over, depending on how much is

8  recorded.  But I mean, what is the-- I guess the

9  magnitude of its memory or what's the potential?

10        I mean, when we start talking about hiring a

11  special master, I have to give them some idea of the

12  scope of review, if they have to go through DVR 5 and

13  sort and cull.  I mean, how many hours?  I mean

14  terabytes and gigabytes mean nothing.  How many hours

15  are we talking about?  Has anybody shared that with you?

16        MS. BRANNON:  No, Your Honor.  I'd probably

17  defer to Mr. Naseem and whether he could even look at

18  the information and-- and guess.  What I can tell the

19  judge, is based on the government's pleadings, they have

20  recordings from January through May.  I-- you know, we

21  probably see 15 clients at CCA a week.  Our office does.

22  So when you add in CJA and retained counsel and beyond

23  that, if we see them for, you know, 15 or 20 hours just

24  ours per week, multiplied by that time, and then you add

25  in the CJA counsel and retained counsel.

```
 1              THE COURT:  Well, if we came at it a

 2   different direction, and this would definitely

 3   overstate, but if we assumed that, you know, in this

 4   five-month time period there are however many hours a

 5   week in which an attorney can use a room-- and I don't

 6   know what CCA's hours are.  I mean, when you-- when you

 7   go visit, what-- what are the hours you're limited to?

 8   I know-- is it Monday through Friday or can you go up on

 9   Saturdays and Sundays?

10              MS. BRANNON:  Generally it's Monday through

11   Friday, 8:00 to 4:00.  But we-- you know, if you call

12   ahead, we do routinely see clients on the weekends.

13              THE COURT:  And does CCA-- I assume they

14   keep a log of that?

15              MS. BRANNON:  Yes.

16              THE COURT:  Is that something that has been

17   part of the discovery, to your knowledge, in this case?

18              MS. BRANNON:  Yes.  I-- I also know that,

19   for example, when a client is in trial, CCA will make

20   accommodations for the attorney to visit in the evening

21   to accomplish trial preparation.  That, too, would be on

22   a-- a log.

23              THE COURT:  Okay.  And I'm unclear, I don't

24   remember, where are those logs?  Was that part of the

25   discovery?
```

1          MS. BRANNON:  I haven't seen the discovery.

2     It's my understanding that it is part of the discovery.

3     When we make an appointment with CCA, they have a

4     calendar up front where it's written out.  And then in

5     addition to that, there is a calendar that the officer

6     who's checking us in has that basically says this

7     attorney is here for this period of time to see this

8     client.  It does not, to my knowledge, correspond to a

9     particular room.

10          But there should be at least two, if not

11    three, records documenting who-- which lawyer is there

12    to see which client.  I don't know that it's always

13    accurate because, you know, our schedules change a lot.

14    And sometimes we get there and the client has been taken

15    to medical or something like that, but it would be--

16    certainly be a starting place.

17          THE COURT:  Okay.  To your knowledge, can

18    someone if-- assuming the logs are discovered, can

19    someone use those logs to - I mean, I think I heard Ms.

20    Rokusek speak to this last time - but identify a-- a

21    date and time that they visited a client or that someone

22    visited a client and then match that up with the video

23    by inputting the date and time?

24          MS. BRANNON:  Generally, I would think so.

25    The-- the issue would be, they would probably have to

1    look at all seven rooms and identify which room that

2    that attorney and client were in.

3              THE COURT:  And you say when you check in or

4    when you fill out a log or whatever, whoever they fill--

5    they fill the log out for you, it's not identified to a

6    specific attorney room, it's perhaps whatever room they

7    have available?

8              MS. BRANNON:  Right.  And sometimes we get

9    back there and they switch them around.  It's-- you

10   know, they work with what they have available and-- and

11   who needs to go in what room.  So it's rather fluid once

12   we get back there.  And I don't know that they saw a

13   reason to record which attorney was in which room, other

14   than knowing it at that time.

15             THE COURT:  Okay.  All right.  Anything

16   else?  We've talked about the video.  The audio,

17   obviously Ms. Barnett needs a chance to respond to, but

18   was there anything else you want to tell me about that

19   at this point?

20             MS. BRANNON:  Well, I don't know if the

21   Court wants us to go here now, but certainly our request

22   for the special master goes beyond just--

23             THE COURT:  Oh, that's right.  Go ahead, we

24   haven't finished.

25             MS. BRANNON:  Okay.  First of all, I want to

 1    say that the Court's order last week solves many of the

 2    prospective, if not all of the prospective, problems

 3    regarding recording.  CCA was very quick to respond.

 4    The cameras are down, there's new signage up.  Back in

 5    the pods, there are different instructions on the

 6    phones.  We've provided a list of our phone numbers that

 7    can be blocked to the chief of security.  That

 8    information and a way to do that has also been

 9    communicated to CCA counsel.  So there have been great

10    strides in solving that problem.

11              What we're left with, though, is what do we

12    do with what's happened to date?  And we think there--

13    the Court needs to appoint a special master which, you

14    know, I think the Court is already talking about, but it

15    needs to be a much broader scope than what the

16    government has proposed.  And we've outlined that in our

17    proposed order to the Court.

18              THE COURT:  One thing I'm going to ask both

19    you and the government to do is to provide me with your

20    own description of the scope of duties.  I know that you

21    all agree to a scope that we've already talked about,

22    but particularly it would be helpful to have in writing

23    from you what the additional scope is.  And I know it's

24    in your order, but I think it would be easier if you

25    identified it specifically that way.  And Ms. Barnett

1    can do the same.  But I'll hear from you now on just

2    whatever other ideas you have.

3           MS. BRANNON:  We think there are three

4    reasons that the Court ought to appoint a special master

5    with broader powers that we've described in the-- in the

6    order.  The first is based on the government's response

7    to date.  The second has to do with the defense's

8    ability to investigate and the defense's perception of

9    what's happened.  And the third is that it would be of

10   great benefit to the Court, we believe, to have this

11   information and to have it in an efficient,

12   authoritative, and orderly manner.

13           Since we started on this, since we first

14   discovered this, the scope of this continues, it's been

15   expanding.  It expanded to the phone calls, it expanded

16   to some things that the Court is going to hear from Ms.

17   Rokusek.  The defense simply cannot keep up with it.

18   And the defense doesn't have the tools and resources to

19   be able to access the information that a special master

20   could.

21           In this case we got wrong information

22   repeatedly from CCA.  We got wrong information from

23   other resources.  It took a lot of work to dig down, and

24   we still think we don't know the answers to so many

25   questions, despite our best efforts.  Communication

1    between the U.S. Attorney's Office and the defense on

2    this issue and on these issues has all but ceased.  Our

3    efforts to-- to work something out have completely

4    broken down.  And so-- and we certainly will undertake

5    what the Court has suggested, but we're making

6    absolutely no progress.

7            The government's response in this-- you

8    know, the Court has given the government an opportunity

9    to address these issues repeatedly and in other

10   circumstances, given the government an opportunity to

11   address these things.  We had a hearing last week, all

12   of this was laid out.  The Court gave seven days for the

13   government to respond.

14           Last night, last night we get a pleading

15   from the government that clouds the issues more than

16   clarifies.  They know the questions that we had, they

17   know the questions before the Court.  Has this happened

18   in other cases?  Do they do this routinely?  Have they

19   used it against other people?  We want to know those

20   things.  And in their response, or a lack of response

21   rather, they are silent on these issues.  And what we

22   read from that is, at the very least, the government

23   does not seem to understand the gravity and the

24   magnitude of what's before it.  Because otherwise, they

25   would have to have had a different response than they've

1    had.

2            When we look at this case and what's

3    happened that we know about so far, the government's

4    invasion into our attorney-client relationship is

5    unprecedented.  We couldn't find anything even

6    comparable to the degree of invasion and misconduct by

7    the government that is before the Court.  This Court

8    heard from both sides of the bar, we presented that

9    evidence.  Heard from an expert, heard from our

10   investigator, heard from Ms. Rokusek.  And the Court

11   shut down the recording so that there would be no

12   further Sixth Amendment violation.  And in response to

13   that, the government still has not taken any remedial

14   action, has done nothing to answer the Court's

15   questions.

16           What we know is that this is not a case

17   where there-- this is not one case, this is not one

18   defendant, this is not one recording.  This is a

19   systemic en masse breach of the attorney-client

20   relationship that we don't even know the magnitude of.

21   We don't know what clients are involved, we don't know

22   what attorneys are involved.  And not only did CCA do

23   that, but in turning that over to the United States

24   Attorney, they exploited that information and used it

25   against defense counsel, and in a way that the Court is

 1    going to hear more of today, and used it against our

 2    clients.

 3              And what's striking is that they were so

 4    bold about it.  This is not some-- you know, this isn't

 5    one rogue line attorney or this isn't some inexperienced

 6    misjudgment.  The head of the Kansas City, Kansas

 7    office, Kim Flannigan, the head of it, endorsed this,

 8    used it, published it.

 9              MS. BARNETT:  I'm going to object to this,

10    Your Honor.  This is just going far afield of what the

11    hearing should be about today.  I am only here to

12    address the issue of a special master and what we can

13    consent to.  But quite frankly, making these statements,

14    making allegations against my office and my colleagues

15    in my office when there's no show of proof of that in

16    any form whatsoever, except maybe some ex parte

17    discussion with the Court back in chambers or out here

18    without anybody else in the courtroom--

19              THE COURT:  There's been no ex parte

20    communications--

21              MS. BARNETT:  No.

22              THE COURT:  -- with this Court.

23              MS. BARNETT:  No, I know that, Your Honor.

24    But what I'm talking about is their request that the

25    Court take Ms. Rokusek's testimony in camera on

1    something.  I can only infer from what Ms. Brannon has

2    said here to the Court that these are going to be

3    accusations against my colleagues.

4          THE COURT:  I have no idea.  But what I will

5    tell you, if I determine that it's not proper ex parte,

6    I will stop and bring you all back in and have her say

7    it in front of you.

8          MS. BARNETT:  Thank you, Your Honor.

9          MS. BRANNON:  If I-- if I may, Judge.  The

10   point of this is that the government had a chance to

11   respond to this and they have not.  The-- the Court

12   heard evidence from Ms. Rokusek about how it was being

13   used and that it was Ms. Flannigan and Ms. Tomasic that

14   were using it.  And the fact that they were so bold in

15   doing it gives us reason to believe that it's happened

16   in other circumstances.  That it's happened in other

17   cases.  That's why a special master needs to be brought

18   in to investigate that.

19          And it's very telling that in the

20   government's response, they do not deny that this has

21   happened on other occasions.  They do not deny that this

22   has been their practice and policy.  They had the

23   opportunity to inform the Court of this.  They had the

24   opportunity to come and help the Court sort this out.

25   And they didn't.  And what is not in their response also

 1   says that we need a special master.  They never deny

 2   that their agents or staff viewed it.  They were very

 3   careful to say government counsel has not reviewed this,

 4   but not that the agents and staff have not.  And

 5   certainly their knowledge imputes to the counsel.

 6   That's a critical issue.

 7            They do not claim inadvertent possession.

 8   They never claimed that this was the first time that it

 9   happened.  They never claimed that it's the only time

10   that it's happened.  These are all questions that the

11   government could have been open about, could've brought

12   to the Court, but they chose not to.  Instead, they were

13   defiant and they did not give information.

14            And, Judge, we-- we are stunned by the

15   cavalier response of the government.  They shrug off the

16   constitutional issues here.  That response that they

17   provided to the Court, what they talk about is standing.

18   What they talk about is, "We don't have to tell you.  Go

19   litigate it widespread, let's just disperse this all

20   over the district."

21            We have this before this Court.  We have

22   these issues before this Court.  We've tried to do this

23   in an organized manner.  We've tried to do it in a

24   uniform manner so that this Court can look at this and

25   make some decisions about what has happened here.

1          What's happened, though, is the government,

2   in addition to not giving the Court information and in

3   addition to not taking any remedial action and not

4   abandoning this material and saying, "No, we weren't

5   entitled to it," they've done nothing.  Well, I take

6   that back, they've done something.  The attorneys who

7   were responsible for these violations are still in place

8   and still on this case.  And what they've done in the

9   time that has passed since the last hearing and this

10  hearing is they've become increasingly aggressive

11  against Ms. Rokusek to get her off that case.  That has

12  been their response in answer to our concerns about

13  these violations.

14          That is why a special master is needed;

15  because of the scope of this, because the government has

16  not responded, and because of the government's

17  continuing conduct in this.

18          The phone issues, this-- you know, our

19  filing yesterday is not the first time the phone issues

20  came up.  It came up in the evidentiary hearing.  This

21  Court ordered the phones to be shut down.  They knew

22  about this, and our inquiries about that have remained

23  unanswered.  So it's not that they just-- that they just

24  learned of it.  That's the first reason the Court ought

25  to appoint a special master.

1              The second reason is because of the defense.

2    We have come to this Court together.  We intervened in

3    the case.  The lawyers here who have been in this

4    courtroom last time and this time, they're not here

5    because they're interested in this, Judge.  They're here

6    because they're outraged.  Our-- our relationship with

7    our clients is sacrosanct.  And beyond the Constitution

8    and everything else, it deserves a very basic respect.

9    And they've just been derisive and dismissive of that

10   and say, "We don't care."

11             They're here to win.  They're not here to

12   help the Court find the truth.  And because of that, the

13   Court needs to appoint a special master.

14             You know, we're public defense lawyers.  And

15   the attacks on us and diminution of our obligations and

16   responsibilities, we just don't understand it.  I mean,

17   it's really been hard to get our heads around this, that

18   there would be a violation of this magnitude, this

19   brazen, that they would be willing to use and exploit in

20   this way.  It's been hard for us to understand that.

21             We don't know the scope.  We don't get it

22   yet.  We don't know how far this goes back.  We know

23   that CCA has recorded since 2008.  We have a lot of

24   suspicions, but we need a special master who has the

25   authority and the power of the Court to come in and

1   delve into these things and sort it out so the defense

2   can at least have some confidence in the integrity of

3   the system, which we don't have now.  And we will not

4   have if this is left to the U.S. Attorney's Office to

5   sort out, simply because of their behavior in this case.

6           They told us that CCA did not record.  They

7   knew that CCA did record.  They stated on the record to

8   this Court and to counsel, "We have these recordings.

9   We have these recordings of these meeting between

10  attorneys and clients."  They called Jackie Rokusek up

11  to watch them.  They were brazen about this.  "We have

12  these recordings."  They knew it.

13          And at the very time that Ms. Rokusek is up

14  viewing those audiotapes, Ms. Tomasic is sending an

15  e-mail to the Court saying, "Oh, I don't know if they

16  actually exist.  I don't know if they actually exist."

17  After they had the index, after they had worked with CCA

18  and the marshals to have a chart, after they had

19  threatened Ms. Rokusek, and after she's in that room

20  watching them, they have the temerity to tell this

21  Court, "We don't know if they exist.  Our information

22  was incorrect.  The marshals say they don't exist.  We

23  were probably wrong about it."

24          We're not going to rely on that office to

25  tell us anything.  We're not going to rely on that

1    office to come in and say, "We're innocent, we didn't

2    view it, it's okay," because we don't believe it.  And

3    we have strong reason not to believe it.  And that

4    evidence is before the Court.

5            This is not just us up here talking and

6    making accusations.  This is in evidence before the

7    Court.  Their response to-- still to this, "Just trust

8    us.  We're officers of the court.  We're telling you

9    this, just trust us."  They've done nothing in this case

10   to earn that trust.  They've done everything to destroy

11   it.

12           Just to restore the integrity and the

13   confidence of the bar, of our clients, and of the

14   public, a special master needs to come in and explore

15   these issues because it is not just about what's on this

16   index sheet, it goes a lot further than that.  What

17   they've done is they've-- they've put this one pleading

18   in front of the Court.  And it's a pleading that is very

19   selective in the facts and it's wrong in the law.  The

20   Court cannot rely on the U.S. Attorney's Office either

21   to present what is actually going on in this case.  They

22   don't even acknowledge the statement of Ms. Rokusek and

23   what went on there.  It's not even given any credence at

24   all.

25           When Ms. Tomasic is in the position of

 1    telling the Court that this evidence exists, telling Ms.

 2    Rokusek it exists, using it to try to get her off the

 3    case, and then turning around and saying, "It doesn't

 4    exist," when she knew it did, that doesn't float.  And

 5    what's happened now is instead of the government coming

 6    in and trying to reconcile it or trying to explain it,

 7    they simply embraced it and they've gone with that

 8    story.  That does nothing to help the Court sort this

 9    out.  Absolutely nothing to help the Court get to the

10    truth in this.

11            I want to talk just-- just for a minute

12    about their written response, because we got it at 9:00

13    last night.  But in pointing out that the Court can't

14    rely on what they present, I want to-- the *Calandra*

15    case, it's a case that-- well, it's inapt here because

16    it talks about a different section of the rule, and

17    Footnote 6 explains that.  *In Re:  Grand Jury Subpoenas*

18    talks about a challenge to the grand jury subpoena.

19    We're not challenging that, we're challenging what

20    happens with the materials.

21            And by the way, we did not know that this

22    material was obtained by a grand jury subpoena until the

23    government provided it to us an hour before the hearing

24    last week.  We tried to find out how they got it, but we

25    couldn't.

```
 1                THE COURT:  As an aside, I'm not clear on
 2   how the audio-recordings-- do you know whether those
 3   were grand jury or otherwise?
 4                MS. BRANNON:  We have no idea.  I want to
 5   point out that the--
 6                THE COURT:  Do you know, Ms. Barnett?
 7                MS. BARNETT:  I don't.  I can ask, Your
 8   Honor, and find out for the Court right now if you want
 9   me to.
10                THE COURT:  All right.  Go ahead.
11                MS. BRANNON:  You know, I would point out
12   that the evidence before the Court is that they want
13   some sort of subpoena to hand this out, except if it's
14   the marshal's office, because the marshal's office owns
15   this material.  So if it was obtained through the
16   marshal's office, we wouldn't know about it.  That's why
17   when we tried to track it down when we subpoenaed
18   records from CCA, because surely they would have some
19   record of it, they didn't.  That's an example of the
20   limitations on the defense and why we can't go fully
21   litigate this on our own.  We need a special master who
22   has the authority to find these things out.
23                THE COURT:  All right.  So tell me again,
24   when you tried to track down what from CCA you couldn't
25   get an answer?
```

```
 1              MS. BRANNON:  We wanted to know how these
 2     recordings got into the United States Attorney's hands.
 3              THE COURT:  All right.  If it was-- there
 4     was a CCA custodian who talked about if we-- if CCA
 5     receives a subpoena, they put it in the detainee's file.
 6     But a "Grand Jury" subpoena is not going to have
 7     somebody's name on it.  I mean, this one didn't at
 8     least.  So it didn't go in anyone's file.
 9              And so you did try to find the subpoena or
10     ask them and they didn't have it and it could've been
11     because they didn't think they could disclose it because
12     it had grand jury on it, or it could've been because
13     they couldn't find it.  But in any event, you weren't
14     able to get it?
15              MS. BRANNON:  Right.  The 17(c) that the
16     Court signed off on was very clear.  One thing she did
17     say is they don't have a central repository for these
18     things.  So we don't even know if they have the record
19     capability to find it, but we couldn't.  We didn't know
20     how they got it.  We didn't know if it was just a
21     request through the U.S. Marshal's, and so that's why we
22     don't know how they get the phone calls.  Maybe it's a
23     grand jury subpoena, we don't know.
24              But to come in and argue that we don't have
25     standing to object to a grand jury subpoena when we
```

```
 1    didn't know anything about it when we wrote the motion
 2    certainly diverts away from the real issues.
 3              The government cites the Floyd versus United
 4    States, as well, which is a Tenth Circuit case.  If the
 5    Court reads that, that fully supports our position,
 6    because the government has attacked our standing under
 7    Rule 41(g).  In that case, it says that the government
 8    had not filed charges against the person did not deprive
 9    the Court of jurisdiction under Rule 41.  Just because
10    we have not been charged in this case does not deprive
11    the Court of jurisdiction under Rule 41.
12              The other thing I will say to that is I did
13    file this motion in a separate case.  I filed a similar
14    motion in United States versus Brenda Wood.  I don't
15    have the case number in front of me.  As part of that
16    motion, I asked the Court to grant me leave to
17    participate in the hearing here because the issues so
18    overlapped.
19              THE COURT:  You asked that in the Brenda
20    Wood motion?
21              MS. BRANNON:  Yes.
22              THE COURT:  Frankly, I think there's been
23    over 30 Rule 41 motions filed--
24              MS. BRANNON:  Yes.
25              THE COURT:  -- in my-- in my caseload.
```

 1   Judge Murguia has had them, other judges have had them.

 2   And I can only speak for myself, I didn't really look at

 3   those yet because I understood that it was probably-- at

 4   least some of the relief that was sought would be

 5   hopefully cured in this case, but-- so I wasn't aware

 6   that you had asked for that in that particular motion.

 7            MS. BRANNON:  I certainly didn't mean that

 8   as a criticism.  The point of it is that that motion is

 9   open and pending before the Court.  The government has

10   not objected to it.  And if the Court sustained that,

11   then that would-- their other objections to the standing

12   of the Federal Public Defender evaporate, not that those

13   were valid objections.  But if the Court sustains that

14   in Brenda Wood, we have every right to be here and

15   participate in this hearing.

16            I also don't understand that they bring this

17   up a week after the hearing, after sitting through

18   that-- that evidence.  I don't know if they're asking

19   the Court to-- to strike all the evidence, to not have

20   heard it, what they think should happen to it by raising

21   standing at this late date.

22            THE COURT:  Well, the evidence is in the

23   record.  And as I stated before, irrespective of that

24   standing issue, there are people here in this courtroom

25   that have standing in the Lorenzo Black case.  I'm not

 1    saying that you don't have standing, I just-- I think

 2    it's an issue that doesn't really matter for purposes

 3    of-- of resolving.  There are a number of defendants

 4    that have moved to join, so it's properly before me

 5    either way.

 6              MS. BRANNON:  I would say, too, I think it's

 7    our responsibility as the Federal Public Defender's

 8    Office to take the lead on these things.  We have the

 9    resources available and we can-- we're not subject to

10    the same sorts of attacks on our livelihood that private

11    counsel are.  I think it's our responsibility.  And

12    that's one reason we did it.  And it's very important to

13    us to take the front line when we can, and that's what

14    we have done or tried to do here.

15              The last thing that we would point out; a

16    special master has to be of benefit to the Court.  There

17    are so many wide-ranging issues.  This continues to

18    expand and compound.  The government's response has not

19    been helpful.  The scope that we've provided and

20    suggested to the Court, you know, it's not limitless.

21    We've identified the issues.  This has to be beneficial

22    to the Court.

23              And as you noted, there have been a number

24    of other motions filed in other cases.  Rather than

25    litigate those independently, as the government

 1   suggests, a special master could go through the facts

 2   and make recommendations that would allow some

 3   consistency in the outcome of those cases.  To-- to file

 4   something in front of a court, a suppression issue or

 5   something of those-- like that, to say we're going to

 6   hold that until the special master is done with that

 7   work, because that special master will have a report--

 8   findings of fact and recommendations that will inform

 9   hopefully every other motion that is based on this.

10   It's orderly.  It's efficient.  It's economical.  It's

11   the best way to proceed.

12           The government's breach here was illegal.

13   Their response defies credibility.  They denied

14   responsibility.  There's no reason to think that they

15   are going to help sort this out.  We have limitations

16   and we want the integrity of a special master to sort it

17   out.  That's what we have to present to the Court.

18           THE COURT:  All right.  Thank you.

19           MS. BRANNON:  We have a lot of other reasons

20   we think, but I think that's-- those three reasons are

21   enough for the Court to grant the scope of our request.

22           THE COURT:  All right.  Unless anyone has

23   anything else, I would like to have the ex parte part of

24   this hearing.  But before you all leave, I will tell you

25   this much, I am going to appoint a special master.  I'm

 1    going to invite the government and the FPD to provide me

 2    with a written description of duties that you would

 3    like.  I've heard your argument and I know it's imbedded

 4    in your motion, Ms. Brannon, but I'd like a job

 5    description, if you will, from both of you.  Ultimately,

 6    I'll make the decision about the scope of the

 7    appointment.

 8             I've given this a lot of thought.  I'm going

 9    to have to have some ex-parte conversations with the

10    defendants or at least with-- actually with the case

11    budget attorney, Cari Waters, because-- and with Ms.

12    Shaneyfelt perhaps, because this is going to be,

13    needless to say, a very expensive enterprise.

14             I've given this a lot of thought in terms of

15    how could-- I mean, what could we start with that

16    hopefully would not cost, you know, an extraordinary

17    amount of money.  And that's why I was trying to hone in

18    on, you know, what is the scope of review of the

19    video-recordings, what is going to be the scope of

20    review of the audio-recordings.  But the-- I guess the

21    threshold question is, what are we trying to accomplish

22    here with even having a special master review all of

23    this?

24             So, for example, if there is a drive that

25    has nothing but attorney-client contacts or perhaps

1    other things such as people walking into the

2    attorney-client room or a person just sitting there

3    waiting on their attorney or some other professional to

4    show up, I don't think it makes a whole lot of sense for

5    us to spend a half a million dollars having someone go

6    through that or a quarter million dollars having someone

7    go through that and segment out this belongs to this

8    lawyer and this belongs to that lawyer and their client

9    when-- I mean, there's no purpose for that.

10              I mean, where this all started was the

11   government or the grand jury subpoenaed

12   video-recordings, presumably because the government or

13   the grand jury, whoever, thought there would be

14   evidentiary value in seeing the-- the non-verbal

15   behavior of people that are targets of the

16   investigation.  Who they were talking to, even if they

17   couldn't hear what they were saying, where they were,

18   maybe hand-to-hand transactions, whatever.  That's what

19   I believe the government thought, at least in part, it

20   was getting through this subpoena.

21              What they got through the subpoena went

22   beyond that.  It went into attorney-client rooms.  And I

23   don't know if that was intentional or inadvertent.  But

24   in any event, they received that information, which

25   raised all of the issues before us, including a very

1    serious Sixth Amendment violation.  Well, actually

2    hundreds of Sixth Amendment violations.  Every-- every

3    person has their own right.

4           So what are we trying to accomplish with

5    having somebody go through and cull a drive that let's

6    just say has nothing but things that are either-- that

7    don't show anything because the defendant is just

8    sitting in a room, or that show the defendant and their

9    non-verbal interaction with somebody from their defense

10   team?  If that has no evidentiary value because it's

11   privileged, why have somebody go through it and slice

12   and dice it anyway?  That was sort of my initial

13   impression, even last week, about this.

14          On the other hand, if there's a drive that

15   has mixed camera angles, such that there could be

16   evidentiary-- things of evidentiary value, for all of

17   the reasons that the government first subpoenaed this

18   stuff to begin with, then it makes sense perhaps to have

19   somebody go through and spend a lot of money and time

20   trying to sort that out.  Again, that's based on the

21   assumptions that it gets us somewhere, that it has

22   evidentiary value to the government.  And maybe it

23   doesn't.

24          One of the types of relief that this Court

25   could impose, either through a Rule 41 motion or some

1   other type of motion, would just to be to exclude the

2   evidence altogether.  That might save us all a lot of

3   money and a lot of time and a lot of grief if we know

4   that none of those-- neither one of those drives, for

5   example, are going to be used.  But perhaps Drives 1

6   through 4 would be used, assuming that everyone could be

7   assured that there weren't any privileged things going

8   on there because the special master had done a sampling.

9         So these are just some of the things I'm

10  sorting through in trying to determine how to go about

11  hiring a special master and what the scope would be and

12  how much money we might spend.  And frankly, none of you

13  have to worry about that, but I do, because we have a

14  limited number of dollars available at a Circuit level

15  for cases, even huge cases and complex cases with unique

16  issues like this.  And so I'm trying to be allegiant and

17  a good shepherd of-- or steward of taxpayer dollars in

18  that sense.  So I've been trying to figure out how to

19  stage this.

20        I will tell you this; I'm going to-- I'm

21  going to retain a special master.  I'm going to invite

22  your-- you know, your input on what the duties shall be.

23  But I will tell you that the appointment order, at least

24  what I'm thinking now, will give the special master

25  "Here's what you start with," but is not going to

1    foreclose the special master from going forward.

2    Frankly, I don't know, there may be a need to go into

3    different avenues.  Today is the first day that I really

4    heard something that gave me concern and I saw

5    something, a demonstrative exhibit, that gave me concern

6    about audio-recordings.  I mean, there was some

7    suggestion of that at the last hearing, but it's more

8    specific now.  And that, as you know, poses all kinds of

9    issues.

10            So a special master appointment order, in my

11   view, will give them a starting place and will leave the

12   door open for the special master to go further if I

13   think that's appropriate.  And obviously that would be

14   in consultation with you all.

15            To the extent the special master thinks that

16   they see things that are-- that-- that raise ethical

17   questions, I think the special master and I think most

18   special matters would agree they're obligated to pursue

19   that avenue.  That's not something they can ignore.

20   They're officers of the court, they're lawyers

21   typically.

22            And so to the extent, you know, Ms. Brannon,

23   you've raised those kinds of issues and concerns, no

24   matter what the scope of the special master's

25   appointment is, they're not going to be foreclosed from

1   looking into that and making recommendations or asking

2   the Court if they can go further or whatever, because

3   they would have some obligation to pursue that if they

4   thought they saw something like that.

5          So I don't think I'm going to get an order

6   out until next month sometime.  I'm going to have to be

7   in conference with the case budgeting attorney, the

8   Tenth Circuit executive.  We're going to have to come up

9   with some idea of how much we can expend and include in

10  the case budget for this.  And with that information,

11  then I can-- I'll have some idea about who we can hire.

12  I have some-- actually, I have some idea now, but I'm

13  not sure we can afford the person that I think might do

14  perhaps the best job.  So don't look for an order from

15  me until next month.

16         In the meantime, all other motions will stay

17  under advisement.  I will look for any further response

18  to the government from this latest filed motion to

19  impound audiotapes.  And I will be issuing an order--

20  before I issue the special master appointment order, I

21  am going to issue a clawback order.  And it may be a

22  very short order, because I think the key is to get all

23  of those into the Court's possession until further order

24  of the Court and also to claw back the additional

25  video-recordings.

1          In fact, I would invite-- Ms. Brannon, if

2    you will submit a proposed order on clawing back the

3    additional video-recordings that weren't-- that have

4    been recorded since the subpoena until they shut off the

5    cameras or took them out of the rooms in CCA.  So an

6    order on that.  And then if you want to submit a

7    proposed clawback order on the audio-recordings and the

8    appropriate time frame, I'll consider that one as well.

9    Run that one by Ms. Barnett.  But I'd like to get both

10   of those orders filed fairly soon.  And then we'll work

11   on getting the special master order done sometime early

12   to mid-September.

13          Is Mr. Naseem here, by the way, today?

14          MR. NASEEM:  I am, Judge.

15          THE COURT:  Oh, there you are.  I don't have

16   anything to take up with you specifically except to say

17   that I do want to have another discovery conference with

18   the parties sometime in mid-September as well.  So we'll

19   be trying to get that scheduled on the other types of

20   discovery.  And to the extent we can deal with this,

21   too, we'll do that, but I doubt we can.

22          Is there anything else that you'd like to

23   say?  Because you have been appointed as the lead

24   discovery attorney in this case.

25          MR. NASEEM:  Nothing at this particular time

```
 1   that hasn't already been said, only that we will
 2   continue to try to push the case forward with the
 3   discovery that we have, minus some of these things, so
 4   that the attorneys in the case can start to work on the
 5   case with their clients and-- and we'll work with the
 6   government to get that done.
 7              THE COURT:  Okay.  All right.  Thank you.
 8   All right.  Unless there's anything more, we will recess
 9   the open court hearing, we'll have an ex parte hearing
10   in which I'll hear from Ms. Rokusek.  Let's take about a
11   10-minute break in that interim.
12              Okay.  Let me make a record of something
13   else.  Mr. Bishop is here and Ms. Rowlette is here.  And
14   I understand that there's some transportation issues
15   with Mr. Bishop.  He's not sure his car will make it
16   back to Sedalia; is that correct?
17              MS. DODGE:  That's correct, Your Honor.
18              THE COURT:  So Ms. Rowlette is willing to
19   travel in tandem with him?
20              MS. DODGE:  Yes.
21              THE COURT:  And they have pretrial
22   conditions of release that avoid-- order them not to
23   contact each other.  But just in this limited instance,
24   I'm going to relax that condition so that Mr. Bishop is
25   not out on the highway with a failed car.  And he can--
```

 1    if something happens to his car, he can-- Ms. Rowlette

 2    can stop and pick him up and take him the rest of the

 3    way.  But once she delivers him to Sedalia, the contact

 4    order goes back into place.

 5            I-- my staff has talked to Marlin Carlson

 6    from Probation, and he is agreeable to that modification

 7    for purposes of today.  And I think Mr. Carlson is maybe

 8    even in the courtroom.  But in any event, there's been a

 9    conversation about it.  And so just so everybody

10    understands, I am modifying that condition just for

11    today to assure that Mr. Bishop can get home safely.

12            MS. DODGE:  Thank you, Your Honor.

13            THE COURT:  All right.  So let's-- yes, Mr.

14    Redmond.

15            MR. REDMOND:  Your Honor, I apologize.  One

16    thing, I stole the exhibit.  I would like to tender that

17    to the Court.

18            The Court had also given us an opportunity

19    at the last hearing to suggest possible names of special

20    masters.  We don't have a whole lot of experience in

21    that particular question, but one name that did come to

22    mind was Judge Malone from Douglas County who just

23    retired and I think would have the time available to do

24    that.  He's got a really good reputation in law

25    enforcement circles.  We didn't really have too much to

```
 1   add-- to add to that.  We're just not familiar with the
 2   area.  May I approach, Your Honor?
 3               THE COURT:  Yes.
 4               MS. BARNETT:  And, Your Honor, if I might.
 5   Another name I had thrown out, or two names, were the
 6   retired magistrate judges, Karen Humphreys and Donald
 7   Bostwick.  I don't know if they would have time or an
 8   interest, but I just was thinking that since they are
 9   recently retired - or I guess Judge Bostwick a few years
10   ago - but both are very familiar with our system and
11   would be familiar with these kinds of issues.
12               THE COURT:  All right.  I appreciate all of
13   that input.
14               All right.  All right.  So let's be in
15   recess for about-- let's see, it's ten after, 3:25.  And
16   then we'll come back, I'll take this up with Ms. Rokusek
17   ex parte.
18               (3:10 p.m., proceedings recessed.
19               (The remaining proceedings are sealed and
20   require a Court order to be transcribed).
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4      I, Kelli Stewart, a Certified Shorthand Reporter and

 5  the regularly appointed, qualified and acting official

 6  reporter of the United States District Court for the

 7  District of Kansas, do hereby certify that as such

 8  official reporter, I was present at and reported in

 9  machine shorthand the above and foregoing proceedings.

10      I further certify that the foregoing transcript,

11  consisting of 72 pages, is a full, true, and correct

12  reproduction of my shorthand notes as reflected by this

13  transcript.

14      SIGNED August 22, 2016.

15

16

17

18          /s/ Kelli Stewart

19          Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25
```