```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
 2

 3    UNITED STATES OF AMERICA,

 4       Plaintiff,

 5       v.
                                        Docket No. 16-20032
 6    LORENZO BLACK (01)
      KARL CARTER (02)
 7
         Defendants.                    Kansas City, Kansas
 8                                      Date:  6/15/2018

 9    FEDERAL PUBLIC DEFENDER,

10       Movant.
      ..........................
11

12                 TRANSCRIPT OF STATUS CONFERENCE
                 BEFORE THE HONORABLE JULIE A. ROBINSON
13             UNITED STATES CHIEF DISTRICT COURT JUDGE

14    APPEARANCES:

15    For the Plaintiff:

16    Stephen R. McAllister
      Kansas Attorney General
17    500 State Avenue
      Suite 360
18    Kansas City, KS 66101

19    Duston J. Slinkard
      United States Attorney's Office
20    444 SE Quincy
      Suite 290
21    Topeka, KS 66683

22
      For the Defendant Lorenzo Black:
23
      John Jenab
24    John Jenab Law Firm, PA
      110 South Cherry Street
25    Suite 103
      Olathe, KS 66061
```

```
 1    APPEARANCES (continued):

 2
      For the Defendant Karl Carter
 3
      David J. Guastello
 4    The Guastello Law Firm, LLC
      811 Grand Boulevard
 5    Suite 101
      Kansas City, MO 64111
 6

 7    For the Federal Public Defender:

 8    Kirk C. Redmond
      Office of Federal Public Defender
 9    117 SW 6th Avenue
      Suite 200
10    Topeka, KS 66603

11
      For the Special Master David Cohen:
12
      Alleen VanBebber
13    VanBebber Law Firm, LLC
      2029 West 95th Street
14    Leawood, KS 66206

15
      For the United States Marshals Office
16
      Gerald M. Auerbach - (by telephone)
17    General Counsel
      CG3
18    15th Floor
      Washington, DC 20530
19

20

21

22

23    _____
24          Kimberly R. Greiner, RMR, CRR, CRC, RDR
              Federal Official Court Reporter
25                  500 State Avenue
                Kansas City, Kansas  66101
```

```
 1                 (Court called to order.)

 2            THE COURT:  All right.  We are on the record

 3   in United States versus Lorenzo Black, Karl Carter,

 4   Anthon Aiono, Case No. 16-20032.  I'll first take the

 5   appearances of those of you who are in the courtroom and

 6   then we'll take the appearances of those that are

 7   appearing by telephone.  So first, Mr. Redmond.

 8            MR. REDMOND:  Good afternoon, Your Honor.

 9   Kirk Redmond on behalf of the Federal Public Defender.

10            MR. JENAB:  Your Honor, John Jenab appearing

11   for Lorenzo Black who's filed a waiver.

12            MR. GUASTELLO:  David Guastello on behalf of

13   Karl Carter who also filed a waiver.

14            THE COURT:  And I don't know if Mr. Hoffman

15   intended to appear.  All right.  And, Miss VanBebber.

16            MS. VANBEBBER:  I'm Alleen VanBebber.  I'm

17   appearing in my capacity as attorney for the special

18   master.

19            THE COURT:  All right.  And then on the

20   phone do we have the special master, Mr. Cohen?

21            MR. COHEN:  Yes, judge.  Thank you.

22            THE COURT:  All right.  And, Mr. McAllister,

23   are you there for the United States?

24            MR. MCALLISTER:  Yes, Your Honor.  Steve

25   McAllister and Duston Slinkard for the United States.
```

 1              THE COURT:  All right.  Is there anyone else

 2    on the phone?

 3              MR. AUERBACH:  Yes, Your Honor.  This is

 4    Gerald Auerbach, general counsel for the Marshal Service

 5    in DC.  I've just called in as to the position of the

 6    U.S. Marshal Service.

 7              THE COURT:  All right.  Thank you.  So this

 8    case -- have I missed anyone else that's on the phone?

 9    All right.  I hear not.

10              This case, of course, was set for a status

11    conference after we adjourned the evidentiary hearing

12    after the parties indicated their desire to negotiate,

13    and I understand that's been going on.  So the purpose

14    of today's status conference is to discuss how that is

15    going.

16              Also there have been two proposed standing

17    orders submitted to me.  These are proposed standing

18    orders meaning they would be orders that would be

19    entered on behalf of the entire court, not just by me as

20    the judge in the pending -- in this particular case,

21    which would necessitate all the other district judges

22    reviewing these orders and making any modifications and

23    us coming to some consensus about the language of the

24    order.  So they're proposed in that sense.

25              If the court is going to enter them as

1    standing orders, it would require me caucusing with the

2    other judges and determining whether they have any

3    concerns.  But we'll talk about those proposed orders as

4    well.

5         Before we do that, Mr. Redmond or

6    Mr. McAllister, is there anything you want to report in

7    terms of the negotiations themselves without telling me

8    about the content of the negotiations?

9         MR. REDMOND:  Certainly, Your Honor.  We

10   have met with the government a number of times.  We sort

11   of see this as breaking down into two categories.  One

12   is achieving prospective relief in a way that prevents

13   this kind of problem from occurring.  The second is

14   retrospective relief to clients that may have been

15   affected by some of the evidence that the court has

16   heard.

17        We've made a lot of progress on the

18   prospective relief.  The court's in receipt of some of

19   the products of those negotiations, and we're still

20   working on the retrospective relief.  Obviously the

21   government's position in the *Black* case itself is our

22   dismissals are going to solve that problem.

23        We would ask for an opportunity for those

24   negotiations to continue.  We would also ask, and the

25   U.S. Attorney knows we're doing this, for the court to

1    reset the evidentiary hearing sort of to create

2    continued momentum, but there are -- there may be some

3    things that we need to present some additional evidence

4    on.  I would ask for a two-day hearing some time after

5    the 4th of July whenever the court's schedule permits,

6    but really the sooner the better I think.

7              THE COURT:  All right.  Before I turn to

8    Mr. McAllister, Mr. Jenab or Mr. Guastello, anything

9    from you?

10             MR. JENAB:  No, Your Honor, nothing

11   additional.

12             MR. GUASTELLO:  No, judge.

13             THE COURT:  All right.  Mr. McAllister,

14   anything from you or any response to the request to set

15   an evidentiary hearing?

16             MR. MCALLISTER:  No.  We just felt this --

17   on -- I think we have --

18             THE COURT:  Mr. McAllister, Mr. McAllister,

19   we're not able to hear you.  You keep cutting out.

20             MR. MCALLISTER:  Yeah, a problem here.  Is

21   that any better, Your Honor?

22             THE COURT:  That was better, yes.

23             MR. MCALLISTER:  Okay.  Yes.  As Mr. Redmond

24   represented, we have been discussing these matters.  We

25   gave you the proposed order in terms of prospective.

1   And we actually have a meeting scheduled I think next

2   Wednesday to further the discussion on retrospective,

3   and also the possibility of any stipulations the parties

4   might enter about some of the issues here, and we are

5   fine with the suggestion or request that the Federal

6   Public Defender set a date out there just so there's

7   something that keeps the momentum going to continue

8   talking.

9                THE COURT:  All right.  Well, the first

10  availability I would have after the 4th of July looks

11  like it would be in the time frame of July 18th and

12  19th.  I'm on vacation for about 10 days before that, so

13  to do a two-block day of time would be difficult in July

14  other than somewhere between 18th, 19th and even part of

15  the 20th.

16               Bonnie, that trial that's set for August

17  7th, is that going to go?

18               (Conferring with courtroom deputy.)

19               THE COURT:  We do -- alternatively we have a

20  criminal trial set for August 7th for four days.  We

21  think it may resolve, but that might be an alternative.

22  If, in fact, it resolves, would you all be available

23  18th, 19th, 20th, somewhere in there of July?

24               MR. REDMOND:  The Federal Defender would,

25  yes, Your Honor.

1          THE COURT:  All right.  Mr. McAllister?

2          MR. MCALLISTER:  Yes, Your Honor, I believe

3    we would be.

4          THE COURT:  Okay.  Well, we'll keep those

5    days open and why don't we set the 18th and 19th and you

6    can let us know if we -- if it -- if really you're going

7    to need that time.

8          And, Mr. Jenab, Mr. Guastello, does that

9    work for you?

10          MR. JENAB:  Judge, I have a jury trial

11    beginning on July 16th, but I do anticipate that it's

12    likely to finish in two days.

13          THE COURT:  Okay.

14          MR. GUASTELLO:  And, judge, that -- those

15    days work for me.

16          THE COURT:  Okay.  Great.  All right.  So

17    let's turn to the two proposed standing orders.  Let's

18    start with the shorter one that really has to do with --

19    it has to do with retrospective relief.  It's the short

20    proposed standing order that has to do with appointing

21    the Federal Public Defender to represent defendants in

22    2255s post-conviction Sixth Amendment claims.

23          I don't think there have been any objections

24    received.  Does anyone have any comment on this order,

25    Mr. Redmond?

1          MR. REDMOND:  No.  The -- I think the --

2     we're in agreement with the U.S. Attorney that given the

3     fact that there would be some cases where we could not

4     represent the clients on other claims but we've dealt

5     with exactly that situation in the *Johnson* litigation

6     and some in the Amendment 782 litigation, so we don't

7     see that to be a problem.

8          THE COURT:  Okay.  Mr. Jenab, Mr. Guastello,

9     would you have any concerns about this proposed standing

10    order on 2255s?

11         MR. JENAB:  Judge, we have not had -- we

12    have -- we haven't seen them.

13         THE COURT:  Okay.

14         MR. JENAB:  They weren't distributed to us.

15         THE COURT:  Okay.  Mr. Redmond, why don't

16    you distribute them to them.  In the meantime, I will

17    distribute this to the judges and then you can let us

18    know if you have any concerns.  I'll hear from the

19    judges and then maybe we can enter it fairly quickly.

20         We're already receiving 2255s.  In my

21    office, I think we have three or four.  My law clerk,

22    Lauren Lowry, is tracking those and she can certainly be

23    in conversation with your office once this order's

24    entered, Mr. Redmond.

25         MR. REDMOND:  Thank you, Your Honor.

1           THE COURT:  Okay.  The other order is a

2    jointly proposed standing order jointly proposed by the

3    United States -- U.S. Attorney's Office and the Federal

4    Public Defender and I believe the defendants, and it's

5    regarding attorney-client communications in criminal

6    cases.  And this is really a prospective relief order in

7    the sense that it directs the United States Marshals

8    Service to direct that -- it says "federal holding

9    facilities," but I think the intent is to cover

10   facilities that house detainees in federal cases in the

11   District of Kansas, and really has to do with, you know,

12   prospectively the Marshal Service directing these

13   facilities to not record attorney-client conversations

14   and to provide for private attorney-client

15   conversations.  And but I -- I'll hear from -- I believe

16   Mr. Auerbach's on the phone about any concerns they have

17   about that.

18           This order also requires that the U.S.

19   Attorney's Office and orders the U.S. Attorney's Office

20   to -- to preclude from obtaining intentionally --

21   intentionally obtaining attorney-client recorded phone

22   calls unless having followed certain protocol and having

23   been authorized, and in particular requires that

24   obtaining recorded phone calls can only be accomplished

25   through a subpoena or court order and what should happen

1   if those recordings include attorney-client recordings

2   despite the directions to the Marshal Service to direct

3   these facilities to not do that in the first instance.

4   And -- and then there's requirements of the defense bar

5   in this order as well in terms of notifying and making

6   sure that the facilities have the phone numbers that

7   they need to make sure that the calls are privatized.

8            So in effect this order is designed, I

9   think, to prevent there being a recording of

10  attorney-client conversations.  But should any be

11  recorded and obtained by investigative agencies,

12  protecting the Sixth Amendment rights of those

13  defendants in the manner described in the order.

14           Is that fair to say, how I characterized

15  that, Mr. Redmond?

16           MR. REDMOND:  Yeah, absolutely, Your Honor.

17           THE COURT:  All right.  You and

18  Mr. McAllister and perhaps others in your office

19  together drafted this order; is that correct?

20           MR. REDMOND:  Yes.  Miss Brannon did the

21  original draft and then the remainder was the product of

22  negotiation with the U.S. Attorney's Office, the -- at

23  least the parts of the order that concern the

24  obligations of the U.S. Attorney's Office were

25  negotiated with them and I think we're in agreement on

1    all that language.

2              THE COURT:  All right.  The special master

3    wasn't part of drafting or the conversations surrounding

4    drafting, and he has provided me with some comments, and

5    a lot of it just, you know, language changes, things

6    that he thinks need to be tightened up.  I don't think

7    any of them, Mr. Cohen's concerns, are substantive, but

8    he had some questions.

9              For example, on page 3 it says, "The

10   facility may never place the burden to privatize

11   attorney-client calls exclusively on the person

12   detained."  He thought that ought to describe who the

13   burden is on.

14             I mean, as -- what the evidence we've heard

15   is right now CCA, CoreCivic, requires that the detainee

16   has the burden to -- to initiate the process, although

17   the detainee can't really do that except through an

18   attorney.  So perhaps to change that language a little

19   bit to say that the burden cannot be exclusively placed

20   on the detainee, and the attorney -- the detainee's

21   attorney has to be part of the process, has to have

22   notice of the protocol to privatize, et cetera, and the

23   burden is on the facility to make sure the attorney

24   knows that.  Because that's been a huge problem and why

25   I think some of these calls were recorded even though

1    the lawyer and the detainee didn't want them to be.

2              There are some other concerns that Mr. Cohen

3    raises.  I don't know that any of them will -- are truly

4    substantive.

5              But Mr. -- other than that, Mr. Cohen, you

6    -- I think also you were concerned about, in talking

7    about the United States Attorney's Office, whether it

8    should be expanded beyond this district.  But in looking

9    at those particular passages, I think it needs to be

10   limited to the District of Kansas.

11             So it would be limited to the U.S.

12   Attorney's Office in this district as well as to CJA

13   panelists in this district because it would be

14   extrajurisdictional as this order -- as a standing order

15   for the District of Kansas to affect other cases or

16   other panelists.  But I'll look more closely at that

17   language.

18             Mr. Cohen, what else would you like to point

19   us to specifically?

20             MR. COHEN:  Well, you know, judge, when I

21   reviewed the order, there were just some bits of

22   language here and there that I thought, you know, the

23   parties, when they negotiated them, probably knew

24   exactly what they meant but I wasn't sure it was -- it

25   was as clear as it might be, especially if it were going

1    to be entered by the court as an order.  And so perhaps

2    I could just share my thoughts directly with the

3    parties.  It's really more about making sure that the

4    language is clear.

5              THE COURT:  Okay.  That would be fine if you

6    do that.  And then -- and then, Mr. Redmond and

7    Mr. McAllister, you can report back to me if you all had

8    any -- any changes in your -- in your proposed standing

9    order and I'll wait to hear from you all back on that.

10             Now, the United States Marshals Service is

11   not a party, of course, to this case.  This standing

12   order does have a section, it begins on page 2 that --

13   and continues on to page 3, that directs the United

14   States Marshal Service to do certain things that,

15   frankly, it being a contractual party with these holding

16   facilities is probably the only one that's in power to

17   do some of these things.

18             But I know that the United States Marshal

19   Service has concerns about some of the -- some of the

20   language in some of the responsibilities, I guess.  And

21   in particular I'm aware that this order, among other

22   things, places the obligation on all investigative

23   agencies, including the U.S. Attorney's Office, to

24   obtain a recording by either court order or subpoena.

25   And I -- I note from having talked to Marshal Miller and

1   Deputy Marshal Beam that they're -- they are -- the U.S.

2   Marshal Service is concerned about that obligation being

3   placed on the United States Marshal Service.

4           So, Mr. Auerbach, I'll hear from you on that

5   concern and any other concerns you have about the order.

6           MR. AUERBACH:  Thank you, Your Honor.  You

7   know, I -- we just got wind of this last week, so we

8   weren't involved in any drafting of this.  And had we

9   been, we would explain what I'm about to explain to

10  everybody now, and that is that there's a basic

11  misapprehension in these provisions here that you refer

12  to on page 2 and 3 as to what the Marshal Service really

13  can do with respect to these local county jails.

14          Under the law, we enter into a governmental

15  agreement with the jail.  But the Supreme Court has made

16  clear in the *Lowe* case and many others that we don't

17  operate, supervise, in any way run these jails.  We have

18  no authority.  They're another sovereign.

19          We -- so the basic notion here in No. 10 of

20  these provisions, "The Marshal Service shall ensure

21  facility compliance," we're not a compliance officer.

22  We're not a certification officer.  We're not an

23  accreditation officer.  We have no power whatsoever

24  other than a contract, and they can basically tell us to

25  go fish.  So our only remedy is to remove prisoners from

1    the facility.  It's not to enforce any rules that we

2    want to enforce or the court would like us to enforce or

3    anybody would like us to enforce in the jail.

4              The remedy, of course, is for someone to

5    bring an action directly against the jail and to insist

6    compliance and to bring a legal action necessary.  But

7    the marshal is -- is not the intermediary or the -- or

8    the facilitator of that kind of an order.  So that's the

9    basic misapprehension here with respect to the local

10   jails -- with respect to almost all these provisions.

11             Now, in the -- in some of the provisions

12   there are even greater problems, and that is that if

13   it's -- our basic notion is that there's a discretion --

14   executive discretion in contracting with local jails.

15   And when we've been challenged that we shouldn't have

16   placed a prisoner in a jail because it's not a good

17   enough jail, those challenges have largely gone -- been

18   unsuccessful because it's considered a discretionary

19   function or executive discretionary decision.  The only

20   section, of course, if there's an order by a court

21   determining that some aspect of the jail is

22   unconstitutional in that case.

23             THE COURT:  Mr. Auerbach -- Mr. Auerbach, in

24   this case we've heard evidence that there is some

25   aspect, and that is that they are recording

1    attorney-client conversations even when attorneys and

2    their clients have utilized the -- the protocol to block

3    or to privatize those calls.

4                    MR. AUERBACH:  Hello.

5                    THE COURT:  Yes.  Did you not hear me?

6                    MR. AUERBACH:  I heard you.  I just didn't

7    know you were finished.

8                    THE COURT:  No, I was finished.  No, I mean,

9    what we were talking about --

10                   MR. AUERBACH:  I understand that.  I

11   understand that.

12                   THE COURT:  So let me ask you this -- let me

13   ask you this:  I know that you -- I know that "you," the

14   United States Marshal Service, has entered into hundreds

15   perhaps of these contracts with the facilities all over

16   the country.  Are there any contract provisions in which

17   -- is there any contract language that requires the

18   facilities to not violate the constitutional rights or

19   maybe perhaps specifically the Sixth Amendment rights of

20   the detainees that you're paying for?

21                   MR. AUERBACH:  There -- the

22   intergovernmental agreements -- intergovernmental

23   agreements with the local jails, which are fairly

24   straightforward documents which are public, we can

25   certainly provide the court and the parties, is a fairly

1  simple mechanism that they have to provide -- under

2  18 U.S. Code 4002 and 4013 that they have to take care

3  of the prisoners, but it specifically provides that they

4  shall follow the rules and regulations of their own

5  facility.

6          There's no provision in there that they have

7  to abide by anything other than the rules, including the

8  federal laws, that cover their -- cover all prisoners

9  including their own prisoners.  So the constitutionality

10  would apply to their prisoners as well as federal

11  pretrial detainees.

12          But in answer to your specific question, it

13  is not a specific clause.  And, again, even if there

14  was, somebody would have to determine -- and there's a

15  -- this case doesn't say it -- would say require a

16  judicial determination finding of unconstitutionality

17  for us to basically say we're pulling our prisoners out.

18          THE COURT:  You talked about the

19  intergovernmental agreements with these county jails at

20  issue here.  And, of course, they're in Kansas, the

21  Marshal Service uses county jails, but primarily uses

22  CoreCivic, which is not a governmental agency at all.

23          MR. AUERBACH:  Correct.

24          THE COURT:  I assume there's a contract.

25  And I will tell you, you know, I don't know about all

1    these county jails, I would be very surprised that their

2    rules and regulations don't require compliance with the

3    United States Constitution.  But CoreCivic at least

4    advertises and publicizes that it provides private

5    attorney-client conversations.  It provides for the --

6    it provides for the detainee to have private

7    attorney-client.

8            So we're talking about you contracting with

9    an entity that says that's their rule and that's what

10   they do and it sounds like your contract says they have

11   to comply with their own rules; correct?

12           MR. AUERBACH:  Well, Your Honor, CoreCivic

13   is a separate matter and that is a national, what we

14   call, FAR, F-A-R, Federal Acquisition Regulations, a

15   true government contract with all the government clauses

16   in it because that's a private entity and we have an

17   actual government procurement contract with them with a

18   lot of clauses including that they -- and a lot of them

19   dealing with their performance and that they have to --

20   to meet the standards.  It's a very lengthy contract.

21           And whether the word "constitutional

22   standards" is in there or not, I -- I have -- I can't

23   say those exact words are, but certainly expected to

24   meet the criteria.  And I would say, yes, they are --

25   they have to respect attorney-client privilege.  And if

1  they don't, they're not performing the contract

2  correctly.

3          THE COURT:  All right.  So you're concerned

4  about language that specifically directs the United

5  States Marshal Service to direct the facilities that you

6  contract with, whether they're an intergovernmental --

7  whether it's another government, another sovereign you

8  have an intergovernmental agreement with or whether it's

9  a national contract with an entity like CoreCivic,

10 you're concerned about language in this order that

11 directs you to direct the facilities to essentially

12 comply with their contractual obligations to follow

13 their own rules and regulations which incorporate, I'm

14 sure, their responsibilities under the United States

15 Constitution; is that fair?

16         MR. AUERBACH:  It all -- well, all I'm

17 saying, Your Honor, is that we can't force them.  With

18 CoreCivic we have a much greater leverage to force them

19 to do things because since we have a contract with

20 provisions in it and penalties and -- and other things,

21 so we have greater possibility with them.

22         But with the local jail, they have no

23 obligation to do -- it's a cancellable at will contract.

24 They have no obligation to do anything we say.  We're

25 not an appropriate enforcement arm.

1            THE COURT:  Well, I am.  And --

2            MR. AUERBACH:  Yes, I mean, that's my point.

3   If Your Honor issues orders to those -- directed to them

4   to do things --

5            THE COURT:  They're not -- they're not a

6   party, sir.  They're not a party and neither are you.

7            Now, this order does contemplate directing

8   you to do certain things because you're the one that's

9   in a contractual relationship or some sort of a

10  agreement with those that are holding these folks.

11           So I'm just trying to understand why -- I

12  may -- I, you know, get that there may be -- there may

13  be language in this proposed order that you think goes

14  beyond what you can direct a holding facility to do.

15  But essentially I think the spirit of this is you are

16  direct -- you're to direct the holding facility to

17  comply with their contractual requirements, which

18  undoubtedly include their requirement that they comply

19  with the Sixth Amendment of the United States

20  Constitution.

21           MR. AUERBACH:  But --

22           THE COURT:  So, I mean, if you are able to

23  frame language in the order that perhaps wasn't as

24  specific as what's in front of me now, but this, in

25  spirit in very general terms, says that your obligation

1    is to tell them they have to oblige with their own

2    requirements and rules and also oblige with the

3    provisions in your contract which -- which I think cover

4    the fact that -- that the people that they hold have

5    Sixth Amendment rights and they're to protect those.

6    Then I -- you know, maybe -- maybe there's a way to

7    get -- what I'm suggesting, maybe there's a way to get

8    to where we want to all get with more general language.

9           MR. AUERBACH:  Well, Your Honor, just to --

10   to specify or to -- to crystallize what I'm saying, on

11   No. 10 it says under the Marshal -- page 3, under

12   Marshal Service provision, it says, "The U.S. Marshal

13   shall ensure facility compliance with this order."  What

14   I'm saying is in no way the marshals can ensure anything

15   with respect to these jails no matter what.  We can ask

16   them.  We can tell them.  We can remove our prisoners if

17   they don't, which is a lever of sorts.  They may not

18   care whether we remove our prisoners.  It may affect the

19   administration of justice in your district.  But we

20   don't -- we don't have an insurance mechanism to ensure

21   compliance with these local jails.

22           THE COURT:  Right.  I understand that.

23           MR. AUERBACH:  Now, with under CCA -- excuse

24   me, with CoreCivic we have a greater ability perhaps to

25   do that.

1                THE COURT:  Okay.  Let me ask you this:  If

2    we take out the ensure language but instead draft

3    something that says not that you ensure compliance, not

4    that you're an enforcement arm, but that you report to

5    the court if you determine that these -- any -- a

6    facility is not providing privatized known attorney

7    numbers, is not, in other words, following the protocol

8    that the court sets out in this order, so it's just more

9    of a reporting function "the Leavenworth County's jail

10   is not doing this," and then that then places the

11   parties, the defense bar, the U.S. Attorney's Office,

12   the court, everyone on notice that we have a problem,

13   and in particular they're not willing to do this.

14               Maybe we need to figure out -- have a

15   hearing and maybe I need to hear from the Marshal

16   Service as to why you want to still house people there

17   when we've got a -- sort of a rogue institution that's

18   not willing to ensure that there will not be a violation

19   of the Sixth Amendment.

20               So, I mean, get rid of the insurance

21   language and supplant that with reporting language.

22   Would that work for you?

23               MR. AUERBACH:  Well, that's in the right

24   direction for sure, Your Honor, but, I mean, it's --

25   there's an underlying issue here, and that is that our

1    general position is that the placement of prisoners, of

2    federal detainees, is a Justice Department executive

3    function, that it's not -- where we place the prisoners

4    is not up to the judicial branch and that it would

5    require a condition that would be determined to be

6    unconstitutional for us to not place a prisoner there.

7              Now, these rules -- some of these rules seem

8    to be -- to be good -- perhaps good faith rules or best

9    practice rules.  But with respect to, for instance, the

10   non-attorney-client communications -- and it suggests

11   here that -- where is it?  "A facility will not produce

12   copies of any recorded communication without a subpoena

13   or court order."  Well, too, that's just simply

14   unworkable for us, for the Marshal Service, because we

15   get all sorts of information about inter-prisoner

16   communications in a jail regarding threats that are

17   being made, security breaches that are potential, escape

18   plans, et cetera, and we have to be able to receive

19   those and without a subpoena or court order.

20             So at -- I mean, some of these provisions

21   are overbroad even with -- because they have not even

22   direct -- they would impede the Marshal Service's

23   functioning.

24             THE COURT:  What function are you talking

25   about?  The investigative function?

1          MR. AUERBACH:  Well -- well, certainly a

2    security function and -- you know, and to some extent

3    investigating threats, yes, and other things.

4          THE COURT:  I mean, I think it's fair to say

5    that the United States Marshal Service perhaps wears two

6    hats, or at least has two very serious concerns.  And

7    one is you are charged with, you know, the security of

8    those that you detain.  And so I could imagine a

9    situation, for example, where there's information that

10   there's recorded conversations or you think there's

11   conversations that have something to do with an imminent

12   threat, perhaps a prison riot or jail riot or something

13   like that, and with urgency you need to get on that

14   right away.

15          On the other hand, I know that the Marshal

16   Service investigates crimes that have already occurred,

17   whether it's assault, other things, contraband,

18   smuggling, that's what this case was about, and the

19   Marshal Service was wearing more of a traditional

20   investigative hat in those instances.

21          So if this order were to focus on, you know,

22   requiring a subpoena or court order from any

23   investigative agency when they're -- when they're

24   acquiring information, when they're acquiring recordings

25   in order to conduct an investigation, it seems to me

1    that the Marshal Service ought to be in the same status

2    as every other investigative agency.

3              On the other hand, if what you're trying to

4    do is prevent a crime or there's some secure -- I

5    certainly understand the urgency of that and you're in a

6    different -- I think wearing a different hat than what

7    you normally wear, which is you're an investigative

8    agency just like FBI, ATF, Homeland Security, et cetera.

9              So, I mean, if we -- if we make that

10   distinction in the order, would that resolve your

11   concerns about that?

12             MR. AUERBACH:  Well, it would help but --

13   but, again, it would be hamstringing the Marshals

14   Service because we're not going to be able to request a

15   subpoena when we don't even know what's -- what's

16   available.  In other words, they -- they -- they can't

17   tell us about information that might help us, including

18   an investigative case, and we can't request a subpoena

19   for it because we don't know about it.  So it's -- it --

20   just doesn't seem workable to me.

21             And plus we have a contract with the

22   facility which requires, as a matter of contract

23   administration, that they tell us everything about

24   what's going on in the facility.  So if they learn about

25   a contraband, they're supposed to tell us.  Now they

1    can't tell us because we don't have a subpoena that we
2    can't operate with.
3              THE COURT:  We're talking about recordings,
4    Mr. Auerbach.  We're not talking about the prison or the
5    jail not sharing information with you, law enforcement
6    information.  We're just talking about if they share
7    with you that we think there's contraband smuggling or
8    we think this person's going to assault this person and
9    you decide, wow, we ought to get the recorded
10   conversations of that person to see if that's what's
11   going on, you're in no different status than the FBI or
12   anybody else wanting to get a recorded conversation to
13   see -- to confirm that something's going on and then in
14   very short order get a subpoena or court order.
15             I'm not understanding how you are distinct
16   from other investigative agencies unless you're trying
17   to thwart a crime, unless there's a security concern or
18   something urgent and imminent.  That's different.  I get
19   that.
20             MR. AUERBACH:  Well, we have a contract.  No
21   other agency has a contract, essentially is a -- is a
22   client or is the -- is the recipient of contract --
23   government contract services from CCA or CoreCivic as --
24   as the Marshal Service is.  And as such, the Marshal
25   Service has to be able to operate its contract.

 1          And you say recorded -- if we limit this

 2   just to tapes as opposed to the information, I mean,

 3   that helps.  But, again, you know, the Marshal Service

 4   gets all sorts of stuff from -- from jails because --

 5   because there's no Fourth Amendment invoking, there's no

 6   Fourth Amendment expectation to privacy on notices -- or

 7   with notices of recorded telephone conversations in the

 8   course of its duties in this -- even investigative

 9   duties.  And so this would be a requirement that's not

10   required by law in our minds.  Now that doesn't mean the

11   judges can't do it, but it would hamstring us.

12          THE COURT:  Well, here's the issue -- all

13   right.  Here's the issue.  I know that you -- the

14   Marshal Service has for a long time -- and I've never

15   seen the contract, so I'm not going to rule on whether

16   you have a contractual right, whether you own these

17   recordings or not, but I know I've heard that

18   repeatedly.  I heard it 30 years ago when I was a

19   prosecutor.

20          Let's just suppose that's true.  Let's

21   suppose that because of the language in the contract you

22   have a contractual right to these.  You don't have to

23   subpoena them.  You don't have to get a court order.

24   They're yours.  You have them.

25          What we're trying to fix here is the fact

1   that you had them and you shared them with other people.

2   And as a consequence, people's Sixth Amendment rights

3   were violated.  So that's what we're trying to prevent

4   from happening.

5           Although you may take the position that you

6   own these recordings, you haven't owned this issue in

7   the sense that you haven't fixed the problem.  We just

8   had a hearing a month ago.  And even though there --

9   it's now CoreCivic and it's now a different contractor,

10  it sounds like they're still having these same issues.

11          So we still have an ongoing problem with

12  Sixth Amendment violations or at least recorded

13  conversations of attorneys and clients being obtained

14  and potentially falling into the hands of the

15  prosecutors who are -- who are, you know, prosecuting

16  people.  We still have that problem.

17          So my point is this:  Whether you acquire

18  them -- however you acquire them -- and if you acquire

19  them through your contractual rights, that's fine.  It

20  does not fix our problem.  I've not heard anything from

21  you that suggests that you're going to fix the problem

22  since you have such contractual powers.

23          So how do you propose to -- how do you

24  propose to make sure that other investigative agencies

25  and the U.S. Attorney's Office don't obtain

1    attorney-client recordings?

2            MR. AUERBACH:  Well, Your Honor, as far as I

3    understand or get, the problem is -- the genesis of the

4    problem is at the facility itself that these recordings

5    are either being made by mistake because they're not the

6    -- the phone numbers have not been privatized or that

7    for whatever reason improper recordings are being made.

8    Unintentionally or intentionally, I don't know.  The

9    Marshal is asking for recordings.  The Marshal is in no

10   position to tell whether or not these are

11   attorney-client calls until perhaps somebody listens to

12   them.

13           So the genesis of the problem is the

14   facility.  The Marshal can't prevent these calls being

15   made.  All they can do is tell the -- the facility

16   you're screwing up.  You're doing the wrong thing.  And

17   once it's determined that they're doing the wrong thing

18   and under the contract of -- telling them that they're

19   not performing correctly under the contract.

20           But that -- I don't know what CCA says about

21   whether they're doing the right or wrong thing.  I think

22   the CCA is saying -- and I'm a newcomer to this case,

23   Your Honor, so I only know so much.  I think CCA is

24   saying, no, the attorneys are screwing up by not

25   privatizing correctly.

1        So, you know, the genesis of the problem is

2   not the Marshal Service.  The Marshal Service has a

3   little bit of capability of helping cure it but it

4   didn't create it and it can't fix it without CCA doing

5   something about it and for them to recognize what the

6   mistake is.

7        So the corrective action is not with the

8   Marshal Service.  The corrective action is with the

9   facility.  And so -- and we'll cooperate with that.  I

10  don't think anybody in the Marshal Service doesn't want

11  to cooperate with fixing it.  It's just the burden of

12  fixing it can't be on the Marshal Service.

13       THE COURT:  All right.  Let me hear from

14  Mr. McAllister.

15       MR. MCALLISTER:  Your Honor, I -- basically

16  we negotiated our provision.  I had nothing to do with

17  the Marshal's provision.  But I think, frankly, our

18  office would take no position on -- on the provision.

19  That we leave to the court and the Marshal Service and

20  the Federal Public Defender.

21       You know, what we took on was what we

22  thought the part we could control, which is what our

23  office will do.  And we have very detailed steps

24  outlined in the proposed order that we will take to try

25  and ensure that attorney-client calls never get to us.

1    And if they do, the court and the defense counsel will

2    be promptly notified and we'll make sure we don't retain

3    those calls.

4              THE COURT:  All right.  Mr. Redmond.

5              MR. REDMOND:  Thank you, Your Honor.  I'm --

6    I'm not following the general counsel's argument, at

7    least in light of the record facts in this case.  I

8    understand two things; (1) that the general counsel's

9    position is that they do not have control over the

10   individual facilities, but on the other hand that they

11   essentially force the individual facilities to do their

12   bidding through the terms of the contract.  And that's

13   exactly the kind of court -- evidence that the court

14   heard over a number of hearings in this case, CCA

15   employees testifying that this -- everything belongs to

16   the marshal.  They do what the marshal asks.  They

17   consider themselves to be directed by the marshal.

18             Now, I don't think that's an issue the court

19   has to resolve today.  We're certainly fine with sitting

20   down at the court's suggestion and tweaking the language

21   to the -- in a way that may make the marshal more

22   comfortable.  But I think, when you view this particular

23   issue through the facts of this case, we agree

24   emphatically with the court that this is a -- a problem

25   that the marshal has to be involved in -- in solving

 1   even if it's simply through directives to the facility

 2   -- or reporting -- the reporting capacity the court was

 3   explaining.  I think there's certainly room to work

 4   here.  But we agree with the court's thrust on this.

 5              THE COURT:  All right.  Mr. Jenab or

 6   Mr. Guastello, either of you?

 7              MR. JENAB:  Judge, I can't comment on -- on

 8   the -- the marshal's arguments, but I am aware that at

 9   the beginning of this litigation, when the issue became

10   public, it was a matter of concern in this district and

11   also in the Western District of Missouri, which also

12   houses prisoners at CCA.  And it is my understanding

13   that with a little bit of prodding from the United

14   States Marshal Service in the Western District, the

15   county jails that are the source of -- or the recipients

16   of farmed inmates in that district very quickly ceased

17   their recording activities.

18              THE COURT:  With respect to the video

19   recording, I recall that very distinctly.  There was one

20   jail in Kansas that didn't want to comply, and that was

21   Leavenworth, and Marshal Miller removed our folks from

22   Leavenworth, but all the other jails did.  I mean, they

23   did their best.  They removed the cameras or whatever

24   they needed to do.

25              Mr. Cohen, did you want to weigh in on this

1    or, Miss -- Miss VanBebber?

2         MS. VANBEBBER:  Yes, Your Honor.

3         MR. COHEN:  Hi, judge, this is David.  I --

4    I wish that I had some smart thing to say, but obviously

5    I don't.  I just have to think about it.  The parties

6    might be able to get back together, all three of them,

7    and make some progress.  That's probably the best

8    chance, but I don't have any -- any thought to it.

9         THE COURT:  All right.  Miss VanBebber.

10         MS. VANBEBBER:  Yes.  As a matter of law, I

11    think having heard what Mr. Auerbach said and having

12    read the June 5th e-mail from the actual U.S. Marshal

13    here saying that "as you know, I have already advised

14    the U.S. Attorney that the USMS contract with CoreCivic

15    does not require a subpoena to receive recordings of

16    non-privileged inmate phone calls," which from what I

17    heard today tells me there seems to be a confusion

18    between what are contractual rights and what are the

19    obligations and rights of a Department of Justice

20    investigative agency, because they seem to be getting

21    confused.  And it seems to me that the proposed order

22    that the defendants and the U.S. Attorney worked out

23    together makes perfect sense.

24         The U.S. Marshal seems to be concerned about

25    things that aren't in the order, that are not involved

```
 1    in the order.  We talked about wearing two hats.  They

 2    do indeed wear two hats but they're two different hats

 3    in this instance, and one of them is right to possession

 4    that they claim they have under their contract.  And as

 5    the court said, you don't need to make a ruling on that

 6    today.  And I would hope no ruling would be made on that

 7    because that is a civil matter between the contracting

 8    parties, which would be the marshals or DOJ, and the

 9    institutions that they're contracting with.

10            And if their claim is that they have a

11    possessory right under the contract and CoreCivic thinks

12    something different, well, they need to work that out

13    with CoreCivic.  Because what's involved here is not the

14    contractual right of the U.S. Marshal.  What's involved

15    here is whether the marshals once --

16            Let's assume as you -- as you did, let's

17    assume that they do have a contractual right to

18    possession of all recordings and all the documents

19    coming out of the contract jail.  Let's just make that

20    assumption.  If that is true, then the question becomes

21    what do you do with it after you get it, which is what

22    the problem is here.  If they have a right to possess it

23    without a -- without a subpoena, that could perhaps be

24    dealt with in the -- in the agreement.

25            But once they possess it, they have no more
```

1   different standing with regard to whether or not they do

2   something else with it than does the FBI, than does the

3   U.S. Attorney itself.  And it doesn't seem to me as a

4   matter of law that they would have anything beyond their

5   contractual agreement to possess that would preclude the

6   issuance of a subpoena and they wouldn't need it any

7   faster than the FBI might need it.

8           So it doesn't seem to me that there is a

9   problem that the parties ought to be considering here;

10  that the special master's investigation has produced

11  what it has produced and that needs to be dealt with in

12  a prospective way as well as retroprospective way.  So

13  while the marshal's concerns maybe real, I think they're

14  confused.  And they're confusing their contractual

15  rights with obligations as an investigative agency, and

16  those are two different hats.

17          THE COURT:  All right.  I'm going to give

18  this some thought.  I will invite everyone that's

19  involved if you want to give me anything more in writing

20  in terms of specific language you want changed and if so

21  what that -- the language, how you want it to read.

22          But I think where I'm headed with this is

23  this:  I'm not going to venture in this area, you know,

24  what are the contractual rights.  That's not properly

25  before me anyway.  You know, I -- and as I said to

1    Mr. Auerbach, I can definitely see that there are
2    situations where it is absolutely critical that the
3    Marshal Service get their hands on whatever documents,
4    recordings, whatever, there's some imminent threat
5    because they -- they're tasked with and the facilities
6    are tasked with the safety of everybody that they house.
7    And so, you know, we've heard of prison riots, that sort
8    of thing or just even on a smaller scale assaults and
9    that sort of thing.

10              But what we're talking about in this case is
11    very different.  We're talking about a -- this case
12    arose out of an investigation that spanned some period
13    of time into contraband smuggling at CCA.  And the
14    marshals obtained recordings of allegedly criminal
15    conversations among co-conspirators and in turn
16    sometimes -- and I -- this is all in the evidentiary
17    record and this is all in the special master's analysis
18    because we obtained all kinds of e-mails, et cetera and
19    we've got a database, we've got analysis of that
20    database.

21              So the marshals obtained these as they
22    typically did by just getting them from the facility and
23    in turn passed them on to the U.S. Attorney's Office, or
24    I think in this case there were a couple of other
25    investigative agencies who were investigating, you know,

1    the crime that occurred there in the facility.  And

2    that's where the problem arose.  These recordings

3    included probably criminal conversations but they also

4    included privileged attorney-client conversations, and

5    that's what we're trying to prevent.

6              There is absolutely no evidence to-date that

7    the facility has owned this and cured the problem.  In

8    fact, they're -- they're pending class actions and civil

9    cases and discovery that are revealing that the problem

10   is far bigger than the scope of this case in terms of

11   the numbers of recordings.  So it is a problem that

12   we're going to have to fix.  The parties are negotiating

13   and they want to fix this problem.

14             I don't see that there's any way I'm going

15   to allow an investigative agency to obtain recordings

16   without a subpoena or court order so we can trigger

17   then, through that initial step of a subpoena or court

18   order, the protocols that this -- this proposed standing

19   order or otherwise addresses to ensure either (1) that

20   there are no attorney-client recordings that are

21   produced or (2), if there are, the prosecutor doesn't

22   have access to them.  There's some mechanism in place,

23   and that the defense bar is placed on notice if that

24   should happen.  So that's the protocol that begins with

25   a subpoena or court order.

1              So it could very well be that the Marshal

2   Service can continue to acquire these the way they

3   always have but they're not going to be able to use

4   them.  When they put their investigative hat on and they

5   want to then use those recordings to go get a search

6   warrant or to, you know, whatever, and of course at that

7   point they've got the U.S. Attorney's Office involved

8   because that's the prosecutor's office, or if they, you

9   know, hear conversations that sound like terrorist

10  conversations and they think Homeland Security needs to

11  know about them, they're not going to be a conduit and

12  pass stuff on because to do that puts us right back

13  where we are now.

14             We got a problem.  The facility hasn't fixed

15  it.  The Marshal Service hasn't fixed it.  And the best

16  I can do is to make sure that we do everything we can to

17  keep attorney-client privileged conversations from ever

18  being recorded.  And if they are, not being acquired by

19  people who shouldn't be listening to them.  So that's

20  the whole point of this order.

21             So I guess I'm drawing a distinction.  I

22  said before I see that the Marshal Service wears two

23  hats.  But when they want to be the investigative

24  agency, which sometimes they are, they're going to --

25  they're not going to be able to provide this information

1    or recordings to anyone else without a subpoena or court

2    order being obtained by someone so that this protocol

3    can be triggered.

4             So I think that's where we're headed.  But,

5    again, I invite everyone involved to by e-mail -- and I

6    don't want any ex-parte e-mails, so that includes you,

7    Mr. Auerbach.  If you want to provide some suggested

8    language, you're going to need to copy the U.S.

9    Attorney's Office and the defense counsel and the FPD,

10   Federal Public Defender, on the e-mail with any

11   suggested language.  And they'll do the same and I'll,

12   you know, wait a week or so and -- and then hopefully

13   craft a better order and/or one that, you know, resolves

14   concerns to the extent I can.

15            Then I will be passing this along to my

16   colleagues.  I will tell them, you know, the concerns

17   the Marshal Service has raised.  And, you know, if I

18   don't think I've completely answered all the Marshal

19   Service concerns, I'll let them know about that and

20   we'll put our heads together and it could be the

21   language will change some more once my district judge

22   colleagues take a look at it as well.

23            But this is part of what I hope will be a

24   global settlement of everything in this case.  And I do

25   intend to enter, to one extent or another, a proposed

1    standing order that places obligations on all concerned.

2         I understand that the Marshal Service -- I

3    don't know if I want to go as far as to say the Marshal

4    Service can't enforce certain things, because they have

5    a contract and contractual rights that obviously they

6    can enforce, but I understand the concerns about

7    ensuring the facility does certain things.  Although,

8    it's hard for me to believe, when you're in a

9    contractual relationship with a facility and you think

10   they're violating the Sixth Amendment, or at least

11   there's those allegations, you are hamstrung and you

12   can't even, you know, tell them they better get their

13   act together or you're going to have to pull all your

14   people out.  I have a hard time believing that.

15        But, anyway, I'm not going to get in the

16   middle of that either.  But I understand some of this

17   language may be too strong for the Marshal Service and

18   we may need to soften it but at the same time reflect

19   that the Marshal Service needs to at least tell these

20   facilities that this -- this is the way it's going to

21   be:  Our detainees have Sixth Amendment rights and

22   you're obligated to make sure those are honored.

23   Whether you can actually do anything other than bring a

24   contract action against them if they don't is a whole

25   other question that I leave up to the general counsel's

1    office there.

2         So, anyway, unless there's anything else,

3    I'll take this under advisement and we will try to get

4    the standing orders as modified out as soon as we can

5    and we'll see you all back, unless we hear otherwise, on

6    July 17th.  What time, Bonnie?

7         COURTROOM DEPUTY:  We have a docket on the

8    17th.  If you want to do the 18th...

9         MR. JENAB:  18th and 19th --

10        THE COURT:  18th at 9:00 a.m.  Mr. Cohen, I

11   should have asked you, does that work for you, those two

12   days?

13        MR. COHEN:  It does -- it does, judge.

14        THE COURT:  It does work.  Okay.  Wonderful.

15   All right.  Thank you all for your time.  Mr. Auerbach,

16   thank you for your time and I'll look forward to

17   anything else you want to submit.

18        MR. AUERBACH:  Thank you, Your Honor.

19        THE COURT:  Thank you we'll be in recess.

20        (Proceedings adjourned.)

21

22

23

24

25

1

2                         CERTIFICATE

3        I certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6        DATE July 6, 2018

7

8                    /s/Kimberly R. Greiner
                     KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
9                    United States Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25